IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

INTELSAT GLOBAL SALES AND
MARKETING, LTD., formerly known as
INTELSAT UK, LTD.,

                Plaintiff,

     v.

COMMUNITY OF YUGOSLAV POSTS
TELEGRAPHS AND TELEPHONES

              Defendant.

**Civil Action Number
1:06CV00897 (RWR)**

Hon. Richard W. Roberts

**STATEMENT OF POINTS AND AUTHORITIES IN SUPPORT OF
DEFENDANT COMMUNITY OF YUGOSLAV POSTS TELEGRAPHS
AND TELEPHONES' MOTION TO DISMISS THE COMPLAINT OR,
IN THE ALTERNATIVE, COMPEL ARBITRATION**

# TABLE OF CONTENTS

Page

INTRODUCTION AND ARGUMENT SUMMARY ................................................................. 1

FACTUAL BACKGROUND ................................................................................................... 4

STANDARD OF REVIEW .................................................................................................... 8

ARGUMENT ......................................................................................................................... 9

I.     THE FSIA DOES NOT PROVIDE A VALID BASIS FOR SUBJECT MATTER
       JURISDICTION OVER THIS DISPUTE. ................................................................. 9

       A.     The FSIA Cannot Create Subject Matter Jurisdiction Where Otherwise
              None Exists. ................................................................................................... 10

       B.     CYPTT Is Not An Agency Or Instrumentality Of A Foreign State. ................... 12

              1.     CYPTT is not an organ of a foreign state. ................................................ 13

              2.     CYPTT is not owned by the state. ........................................................... 15

       C.     No Exception To CYPTT's Alleged Jurisdictional Immunity Applies. ............... 16

              1.     Intelsat's Complaint is not based on commercial activity carried on
                     in the United States by CYPTT. .............................................................. 16

              2.     Intelsat has failed to allege a valid basis for waiver. ............................... 18

II.    THIS COURT LACKS PERSONAL JURISDICTION OVER CYPTT ......................... 20

III.   THIS COURT SHOULD ALSO DISMISS ON GROUNDS OF FORUM NON
       CONVENIENS. ....................................................................................................... 22

       A.     Arbitration At The International Court Of Arbitration Of The International
              Chamber of Commerce Is An Adequate Alternative Forum. ............................. 22

       B.     The Balance Of Interests Dictates That This Court Is Not An Appropriate
              Forum For This Commercial Dispute Between Two Foreign Parties
              Involving Non-U.S. Commercial Services. ...................................................... 23

## TABLE OF CONTENTS
(continued)

Page

IV.  IN THE ALTERNATIVE, THE COURT SHOULD COMPEL ARBITRATION
     UNDER THE SERVICE TERMS AND CONDITIONS....................................................25

     A.   Intelsat Entered Into a Valid, Binding Arbitration Agreement............................27

     B.   The Broad Arbitration Agreement Covers the Plaintiff's Claims. .......................28

CONCLUSION....................................................................................................................29

## TABLE OF AUTHORITIES

### CASES

Akinseye v. District of Columbia, 339 F.3d 970 (D.C. Cir. 2003)................................................11

Alpine View Co., Ltd. v. Atlas Copco AB, 205 F.3d 208 (5th Cir. 2000) ....................................23

American Italian Pasta Co. v. Austin Co., 914 F.2d 1103 (8th Cir. 1990)....................................28

Atl. Tele-Network, Inc. v. Inter-Am. Dev. Bank, 251 F. Supp. 2d 126 (D.D.C. 2003) ................17

Atlantigas Corp. v. Nisource, Inc., 290 F. Supp. 2d 34 (D.D.C. 2003).........................................21

Austin v. Owens-Brockway Glass Container. Inc., 78 F.3d 875 (4th Cir. 1996) ..........................28

Booker v. Robert Half Int'l, Inc., 315 F. Supp. 2d 94 (D.D.C. 2004),
    aff'd, 413 F.3d 77 (D.C. Cir. 2005) .......................................................................................28

Buckeye Check Cashing, Inc. v. Cardegna, 126 S. Ct. 1204 (2006) ........................................25,26

Burger King Corp. v. Rudzewicz, 471 U.S. 462 (1985).................................................................21

Dean Witter Reynolds, Inc. v. Byrd, 470 U.S. 213 (1985).............................................................26

*Dole Food Co. v. Patrickson, 538 U.S. 468 (2003) ............................................................13,15,16

Dowley v. Dewey Ballantine, LLP, No. 05-622, 2006 WL 1102768
    (D.D.C. Apr. 26, 2006) ...........................................................................................................29

*EIE Guam Corp. v. Long Term Credit Bank of Japan, Ltd., 322 F.3d 635
    (9th Cir. 2003)....................................................................................................................13,14,15

*El-Fadl v. Cent. Bank of Jordan, 75 F.3d 668 (D.C. Cir. 1996)............................................22,23

Emeronye v. CACI Int'l, Inc., 141 F. Supp. 2d 82 (D.D.C. 2001)................................................26

FEC v. Club for Growth, Inc., 432 F. Supp. 2d 87 (D.D.C. 2006)..................................................8

Filler v. Hanvit Bank, 378 F.3d 213 (2d Cir.), cert. denied, 543 U.S. 1022 (2004) .....................13

First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938 (1995) ...............................................26,27

Gates v. Victor Fine Foods, 54 F.3d 1457 (9th Cir. 1995) .......................................................13,14

Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20 (1991) .....................................................28

* - Authorities upon which we chiefly rely are marked with asterisks.

Goodman Holdings v. Rafidain Bank, 26 F.3d 1143 (D.C. Cir. 1994) .....................................17,18

Gordon-Maizel Constr. Co. v. Leroy Prods., Inc., 658 F. Supp. 528 (D.D.C. 1987) ...................26

Gulf Oil Co. v. Gilbert, 330 U.S. 501 (1947) .......................................................................24,25

Gutch v. Fed. Republic of Germany, 444 F. Supp. 2d 1 (D.D.C. 2006)................................8,9,20

Held v. Nat'l R.R. Passenger Corp., 101 F.R.D. 420 (D.D.C. 1984) .......................................27,28

Irwin v. World Wildlife Fund, No. 05-1287, 2006 WL 2413701
    (D.D.C. Aug. 22, 2006)...................................................................................22,23,24,25

KPMG Fin. Advisory Servs., Ltd. v. Diligence LLC, No. 05-2204, 2006 WL 335768
    (D.D.C. Feb. 14, 2006) ...............................................................................................22

Lempert v. Republic of Kazakstan, 223 F. Supp. 2d 200 (D.D.C. 2002),
    aff'd, 62 Fed. Appx. 355 (D.C. Cir. 2003)...................................................................17

Lujan v. Defenders of Wildlife, 504 U.S. 555 (1992) ....................................................................8

MacPherson v. Franco, 208 P.2d 641 (Wash. 1949) ...................................................................19

McKeel v. Islamic Republic of Iran, 722 F.2d 582 (9th Cir. 1983)..............................................12

Nat'l R.R. Passenger Corp. v. Consol. Rail Corp., 892 F.2d 1066 (D.C. Cir. 1990) ...................26

Nat'l R.R. Passenger Corp. v. Boston & Maine Corp., 850 F.2d 756 (D.C. Cir. 1988)................29

Nelson v. Insignia/Esg, Inc., 215 F. Supp. 2d 143 (D.D.C. 2002) ................................................26

Nur v. K.F.C. USA, Inc., 142 F. Supp. 2d 48 (D.D.C. 2001).........................................................26

Oceanic Exploration Co. v. ConocoPhillips, Inc., No. 04-332, 2006 WL 2711527
    (D.D.C. Sept. 21, 2006) .............................................................................................21

*Patrickson v. Dole Food Co., 251 F.3d 795 (9th Cir. 2001), aff'd, 538 U.S. 477 (2003) ......14,15

Phoenix Consulting, Inc. v. Republic of Angola, 216 F.3d 36 (D.C. Cir. 2000)............................9

*Piper Aircraft Co. v. Reyno, 454 U.S. 235 (1981)..........................................................22,23,24

Price v. Socialist People's Libyan Arab Jamahiriya, 294 F.3d 82 (D.C. Cir. 2002) ....................12

Republic of Argentina v. Weltover, Inc., 504 U.S. 607 (1992)................................................17,18

- iv -

* - Authorities upon which we chiefly rely are marked with asterisks.

