Tab 5

# Novation Agreement
## Attachment 2:
## Service Terms and Conditions

Attachment 2:
Service Terms
and Conditions


INTELSAT

# ATTACHMENT 2

## SERVICE TERMS AND CONDITIONS

**TABLE OF CONTENTS**
**SERVICE TERMS AND CONDITIONS**

**PART I.　GENERAL TERMS AND CONDITIONS FOR INTELSAT SERVICES**

1.　DEFINITIONS ...........................................................
2.　APPLICABILITY OF TERMS AND CONDITIONS ...................... 3
3.　MODIFICATION OF ORIGINAL TERMS AND CONDITIONS ...... 4
4.　APPLICABLE TECHNICAL STANDARDS................................ 4
5.　APPLICABLE CHARGES AND PAYMENT TERMS .................... 4
6.　SERVICE RESTORATION/PRIORITY OF SERVICES ................. 6
7.　APPLICABLE LICENSES................................................... 9
8.　SERVICE INTERRUPTION/OUTAGE CREDITS; ASSIGNMENT OF .... 11
　　ALTERNATIVE CAPACITY .............................................
9.　MOST FAVORED CUSTOMER (MFC)................................. 14
10.　CONVERSION OF SERVICES ......................................... 14
11.　INTELLECTUAL PROPERTY ........................................... 24
12.　TERMINATION OR SUSPENSION OF SERVICE..................... 25
13.　LIMITATION OF LIABILITY ........................................... 26
14.　ASSIGNMENT............................................................ 29
15.　CONFIDENTIALITY...................................................... 30
16.　GOVERNING LAW........................................................ 30
17.　DISPUTE RESOLUTION................................................. 31
18.　NOTICES................................................................... 31
19.　FORCE MAJEURE ........................................................ 31
20.　WARRANTY ............................................................... 32
21.　WAIVERS .................................................................. 33
22.　RIGHTS CUMULATIVE; INVALIDITY ............................... 33
　　.............................................................................. 33

**PART II.　SERVICE-SPECIFIC TERMS AND CONDITIONS**

　　A.　Terms and Conditions for Lease Services
　　B.　Terms and Conditions for Channel and Carrier Services
　　C.　Terms and Conditions for Occasional Use Services
　　D.　Terms and Conditions for Demand-Based Services
　　E.　Terms and Conditions for Cable Restoration Services

**PART III.　INTELSAT TECHNICAL STANDARDS, GLOSSARY AND DEPLOYMENT PLANS**

**ANNEXES:**

Annex 1 –     Applicable Discount Rates for Lump-Sum Payment of Full-Time Non-Pre-emptible Transponder Lease Services

Annex 2 –     Standard and Premium Capacity

Annex 3 –     DAMA Forms

Annex 4 –     Agreed-Upon Procedures

**PART I.     GENERAL TERMS AND CONDITIONS FOR SERVICES**

**1.      DEFINITIONS**

1.1     "Company" shall mean Intelsat U.K., Ltd., a company incorporated under the laws of England and Wales.

1.2     "IESS" shall mean Intelsat Earth Station Standards set forth in Part III of the Terms and Conditions, as may be amended by the Company from time to time in accordance with Part I – Section 4.1.

1.3     "Intelsat Technical Standards" shall mean the IESS, SSOG and other technical standards applicable to the services offered hereunder.

1.4     "Like Contract" shall mean a Novated Contract, which Contract, when compared to the applicable Post-Privatization Service Order, meets the like-term parameters set forth in Part I – Section 9.

1.5     "Novation Agreement" or "this Agreement" shall mean the agreement among the Company, INTELSAT and the applicable customer pursuant to which each Contract for services between such customer and INTELSAT are novated to the Company, and to which these Terms and Conditions are appended and form a part.

1.6     "Novated Service Rate Schedule" shall mean the schedules of service rates set forth in Part II of the Terms and Conditions.

1.7     "Post-Privatization Service Order" shall mean a Service Order accepted by the Company after the Closing.  This shall not include extensions or recommitments of Novated Contracts.

1.8     "Service Order" shall mean an order of Satellite Capacity via the Space Segment and related services to be submitted by the Customer to the Company, in accordance with the applicable ordering procedures for such service.

1.9     "SSOG" shall mean Satellite Systems Operations Guides set forth in Part III of the Terms and Conditions, as may be amended by the Company from time to time in accordance with Part I – Section 4.1.

1.10    Capitalized terms used but not otherwise defined herein or in the Glossary set forth in Part III of these Terms and Conditions shall have the meanings set forth in the Novation Agreement.

Attachment 2, Part I

**2.     APPLICABILITY OF TERMS AND CONDITIONS**

2.1     <u>Terms and Conditions</u>.

The terms and conditions set forth herein apply to Contracts novated to the Company pursuant to the Novation Agreement (the "Novated Contracts").

2.2     <u>Specific Terms and Conditions</u>.

The specific terms and conditions applicable to each Novated Contract will include (i) the general terms and conditions set forth in Part I of these Terms and Conditions and (ii) the service-specific terms and conditions applicable to each particular service which are set forth in Part II of these Terms and Conditions. Part II of these Terms and Conditions includes service-specific terms and conditions for the following services:

    (a)    Lease Services;
    (b)    Channel and Carrier Services;
    (c)    Occasional Use Services;
    (d)    Demand-Based Services; and
    (e)    Cable Restoration Services.

2.3     <u>Customer's Right to Resell</u>.

The Customer shall be entitled to resell any of the services provided to it hereunder, provided that the Customer shall remain liable for the compliance of the operation of such resold services with all applicable Terms and Conditions hereunder.

**3.     MODIFICATION OF ORIGINAL TERMS AND CONDITIONS**

The Company and the Customer each acknowledges and agrees that certain of the original terms and conditions that were applicable to the Contracts prior to the Closing Date will no longer be applicable following the Closing Date and that from and after the Closing, these Terms and Conditions amend and supercede in their entirety all other previous agreements, arrangements and understandings relating to the provisions of such services to the Customer.

**4.     APPLICABLE TECHNICAL STANDARDS**

4.1     <u>Compliance with Technical Standards</u>.

    (a)    Subject to Part I – Section 4.1(b), the Customer agrees to comply with the relevant Intelsat Technical Standards applicable to each service that is the subject of a Novated Contract. The relevant standards for each service referred to in Part I – Section 2.2 are listed in Part III – Section 5 of these Terms and Conditions.

Attachment 2, Part I

(b)    The applicable Intelsat Technical Standards may be amended from time to time by the Company, subject to prior notification to and consultation with the Customer, provided that if such amendment would materially affect the Customer's use of a service which has already been activated at the time of such change or require the expenditure of capital by the Customer, the Company will only apply such amendment to the Customer's Novated Contracts if such amendment is critical to the operation of the Company's Space Segment. In such circumstances, the Company agrees to negotiate with the Customer in good faith to agree on actions to ameliorate any costs associated with any such amendment.

### 4.2    Earth Station Operation

(a)    All facilities or services using the Company's Satellite Capacity must be connected or used in a manner which does not interfere with the effective operation of the Company's Space Segment or any of its components.

(b)    The Customer agrees to use only transmit earth stations duly authorized by the Company or INTELSAT to access the Company's Satellite Capacity. At the time of authorization, the Company will ensure that all liability, including but not limited to financial liability, for the operation of approved earth stations, is accepted by either the Customer or directly by the earth station operator.

(c)    A request for approval of an earth station to utilize the Company's Space Segment for the transmission of services shall be submitted to the Company by the Customer. If such earth station complies with the applicable Intelsat Technical Standards, the Company's approval shall not be unreasonably withheld or delayed.

### 4.3    Assurance of Compliance

The Company reserves the right to monitor the radio frequency signals carried by the Company's Satellite Capacity to ensure that the Intelsat Technical Standards are met. The Company shall use reasonable efforts to ensure that such monitoring does not impair the quality of any services operated by the Customer utilizing the services provided hereunder.