Republic Steel Corp. v. Maddox, 379 U.S. 650 (1965) ...................................28

Scherk v. Alberto-Culver Co., 417 U.S. 506 (1974)...................................................23

Shulman v. Voyou, LLC, 305 F. Supp. 2d 36 (D.D.C. 2004) .......................................11

Sieverding v. ABA, 439 F. Supp. 2d 111 (D.D.C. 2006) .............................................21

Steel Co. v. Citizens for a Better Envt., 523 U.S. 83 (1998) ........................................8

*USX Corp. v. Adriatic Ins. Co., 345 F.3d 190 (3d Cir. 2003)............................13,14,15

*Verlinden B.V. v. Cent. Bank of Nigeria, 461 U.S. 480 (1983)........................10,11,22

## STATUTES

9 U.S.C. § 1....................................................................................................25

9 U.S.C. § 2....................................................................................................26

9 U.S.C. §§ 3-4................................................................................................26

9 U.S.C. § 201.................................................................................................26

9 U.S.C. § 202.................................................................................................26

28 U.S.C. § 1602...............................................................................................2

28 U.S.C. § 1603(b)........................................................................................13

28 U.S.C. § 1603(b)(2) ...................................................................................15

28 U.S.C. § 1603(d)........................................................................................17

28 U.S.C. §§ 1603-1605 .................................................................................10

28 U.S.C. § 1605(a)(1)-(2)..............................................................................16

28 U.S.C. § 1605(a)(2)................................................................................16,17

## CONSTITUTION

U.S. Const. art. III, § 2....................................................................................11

* - Authorities upon which we chiefly rely are marked with asterisks.

## CONGRESSIONAL MATERIAL

Jurisdiction of U.S. Courts in Suits against Foreign States:  Hearing Before the
    Subcomm. on Administrative Law and Governmental Relations of the House
    Committee on the Judiciary on H.R. 11315, 94th Cong. 31 (1976) (statement of Bruno
    A. Ristau) ...................................................................................................................11,12

## TREATISES

Richard A. Lord, <u>Williston on Contracts</u> § 76:37 (4th ed. 2006)  ...........................................18,19

5B Charles Alan Wright & Arthur R. Miller, <u>Federal Practice and Procedure</u> § 1350
    (3d ed. 2004) ...................................................................................................................8,11

* - Authorities upon which we chiefly rely are marked with asterisks.

Defendant Community of Yugoslav Posts Telegraphs and Telephones ("CYPTT")
submits this statement of points and authorities in support of its motion to dismiss the complaint
for lack of subject matter jurisdiction, lack of personal jurisdiction and *forum non conveniens*, or,
in the alternative, to compel arbitration and dismiss the complaint.

## INTRODUCTION AND ARGUMENT SUMMARY

This case is brought by a United Kingdom corporation against a Serbian trade association
concerning a dispute over the provision of telecommunications services in Serbia under a
contract that requires arbitration in Paris.  This dispute does not belong in the United States
District Court for the District of Columbia.

Plaintiff Intelsat Global Sales and Marketing, Ltd. ("Intelsat") is a United Kingdom
corporation and allegedly the successor in interest for purposes of this dispute to the International
Telecommunications Satellite Organization ("Old Intelsat"), an international organization
created by treaty.  Defendant CYPTT is a non-public association of certain communications
service providers in Serbia and Montenegro.  Intelsat alleges that CYPTT breached a set of form
contracts by failing to pay invoices issued in the United Kingdom for satellite services
purportedly provided by Intelsat to CYPTT in Serbia and Montenegro.  In essence, Intelsat seeks
to use the U.S. courts to collect an allegedly overdue corporate telephone bill from a Serbian
customer.

Intelsat relies upon the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602 et seq.
("FSIA") to invoke this Court's jurisdiction.  Ironically, in order to support subject matter
jurisdiction, Intelsat first must prove that CYPTT is a sovereign entity otherwise entitled to
immunity under the FSIA, and then also demonstrate that one of the exceptions to immunity in
the FSIA applies.  Intelsat thus contends that CYPTT is an agency or instrumentality of a foreign
state that has engaged in commercial activity in the United States (the commercial activity

exception) and waived its sovereign immunity (the waiver exception). The complaint contains no facts to support these bald allegations, and Intelsat is wrong on all counts.

Intelsat cannot use the FSIA to create subject matter jurisdiction that otherwise would not exist. The FSIA regulates the immunity of foreign sovereign entities in U.S. courts; it is not designed to create a new basis for subject matter jurisdiction in Article III courts. 28 U.S.C. § 1602. If the FSIA can serve as an independent basis for subject matter jurisdiction as Intelsat alleges, any non-U.S. entity contracting with a foreign state or an agency or instrumentality of a foreign state could manufacture federal subject matter jurisdiction by agreeing to allow U.S. courts to adjudicate their contract disputes. Such a reading of the FSIA is not only inconsistent with its purpose, but also would violate Article III. The dispute presented here -- a contract claim between two foreign entities for services rendered outside the Unites States -- does not fall within this Court's limited Article III jurisdiction. Intelsat's claims should be dismissed for lack of subject matter jurisdiction.

Even if the FSIA could be read to provide an independent basis for subject matter jurisdiction in an appropriate case, it does not apply to Intelsat's claims. CYPTT is not an agency or instrumentality of a state. CYPTT is a Serbian business association -- a private enterprise akin to a trade association. CYPTT is not a government agency. It is not owned by a government. It has no governmental regulatory authority. It is a profit-making enterprise for its members, and it pays taxes like any other private entity. In short, it is not an agency or instrumentality of a state.

Whether or not it is an agency or instrumentality of a state, neither of the two exceptions to sovereign immunity invoked by Intelsat applies. The commercial activity exception does not apply. Claims for payments owing to a United Kingdom entity in the U.K. on a contract with a

Serbian entity for the provision of telecommunications services in Serbia and Montenegro do not involve commercial activity in the United States.

The waiver exception does not apply. To create the appearance of waiver by contract, Intelsat selectively attaches one piece of the contractual arrangements under which it is suing and claims that the "governing law" provision in that document constitutes waiver. Yet the basic terms of the alleged contract -- pricing, duration and service terms -- are not in the document Intelsat attaches to its complaint. In fact, this dispute is governed by a different, related agreement that does not contain the same governing law provision, and instead provides that disputes such as this one must be resolved by arbitration under the Rules of Arbitration of the International Chamber of Commerce ("ICC") in Paris, France.

The Court also lacks personal jurisdiction over CYPTT. The sole basis for personal jurisdiction alleged in the complaint is waiver under the same governing law provision discussed above that does not apply to this dispute. Thus, Intelsat has failed to allege a valid basis for personal jurisdiction. Moreover, CYPTT does not have the requisite minimum contacts with the United States or the District of Columbia to satisfy the Due Process Clause. CYPTT has no office, no property, no bank account and no phone number in the United States, and it does not actively advertise or solicit business in the United States or send its employees here. Intelsat's claims therefore also should be dismissed for lack of personal jurisdiction.

Further, venue in this court is improper under the doctrine of *forum non conveniens*. Because Intelsat is not a D.C. or U.S. resident, its choice of forum warrants no deference. There is a readily available alternative forum -- arbitration at the ICC -- that Intelsat itself chose in the form contract it drafted and that governs this dispute. All of the private and public forum selection considerations dictate that this Court is not the appropriate forum. To the best of

CYPTT's knowledge, none of its witnesses and records are located in the United States, and it would be a significant hardship for CYPTT to litigate the dispute here. Moreover, this Court has little interest in adding to its already heavy docket to settle a dispute involving two non-U.S. entities that has no connection to the United States or the District of Columbia. For these reasons, the case should also be dismissed on grounds of *forum non conveniens.*

If the Court declines to dismiss the case for any of the reasons set out above, CYPTT moves in the alternative to compel arbitration. The contract that governs this dispute provides for mandatory arbitration. The only exception to arbitration is for claims seeking "interim relief, including injunctive relief or confirmation of any arbitral award" or attempts to enforce relief awarded in such proceedings. Because this is not a claim for interim relief, under the terms of the governing contract, it must be arbitrated.