### 4.4    Allocated Capacity

Allocated Satellite Capacity may be used by the Customer for any service application, as long as operation of such Capacity is at all times in conformance with the approved use of the Satellite Capacity and the technical and operational conditions specified in the applicable Intelsat Technical Standards, and is approved by the Company.

Attachment 2, Part I

4.5    Scheduled Pre–Service Testing; No Commercial Traffic.

No commercial traffic may be placed on the Company's Space Segment during the scheduled pre–service testing period.

**5.    APPLICABLE CHARGES AND PAYMENT TERMS**

5.1    Charges.

Customer shall pay to the Company the charges applicable to each Novated Contract in accordance with the payment terms set forth in this Part I – Section 5 and in accordance with the rates set forth in Attachment 1 to the Novation Agreement or, if no such rate is set forth in Attachment 1 for a Novated Contract, the applicable rates set forth in the Novated Service Rate Schedule.

5.2    Provision of Adequate Security of Payment.

With respect to any Novated Contract for which collateral has been required prior to the date of execution of the Novation Agreement pursuant to INTELSAT's collateral terms and conditions applicable to such Novated Contract prior to the Closing Date, such collateral will continue to be required from and after the Closing Date. The form and amount of such required collateral shall be specified in Attachment 1 to the Novation Agreement. For the avoidance of doubt, if no collateral has been required prior to the date of execution of the Novation Agreement pursuant to INTELSAT's collateral terms and conditions with respect to a Novated Contract prior to the Closing Date, no amount is specified in Attachment 1 with respect to a Novated Contract; thus there is no collateral requirement in respect of such Novated Contract.

5.3    Billing and Payment.

(a)    Billing Cycles and Other Billing Terms.  The four billing cycles and related terms applicable to Novated Contracts are described below.  With respect to a Novated Contract, the Customer will continue to be billed for such Novated Contract after the Closing Date in accordance with the billing cycle and related terms that applies to such Novated Contract as set forth in Attachment 1. Any and all transfer, currency exchange or similar fees are the responsibility of the Customer.  Any late payments of amounts due will be charged interest of sixteen (16) percent per annum, provided that if an amount is being disputed in accordance with Part I – Section 5.3(b) hereof, no such interest will be charged other than in the circumstances set forth in such Section.  The four billing cycles and their related terms are as follows:

(i)    Quarterly in Arrears.

Pursuant to the quarterly in arrears billing cycle, the Company bills quarterly in arrears, in U.S. dollars, in the month following the quarter of service, with the amount billed due for payment in U.S. dollars sixty (60) days after the invoice date.

(ii)    Monthly in Arrears.

Pursuant to the monthly in arrears billing cycle, the Company bills monthly in arrears, in U.S. dollars, in the month following the month of service, with the amount billed due for payment in U.S. dollars forty-five (45) days after the service month end.

(iii)    Quarterly in Advance.

Pursuant to the quarterly in advance billing cycle, the Company bills quarterly in advance, in U.S. dollars, in advance of the quarter of service, with the amount billed due for payment in U.S. dollars by the tenth (10th) day of the month preceding the quarter of service. No interest will be earned by the Customer on any prepayments.

(iv)    Monthly in Advance.

Pursuant to the monthly in advance billing cycle, the Company renders monthly bills in advance, in U.S. dollars, in advance of the month of service, with the amount billed due for payment in U.S. dollars prior to the commencement of the month of service. No interest will be earned by the Customer on any prepayments.

(b)    Invoice Disputes. The Customer shall notify the Company as soon as possible but no later than 45 days after the invoice date in the event of any dispute regarding the charges payable by the Customer to the Company. The Customer shall pay the undisputed amount of any invoice by the relevant payment due date. The Company and the Customer shall enter into discussions and shall use their best efforts, including reciprocal provision of relevant records, to resolve disputes within sixty (60) days from the relevant payment due date. In the event that, as a result of such discussions, it is determined that the Customer should pay any amount to the Company, the Customer shall pay interest to the Company in the amount of sixteen (16) percent per annum on any amounts paid after the payment due date notwithstanding initiation

7

of such discussions. Each party will bear its own costs in connection with any such dispute.

5.4    Taxes.

(a)    Except as provided in Part I – Section 5.4(b), the Customer agrees to pay all applicable withholding, excise, sales, value added, privilege, gross receipts, use, transfer and similar taxes, duties, imposts, levies, fees and assessments, including government and/or Customer "mark–up" on service(s) or similar liabilities however denominated, other than taxes of the jurisdiction under the laws of which the Company is organized or in which its principal office is located that are imposed on or measured by the Company's net income or any fees imposed by a government regulatory authority that is not a taxing authority ("Taxes"), that are or may be directly levied by any applicable government authority on account of the services provided or payments made under this Agreement on or after the Closing Date, and any amounts payable to the Company from the Customer hereunder shall be increased such that the net amount actually received by the Company from the Customer hereunder after giving effect to such Taxes will equal the amount the Company would have received hereunder had no Taxes been imposed.

(b)    During the original term of the applicable Novated Contract, provided that the Customer is in compliance with its obligations set forth in paragraph (c) below, any amount payable to the Company hereunder shall be reduced by the amount of any withholding taxes imposed on such amount by any taxing authority of any jurisdiction in which the Customer or an affiliate of the Customer is located or which otherwise has jurisdiction over the Customer with respect to any payments for or with respect to the services provided by the Company to the Customer hereunder; provided that to the extent that the Customer or an affiliate of the Customer is entitled to a refund of, or a credit against taxes imposed by the jurisdiction in which the Customer or an affiliate of the Customer is located for such withholding taxes, then no reduction shall be made pursuant to this Section 5.4(b).

(c)    The Customer will cooperate with the Company to reduce the amount of any withholding taxes imposed on amounts payable by the Customer or an affiliate to the Company including, without limitation, by making any elections or taking any actions available or permissible under any applicable tax treaty, tax law, or any International Telecommunications Union agreement, accord or initiative. If the Customer does not comply with its obligations set forth in this paragraph (c), it shall not be entitled to reduce any

Attachment 2, Part I

amount payable by it to the Company pursuant to paragraph (b) above.

5.5     Payment Instructions.

(a)     For the purpose of providing invoices and making payments in connection with this Agreement, the details set forth in Schedule 1 to the Novation Agreement shall be used.

(b)     Such payments shall be deemed to be made by delivery of cash, check drawn on the Customer's business account, certified cashier's check, or bank wire transfer. All payments between the Customer and the Company pursuant to this Agreement shall be made in U.S. dollars or such other currency as the Company may agree to.

**6.     SERVICE RESTORATION/PRIORITY OF SERVICES**

6.1     Acknowledgement and Agreement.

The Customer acknowledges and agrees to the principles for services set forth in this Part I – Section 6 which shall be deemed applicable to all Novated Contracts.

6.2     Purpose.

Restoration procedures are based on the Company's priority list, which serves two purposes in cases of Space Segment malfunction: (a) the order in which services on the malfunctioning capacity would be restored, and (b) the order in which services on healthy Satellites would be preempted. In the case of a partial or total Satellite failure, reallocation of a service by the Company, at its own discretion, from one Company facility to another, is not considered to be preemption, provided that the alternative capacity provides at least equal performance to the required coverage area, but shall be considered an assignment governed by Part I – Section 8.2.

6.3     Priority List.

(a)     The priority list consists of four categories ranging from the most protected services (i.e., most likely to be restored and least likely to be preempted) to the least protected services. The four categories are as follows:

(i)     non-preemptible international services (public switched network ("PSN") carrier services followed by non-preemptible leases);

(ii)    non-preemptible domestic services;

9

     (iii)    preemptible international services; and

     (iv)    preemptible domestic services.