## FACTUAL BACKGROUND

*Plaintiff and Defendant Are Foreign, Private Entities*

Plaintiff Intelsat alleges that it is a corporation existing under the laws of the United Kingdom. Compl. ¶ 1. According to the Complaint, Intelsat is "the successor in interest to certain contractual rights" Old Intelsat. Id. Old Intelsat was "an international organization established by the Agreement Relating to the International Telecommunications Satellite Organization, an international treaty dated August 20, 1971." Id.

Defendant CYPTT is a Serbian business association registered with the Business Registers Agency of the Republic of Serbia. Declaration of Živojin Matejić ("Matejić Decl.") ¶ 3.[1] In Serbia, a business association is a form of trade organization. Id. ¶ 4. CYPTT's purpose

---

[1] Until recently, the Republic of Serbia was part of a federated state known as the State Union of Serbia and Montenegro. On May 21, 2006, Montenegro voted to leave the federated union of Serbia and Montenegro. Matejić Decl. ¶ 9. On June 3, 2006, the

is to coordinate efficient communication among its member companies in order to aid the regular and uninterrupted functioning of postal and telecommunications traffic. Id. ¶ 7. CYPTT is a for-profit entity that distributes all profits to its member companies and pays taxes. Id. ¶¶ 7, 15-16.

CYPTT is comprised of six member companies: Telekom Srbija; Telekom Montenegro; Jugomarka; the Postal Savings Bank; the Posts Telegraphs and Telephones Traffic Enterprise of Srbija; and the Post of Montenegro. Id. ¶ 5. Not all telecommunications companies in Serbia are members of CYPTT. Id. ¶ 8. For example, telecommunications companies such as Mobtel, ProMonte, and Monet operate in Serbia and Montenegro but are not members of and are not regulated by CYPTT. Id.

The government of Serbia is not a member of CYPTT and does not have an ownership interest in CYPTT. Id. ¶¶ 10, 12. CYPTT is not an agency of the government of Serbia. Id. ¶ 11. Its activities are funded by its members, not by the government. Id. ¶ 15.

While CYPTT issues guidelines for its member companies, it does not have any governmental regulatory authority. Id. ¶ 13. Rather, the Republic Telecommunications Agency in Serbia and the Agency for Telecommunications in Montenegro are solely responsible for regulation of telecommunications in Serbia and Montenegro. Id. ¶ 14.

***The Service Terms and Conditions Govern The Relationship Between Intelsat and CYPTT***

In 2001, Old Intelsat voted to privatize. Matejić Decl., Ex. 3 ("Novation Agreement"), Tab 2 at pp. 1-2.[2] As part of the privatization, Intelsat took over Old Intelsat's obligations to

---

Montenegrin Parliament confirmed the results of the cessation vote and asserted Montenegro's independency. Id. Currently, the Republic of Serbia and the Republic of Montenegro are two separate countries. Id.

[2]    Intelsat's Complaint relies on and attaches a document it calls the "Novation Agreement." See Compl. ¶¶ 5-9 & Ex. 1. The document attached to Intelsat's complaint in incomplete, as is apparent from the document itself. See, e.g., Compl., Ex. 1 at p. 3,

provide and manage satellite services for Old Intelsat's members. <u>See</u> Novation Agreement at p. 1. In order to transfer Old Intelsat's obligations to Intelsat, the companies entered into a series of novation agreements -- form contracts drafted by Intelsat -- with all of Old Intelsat's customers, including CYPTT. <u>See</u> Matejić Decl. ¶ 19; <u>see also</u> Novation Agreement, Cover Letter from John Stanton (describing the contents of the Novation Agreement, the "streamlined" review process of the Novation Agreement, and referring to CYPTT as "your organization").

On July 18, 2001, Old Intelsat, Intelsat, and CYPTT agreed that Old Intelsat would transfer to Intelsat all obligations to provide satellite service to CYPTT. <u>See</u> Compl. ¶ 5. This agreement (the "Tripartite Novation") merely constituted a novation of Old Intelsat's obligations and required Intelsat to continue to provide satellite service to CYPTT under essentially the same terms and conditions as it received with Old Intelsat. Novation Agreement, Tab 2 § 1.1 (defining "Terms and Conditions"), § 3 ("such Novated Contracts will be provided according to the Terms and Conditions").

The contract labeled "Service Terms and Conditions" defines the service relationship between Intelsat and CYPTT. <u>See id.</u> § 2.2; Novation Agreement, Tab 5 ("Service Terms and Conditions") § 2.1. The Service Terms and Conditions provide for the methods of billing (§ 5); payment terms (§ 5.3(a)); payment method (§ 5.5); technical standards for service (§ 4); service restoration (§ 6); conversion of services (§ 10); and termination of services (§ 12).

In contrast, the Tripartite Novation states: "Any breach of any of the Terms and Conditions with respect to any Novated Contract will not invalidate or otherwise affect the

---

¶ 1.1 (defining "Terms and Conditions" as the terms and conditions set forth in Attachment 2, which is not provided in Intelsat's exhibit). A complete copy of the Novation Agreement is attached to the Matejić Declaration as Exhibit 3.

novation of the Contracts pursuant to this Agreement." Novation Agreement, Tab 2 § 7. Thus, a breach of the Service Terms and Conditions does not have any effect on the Tripartite Novation.

The Service Terms and Conditions also define how disputes between the parties concerning the provision of telecommunications services shall be resolved. Service Terms and Conditions § 17. If the parties are unable to resolve their disputes informally, the Service Terms and Conditions provide that the dispute should be resolved by arbitration before the ICC in Paris, France. Id.

***Nature of the Allegations***

Intelsat alleges that CYPTT breached the "Novation Agreement and the Service Contracts" by failing to pay certain invoices for satellite services. Compl. ¶¶ 9, 12. According to Intelsat, as a result of the alleged failure to pay, it "terminated the Novation Agreement and all Service Contracts" between Intelsat and CYPTT on December 23, 2005. Id. ¶ 8. Intelsat also alleges that "[u]nder the terms of the Novation Agreement and Service Contracts, all amounts due from defendant to plaintiff under the remaining term of the Service Contracts became immediately due and payable" when Intelsat terminated the Service Contracts. Id. Of the purported $12,835,670.89 in outstanding invoices, $11,528,136.62 are attributed to "termination" of the contracts. Id., Ex. 2. Intelsat asserts claims for breach of contract and unjust enrichment. Id. ¶¶ 10-19.

Intelsat alleges that this Court has subject matter jurisdiction over this dispute pursuant to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1330, on the theory that that CYPTT is an instrumentality of the government of Serbia and Montenegro, as defined by 28 U.S.C. § 1603. Id. ¶¶ 2-3. Intelsat further alleges that CYPTT waived its jurisdictional immunity and is engaged in commercial activity that causes a direct effect in the United States

pursuant to 28 U.S.C. § 1605(a)(1) and (2). Id. ¶ 3. This is the sole basis for subject matter

jurisdiction alleged, and waiver under a governing law provision of the Tripartite Agreement is

the sole ground alleged for personal jurisdiction. Id. ¶ 4.

## STANDARD OF REVIEW

CYPTT moves to dismiss the complaint for lack of subject matter jurisdiction, lack of

personal jurisdiction and improper venue under the doctrine of *forum non conveniens*. In the

alternative, it also moves to compel arbitration under the Federal Arbitration Act ("FAA").