(b)    For the purposes of applying this priority list, (i) "international services" shall be deemed to mean the following:  (A) international public telecommunications services between or among territories under the ultimate jurisdiction of two or more government authorities; (B) domestic public telecommunications services between areas separated by areas not under the same ultimate jurisdiction as the applicable customer, or between areas separated by the high seas; and (C) domestic public telecommunications services between areas which are not linked by any terrestrial wideband facilities and which are separated by natural barriers of such an exceptional nature that they impede the viable establishment of terrestrial wideband facilities between such areas; and (ii) "domestic services" shall be deemed to mean the following:  domestic public telecommunications services in territories under the ultimate jurisdiction of one government authority. Notwithstanding the foregoing, services will be treated as "international" unless the Company is notified by the Customer that they are used solely for domestic applications and such services fall within the definition of "domestic services" set forth above.

The Company's services may be used for international or domestic applications, or for a combination of international and domestic applications, subject to the applicable Intelsat Technical Standards.

(c)    Within each of the four categories specified in paragraph (a), PSN carrier services are given priority and the remaining services, in each category, are given priority chronologically, with the oldest start of service date having the highest priority and the most recent start of service date having the lowest.

6.4    <u>Reassignment</u>.

In the event that a space segment malfunction is of such a scale that all preemptible leases have been preempted and additional services need to be preempted, then it would be necessary to remove non-preemptible services by reference to the Company's priority list.  Consistent with the deployment plans listed in Part III to these Terms and Conditions and effective upon the arrival of the INTELSAT IX system spare at 332.5°E, non-preemptible leases on a non-failed satellite will not be preempted to restore higher priority services.  In the event of an in-orbit space segment malfunction and in accordance with preemption procedures which permit service to be preempted from a non-failed spacecraft to restore services

Attachment 2, Part I

from the spacecraft where the malfunction occurred, preemption procedures would require either:

(a)    reassigning the services from the orbital location where the malfunction occurred to the orbital location(s) of the restoration spacecraft, or

(b)    the redeployment of a restoration spacecraft to the orbital location where the malfunction occurred, either upon arrival of a replacement spare spacecraft or immediately after the loss of the spacecraft at the failed orbital location.

In the case of satellite malfunction, practical circumstances of geography and beam coverages will be taken into account by the Company in implementing the foregoing procedures.

## 7.    APPLICABLE LICENSES

7.1    <u>Customer Obligations and Right to Terminate</u>.

(a)    The Customer shall comply with all applicable regulatory and licensing requirements promulgated by the applicable domestic authority.  As a condition of using the services provided by the Company under any Novated Contract, the Customer shall obtain licenses and approvals necessary to operate Customer's services with the Company's Space Segment, including those governmental authorizations, licenses, and approvals required at the Closing Date by reason of the Company providing Services pursuant to the Novation Agreement and required as a result of the Privatization ("New Authorizations").

(b)    If any such New Authorizations have not been obtained by the Customer at the Closing Date, the Customer will continue to use its best efforts to obtain such authorizations promptly following the Closing Date, and shall undertake any measures in connection therewith reasonably requested by the Company in good faith.

If, notwithstanding such efforts, the New Authorizations are not obtained by the ninetieth day following the Closing Date, or if, prior to the expiration of such 90 day period, a final, non-appealable decision is rendered by the applicable government authority denying such New Authorization, the Customer may terminate those Novated Contracts to which such New Authorizations relate by giving 30 days written notice to the Company of such termination, without penalty except as set forth in paragraph (d) below.

Attachment 2, Part I

(c)   If any governmental action (whether in its sovereign or contractual capacity) of any government authority of any jurisdiction other than the jurisdiction under the laws of which the Customer is organized or in which its principal office is located, reasonably beyond the control of the Customer, is taken or will be taken which prevents the Customer from receiving the services provided under any Novated Contract, the Customer shall notify the Company of such action promptly after such action has been taken or when the Customer has knowledge that such action will be taken, if earlier. The Customer shall use its best efforts to cause any action to be taken which would permit the Customer to receive such services and shall undertake any measures in connection therewith reasonably requested by the Company in good faith.

If, notwithstanding such efforts, the Customer is still prevented from receiving such services on the date ninety (90) days following the date such government action is taken, or if, prior to the expiration of such 90 day period, a final, non-appealable decision is rendered by the applicable government authority preventing the Customer from receiving such services, the Customer shall have the right to terminate those Novated Contracts affected without penalty, except as set forth in paragraph (d) below.

(d)   If the Customer terminates Novated Contracts in accordance with paragraph (b) or (c) above, the following will apply:

(i)   The Company will calculate the NPV in U.S. Dollars of all terminated Novated Contracts on the date of such termination (the "Terminated NPV"). The "net present value" or "NPV" as of any determination date means the aggregate of the future payments for service charges to be made in respect of the applicable Novated Contract, each discounted from its scheduled due date to present value on such determination date using a rate of 14% per annum, compounded quarterly. For purposes of the preceding definition, the scheduled due date for payments of service charges will be determined assuming that such charges are billed on a quarterly in arrears billing cycle. For preemptible services, the future payments to be made for such services will be deemed, for the purposes of the NPV calculation, to be limited to the applicable cancellation charge.

(ii)   During the twelve month period following the termination date of the terminated Novated Contracts, the Customer agrees to undertake commitments to the Company to order new services with an NPV (calculated in U.S. Dollars on

12                                              Attachment 2, Part I

the date such new services are ordered) up to the value of the Termination NPV in clause (i).

(iii)   During the twelve month period following the termination date of the terminated Novated Contracts, in parallel to the Customer's actions in (ii), the Company will use all reasonable endeavors to resell the capacity that had been allocated for the provision of the services pursuant to the terminated Novated Contracts.

(iv)   The termination NPV will be reduced during the twelve month period by the total NPV of all new contracts entered into pursuant to clause (ii) and (iii) above, calculated in U.S. Dollars on the date each such new contract is entered into.

(v)   On the first anniversary of the termination date of the terminated Novated Contracts, any balance of the Termination NPV remaining will be calculated by the Company and notified to the Customer. The Customer has 30 days following such notification to pay 50% of the balance of the Termination NPV in full and final settlement of all liabilities with respect to the terminated Novated Contracts or to order new services with an NPV (calculated in U.S. Dollars on the date such new services are ordered) equal to 100% of such balance.

(e)   For purposes of this Part I – Section 7.1, "best efforts" shall mean diligently and in a timely manner making all applications, submissions, filings and other submissions necessary or appropriate in connection with obtaining the applicable government authorization and making all appeals permissible in connection therewith, promptly and comprehensively responding to any inquiries or requests and otherwise cooperating with, any government authority relating to the applicable government authorization, approaching any government authority and requesting that actions be taken in order for such government authorization to be issued and paying any fees imposed by any government authority in connection with obtaining such government authorization.

7.2   <u>Company Obligations</u>.

The Company agrees to procure and maintain all licenses, approvals and government authorizations required to be obtained by the Company in order to provide the Satellite Capacity via the Space Segment and related services to the Customer hereunder and to comply with all statutes, by-

13

laws, regulations and requirements of any government or other competent authority applicable to the Company.

**8.    SERVICE INTERRUPTION/OUTAGE CREDITS; ASSIGNMENT OF ALTERNATIVE CAPACITY**

8.1    Reassignment.

In the event of either failure or significant degradation of service that is not caused by the Customer, the Company will exercise its best efforts to reassign the Customer to equivalent alternative capacity. In certain circumstances set forth in Part II of these Terms and Conditions, the Company shall provide outage credits for certain service interruptions.

8.2    Assignment of Alternative Capacity.

Except as specifically set forth in Part II of these Terms and Conditions, the Company may not assign new or alternative Satellite Capacity for a particular service provided pursuant to a Novated Contract without the prior consent of the Customer, which consent shall not be unreasonably withheld or delayed.

**9.    MOST FAVORED CUSTOMER (MFC)**

9.1    Applicability of MFC.

(a)    The Customer's Novated Contracts as set forth in Attachment 1 shall be eligible for Most Favored Customer ("MFC") rates and terms and conditions as set forth herein.