Because any challenge to the Court's subject matter jurisdiction questions the Court's

fundamental ability to hear this case, the Court must decide this issue before all others. Steel Co.

v. Citizens for a Better Envt., 523 U.S. 83, 93 (1998). If the Court finds that it does not have

subject matter jurisdiction, all other questions are moot and the case must be dismissed. Id. at

94; see also 5B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1350,

at 139 (3d ed. 2004) (collecting cases). "On a motion to dismiss for lack of subject-matter

jurisdiction pursuant to Rule 12(b)(1), the plaintiff bears the burden of establishing that the court

has subject-matter jurisdiction." Gutch v. Fed. Republic of Germany, 444 F. Supp. 2d 1, 5

(D.D.C. 2006) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992)). "Because

subject-matter jurisdiction focuses on the court's power to hear the claim . . . the court must give

the plaintiff's factual allegations closer scrutiny when resolving a Rule 12(b)(1) motion than

would be required for a Rule 12(b)(6) motion for failure to state a claim." FEC v. Club for

Growth, Inc., 432 F. Supp. 2d 87, 89 (D.D.C. 2006). Moreover, the Court is not limited to the

complaint's allegations, and may consider materials outside the pleadings. Gutch, 444 F. Supp.

2d at 6.

Intelsat's invocation of the FSIA as grounds for subject-matter jurisdiction likewise

permits the Court "to engage in more than the usual pretrial factual and legal determinations."

Id.  A defendant can assert both legal and factual challenges to the sufficiency of the plaintiff's

jurisdictional allegations.  Phoenix Consulting, Inc. v. Republic of Angola, 216 F.3d 36, 40 (D.C.

Cir. 2000).  When a defendant challenges the factual basis for jurisdiction under the FSIA, "the

court may not deny the motion to dismiss merely by assuming the truth of the facts alleged by

the plaintiff."  Id.  Rather, "the court must go beyond the pleadings and resolve any disputed

issues of fact the resolution of which is necessary to a ruling upon the motion to dismiss."  Id.  If

this Court finds that subject matter jurisdiction under the FSIA is inappropriate, this Court must

dismiss the complaint.

**ARGUMENT**

**I.    THE FSIA DOES NOT PROVIDE A VALID BASIS FOR SUBJECT MATTER JURISDICTION OVER THIS DISPUTE.**

In order to support its sole alleged basis for subject matter jurisdiction, Intelsat must

demonstrate as a matter of law that the FSIA can provide subject matter jurisdiction where

otherwise none would exist, and then demonstrate as a matter of fact that the FSIA applies.

Intelsat can do neither.

Non-U.S. parties cannot by contract create federal subject matter jurisdiction under the

FSIA over a dispute with no connection to the United States.  Use of the FSIA in this way would

violate Article III and be inconsistent with the language and purpose of the FSIA  The FSIA

cannot provide subject matter jurisdiction over Intelsat's claims under any circumstances.

Moreover, even if the FSIA in theory could provide jurisdiction, it does not apply to this

dispute.  To have any application to this dispute, the FSIA requires Intelsat to prove both that

CYPTT is an agency or instrumentality of a foreign state and that one of the exceptions to the

general rule of immunity of such entities applies.  28 U.S.C. §§ 1603-1605.  Specifically, Intelsat

asserts two exceptions to the general rule of immunity, waiver under 28 U.S.C. § 1605(a)(1) and

the so-called "commercial activity" exception under 28 U.S.C. § 1605(a)(2).  Compl. ¶ 3.  For

the reasons set out below CYPTT is not an agency or instrumentality of a government, and

neither of the two exceptions to immunity applies.

> **A.      The FSIA Cannot Create Subject Matter Jurisdiction Where Otherwise
> None Exists.**

In one of its first cases addressing the FSIA, the Supreme Court raised, but did not

answer, the question posed by this case, namely, "whether, by waiving its immunity, a foreign

state could consent to suit based on activities wholly unrelated to the United States."  Verlinden

B.V. v. Cent. Bank of Nigeria, 461 U.S. 480, 491 n.15 (1983).  For two reasons, the FSIA should

not be construed to allow two foreign entities to craft a contract that bestows federal subject

matter jurisdiction over a claim that has no connection to the United States.  First, such a reading

would violate Article III of the United States Constitution.  Second, it would be inconsistent with

the purpose and intent of the FSIA.

Article III gives the federal courts jurisdiction over "all Cases, in Law and Equity, arising

under this Constitution, the Laws of the United States, and Treaties made, or which shall be

made, under their Authority; to all Cases affecting Ambassadors, other public Ministers and

Consuls; to all Cases of admiralty and maritime Jurisdiction; to Controversies to which the

United States shall be a Party; to Controversies between two or more States; between a State and

Citizens of another State; between Citizens of different States; between Citizens of the same

State claiming Lands under Grants of different States, and between a State, or the Citizens

thereof, and foreign States, Citizens or Subjects."  U.S. Const. art. III, § 2.  Nowhere on this list

is a claim that arises out of a contractual relationship between two foreign entities that, but for a

contractual choice-of-law provision, would have no connection to, or arise out of, the laws of the

United States.

It is axiomatic that parties cannot contractually agree to subject-matter jurisdiction in the United States Courts. See Akinseye v. District of Columbia, 339 F.3d 970, 971 (D.C. Cir. 2003) (holding that because subject-matter jurisdiction is "an Art. III as well as a statutory requirement . . . no action of the parties can confer subject-matter jurisdiction upon a federal court"); Shulman v. Voyou, LLC, 305 F. Supp. 2d 36, 38 (D.D.C. 2004) (same); see also 5B Wright & Miller, Federal Practice and Procedure § 1350, at 128-30 (collecting cases). Interpreting the FSIA to cover this claim would contravene Article III and violate this doctrine by permitting private entities to create federal subject matter jurisdiction by contract where it otherwise could not exist.

Moreover, Congress did not intend the FSIA to cover cases such as this. The purpose of the FSIA was "to provide when and how parties can maintain a lawsuit against a foreign state or its entities." Through the FSIA, Congress "expresses the desire to ensure . . . access to the courts" over claims that, if a foreign sovereign was not involved, could be brought in the United States Courts. Verlinden, 461 U.S. at 490 (citing H.R. Rep. No. 94-1487, at 6-7 (1976)). Congress included "substantive provisions [in the FSIA] requiring some form of substantial contact with the United States" in order to prevent the United States Courts from turning into "small international courts of claims." Id. (citing Jurisdiction of U.S. Courts in Suits against Foreign States: Hearing Before the Subcomm. on Administrative Law and Governmental Relations of the House Committee on the Judiciary on H.R. 11315 ("Hearing"), 94th Cong. 31 (1976) (statement of Bruno A. Ristau)). Insistence on connections between the defendant and the United States also helped ensure that the due process requirements for personal jurisdiction would be met. Price v. Socialist People's Libyan Arab Jamahiriya, 294 F.3d 82, 89 (D.C. Cir. 2002) ("[I]t was generally understood that in order for immunity to be lost, there had to be some

tangible connection between the conduct of the foreign defendant and the *territory* of the United States.") (emphasis in original); McKeel v. Islamic Republic of Iran, 722 F.2d 582, 588 (9th Cir. 1983) ("[N]othing in the legislative history [of the FSIA] suggests that Congress intended to assert jurisdiction over foreign states for events occurring wholly within their own territory. Such an intent would not be consistent with prevailing practice in international law."); Hearing, 94th Cong. 31 (noting that these requirements "will insure that only those disputes which have a relation to the United States are litigated in the courts of the United States").

Were the Court to exercise subject matter jurisdiction over this case based solely on the theory that CYPTT, as an instrumentality of a foreign state, contractually waived its immunity in a contract with a non-U.S. entity, it would blaze a trail that could be followed by any non-U.S. entity about to enter into a contractual arrangement with a foreign state or its agency or instrumentality. Any entity in the world that believed the U.S. federal court system might be an effective mechanism for enforcing a contract with a foreign state or its agency or instrumentality would be able to gain access to U.S. courts simply by contractually requiring that disputes be settled here under U.S. law. The FSIA was not designed to operate in this way and should not be so construed.