(b)    MFC protection shall entitle the Customer to protection that the rates charged by the Company on the Novated Contracts continue to be charged by the Company at a rate that is no greater than the lowest rate that the Company charges (after giving effect to any discounts or rebates other than those specified in Part I – Sections 9.3 (c) and (d)) or any Post-Privatization Service Order ("most-favored-customer rates") for Satellite Capacity having the same or comparable of the following like-term parameters, each as described further below:

(i)    Technical Parameters:

(A)    orbital location / spacecraft;
(B)    connectivity;
(C)    power;
(D)    bandwidth; and
(E)    service type; and

14                              Attachment 2, Part I

    (ii)      Commercial Parameters:

          (A)    service commitment duration;
          (B)    preemptibility;
          (C)    advance reservation commitment status; and
          (D)    demand.

(c)    For purposes of this Part I – Section 9.1:

    (i)      "Orbital location/spacecraft" refers to the applicable spacecraft and its equatorial slot (defined in degrees of East longitude) through which a particular service is provided. The "same or comparable" orbital location/spacecraft will be deemed to be used for two services if both services are provided using:

          (A)    Company spacecraft at the same orbital location;

          (B)    Company spacecraft which are co–located at the same orbital location; or

          (C)    two "identical" spacecraft (e.g., 2x generic IS–IXs) located within 2 degrees of each other.

    (ii)      "Connectivity" refers to the uplink and downlink beam combination used on a satellite to provide a particular service. Beams on Intelsat satellites (Series VI, VII, VIIA, VIII, VIIIA, IX, X) and APR-1 and -2 leased capacities are defined below:

          (A)    C–Band: Wide Beam (WB), Zone Beam (ZB), East Zone (EZ), West Zone (WZ), East Hemi (EH), West Hemi (WH), Hemi A (HA), Hemi B (HB), North West Zone (NWZ), North East Zone (NEZ), South West Zone (SWZ), South East Zone (SEZ), Mid–West Zone (MWZ), Global (G) and C–Spot (CS).

          (B)    Ku-Band: East Spot (ES), West Spot (WS), Spot 1 (S1), Spot 2 (S2), and Spot 3 (S3).

The "same or comparable" connectivity will be deemed to be used for two services if the connectivities used to provide such services are identical.

    (iii)    "Power" refers to the equivalent isotropically radiated power of the transponder. The "same or comparable" power will be deemed to be used for two services if such

15

power is categorized for billing purposes as "standard" for both services or is categorized as "premium" for both services in the Novated Service Rate Schedule.

(iv)  "Bandwidth", for lease services, refers to the power equivalent bandwidth used on a transponder or transponders to provide the applicable service. "Bandwidth", for purposes of channel and carrier services, refers to the amount of bandwidth and associated power based on the receive earth station type, bit rate and the forward error correction coding being used for such service. The "same or comparable" bandwidth will be deemed to be used by two services if the applicable increments of bandwidth are identical or are in the same category (or "tier") of bandwidth used for tariffing purposes under these Terms and Conditions and set forth in the Novated Service Rate Schedule.

(v)  "Service types" refer to the category designations for various service applications referred to in the List of Intelsat Technical Standards set forth in Part III – Section 5 to these Terms and Conditions. Two services will be deemed to be of the "same or comparable" service type if their service types are identical.

(vi)  "Service commitment duration" refers to the length of term of a customer's commitment to utilize a particular service. Two services will be deemed to have the "same or comparable" service commitment durations if they fall within the same category (or "tier") of commitment duration for tariffing purposes under these Terms and Conditions and set forth in the Novated Service Rate Schedule.

(vii)  "Preemptibility" refers to the priority given to a particular lease service in the event that lease services must be preempted. Two services will be deemed to have the "same or comparable" preemptibility status if they are in the same category of preemption, i.e. either they are both "preemptible" or both "non-preemptible".

(viii)  "Advance reservation commitment status" refers to whether a service is entitled to the discount offered to a reservation with a start date that coincides with the operational availability of a satellite at a specific orbital location. Such discounts do not apply to Contracts that commence service at a point after the date of operational availability. Two

Attachment 2, Part I

services will be deemed to have the "same or comparable" advance reservation commitment status if the two services either both commence on the first day of operational availability of the applicable satellite or (ii) both commence on other dates.

(ix)    "Demand" refers to (A) whether a particular transponder capacity meets the criteria for "unused transponder capacity" in Part II – A – Section 7 "Service Rates Applicable to Lease Services – Incentives for Unused Transponder Capacity" and (B) whether, in the process of building new communities, the utilization of capacity by the applicable customer enables the Company to charge higher rates with respect to subsequent orders for capacity on the same connectivity and the applicable service order by such customer is sizeable (i.e. it utilizes capacity at least equivalent to the bandwidth on a full transponder) (a customer with such enabling ability is referred to herein as an "anchor tenant").  Two services will be deemed to have the "same or comparable" demand if (A) the applicable capacity used to provide the two services either both meet the criteria for "unused transponder capacity" as described above or both do not meet the criteria for "unused transponder capacity" and (B) the applicable customers are either both "anchor tenants" as described above or both do not fall within the definition of "anchor tenant".  The Company agrees that any discount or rebate granted to a customer based on Demand shall be recorded in an auditable manner.

(d)    Subject to Part I – Section 12.2, in the event that the Company charges a rate for a Post-Privatization Service Order that is lower than the rate charged to the Customer for a Like Contract, such Customer shall be entitled to the MFC rates on like terms, provided that such Customer also agrees that the other terms and conditions applicable to such Post-Privatization Service Order which are, in the good faith determination of the Company, material to its price ("Other Applicable Terms") shall also apply to such Like Contract (referred to herein as a "Like-terms Offer").  The acceptance by the Customer of such Other Applicable Terms shall not result in the loss of the protections provided by the MFC provisions.  Upon such election and agreement, the Terms and Conditions applicable to such Like Contract shall be deemed to be amended by such Other Applicable Terms with effect as of the next following billing cycle.

17

Attachment 2, Part I

9.2    Term of MFC.

The term (the "Term") of the MFC provision shall not exceed the lesser of (i) five (5) years after the Closing Date, or (ii) the end of the specified term of the Customer's Novated Contract, including any extension or amendment of the term of such Novated Contract in accordance with these Terms and Conditions. The protections provided by the MFC provisions may be exercised an unlimited number of times during the Term in accordance with the provisions hereof. Except as set forth in the following sentence, if the Terms and Conditions applicable to any Novated Contract are amended, including pursuant to a "migration" pursuant to Section 4 of the Novation Agreement, then the MFC provisions shall immediately expire with respect to such Contracts. Notwithstanding the preceding sentence:

(A)    any amendments to the Terms and Conditions pursuant to Part I – Section 9.1 (d);

(B)    any change made to an Allotment (as defined in Part II – B – Section 2) associated with a Channel or Carrier Service Commitment (each as defined in Part II – B) covered by a Novated Contract;

(C)    any conversion of service pursuant to Section 10;

(D)    any amendment (including one–time extensions of leases) pursuant to Part II – A– Section 2.6;

(E)    any remapping of any Channel or Carrier Service pursuant to Part II – B – Section 2.4(f); and

(F)    any other type of amendment which is specifically contemplated by, and for which provisions have been specifically set forth in, Part II of these Terms and Conditions,

shall not terminate the MFC protections which would otherwise apply to such service hereunder.

9.3    Limitations on the Application of the MFC Protection.

Notwithstanding the foregoing, the Company shall not be obligated to provide MFC protection to the Customer's Novated Contracts in the following circumstances (regardless of whether the like-term parameters of any such Contract and any Post-Privatization Service Order are satisfied):

Attachment 2, Part I

(a)    <u>Materiality</u>. Notwithstanding the MFC provisions of this Part I – Section 9, the Customer shall only be entitled to MFC protection if the annual service charge with respect to the applicable Like Contract is five percent or more higher than the annual service charge with respect to the applicable Post-Privatization Service Order. For the avoidance of doubt, if a Contract is not entitled to MFC protection with respect to a Post-Privatization Service Order because of the application of this Part I – Section 9.3(a), such Contract may still be entitled to MFC protection with respect to any subsequent Post-Privatization Service Order in accordance with the terms and provisions of this Part I – Section 9.