### B.    CYPTT Is Not An Agency Or Instrumentality Of A Foreign State.

Under the FSIA, an "agency or instrumentality" of a foreign state is any entity:  "(1) which is a separate legal person, corporate or otherwise; and (2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof . . . ."  28 U.S.C. § 1603(b).  Because CYPTT is not an organ of a foreign state or political subdivision thereof, and because it is not

owned by a foreign state or political subdivision thereof, it is not an agency or instrumentality of
a foreign state.[3]

       1.     CYPTT is not an organ of a foreign state.

Under the FSIA, an "organ" of a foreign state is an entity that "engage[s] in a public
activity on behalf of the foreign government." USX Corp. v. Adriatic Ins. Co., 345 F.3d 190,
208 (3d Cir. 2003); see also EIE Guam Corp. v. Long Term Credit Bank of Japan, Ltd., 322 F.3d
635, 640 (9th Cir. 2003) (same).  Requiring a less stringent standard "would open the door to
situations in which a party only tangentially related to a foreign state could claim foreign state
status and avail itself" of the FSIA's procedural protections.  USX Corp., 345 F.3d at 208.  In
assessing whether an entity performs such a public activity, courts examine the purpose,
governance and ownership structure of the entity.  See id. at 209; EIE Guam, 322 F.3d at 640;
Filler v. Hanvit Bank, 378 F.3d 213, 217 (2d Cir.), cert. denied, 543 U.S. 1022 (2004); Gates v.
Victor Fine Foods, 54 F.3d 1457, 1461 (9th Cir. 1995).

To be considered an organ of a foreign state, an entity must perform an activity of
national character and scope.  For example, in USX, the Third Circuit found that ICAROM,
formerly known as the Insurance Corporation of Ireland ("ICI"), was an organ of the government
of Ireland, because the Irish government indirectly acquired ICI "to serve the important national
interest of protecting the Irish insurance and banking industries from financial disaster, which in
turn helped to maintain the stability in the Irish economy."  345 F.3d at 209-10, 216.  Likewise,
in EIE Guam, the Ninth Circuit determined that the Resolution and Collection Corporation
("RCC") was an organ of the government of Japan, because RCC was created solely for the

---

[3]      In assessing whether an entity is an agent or instrumentality of a foreign government, the
court should analyze the entity as it existed at the time the complaint was filed.  Dole
Food Co. v. Patrickson, 538 U.S. 468, 478 (2003).

purpose of "carry[ing] out Japanese national policy related to revitalization of the Japanese financial system." 322 F.3d at 641. In contrast, the Ninth Circuit held that the Dead Sea Companies, which were Israeli companies referred to by the government of Israel as "government companies," were not organs of the government of Israel under the FSIA, because the Companies were "independent commercial enterprises, heavily regulated, but acting to maximize profits rather than pursue public objectives." Patrickson v. Dole Food Co., 251 F.3d 795, 808 (9th Cir. 2001), aff'd, 538 U.S. 477 (2003).

CYPTT, like the Dead Sea Companies and in contrast to ICAROM and RCC, functions as an independent commercial enterprise acting to maximize profits for its member companies, and not as a proxy for the Serbian government. Unlike ICAROM and RCC, CYPTT's purpose is not to effectuate governmental functions on behalf of the government. Compare Matejić Decl. ¶ 7, with USX Corp., 345 F.3d at 210; EIE Guam, 322 F.3d at 642. Unlike the Canadian Marketing Board examined by the Ninth Circuit, see Gates 54 F.3d at 1461, CYPTT's employees are not considered or treated as employees of the state. Matejić Decl. ¶ 17. Rather, CYPTT operates independently from the state in order to: a) facilitate communication and coordination amongst its member companies; and b) make a profit for its members. Id. ¶ 7. CYPTT is essentially a trade organization: it issues guidelines and regulations for its members, it encourages the adoption of uniform technological standards, and provides a forum to collectively advance all members' interests. Id. ¶¶ 3-4, 13. In addition, each of CYPTT's member companies is a separate entity that functions independently outside of CYPTT. Id. ¶ 5.

The Serbian government does not play a substantial role in the operation of CYPTT's business. For example, CYPTT does not receive any financial support from the government and all profits from CYPTT's activities are distributed among its member companies. Id. ¶ 15. By

contrast, ICAROM and RCC received substantial financial support from the Irish and Japanese

governments.  See USX Corp., 345 F.3d at 212 (finding that the Irish government exercised "'a

substantial level of oversight and control over all major decision-making affecting ICAROM's

ongoing financial affairs,'" including arranging and providing financial support for ICAROM, as

well as assuring ICAROM's solvency) (citation omitted); EIE Guam, 322 F.3d at 640 (finding

that the RCC was funded by the Japanese government and the Japanese government would

compensate the RCC for any losses incurred during the year).

Like the Dead Sea Companies that were held not to be organs of the Israeli government,

the Serbian government has not granted CYPTT any regulatory authority.  See Patrickson, 251

F.3d at 808; Matejić Decl. ¶¶ 8, 13.  By contrast, RCC was granted certain exclusive functions

related to the Japanese economy that other companies were prohibited from performing, EIE

Guam, 322 F.3d at 642, leading to the conclusion that it was an organ of the Japanese

government.

In short, CYPTT does not engage in a public activity on behalf of the Serbian

government.  Therefore, CYPTT is not an organ of the state under the FSIA.

### 2.    CYPTT is not owned by the state.

A corporate entity is considered an instrumentality of a foreign state if the foreign state

owns the majority of the entity's shares or other ownership interest.  See 28 U.S.C. § 1603(b)(2).

Under this provision, "[a] corporation is an instrumentality of a foreign state under the FSIA only

if the foreign state *itself* owns a majority of the corporation's shares."  Dole, 538 U.S. at 477

(emphasis added).  Indirect or "tiered ownership" does not suffice; "only direct ownership of a

majority of shares by the foreign state satisfies the [FSIA] requirement."  Id. at 474.

CYPTT is a Serbian business association owned by its various members.  Matejić Decl.

¶¶ 3-4, 6.  CYPTT's members are Telekom Srbija; Telekom Montenegro; Jugomarka; the Postal

- 15 -

Savings Bank; the Posts Telegraphs and Telephones Traffic Enterprise of Srbija; and the Post of

Montenegro.  Id. ¶ 5.  There are no other owners of CYPTT.  Id. ¶ 6.  None of these entities is a

foreign state.  Id. ¶ 5.  Because no foreign state owns CYPTT, CYPTT is not an instrumentality

of a foreign state under the FSIA's ownership test.

### C.    No Exception To CYPTT's Alleged Jurisdictional Immunity Applies.

In addition to demonstrating that CYPTT is an agency or instrumentality of the

government of Serbia and Montenegro, Intelsat must also prove that one of the general

exceptions to a foreign state's jurisdictional immunity applies in this dispute.  Intelsat has alleged

that both the waiver and commercial activity exceptions apply.  See Compl. ¶ 3 (citing 28 U.S.C.

§ 1605(a)(1)-(2)).  Even if this Court finds that CYPTT is an instrumentality of a foreign state,

this Court still must dismiss Intelsat's complaint because Intelsat cannot demonstrate that either

jurisdictional exception applies to CYPTT.

### 1.    Intelsat's Complaint is not based on commercial activity carried on in the United States by CYPTT.

Intelsat incorrectly argues that CYPTT is not entitled to jurisdictional immunity in this

case because CYPTT's activity in Serbia and Montenegro constitutes commercial activity

outside the United States that has a direct effect in the United States.  See id. (citing 28 U.S.C.

§ 1605(a)(2)).  CYPTT's payment in the United Kingdom for services rendered in Serbia and

Montenegro has no direct commercial effect in the United States.

The FSIA makes a general exception to a foreign state's jurisdictional immunity for

certain commercial activity, including "an act outside the territory of the United States in

connection with a commercial activity of the foreign state elsewhere and that act causes a direct

effect in the United States."  28 U.S.C. § 1605(a)(2).  The FSIA defines commercial activity as

"either a regular course of commercial conduct or a particular commercial transaction or act."