(b)    [Intentionally Omitted.]

(c)    <u>Competitive Response Offer</u>.

    (i)    Notwithstanding the MFC provisions of this Part I – Section 9, the Customer shall not be entitled to MFC protection with respect to rates charged by the Company to other customers pursuant to any Competitive Response Offer (as defined below) the Company may choose to make.

    (ii)    A "Competitive Response Offer" is an offer by the Company to provide service to a customer on terms that meet those being offered to such customer by a satellite capacity provider which is a competitor to the Company and that satisfies the following additional requirements:

      (A)    Such Competitive Response Offer is being made to a customer who has provided documented or other auditable evidence to the Company, to the satisfaction of the Company, that such customer is in receipt of a bona fide and time–sensitive offer from a competitor of the Company that will expire within ninety (90) calendar days from the date first made for service substantially similar to the service being provided to such customer by the Company, and such competitor is offering a rate that is at least ten (10) percent lower than the rate that the Company is charging; and

      (B)    the service provided by the Company to such other customer which is the subject of the Competitive Response Offer utilizes at least 18 MHz of capacity.

19

(d)    <u>Co–Marketing Agreements</u>. Notwithstanding the MFC provisions of this Part I – Section 9, the Customer shall not be entitled to MFC protection if the Company offers non-discriminatory co–marketing agreements, that may include targeted promotional discount incentives or other tailored service terms and conditions offered to another customer as part of a joint marketing or promotional program between the Company and such other customer, pursuant to which such customer is required to pay a fee or provide other consideration for participation in such program.

(e)    <u>Compliance with Applicable Law</u>. Notwithstanding the MFC provisions of this Part I – Section 9, the Customer shall not be entitled to the MFC protection if, in offering any such protection, the Company would be in breach of any applicable laws or regulations.

9.4    <u>Remedies</u>: The Company's compliance with its MFC obligations shall be verified as follows:

(a)    <u>Internal Review</u>.

    (i)    <u>Timing</u>: The Company will conduct an internal MFC review on an annual basis.

    (ii)    <u>Officer's Certificate</u>: Within 30 days of the completion of the Company's annual external audit of the Company's financial statements, the Chief Financial Officer of the Company will issue a Certificate, a copy of which shall be provided to the Customer upon its written request, certifying that, based on the Company's internal MFC review, the Company is in material compliance with respect to the application of the MFC provisions to the Novated Contracts.

(b)    <u>External Audit</u>.

    (i)    <u>Timing</u>: The Company will select an external auditing firm to perform an annual MFC audit (the "Auditor"). The first such audit will commence after the first annual anniversary of the Closing Date and will cover MFC-related activity during the first year after Privatization. Subsequent annual external audits will cover subsequent years' activities. The final audits for any Novated Contract will occur after the termination of the MFC Term applicable to such Novated Contract.

Attachment 2, Part I

(ii) <u>Audit Costs</u>: The Company is solely responsible for the Auditor's fees, except in the circumstances described in paragraph (vii) below.

(iii) <u>Purpose</u>: The Auditor will perform an audit solely for the purpose of verifying whether the Company has properly discharged its MFC obligations.

(iv) <u>Procedures</u>: The audit shall be undertaken at the Company's offices during normal business hours at times acceptable to the Company and shall be conducted in such a way so as to minimize disruptions to the Company's day-to-day activities.

(v) <u>Confidentiality</u>: The Auditor shall agree to be bound by a written obligation of confidentiality in favor of the Company that is acceptable to the Company. The Auditor must be obligated in all circumstances not to disclose to parties other than the Company any information revealed during the audit and to limit its report as specified in clause (vi) below.

(vi) <u>Auditor's Report</u>: The Auditor is solely permitted to report its findings in a written report to the Company which will state the results of their review using Agreed-Upon procedures substantially similar to the procedures set forth in Annex 4 to the Terms and Conditions as to the Company's compliance with the MFC provisions with respect to Novated Contract(s). The Auditor's report shall not contain any confidential information relating to the Company or any of its customers. The Company shall promptly provide a copy of such Auditor's report to the Customer upon the Customer's written request, together with a list of the service order numbers of the Contracts reviewed in such audit.

(vii) <u>Customer Request for Second Stage Audit</u>: Within 30 days after issuance of the Auditor's report pursuant to paragraph (vi), the Customer may request that a second stage of the external audit be conducted by the Auditor with respect to all or a portion of the Customer's Novated Contracts, <u>provided</u> that such Contracts were not covered by the initial audit conducted with respect to such audit year. Such Customer's request for a second stage audit shall be in writing.

21

One second stage audit shall be conducted in accordance with the provisions of this Part I – Section 9, promptly after the expiration of the 30 day period following the issuance of the Auditor's report, with respect to the applicable Contracts of all customers requesting such second stage audit, if any.

The Auditor shall report its findings in a second written report to the Company which will state the results of their review using the Agreed-Upon procedures referred to above as to the Company's compliance with the MFC provisions with respect to such Contracts. The second Auditor's report shall not contain any confidential information relating to the Company or any of its customers. The Company shall promptly provide a copy of such second Auditor's report to each customer that has requested such second stage audit.

If pursuant to such second stage audit the Company is found to be in material compliance with its MFC obligations with respect to the applicable Contracts, the Customer shall pay its portion of the expenses of such audit, based on the number of Contracts reviewed by the Auditor at the Customer's request. If pursuant to such second stage audit, the Company is found not to be in material compliance with its MFC obligations with respect to the applicable Contracts, the Customer shall not have to pay for the expenses of such second stage audit.

(c)    Binding Result: If an external audit under Part I – Section 9.4 (b) (vii) determines that the Company is in material compliance with its MFC obligations under this Agreement, such determination will be final and binding.

(d)    Remedy for Failure to Comply with MFC: If the Company is found not to be in material compliance with its MFC obligations under this Part I – Section 9, either pursuant to an external or internal audit, the Company shall offer the Customer modifications to the applicable Novated Contract(s) that cause the Company to come into material compliance with this Agreement, such offering to be made in accordance with paragraph (e). If the Customer accepts such offer, the Company shall credit any applicable overcharge to the Customer's payment obligations under the applicable Novated Contract(s), together with interest on such amount of overcharge, calculated as set forth below, plus an additional amount equal to 20% of the sum of the amount of such overcharge plus interest. Any applicable credit due to the

Attachment 2, Part I

Customer will be calculated based on the date that the Customer would have received the benefit of the modified contract price had the Company's non-compliance with the MFC provisions not occurred, provided that, unless such non-compliance was determined pursuant to a second stage audit, the retroactive effect of such credits will be limited to the beginning of the year under audit. Interest shall be calculated on such credit amount as if such amount was borrowed by the Company on the applicable date(s) the Customer would have received the benefit of the modified contract price, and was repaid on the date such credit is made and bore interest at the London Interbank Offered Rate for overnight funds denominated in U.S. dollars in effect during such period.

This Part I – Section 9.4 shall be the Customer's sole remedy in the event that the Company fails to comply with its MFC obligations under this Part I – Section 9. In no event shall the Company's failure to comply with Part I – Section 9.4(d) entitle the Customer to terminate the underlying Novated Contracts.

(e)    Notice:  If an audit (internal or external) determines that the Company did not offer a Like-Terms Offer in accordance with this Part I – Section 9, the Company shall notify the Customer of its Like-Terms Offer no later than 45 days after such determination, in the case of an internal review, or 45 days after the issuance of the Auditor's report, in the case of an external audit. Within 45 calendar days after the Company has sent its Like-terms Offer, the Customer shall notify the Company in writing if it accepts the Like-Terms Offer. If the Customer accepts such offer, the Company will effect the adjustments to the applicable Novated Contracts and any applicable credit in accordance with paragraph (d) within 45 days after the Company has received the Customer's acceptance of the offer. If the Customer does not provide the Company with a written response within 45 calendar days after the Company has sent its Like-Terms Offer, the offer will lapse and the Company will have no further obligation to the Customer with respect to the audit findings.