Id. § 1603(d). "[T]he commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." Id.

A direct effect is one that "follows as an immediate consequence of the defendants . . . activity." Goodman Holdings v. Rafidain Bank, 26 F.3d 1143, 1146 (D.C. Cir. 1994) (quoting Republic of Argentina v. Weltover, Inc., 504 U.S. 607, 618 (1992)). The direct effect test requires "a clause in a contract mandating the fulfillment of contractual obligations *in the United States.*" Atl. Tele-Network, Inc. v. Inter-Am. Dev. Bank, 251 F. Supp. 2d 126, 134 (D.D.C. 2003) (emphasis in original). Thus, even a refusal to pay for services provided by an American plaintiff, without any contractual provision for payment in the United States, does not constitute a direct effect. Lempert v. Republic of Kazakstan, 223 F. Supp. 2d 200, 204 (D.D.C. 2002), aff'd, 62 Fed. Appx. 355 (D.C. Cir. 2003).

For example, in Weltover, Argentina rescheduled the payment dates for certain bonds it issued. New York payees of these bonds "had designated their accounts in New York as the place of payment, and Argentina made some interest payments into those accounts" before the rescheduling occurred. 504 U.S. at 619. The Court held that "[b]ecause New York was . . . the place of performance for Argentina's ultimate contractual obligations, the rescheduling of those obligations necessarily had a 'direct effect' in the United States: Money that was supposed to have been delivered to a New York bank for deposit was not forthcoming." Id.

In Goodman, the D.C. Circuit held that the direct effect test was not satisfied where an Iraqi bank did not honor certain letters of credit payable to two Irish corporations even though some of the letters of credit had been paid using funds in United States banks. 26 F.3d at 1144, 1146-47. The court held that the defendant's failure to honor letters of credit had no immediate

- 17 -

consequence in the United States because no United States location was designated as the "'place of performance' where money was 'supposed' to have been paid." Id. at 1146 (citation omitted). The defendant "might well have paid [the letters of credit] from funds in United States banks but it might just as well have done so from accounts located outside of the United States, as it had apparently done before." Id. at 1146-47.

The commercial relationship between Intelsat and CYPTT had no direct effect in the United States. Intelsat invoiced CYPTT from the United Kingdom and demanded payment in the United Kingdom. None of the agreements at issue in this case require payment in the United States. Intelsat provided services in Serbia and Montenegro only. Therefore, this Court cannot invalidate CYPTT's jurisdictional immunity pursuant to the commercial activity exception to the FSIA.

### 2.    Intelsat has failed to allege a valid basis for waiver.

Intelsat alleges that CYPTT waived sovereign immunity in paragraph 9 ("Paragraph 9") of the Tripartite Novation. Compl. ¶ 4. It asserts no other basis for waiver. This allegation is insufficient, because Paragraph 9 does not govern this dispute.

A novation is "a mutual agreement among all parties concerned for the discharge of a valid existing obligation by the substitution of a new valid obligation . . . or a like agreement for the discharge of a debtor to his creditor by the substitution of a new creditor." Richard A. Lord, Williston on Contracts § 76:37 (4th ed. 2006) (quoting MacPherson v. Franco, 208 P.2d 641, 642 (Wash. 1949)). The Tripartite Novation between and among Intelsat, Old Intelsat, and CYPTT is an example of the latter. See Novation Agreement at p. 1. The purpose of the Tripartite Novation is "to release and discharge [Old Intelsat] from its contractual obligations to [CYPTT] and novate such obligations from [Old Intelsat] to [Intelsat]." Id. Under the Tripartite Novation, Intelsat undertook "to accept, observe, perform and discharge all liabilities and obligations of

- 18 -

[Old Intelsat], howsoever arising under each [service contract], in substitution for and to the same extent as [Old Intelsat]." Id. § 2.2(b).

The Tripartite Novation requires that all novated service contracts "will be provided according to the [Service Terms and Conditions]." The Tripartite Novation itself contains no provisions governing Intelsat's provision of services to its customers. In fact, the Tripartite Novation explicitly states "[a]ny breach of the [Service Terms and Conditions] with respect to any Novated Contract will not *invalidate or otherwise affect* the novation of the Contracts pursuant to this Agreement." Id. § 7 (emphasis added).

The Service Terms and Conditions, on the other hand, govern the service relationship between Intelsat and CYPTT. For example, Section 5 governs "Applicable Charges and Payment Terms," including billing and payment terms and invoice disputes. See Service Terms and Conditions § 5. Section 12 governs the "Termination or Suspension of Service." Id. § 12. Specifically, Section 12 permits Intelsat to terminate or suspend a customer's service for cause due to any material breach of the contract, including "Customer's non-payment of amounts due hereunder." Id. § 12.1(a).

Intelsat's claim for relief confirms that it is suing under the Service Terms and Conditions, not the Tripartite Novation. Intelsat points to no specific provision of the Tripartite Novation that has been breached, and there is none. Further, the Tripartite Novation contains no provision supporting Intelsat's allegation that "[u]nder the terms of the Novation Agreement and Service Contracts, all amounts due from defendant to plaintiff under the remaining term of the Service Contracts became immediately due and payable" when Intelsat terminated "the Novation

Agreement and all Service Contracts between plaintiff and defendant." Compl. ¶ 8.[4] The

Service Terms and Conditions, on the other hand, provide that if Intelsat terminates the contract

for nonpayment, "the Customer will be liable for the entire balance that would have been due

under the scheduled duration of the Novated Contract." Service Terms and Conditions § 12.1(d).

Thus, Intelsat's claim rests on the Service Terms and Conditions, not on the Tripartite Novation.

The Service Terms and Conditions contains its own governing law and dispute resolution

provisions. Id. §§ 16-17. These provisions, not Paragraph 9, govern this dispute. Accordingly,

Intelsat has not alleged a valid basis for waiver of immunity under 28 U.S.C. § 1605(a)(1), and

its claim must be dismissed. See Gutch, 444 F. Supp. 2d at 6 ("[T]he plaintiff bears the burden

to establish that one of the FSIA exceptions applies and allows his claim to proceed.").

For these reasons, the FSIA under any circumstances cannot provide federal subject

matter jurisdictions for Intelsat's claims, and they should be dismissed for lack of subject matter

jurisdiction.

## II.    THIS COURT LACKS PERSONAL JURISDICTION OVER CYPTT.

Intelsat alleges that the CYPTT has consented to the jurisdiction of this Court under

Paragraph 9. Compl. ¶ 4 (citing Novation Agreement, Tab 1 ¶ 9). Waiver under Paragraph 9 is

the only basis for personal jurisdiction alleged. As discussed above, Paragraph 9 does not

govern this dispute. Because CYPTT is not an agency or instrumentality of a foreign state, there

is also no personal jurisdiction under 28 U.S.C. § 1330(b). Thus, Intelsat has failed to plead an

adequate basis for personal jurisdiction, and its claims must be dismissed for lack of personal

jurisdiction as well. Sieverding v. ABA, 439 F. Supp. 2d 111, 114 (D.D.C. 2006).

---

[4]      Although Intelsat repeatedly uses the capitalized term "Service Contracts" in its
complaint, it never defines the term.

Intelsat will be unable to cure this deficiency, because CYPTT does not have the requisite minimum contacts with the United States to establish personal jurisdiction. When a defendant is not a resident of the United States, the personal jurisdiction inquiry requires at a minimum that the defendant must have "sufficient minimum contacts with the United States [as a whole] so as not to offend traditional notions of fair play and substantial justice as required under the Due Process Clause of the Fifth Amendment." Oceanic Exploration Co. v. ConocoPhillips, Inc., No. 04-332, 2006 WL 2711527, at *14 (D.D.C. Sept. 21, 2006) (citing Burger King Corp. v. Rudzewicz, 471 U.S. 462, 474 (1985)). The constitutional touchstone of the due process inquiry is "whether the defendant purposefully established 'minimum contacts' in the forum . . . 'such that [the defendant] should reasonably anticipate being haled into court there.'" Burger King Corp., 471 U.S. at 474 (citation omitted). In the District of Columbia, general jurisdiction requires a defendant to have systematic contacts with the District demonstrating "'a continuing corporate presence in the forum . . . directed at advancing the corporation's objectives.'" Atlantigas Corp. v. Nisource, Inc., 290 F. Supp. 2d 34, 50 (D.D.C. 2003) (citation omitted).