9.5    LCO.

Novated Contracts which are LCO Service Contracts as identified in Attachment 3 to the Novation Agreement are not eligible for the MFC provisions in this Novation Agreement; all other Novated Contracts are eligible for such MFC provisions.

23

Attachment 2, Part I

**10.    CONVERSION OF SERVICES**

10.1    <u>Facilitation of Transitioning to a Full Circuit/Service Basis</u>.

(a)    If the Customer desires to amend any Novated Contract hereunder that was undertaken on a half-circuit basis to a full circuit/service basis, the Company agrees to use its best efforts to facilitate the orderly transitioning of the services provided under such Contract.

(b)    The efforts of the Company to facilitate such an orderly transition will be undertaken in accordance with three basic principles:

(i)    all half-circuit transitions are optional and must be voluntarily initiated by the party responsible for the identified commitments related to the identified half-circuits;

(ii)    all half-circuit transitions are subject to the agreement of all involved participants, including the correspondents for the applicable service; and

(iii)    the full financial value to the Company of the commitments associated with the circuits being transitioned must be preserved.

(c)    The Company agrees to identify and undertake a range of appropriate mechanisms for facilitating this orderly transition. The mechanism for achieving the goal of an orderly transition for a given service or set of services would be subject to the agreement of all parties involved in any given transaction. The mechanisms will include as appropriate, among others, the following:

(i)    transfer to a "self-matching" or single circuit/service basis for a given set of services and related commitments;

(ii)    assistance with "swapping" or "matching" of existing half-circuits;

(iii)    reasonable efforts to identify service providers, including existing and new customers, interested in the transition of half-circuit services; and

(iv)    contractual arrangements for the assignment, transfer or novation of existing half-circuit services among customers and the Company on the terms and conditions agreed among the applicable participants.

Attachment 2, Part I

10.2    Leases.

    (a)    For lease services with multiple Participants (as defined in Part II – A), the Company would undertake, in accordance with the principles set forth in Part I – Section 10.1(b), to assist customers, at their request, with the transition to a single customer/lease service utilizing the mechanisms available within these Terms and Conditions for lease services, i.e., the ability of Committing Participants (as defined in Part II – A) to advise the Company of their mutual agreement regarding their respective shares of a given lease and the Company's related ability to release Participants from their existing commitment obligation when such an action is deemed to be in the interests of the Company's system.

    (b)    If, in order to facilitate an orderly transition of lease services, the Committing Participants voluntarily reached agreement pertaining to such a release, the Company would agree not to unreasonably withhold or delay its agreement to such a release.

## 11.    INTELLECTUAL PROPERTY

### 11.1    Intelsat Intellectual Property.

The Company represents and warrants that it has the right to use the Intelsat Technical Standards including the patents, trade secrets and copyrights embodied therein (but excluding any trademarks, servicemarks or tradenames) (collectively referred to as the "Company Intellectual Property").

### 11.2    License to Intelsat Intellectual Property.

The Company hereby grants the Customer the non–exclusive right to use the Company Intellectual Property solely to the extent reasonably necessary in order to use the services provided pursuant to the Novated Contracts in accordance with the Terms and Conditions.  The license granted herein shall include the Customer's right to sublicense to any entities with which the Customer has contracted for down-stream use of services provided under Novated Contracts ("Relevant Entities") the right to use such Company Intellectual Property solely to the extent reasonably necessary for such Relevant Entity to use such services in accordance with the Terms and Conditions.  Any such sublicense shall be no greater in scope than the license granted herein.  The license granted by this Section 11.2 is contingent on the Customer (including the Relevant Entities) protecting the Company's rights in the Company Intellectual Property, including monitoring and enforcing the terms of use on the Relevant Entities.  Without limitation of the Customer's obligations under Part I – Section 7.1(a), the Customer agrees to comply with all applicable

Attachment 2, Part I

export and re-export laws and regulations in connection with the transfer, delivery or disclosure of any of the Company Intellectual Property. Except for the limited rights granted by this Part I – Section 11, all rights to the Intelsat Technical Standards shall remain the property of the Company; the Customer will not have, and shall not provide to the Relevant Entities, any other right of use unless otherwise expressly mutually agreed by the Company and the Customer in writing signed by duly authorized representatives of each such Party.

11.3    Remedies.

Without limiting of any other remedies available hereunder or otherwise available under applicable law, in the event the Customer breaches the provisions of this Part I – Section 11, the Company shall be entitled to seek equitable (including injunctive) relief relating to such breach in any court having jurisdiction over the parties.

## 12.    TERMINATION OR SUSPENSION OF SERVICE

12.1    Termination or Suspension by the Company for Cause.

(a)    Subject to Part I – Section 12.3 below, the Company reserves the right to terminate or suspend any services provided to Customer under any applicable Novated Contract for cause due to the Customer's breach of the material terms of this Agreement in respect of such Novated Contract, including, but not limited to, Customer's non-payment of amounts due hereunder and/or Customer's non-compliance with applicable Intelsat Technical Standards, if (i) the Company has provided the Customer with notice of such breach and the Customer has not within the thirty (30) day period following the date the Company has given such notice cured such breach to the Company's satisfaction or (ii) in the case of non-payment of charges for services, if such charges are (A) sixty (60) days past due, in the case of services billed on a quarterly in arrears billing cycle, (B) forty-five (45) days past due, in the case of services billed on a monthly in arrears billing cycle, and (C) five (5) days, past due, in the case of services billed on a quarterly or monthly in advance billing cycle; provided that such time period shall not begin to run if an amount is being disputed in accordance with Part I – Section 5.3(b) hereof until the earlier of the settlement of such dispute or the expiration of the sixty–day period referred to in such Section.  For purposes of this Part I – Section 12.1(b), "NPV" shall be calculated as set forth in Part II – A – Section 2.6(a).

(b)    Subject to the limitations set forth further below in this paragraph (b), in the event of a breach of this Agreement by the Customer

relating to non-payment of charges for services, the Company shall be entitled to terminate or suspend some or all of the Customer's Novated Contracts pursuant hereto. The maximum number of Novated Contracts which may be terminated or suspended by the Company for non-payment shall be limited by reference to the amount past due from the Customer expressed as a percentage of the total amount that was due from the Customer during the applicable billing period (the "Default Percentage"), as set forth below. The Company shall terminate Novated Contracts in the following order: terminate the Customer's Novated Contract with the most recent start of service date until the sum of the NPV of such terminated Novated Contracts divided by the NPV of all the Customer's Novated Contracts equals or approximates the Default Percentage. In the event that any amount remains past due on a date more than six months after the due date applicable to such amount, the Company may terminate or suspend Novated Contracts representing up to 100% of the NPV of all of the Customer's Novated Contracts as of such date, terminating the Novated Contract with the most recent start of service date prior to terminating any other Novated Contract. In the event of any other breach of this Agreement by the Customer, which has not been cured after the period specified in paragraph (a) above, the Company shall be entitled to terminate or suspend the applicable Novated Contract to which such breach relates. Any notice of termination or suspension shall state the Novated Contract(s) being terminated or suspended, the effective date of termination or suspension and the circumstances giving rise to termination or suspension. For purposes of this Part I – Section 12.1(b), "NPV" shall be calculated as set forth in Part II – A – Section 2.6(a).

(c)    In the event of any suspension by the Company of service under any Novated Contract pursuant to Part I – Section 12.1(b), (i) the Company may, after the applicable default has been cured, reinstate the applicable service, provided that the Company provides no assurances regarding the Company's ability to reinstate Satellite Capacity to the Customer if the applicable account is subsequently made current, and (ii) during the period which any such service is so suspended, the Customer shall not be entitled to the MFC protections under Part I – Section 9 hereof with respect to any of its Novated Contracts.