CYPTT does not have sufficient minimum contacts with the United States to permit the Court to exercise personal jurisdiction. CYPTT does not have an office in the United States and does not maintain a United States phone number. Matejić Decl. ¶¶ 21, 27. CYPTT does not own any property located in the United States and does not maintain a bank account in the United States. Id. ¶¶ 23-24. Moreover, no CYPTT employees reside or work in the United State, and no CYPTT employees make routine business trips to the United States. Id. ¶¶ 25-26. Furthermore, CYPTT does not actively advertise or solicit business in the United States. Id. ¶ 28. Finally, with the exception this matter, CYPTT has not sued or been sued in the United States. Id. ¶ 29. In short, CYPTT has no systematic or continuous contacts with the United

States or the District of Columbia.  This Court therefore lacks personal jurisdiction over CYPTT

with respect to this dispute.

## III.    THIS COURT SHOULD ALSO DISMISS ON GROUNDS OF *FORUM NON CONVENIENS*.

The doctrine of *forum non conveniens* "permits a court to dismiss an action over which it

has jurisdiction when there is another available and adequate forum in which the case can be

tried and when it appears that the convenience of the parties and the court and the interests of

justice indicate that 'the action should be tried in [that] forum.'"[5] KPMG Fin. Advisory Servs.,

Ltd. v. Diligence LLC, No. 05-2204, 2006 WL 335768, at *1 (D.D.C. Feb. 14, 2006) (citation

omitted).  In assessing whether a case should be dismissed on grounds of *forum non conveniens*,

the court must (1) assess whether an adequate alternative forum exists; and (2) balance both the

private and public interest factors against the presumption in favor of plaintiff's choice of forum.

See El-Fadl v. Cent. Bank of Jordan, 75 F.3d 668, 676-77 (D.C. Cir. 1996); Irwin v. World

Wildlife Fund, No. 05-1287, 2006 WL 2413701, at *3 (D.D.C. Aug. 22, 2006).

### A.    Arbitration At The International Court Of Arbitration Of The International Chamber of Commerce Is An Adequate Alternative Forum.

The court must first establish that there is an adequate alternative forum.  El-Fadl, 75

F.3d at 676.  Generally, this requirement is satisfied when the defendant is "'amenable to

process'" in the alternative forum.  Piper Aircraft Co. v. Reyno, 454 U.S. 235, 255 n.22 (1981)

(citation omitted).  Only "in rare circumstances" is an alternative forum unsatisfactory.  Id.  For

example, "dismissal would not be appropriate where the alternative forum does not permit

litigation of the subject matter of the dispute.  Id.  See El-Fadl, 75 F.3d at 678-79.  "As long as

---

[5]    The FSIA does not affect the traditional doctrine of *forum non conveniens*.  Verlinden, 461 U.S. at 491 n.16.

the alternative forum meets the threshold standard of adequacy, perceived differences in the

substantive law or the comparative amount of recovery obtainable in the two alterative forums

are not relevant." Irwin, 2006 WL 2413701, at *4 (citing Piper Aircraft, 454 U.S. at 248-49).

In this case, Intelsat already consented -- in its own form contract and presumably with

many other customers -- to appear before the ICC regarding any dispute over Intelsat's services.

See Service Terms and Conditions § 17. Any argument now that the ICC is an inadequate forum

would be specious. Further, courts have recognized that arbitration panels, including the ICC,

are adequate alternative fora for the resolution of disputes. See Scherk v. Alberto-Culver Co.,

417 U.S. 506, 519-20 (1974) (finding that the ICC is an adequate forum to resolve disputes);

Alpine View Co., Ltd. v. Atlas Copco AB, 205 F.3d 208, 221 (5th Cir. 2000) (finding that

plaintiff's agreement to arbitrate dispute before a Norwegian arbitration panel demonstrated that

plaintiff did not believe that Norway was an inadequate alternative forum). There is no dispute

that the ICC recognizes plaintiff's claims.

**B.    The Balance Of Interests Dictates That This Court Is Not An Appropriate Forum For This Commercial Dispute Between Two Foreign Parties Involving Non-U.S. Commercial Services.**

Once the court establishes that an adequate alternative forum exists, it must balance both

the private and public interest factors against plaintiff's choice of forum. See El-Fadl, 75 F.3d at

677, Irwin, 2006 WL 2413701, at *3. Ordinarily, plaintiff's choice of forum is entitled to

deference and should not lightly be disturbed. See Piper Aircraft, 454 U.S. at 254. However, the

plaintiff's choice of forum is entitled to less deference if, like Intelsat, the plaintiff is a resident

of a foreign state. Irwin, 2006 WL 2413701, at *3 (citing Piper Aircraft, 454 U.S. at 255-56).

"When the home forum has been chosen, it is reasonable to assume that this choice is

convenient. When the plaintiff is foreign . . . this assumption is much less reasonable . . .

[b]ecause the central purpose of any *forum non conveniens* inquiry is to ensure that the trial is

- 23 -

convenient." Piper Aircraft, 454 U.S. at 255-56. Thus, Intelsat's selection of the United States

District Court for the District of Columbia as its chosen forum must be given less deference than

a resident plaintiff's choice of this court would carry.

In assessing the balance of private interest factors, courts should consider: "(1) the

relative ease of access to sources of proof; (2) the availability of process for compelling

unwilling witnesses; (3) the cost for obtaining attendance of willing witnesses; (4) the possibility

of inspecting the premises, if appropriate; and (5) all other practical problems that make trial of a

case easy, expeditious, and inexpensive." Irwin, 2006 WL 2413701, at *5 (citing Gulf Oil Co. v.

Gilbert, 330 U.S. 501, 508 (1947)). Litigating this case in the United States would cause

significant hardship for CYPTT, both in terms of the expense and administrative burdens of

litigating in an unfamiliar judicial system at a great distance. Matejić Decl. ¶ 32. To the best of

CYPTT's knowledge, none of its potential witnesses are located in the United States, and the

majority are located in Serbia. Id. ¶ 31. In addition, all relevant documents and other evidence

related to this dispute in the possession of CYPTT are located in Serbia. Id. ¶ 30. In short, the

balance of private interest factors does not support the United States District Court for the

District of Columbia as the appropriate forum for this dispute.

The public interests involved likewise weigh against Intelsat's choice of forum. Public

interests include: "(1) administrative difficulties caused by foreign litigation congesting local

court dockets; (2) local interest in having localized controversies decided at home; (3) imposing

jury duty on residents of a jurisdiction have little relation to the case; and (4) avoiding

unnecessary problems in choice-of-law and the application of foreign law." Irwin, 2006 WL

2413701, at *6 (quoting Gilbert, 330 U.S. at 508-09). Using these interests as guideposts, it is

clear that the United States District Court for the District of Columbia has no interest in donating

its scarce resources to a U.K. entity so it can sue a Serbian entity to collect an alleged bill for telecommunications services.  None of the parties to this dispute are residents of the United States, let alone the District of Columbia, and none of the events at issue occurred in the United States.  Plaintiff's "Quantum Meruit/Unjust Enrichment" claim, Compl. ¶¶ 15-19, which does not sound in contract, threatens to present to the Court the question whether such a claim is governed by U.K. law or Serbian law.  In short, there is no cognizable public interest in litigating this matter in this court.

Because the ICC is an adequate alternative forum and the private and public interest factors do not support the District of Columbia as the appropriate forum, this Court should dismiss this case on grounds of *forum non conveniens*.