(d)    In the event of any termination by the Company of any Novated Contract pursuant to Part I – Section 12.1(b), the Customer will be liable for the entire balance that would have been due under the scheduled duration of the Novated Contract, except in the case of Novated Contracts for preemptible lease service, in which case the

applicable cancellation charges shall apply as set forth in Part II – A – Section 4.5.

(e)    The Company shall not be obligated to activate new service for the Customer if the Customer has unpaid balances for charges that are (A) more than thirty (30) days past due, in the case of services billed on a quarterly or monthly in arrears billing cycle, (B) unpaid after the applicable due date, in the case of services billed on a quarterly in advance billing cycle, and (C) more than five (5) days past due, in the case of services billed on a monthly in advance billing cycle.

12.2    Retention of Funds.

The Company may, at its discretion, retain deposits or other sums paid by the Customer and apply such amounts to compensate for any damages caused to the Company by the breach (other than damages which the Company is not entitled to claim pursuant to Part I – Section 13).  Any retention of Customer's funds shall not preclude the Company from making additional claims for compensation or from receiving such other damages that may be available at law or equity.

12.3    Default Under Multiple Customer Novated Contracts.

Provided that the Company has provided the Customer with notice and the right to cure as provided in Part I – Section 12.1, prior to any termination of a Novated Contract for non-payment pursuant to Part I – Section 12.1, the Company shall notify the defaulting Customer's correspondent(s) on such Novated Contract, if any, including, in the case of lease services, any other applicable Committing Participants (as defined in Part II – A) with respect to such Novated Contract, of such default.  Following such notice, any of the applicable correspondents shall have the right to cure such default within fifteen (15) days of receipt of such notice.  If the applicable correspondent(s) do so cure such default within such fifteen (15) day period and agree to assume the full liability for the balance of all payments due under such Novated Contract, the Company shall be deemed to accept the assignment of the defaulting Customer's Novated Contract to the applicable correspondent(s).  If such assignment occurs as a result of a default, the defaulting Customer also shall be deemed to have agreed to such assignment and all rights of the defaulting Customer under such Novated Contract shall be terminated at the time of the assignment of the Novated Contract to the correspondent(s) who cured the default.

**13.    LIMITATION OF LIABILITY**

13.1    No Liability.

Except as otherwise provided in Part I – Section 8 ("Service Interruption/Outage Credits; Assignment of Alternative Capacity") above, the Company shall not be liable for, and Customer shall hold the Company harmless from, any claim asserted by or any loss, damage, liability or expense sustained by any person or entity by reason of an interruption in the availability of the allotted capacity, regardless of the cause of the interruption.

13.2    Indemnity.

The Customer shall indemnify and hold the Company harmless from any loss, damage, liability or expense including all costs and expenses paid or incurred in disputing and/or defending against any of the following:

(a)    Libel, slander, invasion of privacy, or infringement of copyright arising from the use by the Customer or its customers of the allotted capacity;

(b)    Infringements of patents arising from (i) combining with, or using in connection with the allotted capacity, apparatus and systems of a Customer, its users, customers, contractors, lessees or assignees; or (ii) use by the Customer or its users, customers, contractors, lessees or assignees of the allotted capacity in a manner not contemplated by the Company and over which the Company exercises no control; and

(c)    Any act or omission of the Customer, its users, customers, contractors, lessees, agents, assignees, or employees in connection with the use of allotted capacity.

13.3    No Liability for Indirect Damages.

IN NO EVENT SHALL EITHER THE COMPANY OR THE CUSTOMER BE LIABLE FOR ANY INDIRECT, SPECIAL, PUNITIVE, INCIDENTAL OR CONSEQUENTIAL DAMAGES ARISING OUT OF OR UNDER THIS AGREEMENT WHETHER UNDER CONTRACT, WARRANTY, OR TORT OR OTHERWISE, INCLUDING LOSS OF REVENUE OR PROFITS, REGARDLESS OF THE FORESEEABILITY OF SUCH DAMAGES. Nothing in this Agreement shall exclude or limit the liability of the Customer or the Company for death or personal injury resulting from such party's own negligence in any jurisdiction where, as a matter of law, such liability cannot be excluded or limited.

14.    **ASSIGNMENT**

Neither this Agreement, nor any of the rights, duties, or obligations of the Customer or the Company hereunder may be assigned or delegated by the Customer or the Company without the prior written consent of the Company or the Customer, as the case may be (which consent shall not be unreasonably withheld or delayed), provided that no such consent shall be required for any such assignment or delegation to an entity that, as a result of a merger, consolidation, corporate reorganization or other similar transaction becomes a legal successor in interest to the Company or the Customer, as the case may be. If consent is required pursuant to the preceding sentence, any attempted assignment or delegation without such consent shall be void and without effect. The foregoing shall not be construed to prohibit the Customer from using its allotted capacity under any Novated Contract to provide service to third parties, subject to the terms of this Agreement.

15.    **CONFIDENTIALITY**

15.1    Confidentiality Obligation

The Company and the Customer hereby agree that it may be necessary to the performance of this Agreement for either the Company or the Customer (the "Disclosing Party") to disclose to the other (the "Receiving Party") certain information that the Disclosing Party deems to be confidential and proprietary. The Receiving Party shall maintain the security and confidentiality of all Confidential Information (as defined below) received from the Disclosing Party hereunder, except:

(a)    as part of its normal reporting or review procedure to regulatory agencies, its parent company, its auditors and its attorneys; provided that the party making such disclosure to any such regulatory agency shall seek confidential treatment of such information to the extent possible; and, provided, further, that any other third party to whom disclosure is made agrees to the confidential treatment of such information;

(b)    in order to enforce its rights and perform its obligations pursuant to this Agreement;

(c)    to the extent necessary to obtain appropriate insurance, to its insurance agent; provided that such agent agrees to the confidential treatment of such information; and

(d)    to the extent necessary to negotiate clauses that will be common to all service contracts.

15.2    Confidential Information

For purposes hereof "Confidential Information" shall include technical information, customer lists and other business information or data relating to the Disclosing Party, its affiliates or other representatives that is reduced to writing and marked "Confidential" or with a similar designation by the Disclosing Party. Notwithstanding anything contained herein to the contrary, Confidential Information shall not include (i) information developed independently by the Receiving Party or lawfully received from a third party not under an obligation of confidentiality; or (ii) information in the public domain; or (iii) information disclosed pursuant to law, judicial order or governmental regulation.

**16.    GOVERNING LAW**

These Terms and Conditions shall be governed by the laws of the District of Columbia.

**17.    DISPUTE RESOLUTION**

The Customer and the Company agree to endeavor to settle all disputes, controversies or claims arising under this Agreement, or in connection with services provided pursuant to this Agreement, within sixty (60) days, or such longer period as may be mutually agreed upon, from the date that either party has given written notice of the existence of such dispute, controversy or claim to the other. If within such time the Customer and the Company have not been able to reach a settlement, either party may submit the dispute, controversy or claim for settlement by arbitration in accordance with the Rules of Arbitration of the International Chamber of Commerce in effect on the date of the Agreement before a panel of three arbitrators designated pursuant to those rules and the decision shall be binding on the Customer and the Company. The place of arbitration shall be Paris, France, unless otherwise mutually agreed by the Company and the Customer. Any party to this Agreement may seek from a court of the District of Columbia or a United States Federal Court sitting in the District of Columbia any interim relief, including injunctive relief or confirmation of any arbitral award rendered in whole or in part. This Section shall not limit the rights of any party to obtain execution of judgment or to seek injunctive relief or specific performance in aid of such an award from a court of the District of Columbia or a United States Federal Court sitting in the District of Columbia.

**18.    NOTICES**

Any notices, reports and other communications in connection with this Agreement shall be in writing and shall be given by any two (2) of the

following methods: hand, fax, international courier (such as TNT, DHL or Federal Express) or certified or registered mail to the fax number or address set forth in Schedule 1 to the Novation Agreement for such purpose.