## IV.    IN THE ALTERNATIVE, THE COURT SHOULD COMPEL ARBITRATION UNDER THE SERVICE TERMS AND CONDITIONS.

Even if this Court finds it has subject matter and personal jurisdiction over this case and that venue is proper, it should give effect to the parties' agreements, compel arbitration and dismiss this action.  In the Service Terms and Conditions, the parties committed to resolve "all disputes, controversies or claims arising under . . . or in connection with services provided pursuant to" the Service Contracts through arbitration before the ICC.  Service Terms and Conditions § 17.  Under the FAA, the Court should enforce this provision.  See 9 U.S.C. § 1.

Congress enacted the FAA to overcome judicial resistance to arbitration, codify a national policy favoring arbitration, and place arbitration agreements on equal footing with all other contracts.  Buckeye Check Cashing, Inc. v. Cardegna, 126 S. Ct. 1204, 1207 (2006).  The FAA implements the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, which establishes "the recognition and enforcement of arbitral awards made in the territory of a State other than the State where the recognition and enforcement of such awards are

sought." 9 U.S.C. § 201. An arbitration agreement arising out of a contractual or other legal

transaction falls under the Convention. Id. § 202.

The FAA creates a body of federal substantive law, applicable in all state and federal

courts. Buckeye, 126 S. Ct. at 1208-09. The statute provides that an arbitration provision is

valid, irrevocable, and enforceable, unless there are grounds to revoke the contract. 9 U.S.C. § 2.

The FAA further requires this Court to direct the parties to proceed to arbitration when the court

determines that an arbitration provision has been entered into by the Plaintiff and Defendant. Id.

§§ 3-4; see also Nat'l R.R. Passenger Corp. v. Consol. Rail Corp., 892 F.2d 1066, 1069 (D.C.

Cir. 1990) (citing Dean Witter Reynolds, Inc. v. Byrd, 470 U.S. 213, 218, (1985)). Under the

FAA, a trial court has no discretion not to order parties to proceed to arbitration when the parties

have entered into an arbitration agreement. Gordon-Maizel Constr. Co. v. Leroy Prods., Inc.,

658 F. Supp. 528, 531 (D.D.C. 1987).

When presented with a motion to compel arbitration, this Court must determine the

enforceability of the agreement to arbitrate and decide whether arbitration should be compelled.

Nelson v. Insignia/Esg, Inc., 215 F. Supp. 2d 143, 146 (D.D.C. 2002). Such a determination

requires a two-part inquiry. Id. at 149-50. First, a court should decide whether the parties

entered into a valid and enforceable arbitration agreement. Nur v. K.F.C. USA, Inc., 142 F.

Supp. 2d 48, 50-51 (D.D.C. 2001). In determining whether an arbitration agreement is a valid

contract, courts apply ordinary state law principles governing the formation of contracts.

Emeronye v. CACI Int'l, Inc., 141 F. Supp. 2d 82, 85 n.3 (D.D.C. 2001) (citing First Options of

Chicago, Inc. v. Kaplan, 514 U.S. 938, 944 (1995)). Second, if the court finds that the parties

did enter into a valid arbitration agreement, it must determine whether the arbitration agreement

encompasses the claims raised in the complaint.  Id.  If this Court determines that the arbitration agreement is valid and that the agreement encompasses the dispute, it must compel arbitration.

### A.    Intelsat Entered Into a Valid, Binding Arbitration Agreement.

Pursuant to the Service Terms and Conditions, final relief -- such as that sought by Intelsat through this action -- may be pursued only through arbitration:

> The Customer and the Company agree to endeavor to settle **all disputes, controversies or claims arising under this Agreement, or in connection with services provided pursuant to this Agreement**, within sixty (60) days, or such longer period as may be mutually agreed upon, from the date that either party has given written notice of the existence of such dispute, controversy or claim to the other.  If within such time the Customer and the Company have not been able to reach a settlement, **either party may submit the dispute, controversy or claim for settlement by arbitration in accordance with the Rules of Arbitration of the International Chamber of Commerce in effect on the date of the Agreement before a panel of three arbitrators designated pursuant to those rules and the decision shall be binding on the Customer and the Company.**  The place of arbitration shall be Paris, France, unless otherwise mutually agreed by the Company and the Customer.  Any party to this Agreement may seek from a court of the District of Columbia or a United States Federal Court sitting in the District of Columbia any interim relief, including injunctive relief or confirmation of any arbitral award rendered in whole or in part.  This Section shall not limit the rights of any party to obtain execution of judgment or to seek injunctive relief or specific performance in aid of such an award from a court of the District of Columbia or a United States Federal Court sitting in the District of Columbia.

Matejić Decl., Ex. 3 § 17 (emphasis added).

Arbitration under Section 17 of the Service Terms and Conditions is not an option, but a requirement.  Reviewing similar arbitration clauses, this Court and others have determined that parties seeking final resolution of claims can only do so through arbitration.  See Held v. Nat'l R.R. Passenger Corp., 101 F.R.D. 420, 424 (D.D.C. 1984) (contract language stating that either party "may" submit its claims to arbitration does not imply that the parties to the agreement have

the option of invoking some remedy other than arbitration; the only option available to an

aggrieved party retained through use of the word "may" is to abandon the claim); see also Austin

v. Owens-Brockway Glass Container. Inc., 78 F.3d 875, 879 (4th Cir. 1996) (agreement

providing that "'[a]ll disputes not settled . . . may be referred to arbitration'" requires arbitration)

(citation omitted); American Italian Pasta Co. v. Austin Co., 914 F.2d 1103, 1104 (8th Cir. 1990)

(same); Republic Steel Corp. v. Maddox, 379 U.S. 650, 657-58 (1965) (holding that that under

an arbitration agreement and absent an express contractual agreement that arbitration was not the

exclusive remedy available to parties, a Plaintiff cannot bring a court action).

    The fact that Section 17 permits a party to apply for "interim relief," or to enforce an

award of such relief in a court, confirms that arbitration is required for relief that is not "interim."

To give the arbitration agreement independent meaning, Austin, 78 F.3d at 879, Section 17 must

be read to require claims like the case at bar seeking final resolution of disputes to be arbitrated,

and permitting recourse to the courts only in the event "interim relief" or enforcement of an

arbitrated judgment is sought.

## B.    The Broad Arbitration Agreement Covers the Plaintiff's Claims.

    There is a strong presumption favoring the enforcement of arbitration agreements, and

doubts regarding the scope of an arbitration agreement must be resolved in favor of arbitration.

Booker v. Robert Half Int'l, Inc., 315 F. Supp. 2d 94, 97 (D.D.C. 2004), aff'd, 413 F.3d 77 (D.C.

Cir. 2005); see also Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 24-25 (1991).  Section

17 of the Service Terms and Conditions covers "all disputes, controversies or claims arising

under this Agreement, or in connection with services provided pursuant to this Agreement."

Such broad language dictates that that Intelsat's claims are covered by Section 17 and must be

arbitrated.  See, e.g., Nat'l R.R. Passenger Corp. v. Boston & Maine Corp., 850 F.2d 756, 762

(D.C. Cir. 1988); <u>Dowley v. Dewey Ballantine, LLP</u>, No. 05-622, 2006 WL 1102768, at *8-*9

(D.D.C. Apr. 26, 2006).

## CONCLUSION

For the foregoing reasons, the Court should grant CYPTT's motion to dismiss Intelsat's

complaint, or, in the alternative, to compel arbitration and dismiss the complaint.

Dated:  November 28, 2006                    Respectfully submitted,

                                             COMMUNITY OF YUGOSLAV POSTS
                                             TELEGRAPHS AND TELEPHONES

                                             By:

                                             Kevin B. Clark, D.C. Bar No. 289421
                                             Joseph G. Davis, D.C. Bar No. 441479
                                             WILLKIE FARR & GALLAGHER LLP
                                             1875 K Street, N.W.
                                             Washington, D.C. 20006
                                             Tel.:    (202) 303-1000
                                             Fax:    (202) 303-2000