Any such notice, report, or communication will be deemed to have been received on the calendar day following the transmission of the notice by fax, the day that it is delivered to the applicable address by hand or international courier or fifteen (15) calendar days after it has been dispatched by certified or registered mail.

Each of the Company and the Customer agrees to keep this information current at all times and to notify the other party promptly of any changes to the pertinent information related to invoicing, billing, utilization of the allotted capacity and general communications.

19.    **FORCE MAJEURE**

Except as set forth in Part I – Section 7.1, with respect to the Customer, neither the Company nor the Customer shall be liable for failure to perform under this Agreement due to any act, event or cause beyond its reasonable control ("Force Majeure Event") including, but not limited to:

(a)    acts of God, peril of the sea, accident of navigation, war, terrorism, riot, insurrection, civil commotion, national emergency (whether in fact or by law), martial law, fire, lightning, flood, cyclone, earthquake, landslide, storm or other adverse weather conditions, explosion, power shortage, strike or other labor difficulty (whether or not involving the Company's or the Customer's employees), epidemic, quarantine, radiation or radioactive contamination;

(b)    in the case of the Company, any action or inaction of any government or other competent authority (including any court of competent jurisdiction), including expropriation, restraint, prohibition, intervention, requisition, requirement, direction or embargo by legislation, regulation, decree or other legally enforceable order, or refusal to grant or revoke a license if such refusal is not occasioned by the failure of the Company to apply therefor, prosecute applications as necessary or to comply with applicable law or regulation; and

(c)    externally caused  transmission interference or satellite failure, or satellite launch failure or delay, or satellite malfunction.

The Customer's rights in the event of certain government actions are set forth in Part I – Section 7.1.

Attachment 2, Part I

19.2    Certain Obligations.

In the event that a Force Majeure Event exceeds thirty (30) consecutive days, then following such thirty (30) day period, the Customer and the Company shall meet and negotiate the continuation, suspension, termination, restructuring or other disposition of this Agreement. Upon removal or cessation of the Force Majeure Event, all obligations under this Agreement shall resume.

20.    **WARRANTY**

Except as expressly set forth in the Intelsat Technical Standards, the Company makes no warranty, express or implied, regarding the performance of the service, and specifically disclaims any warranty of merchantability or fitness for a particular purpose.

21.    **WAIVERS**

A waiver by the Company or the Customer of any of the terms and conditions of this Agreement in any instance shall not be deemed or construed to be a waiver of such term or condition for the future, or of any subsequent breach thereof.

22.    **RIGHTS CUMULATIVE; INVALIDITY**

All rights and remedies conferred hereunder or otherwise shall be cumulative and may be exercised individually or concurrently. Failure by the Company or the Customer to enforce any of their respective rights hereunder shall not be deemed a waiver of future enforcement of such right or any other rights. If any provision of this Agreement is held to be invalid, it shall not affect any other provision of this Agreement.

PART II.    SERVICE–SPECIFIC TERMS AND CONDITIONS

A.    TERMS AND CONDITIONS FOR LEASE SERVICES

    1.    APPLICABILITY

The terms and conditions in this Part II – A are applicable to the following services under Novated Contracts:

(a)    Full-time non-preemptible transponder lease services and Full-time preemptible transponder lease services; and

(b)    Guaranteed Reservations ("GR") for leases for which the start date occurs after the Closing Date and First Refusal Rights ("FRR") which have not been converted into GRs as of the Closing Date including a request for GRs and FRRs in queue as of the Closing Date.

The Customer may order new lease services after the Closing Date with the consent of the Company and upon mutually agreed terms and conditions. Except as expressly provided for herein, nothing in this Part II – A entitles the Customer to order new leases or to place GRs or FRRs for new lease services after the Closing Date other than with the consent of the Company and upon mutually agreed terms and conditions.

    2.    GENERAL TERMS AND CONDITIONS FOR LEASE SERVICES

The following general terms and conditions apply to all lease services.

    2.1    Definitions.

(a)    "Allotments" shall mean the Company's Satellites Capacity provided via the Space Segment that is allocated for a Customer's use.

(b)    "Committing Participant" shall mean a customer who participates in the lease and bears ultimate responsibility for payment of the lease up to such customer's specific commitment share level in the event of default under the lease.

(c)    "Non-committing Participant" shall mean a customer who participates in a lease and agrees to pay such customer's billing share (which may be zero) of the applicable charges but who does not agree to bear ultimate responsibility for payment of the lease in the event of a default by any other Participant under the lease.

(d)    "Non-preemptible service" shall mean service for which restoration and continuity of service is given priority in accordance

with Part I – Section 6 hereof ("Service Restoration/Priority of Services"). The status of a lease service as "non-preemptible" is established at the time that the Customer's service order is accepted by the Company. A "non-preemptible" service may only be interrupted as set forth in Part I – Section 6 ("Service Restoration/Priority of Services").

(e)    "Participant" shall mean any customer that participates in a lease either on a "Committing" or "Non-committing" basis.

(f)    "Preemptible service" shall mean service in which the current status of the service can be discontinued, temporarily or permanently and in whole or in part, in favor of one or more services of a higher priority as determined by the Company in accordance with Part I – Section 6 hereof ("Service Restoration/ Priority of Services"). The status of a lease service as "preemptible" is established at the time that the Customer's service order is accepted by the Company.

2.2    <u>Use of Allotments by Participants.</u>

(a)    One or more Participants may request and commit to pay for a lease allotment or the lease term. The lease may be used by Non-committing Participants, as long as there is prior agreement by all of the Committing Participants.

(b)    Committing Participants must unanimously advise the Company prior to the start of a lease (or guaranteed reservation) how to divide their respective shares of the commitment and the ultimate liability for payment between them in case of default or terminate service prior to lease expiration. The commitment shares and the division of ultimate liability will remain fixed for the duration of the lease.

(c)    In exceptional circumstances, the Company may release a Participant or group of Participants from a commitment obligation if all the Committing Participants and the Company wish to terminate the commitment. The Company would release the Committing Participants only if it were clearly considered to be in the best interest of the Company's system as a whole.

(d)    If the Company determines that subdividing an existing lease or grouping two or more leases together may better serve overall system efficiency, the Company may recommend such a fragmentation or consolidation to the Participants. Although Participants would be allowed to benefit from lower charges resulting from consolidations, a lease fragmentation proposed by

the Company would not impose higher space segment charges on any Participant for the duration of the lease term.

(e)     Requests to upgrade, subdivide or consolidate a lease may be made by the Committing Participants acting jointly. Approval by the Company is subject to the Company's determination that the proposed changes preserve overall system efficiency and do not diminish the overall financial benefit to the Company.

2.3     Start of Service.

Following transmission plan and earth station approval by the Company, service may commence on the start date approved by the Company.

2.4     Billing.

Part I – Section 5 of these Terms and Conditions ("Applicable Charges and Payment Terms") applies to lease services provided under this Agreement. In addition, the following billing terms apply:

(a)     Unless otherwise specified by the Company or as otherwise provided for herein, charges are payable on a quarterly basis from the approved commencement date through the termination date of the current commitment period.

(b)     For an allotment with more than one Participant, all lease Participants (i.e., both Committing and Non-committing) and the Company must jointly agree to a billing arrangement. The billing arrangement does not have to be related to the Customers' agreed commitment arrangements.

(c)     If billing arrangements need to be revised, the Company must be advised in advance. Updates will be effective from the first day of the calendar quarter following notification to the Company. Updates to billing arrangements must be submitted jointly by all Participants and agreed by the Company.

(d)     If there is no agreement among Participants regarding billing arrangements, the Committing Participants will be responsible for all payment obligations, including any outstanding interest charges, in proportion to the Committing Participants' respective shares of the commitment.

(e)     The Committing Participants are ultimately responsible, in proportion to their share of the commitment, for payment of the lease charges. In the case of a default in payment by one or more Non-committing Participants, the Committing Participants will remain liable for all payment obligations and outstanding interest