

# Report 1 – Country profiles

**Supply of services in monitoring of South East Europe - telecommunications services sector and related aspects**

**August 26, 2005**

# Table of Contents

I.    ALBANIA ................................................................................................................................ 1
   A.   Legislative Process and Overview of the Relevant Institutions ............................ 1
      1.    Legislative process .............................................................................................. 1
      2.    Overview of the relevant institutions ................................................................. 2
   B.   Basic Legislation ......................................................................................................... 7
      1.    Primary legislation .............................................................................................. 7
      2.    Secondary legislation .......................................................................................... 8
   C.   Status and Recent Developments on Key Telecommunications Issues ................ 9
      1.    Introduction ......................................................................................................... 9
      2.    Licensing Regime ............................................................................................... 10
      3.    Privatization Status ........................................................................................... 11
      4.    Interconnection .................................................................................................. 12
   D.   Summary ...................................................................................................................... 13

II.   BOSNIA AND HERZEGOVINA ....................................................................................... 14
   A.   Legislative process and overview of the relevant institutions ........................... 14
      1.    Legislative process ............................................................................................ 14
      2.    Judicial process ................................................................................................. 15
      3.    Overview of the relevant institutions ............................................................... 15
      4.    Ministry of Communications and Transport (MCT). ...................................... 16
      5.    Article 3 of BiH Communications Law ............................................................ 17
      6.    Communications Regulatory Agency (RAK). ................................................. 18
      7.    RAK Procedural provisions ............................................................................. 19
   B.   Main legal instruments .............................................................................................. 20
      1.    Primary legislation ............................................................................................ 20
      2.    Secondary legislation ........................................................................................ 20
   C.   Status and recent developments on key communications issues ........................ 21
      1.    Introduction ....................................................................................................... 21
      2.    Licensing / liberalisation / market access issues ........................................... 21
      3.    Competitive safeguards, including SMP designation, carrier selection, number portability, accounting separation ............................................................................................................................. 23
      4.    Interconnection .................................................................................................. 23
      5.    Local loop unbundling and broadband developments ................................... 23
      6.    Universal service developments ....................................................................... 23
      7.    Other developments ........................................................................................... 23
   D.   Summary ...................................................................................................................... 24

III.  BULGARIA ........................................................................................................................ 25
   A.   Legislative process and overview of the relevant institutions ........................... 25
      1.    Legislative process ............................................................................................ 25
      2.    Overview of the relevant institutions ............................................................... 25
   B.   Basic legislation ......................................................................................................... 30
      1.    Primary legislation ............................................................................................ 30
      2.    Secondary legislation ........................................................................................ 31
   C.   Status and recent developments on key telecommunications issues.................. 33
      1.    Introduction ....................................................................................................... 33
      2.    Licensing / liberalisation / market access issues ........................................... 33
      3.    Competitive safeguards, including SMP designation, carrier selection, number portability, accounting separation ............................................................................................................................. 35
      4.    Interconnection .................................................................................................. 36
      5.    Local loop unbundling and broadband developments ................................... 37
      6.    Universal service developments ....................................................................... 37
      7.    Other developments (including privatisation) ................................................ 38
   D.   Summary ...................................................................................................................... 39

IV.   CROATIA........................................................................................................................... 40
   A.   Legislative process and overview of the relevant institutions ........................... 40
      1.    Legislative process ............................................................................................ 40
      2.    Overview of the relevant institutions ............................................................... 40
      3.    The Croatian Agency for Telecommunications.............................................. 42
   B.   Main legal instruments .............................................................................................. 45
      1.    Primary legislation ............................................................................................ 45
      2.    Secondary legislation ........................................................................................ 47

C.  STATUS AND RECENT DEVELOPMENTS ON KEY TELECOMMUNICATIONS ISSUES...................................49
  1.  Introduction .............................................................................................................49
  2.  Licensing / liberalisation / market access issues .................................................49
  3.  Competitive safeguards, including SMP designation, carrier selection, number portability, accounting
  separation ..........................................................................................................................52
  4.  Interconnection ..........................................................................................................53
  5.  Local loop unbundling and broadband developments ..........................................53
  6.  Retail price regulations .............................................................................................54
  7.  Universal service developments ...............................................................................54
  8.  Other developments (including privatisation) ........................................................54
D.  SUMMARY ...............................................................................................................................55
V.  ROMANIA ...........................................................................................................................56
  A.  LEGISLATIVE PROCESS AND OVERVIEW OF THE RELEVANT INSTITUTIONS ........................56
    1.  Legislative process ....................................................................................................56
    2.  Overview of the relevant institutions .......................................................................56
  B.  MAIN LEGAL INSTRUMENTS ...................................................................................................58
    1.  Primary legislation ...................................................................................................58
    2.  Secondary legislation ...............................................................................................60
  C.  STATUS AND RECENT DEVELOPMENTS ON KEY TELECOMMUNICATIONS ISSUES...................................61
    1.  Introduction ...............................................................................................................61
    2.  Licensing / liberalisation / market access issues .................................................61
    3.  Competitive safeguards, including SMP designation, carrier selection, number portability, accounting
    separation ..........................................................................................................................63
    4.  Interconnection ..........................................................................................................64
    5.  Local loop unbundling and broadband developments ..........................................65
    6.  Retail price regulations .............................................................................................65
    7.  Universal service developments ...............................................................................65
    8.  Other developments (including privatisation) ........................................................66
  D.  SUMMARY ...............................................................................................................................67
VI.  SERBIA AND MONTENEGRO / MONTENEGRO ...................................................68
  A.  LEGISLATIVE PROCESS AND OVERVIEW OF THE RELEVANT INSTITUTIONS ........................68
    1.  Legislative Process ....................................................................................................68
    2.  Overview of the Relevant Institutions .......................................................................69
  B.  MAIN LEGAL INSTRUMENTS ...................................................................................................73
    1.  Primary legislation ...................................................................................................73
    2.  Secondary Legislation ...............................................................................................74
  C.  STATUS AND RECENT DEVELOPMENTS ON KEY ISSUES .........................................................76
    1.  Licensing / Liberalization / Market Access Issues .................................................76
    2.  Interconnection ..........................................................................................................78
    3.  Tariff regulations ......................................................................................................79
    4.  Universal Service ......................................................................................................80
    5.  Consumer protection .................................................................................................80
    6.  Public pay phone services ........................................................................................81
    7.  Internet Services ........................................................................................................81
  D.  SUMMARY ...............................................................................................................................82
VII.  SERBIA AND MONTENEGRO / SERBIA ..................................................................83
  A.  LEGISLATIVE PROCESS AND OVERVIEW OF THE RELEVANT INSTITUTIONS...................................83
    1.  INTRODUCTION .......................................................................................................83
    2.  Legislative process ....................................................................................................83
    3.  Overview of the relevant institutions .......................................................................84
  B.  BASIC LEGISLATION...............................................................................................................92
  C.  STATUS AND RECENT DEVELOPMENT OF TELECOMMUNICATIONS .......................................93
    1.  Introduction ...............................................................................................................93
    2.  Description of telecommunications market ..............................................................93
    3.  Conclusion .................................................................................................................95
  D.  SUMMARY ...............................................................................................................................97
VIII.  SERBIA AND MONTENEGRO / KOSOVO .................................................................98
  A.  LEGISLATIVE PROCESS AND OVERVIEW OF THE RELEVANT INSTITUTIONS .........................98
    1.  Introduction ...............................................................................................................98
    2.  Sharing of responsibilities between UNMIK and national institutions ...................99
    3.  Legislative process ....................................................................................................99
    4.  Overview of the relevant institutions .....................................................................100

B.   MAIN LEGAL INSTRUMENTS ............................................................................................... 103
  1.   Primary legislation ............................................................................................................... 103
  2.   Secondary legislation ........................................................................................................... 104
C.   STATUS AND CURRENT DEVELOPMENTS ON KEY TELECOMMUNICATION ISSUES ........................ 104
  1.   Introduction .......................................................................................................................... 104
  2.   Licensing/liberalization/market access issues ...................................................................... 105
  3.   Competitive safeguards, including SMP designation, carrier selection, number portability, accounting
  separation .................................................................................................................................... 106
  4.   Interconnection ..................................................................................................................... 106
  5.   Local loop unbundling .......................................................................................................... 106
  6.   Universal Service .................................................................................................................. 107
D.   SUMMARY ................................................................................................................................ 108
IX.   THE FORMER YUGOSLAV REPUBLIC OF MACEDONIA ............................................... 109
A.   LEGISLATIVE PROCESS AND OVERVIEW OF THE RELEVANT INSTITUTIONS ................................... 109
  1.   Introduction .......................................................................................................................... 109
  2.   Legislative process ............................................................................................................... 109
  3.   Overview of the relevant institutions .................................................................................... 110
B.   MAIN LEGAL INSTRUMENTS ............................................................................................... 114
  1.   Primary legislation ............................................................................................................... 114
  2.   Secondary legislation ........................................................................................................... 115
C.   STATUS AND CURRENT DEVELOPMENTS ON KEY TELECOMMUNICATION ISSUES ........................ 116
  1.   Introduction .......................................................................................................................... 116
  2.   Licensing/liberalization/market access issues ...................................................................... 116
  3.   Competitive safeguards, including SMP designation, carrier selection, number portability, accounting
  separation .................................................................................................................................... 117
  4.   Interconnection ..................................................................................................................... 118
  5.   Local loop unbundling and broadband developments .......................................................... 118
  6.   Other developments (including privatization) ...................................................................... 118
D.   SUMMARY ................................................................................................................................ 120
X.   TURKEY ................................................................................................................................... 121
A.   LEGISLATIVE PROCESS AND OVERVIEW OF THE RELEVANT INSTITUTIONS ................................... 121
  1.   Legislative process ............................................................................................................... 121
  2.   Overview of the relevant institutions .................................................................................... 121
B.   BASIC LEGISLATION ................................................................................................................. 123
  1.   Primary legislation ............................................................................................................... 123
  2.   Secondary legislation ........................................................................................................... 123
C.   STATUS AND RECENT DEVELOPMENTS ON KEY TELECOMMUNICATIONS ISSUES .......................... 124
  1.   Licensing/liberalisation/market access issues ...................................................................... 124
  2.   Interconnection ..................................................................................................................... 125
  3.   Competitive safeguards including SMP designation, carrier selection, number portability, accounting
  separation .................................................................................................................................... 127
  4.   Local loop unbundling and broadband developments .......................................................... 127
  5.   Other developments (including privatisation) ...................................................................... 128
D.   SUMMARY ................................................................................................................................ 129

NB.   The reference date for the information in this report is April 1, 2005 except where otherwise noted.

**Contact information:**
Cullen International SA
Rue St. Jean 6
B-5000 Namur
jan.guettler@cullen-international.com / +32 (0) 81 257480
www.cullen-international.com

---

**The opinions expressed in this study are those of the authors and do not necessarily reflect the views of the European Commission.**

Report 1 - Country profiles - August 26, 2005

## I.    ALBANIA

### A.    Legislative Process and Overview of the Relevant Institutions

Albania is administratively divided in 12 Prefectures (Qarqet [Circles]) and 36 districts (Qytetet [cities]), plus the municipality of Tirana, which has the status of a district. Officially, there are 74 cities and 2,980 villages (INSTAT, 2002). The total surface area of Albania is 28,748 square km.

According to estimates and the 2001 census (INSTAT 2002), Albania had a population of 3,069,275 inhabitants, the economically active population was estimated as 1,320,280, the average national monthly salary was 16,594 Leks (133 euro) and 17,570 Leks (141 euro) in Tirana, and an illiteracy rate of 1.6% for the population over six years old. On January 1, 2004 the population was estimated to be 3,144,058 inhabitants.

### 1.    Legislative process

The central legislative institution in Albania is the Parliament. This institution selects the President of the Republic and approves the Government. Laws are proposed to Parliament by the Government, by members of Parliament, or by a group of 20,000 electors. Laws are approved by Parliament and decreed by the President.

There are three levels of legislation in Albania:

- Primary: laws passed by the Parliament and decreed by the President

- Secondary: Government decisions, based on primary legislation

- Tertiary: regulations and orders issued by ministries and agencies, based on primary and secondary legislation.

The preparation of primary legislation begins in ministries. Depending on the sector, the ministry in charge prepares a proposal. The draft may then be discussed in other relevant institutions affected by the proposed law; suggestions from other institutions may be considered. The final draft is presented in a meeting of the Council of Ministers, which may approve it. Approved drafts are passed to the Parliament, otherwise it is sent back to be modified.

The members of parliament are grouped in several commissions covering the main fields of the State's activity. Commissions covering the affected sector discuss the draft and the Law Commission approves the draft. Finally, the draft may be returned to the Government, or forwarded to a Parliamentary plenary session for approval. Approved drafts are sent to the President of the Republic to be formally decreed. Decreed laws are published in the Official Gazette. The Centre for Official Publications has recently opened a website[1] where laws are published online.

Based on the legislation approved by the Parliament, the government prepares the second level of legislation, i.e. government decisions where details are elaborated for the application of Parliamentary laws. Government decisions are also published in the Official Gazette.

---

[1] http://www.qpz.gov.al/

Report 1 - Country profiles - August 26, 2005

Ministries and other government agencies also prepare their decisions. Depending on the case, joint decisions may be prepared to define implementation details of higher-level legislation.

## 2. Overview of the relevant institutions

The institutional structure in Albania is shown in Figure 1 below and is discussed in the following paragraphs.



**Figure 1 – Main institutions in the Albanian telecommunications regulatory framework**

Report 1 - Country profiles - August 26, 2005

*a)    Ministry of Transports and Telecommunications*

The Ministry's responsibilities are defined in the <u>Presidential Decree</u>[2] No. 3259 of February 15, 2002. The Ministry's responsibilities are "*preparation and implementation of objectives of Government's economic policy for development of transport and telecommunication in all their components (infrastructure, equipment, operation etc.) in national and international scale*".

The Ministry is responsible for two sectors: "transport" and "posts and telecommunications". Within the Ministry, the General Directorate of Posts-Telecommunications deals with postal and telecommunications services.

*b)    General Directorate of Posts-telecommunications*

This Directorate's activities are defined by Laws No. 8618 of June 14, 2000 "For Telecommunications in the Republic of Albania" and No. 8530 of September 23, 1999 "For Postal Services in the Republic of Albania". In the field of telecommunications, the Directorate:

- Prepares and proposes policies and legislation for telecommunications development, and policies for the use of radiofrequency spectrum.

- Prepares and proposes the National Plan of Radiofrequency Use and works towards its harmonization with international policies on radiofrequency spectrum development. Follows-up implementation of responsibilities resulting from the National Plan of Radiofrequency Use by other institutions charged with the administration of the spectrum.

- Participates in the preparation of national policies for the development of information technologies and implementation of action plans to realise the objectives of these policies.

- Acts as an Appeal Body for complaints coming from telecommunication operators against decisions made by the Telecommunications Regulations Entity for modification, suspension or cancellation of licences and proposes related decisions to the Minister.

- Prepares and proposes regulations and directives in accordance with Article 57 of Law No. 8618 of June 14, 2000. This article authorizes the Ministry to prepare directives and regulations for different telecommunications issues.

- Coordinates national and international activities of sea to shore radio communications.

- Supports activities of radio-amateurs.

- Collects and processes data from public telecommunication operators and prepares studies on the status of telecommunications and prognosis for the future.

- Follows-up on the implementation of obligations in the telecommunications sector resulting from bilateral and multilateral agreements, conventions and protocols to which the Republic of Albania adheres.

*c)    Telecommunications Regulations Entity (TRE)*

The TRE's status is defined by Article 8 and 9 of Law No. 8618 of June 14, 2000 "On Telecommunications in the Republic of Albania" as being the "*telecommunications regulatory*

---

[2] http://www.mtt.gov.al/

*institution that monitors the regulatory framework defined by this law and by development policies prepared by Council of Ministers*". The TRE:

- Promotes the development of the telecommunications sector, applying licensing procedures in accordance with this law.

- Issues licences in accordance with the law and monitors the compliance with the licence conditions.

- Regulates the interconnection of telecommunication networks.

- Controls the quality of services offered by operators and requires the quality to match defined standards.

- Ensures that competition between telecommunication operators follows the principles of transparency, non-discrimination and fairness.

- Prepares and approves the national numbering plan and monitors its implementation by operators.

- Protects the interests of telecommunications services users from dishonest practices by the operators.

- Verifies the conformity of imported telecommunications equipment and performs type approval for equipment produced in Albania.

- Prepares and approves the technical conditions and standards for telecommunications networks according to international recommendations.

- Defines radiofrequencies for every civil user, except radio-television operators, issues the necessary licences; ensures the elimination of interference, identifies infractions of the regulation and eliminates abusive use of radiofrequencies.

- Monitors how tariffs offered by public telecommunication operators conform to the legal requirements.

The TRE's decisions are published in the TRE's Bulletin.

The TRE is headed by a board of five people appointed by the Parliament following a proposal from the Council of Ministers. Members of the board have mandates for five years and cannot be appointed more than twice. The TRE presents an annual report of its work to the Council of Ministers and Parliament.

The status of the TRE is that of a "public non-budgetary (i.e. self-financing) organization". The TRE's financing comes from licence fees. This income is used for TRE's own expenses and any excess is transferred to the State budget.

*d)    The National Council for Radio-Television*

The National Council for Radio-Television was created by Law No. 8410 of September 30, 1998. The Council has the following responsibilities:

- Follow up the application of legislation related to mass media.

Report 1 - Country profiles - August 26, 2005

- Monitor information programmes broadcast by national, and in certain cases local, radio-television operators.

- Define regulations, and issue licences and frequencies, for radio-television operators.

- Guarantee competition in the radio-television broadcasting sector.

- Participate in the preparation of development strategies for radio-television.

- Propose legislation and regulations according to technological, economic, social and cultural development in the radio-television broadcasting sector.

- Control the quality of radio-television signals in collaboration with the TRE.

The Council is composed of seven people elected by the Parliament for a mandate of 5 years, but they cannot have more than two consecutive mandates.

*e)   National Competition Authority*

The National Competition Authority was created by Law No. 9121, of July 28, 2003 "On Protection of Competition". This authority is composed of a five member Commission appointed by the Parliament, similarly to the Supreme Court Judges, and a secretariat for the authority's operational activities. The same Law gives authority to the Tirana District Law Court to apply competition rules.

The National Competition Authority concentrates strictly on anti-trust issues. Other issues are subject to the Albanian Civil Code.

*f)   State Audit*

The Constitution defines the State Audit (High State Control) as the highest institution of economic and financial control (Article 162). The State Audit supervises the State's institutions and other legal entities belonging to the State.

The Head of the High State Control is appointed and dismissed by the Parliament following a proposal from the President of the Republic, for a mandate of 7 years, with the right of re-election. The Head of the High State Control has the immunity of a member of the High Court.

*g)   The Law Court*

The Constitution defines that judicial power is exercised by the High Court, as well as the courts of appeal and courts of first instance, which are established by law (Art. 135). The members of the High Court are appointed by the President of the Republic with the consent of the Parliament, with mandates of 9 years without the right of reappointment. Other judges are appointed by the President of the Republic upon the proposal of the High Council of Justice (the High Council of Justice consists of the President of the Republic, the Chairman of the High Court, the Minister of Justice, other members elected by the Parliament and the National Judicial Conference).

In the framework of telecommunications, the role of the Law Courts is to deal with issues not solved by other relevant institutions. Affected parties may appeal against decisions made by the Government and its agencies. Depending on the case, appeals may be addressed to the institution

that takes decisions, to its parent institution, and in some cases in a Law Court. Appeal procedures are defined in respective legislation.

*h)      Development Strategies and Policies*

Development strategies are prepared by relevant institutions and approved by the Council of Ministers.

The Policy for the Development of Telecommunications in the Republic of Albania was prepared by the Ministry of Transports and Telecommunications and approved by a decision of the Council of Ministers No. 288, June 18, 1999. This decision and related documents were subsequently modified by the following decisions by the Council of Ministers No. 311 of July 5, 1999, No. 615 of November 2, 2001, No. 692 of December 27, 2002 and No. 464 of July 3, 2003. The main topics in the policy document include:

- General Framework: a description of the situation and the Government's objectives.

- Mid-Term Objectives: an increase of penetration by 15% for fixed telephony in 2005, extension of access in rural areas, opening of telecommunication services to the private sector, improvement of the Quality of Service (QoS), regulation of tariffs towards real costs, stimulation of new services, implementation in practice of EU directives.

- Structure of Telecommunications Market: transformation of the market structure through gradual privatization and liberalization.

- Privatization: selling of AMC and Albtelecom. For Albtelecom the objective was to privatize it in 2001.

- Liberalization: data transmission, Internet access (including VSAT), value added services, and rural telephony have been liberalized. International telephony services will be open to competition in 2005.

- Rural Areas: Albtelecom must achieve a point of access in each commune with at least 4 lines by the end of 2001, to have 5% of subscribers in rural areas and at least 2 Mbps access for each commune by the end of 2004, rural operators will be licensed "first come first served" and must ensure at least 1 line per 100 inhabitants.

- Mobile Telephony Services: privatization of AMC and licensing of new operators.

- Policy for Public Services Licences: classification of licences, distinguishing limited competition and full competition.

- Private Networks: considered for full competition.

- Interconnection: principles for objectives and interconnection procedures.

- Regulation of Tariffs: description of principles to be used for the definition of the tariffs applied by Albtelecom as the public operator in order to have a regulatory role in the market. In particular, the role of upper limits for tariffs is described.

- Numbering: TRE has the responsibility for the development of numbering plans and has to consider the portability of numbers in the future.

Report 1 - Country profiles - August 26, 2005

- Management of Frequencies: the role of TRE and National Council of RTV, effective use of frequencies especially for public mobile services.

- Legislation: role and content of legislation. Creation of a Consultative Council for Telecommunications.

The National Strategy for Development of ICT and related Road Map was prepared by UNDP with the participation of local and foreign experts, and approved by the Council of Ministers in 2003. The document considers:

- Institutionalizing the role of the government as an ICT champion, through the creation of a government body with a permanent administrative Information Policy Unit under the Minister of State, charged with the coordination and monitoring of the implementation of this strategy and related policies. Creation of such a body is also required by the eSEEurope Agenda signed by countries of South-East Europe including Albania.

- Creation of a permanent ICT business forum, with members from the private sector, the academic community, the government, business associations, donors, and others. Its role would be to define appropriate measures for the ICT sector in partnership with all actors.

Despite the existence of these documents, their implementation has been delayed, in particular the privatization of Albtelecom and the implementation of the ICT strategy.

## B.    Basic Legislation

### 1.    Primary legislation

The primary legislation related to telecommunications is described in following table.

| MEASURE | SUBJECT |
|---|---|
| Law No. 8044, December 7, 1995 "On competition" | The Law defines that no association or operator in a free market can have a dominant position and not allowed to own more than 40% of the market of its activity sector. The law on telecommunications, however, defines that an operator cannot get more than 25% of the telecommunications market, otherwise it may be considered as dominant. |
| Law No. 8287, February 18, 1998 "For some changes in the Law No. 8038, November 23, 1995 'For telecommunications in Republic of Albania'" | The Law defines full competition for important services such as rural telecommunications, Internet and data transmission. |
| Law No. 8506, March 14, 1998 "On the Privatization of Strategic Sectors of the Economy" | The Law defines guidelines for privatizing public enterprises and introducing competition in fields considered important such as telecommunications. Albtelecom holds an exclusive right to provide international and long distance voice telephony services and local telephony services in urban areas over its fixed network until December 31, 2002. |
| Law No. 8410, September 30, 1998 "On Public and Private Radio and Television in the Republic of Albania" | The Law regulates the content of radio and television broadcasts. It creates the institution of National Council for Radio-Television and defines modalities for election of its members. This Council is responsible for licensing radio and television operators, as well as managing the frequencies dedicated to broadcasting. |

Report 1 - Country profiles - August 26, 2005

| MEASURE | SUBJECT |
|---------|---------|
| Law No. 8502, June 30, 1999 "For information rights on official documents" | The Law regulates the right of information on official documents. According to this law, each person has the right to ask for information about official documents, when dealing with state government activities. |
| Law No. 8517, July 22, 1999 "On the protection of personal data" | The Law guarantees the protection and legitimate use of personal data and their treatment by public authorities. |
| Law No. 8618, June 14, 2000 "On Telecommunications in Republic of Albania" | The Law was drafted with the assistance of the EBRD, implements the 1999 policy and sets the minimum standards for the sector, including radio frequency allocation and payments for licences. This law also lays the foundation for the liberalization of the sector in 2003 and brings the country's laws more in line with EU and WTO telecommunications norms. |
| Law No. 9121, July 28, 2003 "On the Protection of Competition" | The Law re-defines policies and procedures for the protection of competition. On February 26, 2004, in compliance with this Law, the Albanian Parliament concluded the procedures for the election of the members and nomination of the head of the Competition Commission. |

**Table 1 – Primary legislation**

## 2.    Secondary legislation

The main Government decisions related to telecommunications are described as follows:

| MEASURE | SUBJECT |
|---------|---------|
| Decision No. 601, October 2, 1995 | For a Developing Strategy of the Albanian Telecommunications |
| Decision No. 217, January 4, 1996 | For approving the organizational structure of the State Department of Posts and Telecommunications (DSHPT) |
| Decision No. 446, June 24, 1996 | For approving the Development Administrative Program and procedures in the Telecommunications Field |
| Decision No. 288, June 18, 1999 | For the approval of development policy document of telecommunication sector in the Republic of Albania |
| Decision No. 379, May 31, 2001 | National Frequencies Plan |
| Decision No. 465, July 19, 2001 | For the methodology of regulation of tariffs of public telecommunications operator Albtelecom Ltd. |
| Decision No. 615, November 2, 2001 | For some additions and changes to Decision No. 288 of June 18, 1999 of the Council of Ministers for the approval of the document on telecommunications development policies in the Republic of Albania, changed by Decision No. 311 of July 5, 1999 of the Council of Ministers |
| Decision No. 692, December 27, 2002 | For some changes to Decision No. 288 of June 18, 1999 of the Council of Ministers for the approval of the document on telecommunications development policies in the Republic of Albania |
| Decision No. 464, July 3, 2003 | For some changes to Decision No. 288 of June 18, 1999 of Council of Ministers for the approval of the document on telecommunications development policies in the Republic of Albania |
| Decision No. 582, August 21, 2003 | For the approval of the methodology for regulation of tariffs of organizations with significant market power that offer fixed public telephony services and leased lines. |

Report 1 - Country profiles - August 26, 2005

| MEASURE | SUBJECT |
|---|---|
| Decision No. 169, March 30, 2004 | For some changes to Decision No. 582 of August 21; 2003 for the approval of the methodology for the regulation of tariffs of organizations with significant market power that offer fixed public telephony services and leased lines. |

**Table 2 –Secondary legislation**

## C.    Status and Recent Developments on Key Telecommunications Issues

### 1.    Introduction

Until 1990, the telecommunications network in Albania was based on analogue switches and the network had a penetration rate of about 3%. During the 1990's development of telecommunications accelerated and:

- automatic calling to/from abroad was enabled;

- digital switches were installed;

- optical backbone was built;

- last mile network was extended;

- two mobile operators were created.

As a result, the number of subscriptions for Albtelecom increased by up to 35% per year, reaching 7.7% at the end of 2003. By year end 2004, the number of fixed lines has reached 274,557 with an 8.8% penetration rate. About 94% of subscribers are residents[3]. Considering the number of families in 2004 as 744,038[4], the household penetration is about 35%. Nevertheless, Albtelecom had difficulties in responding to demand from potential subscribers and at the end of 2003, there were 86,000 pending requests.

The first mobile operator was AMC, created in 1995 as a State owned company. In 2000, 85% of its shares were sold to the Cosmote+Telenor consortium. Until 2001, AMC only provided subscriptions with contracts. In 2001, the second operator, Vodafone, was licensed. Together with AMC, they started to supply prepaid cards and this opened the market for ordinary people and attained one million subscriptions in 2003 (32% in 2003). In 2004, a third mobile licence was given to Albtelecom, which created a subsidiary - "Eagle" but has not started to operate yet (May 2005). By the beginning of 2005, mobile penetration had reached 39%.

The data transmission market is not very developed, due to a lack of large enterprises. Leased lines are mainly used by banks for data transmission. Such services are offered by Albtelecom, mobile operators and six other private companies licensed for data transmission. Private networks are used by many companies, especially for mobile wireless communication. There is a private company that has a licence to install optical fibres in Tirana, using Albtelecom's conduits. More services were liberalized with the new Telecommunications Law in 2000.

---

[3] http://www.mtt.gov.al
[4] Instat estimate

Report 1 - Country profiles - August 26, 2005

Internet services were liberalized in 1998 and there are actually several ISPs operating in Albania, mainly in Tirana. In 2004, there were only three ISPs with international connectivity of 12 Mbps. In a report[5] issued by the Ministry of Transport and Telecommunications in December 2003 the number of Internet users is evaluated as being 6 times the number of Internet subscriptions (30,000 users for 4,470 subscriptions (data from 50% of ISPs only). An evaluation of 18,000 Internet subscriptions in 2004 is found in a draft-report by the UNDP/ICTD for eSEE, which leads to the conclusion that the potential number of Internet users would be about 100,000. In the same report, the penetration of Internet in private and public organizations is over 80%. In 2002, there were 40 Internet cafes with an average usage of 2,500 person-hours/day). The Government has ordered all ministries and its agencies to have a website. Albtelecom offers unlimited dial-up Internet access, is experimenting with ADSL technology, and it has a licence to be an Internet backbone operator.

In rural areas, there are 46 active telecommunications operators, with a combined total of 34,185 lines for a rural population of 1,744,000 inhabitants. Penetration of Albtelecom in rural areas is much lower, but Albtelecom has access in all communes. The mobile service covers over 80% of the territory (2/3 of the territory of Albania are mountains).

The biggest problems for telecommunications in Albania are a low QoS and high prices, especially in the leased lines market.

## 2.    Licensing Regime

Licensing of telecommunication activities is performed by the Telecommunications Regulations Entity (TRE). In the case of broadcasting, this responsibility is delegated to the National Council for Radio-Television (NCRT).

Licences issued by TRE are divided in two classes:

- Individual Licences:

    - Class I: national public telephone services. Their number is decided by the Council of Ministers.

    - Class II: rural public telephone services, paging, global personal mobile communication and all other services that use frequency spectrum.

- General Licences: Internet access, data transmission, value added services, public payphone or prepaid cards services, and all other services not mentioned in classes I and II of individual licences. TRE drafts technical requirements and documentation a subject must have in order to apply for a general licence. Different requirements are applied for different services.

Tariffs for the main types of licences are given in the following table (Council of Ministers decision No. 75 of February 6, 2003)

---

[5] http://www.mtt.gov.al

Report 1 - Country profiles - August 26, 2005

| TYPE OF LICENCE | FEE | FREQUENCY |
|---|---|---|
| Public Telecommunications Operators | | |
| Permanent public telephonic service | 7 million Lek (56,180 euro) | yearly |
| Mobile terrestrial public telephonic service | 7 million Lek (56,180 euro) | yearly |
| Permanent public telephonic service in rural area | 20,000 Lek (160 euro) per commune | yearly |
| Internet Service Providers | | |
| PoP | 25,000 Lek (200 euro) | yearly |
| Local ISP | 75,000 Lek (600 euro) | yearly |
| Regional ISP | 150,000 Lek (1,200 euro) | yearly |
| National ISP | 200,000 Lek (1,600 euro) | yearly |
| Backbone ISP | 2 million Lek (16,050 euro) | yearly |
| Mobile Public Radio-communication Service | | |
| Paging local | 30,000 Lek (240 euro) | yearly |
| Paging regional | 75,000 Lek  (600 euro) | yearly |
| Paging national | 150,000 Lek (1,200 euro) | yearly |
| Mobile telephony GSM | 100,000 Lek (800 euro) | yearly |
| Mobile telephony GMPCS | 2,000 USD (1,600 euro) | yearly |
| Satellite Service | | |
| Fixed terrestrial station | 150,000 Lek (1,200 euro) | yearly |
| VSAT | 15,000 Lek (120 euro) per terminal | yearly |
| Mobile satellite terminal | 5,000 Lek (40 euro) | yearly |
| Mobile terrestrial station (SNG) | 1,000 - 5,000 USD (800-4,000 euro) | 1-12 weeks |
| Data Transmission Service | | |
| Data transmission local | 75,000 Lek (600 euro) | yearly |
| Data transmission regional | 150,000 Lek (1,200 euro) | yearly |
| Data transmission national | 200,000 Lek (1,600 euro) | yearly |
| Radio-Relay | | |
| One way point-to-point | 25,000 Lek/link (200 euro) | yearly |
| Two way point-to-point | 75,000 Lek/link  (600 euro) | yearly |
| Two way point-to-multipoint | 50,000 Lek/link (400 euro) | yearly |

**Table 3 –Licensing fees**


**3.     Privatization Status**

*a)     Fixed Telephony*

The only State-owned national fixed voice telephony operator is Albtelecom. This company has had exclusive rights for the provision of urban and international telephony services. Albtelecom's monopoly has to end in 2005, but there is still no apparent movement from the Government in the direction of liberalizing urban telephony services.

Privatization of Albtelecom was scheduled to take place in 2001, but it failed. To improve the situation of the company, licences for Internet national backbone and for mobile telephony (Eagle Mobile) were given and the procedures were repeated in 2004-2005, aiming to sell 76% of its shares.

Report 1 - Country profiles - August 26, 2005

*b)    Mobile Telephony*

The first licence was given to AMC. When created, it was State owned. In 2000, the State sold 85% of its shares to the Cosmote+Telenor consortium.

The second licence was given to a consortium of Vodafone International (51% of shares) and Vodafone-Panafon (49% of shares) in 2001.

The third licence was given to Eagle Mobile, a subsidiary of Albtelecom and going to be sold as a package with the latter. This new operator has not started the service yet.

## 4.    Interconnection

Interconnection is forced by legislation, particularly for operators with significant market power. In Albania, the main operator requested to provide interconnection is Albtelecom - it owns fixed telephony infrastructure and international optical fibre links. Other operators with significant market power are AMC and Vodafone that are interconnected with Albtelecom.

Report 1 - Country profiles - August 26, 2005

**D.    Summary**

| Albania | |
|---|---|
| **Topic** | **Status** |
| National Regulatory Entity | • Telecommunications Regulations Entity (TRE)<br>• Appointment by Parliament<br>• 14 professional staff for regulatory tasks<br>• Financed primarily from frequency fees and licensing fees<br>• Not covering broadcasting frequencies<br>• Not responsible for Cable TV<br>• Not responsible for solving commercial disputes |
| Market Access | • Mostly liberalised framework, not yet competitive market for fixed telephony<br>• Individual licences required for telephony networks and services<br>• Individual authorisation – general licence for ISPs<br>• VoIP unregulated<br>• Individual licences required for Cable TV |
| Competitive safeguards | • Carrier selection and pre-selection not yet decided<br>• Number portability not yet decided<br>• One fixed and two mobile operators with SMP designation<br>• Reference interconnection offer not available<br>• Reference unbundling offer not decided |
| Universal service | • Universal service requirements in law – to be completed with secondary legislation<br>• No USO cost recovery scheme |
| Telephony – Market structure | • Albtelecom incumbent operator – national level  - 100% state owned<br>• 51 small rural operators / 20% market share<br>• Three 2G mobile operators / no 3G / no service providers<br>• Public radio local area networks active<br>• Fixed penetration 11.6, digitalisation 97.6, party lines 0.17<br>• Mobile penetration 39.0 |
| Telephony – Retail tariffs | • Tariffs not yet rebalanced – Residential access: 3.42[6], Business access: 8.24<br>• Local calls – low range – no low tariff package<br>• National long distance calls – high range<br>• International long distance calls – medium range |
| Telephony – Wholesale tariffs | • Interconnection charges fixed network – low range<br>• Interconnection charges mobile network – high range |
| Internet and broadband | • Internet penetration 1.28%<br>• Internet dial-up cost – medium range<br>• xDSL lines – information not available<br>• Number of broadband connections – information not available<br>• 17 national ISPs |

---

[6] For an explanation of this indicator, see Report 1 – Country Comparative Report, Chapter III.G.4 on Access charges

## II.    BOSNIA AND HERZEGOVINA

### A.    Legislative process and overview of the relevant institutions

### 1.    Legislative process

Bosnia and Herzegovina has two first-order administrative entities (Federation of Bosnia and Herzegovina, and Republika Srpske) and one internationally supervised district (Brcko District). Hence, the legal system – though based upon civil law – has many elements.

The Parliamentary Assembly has two chambers: the House of Peoples and the House of Representatives.

The House of Peoples comprises 15 Delegates, two-thirds from the Federation (including five Croats and five Bosniacs) and one-third from the Republika Srpske (five Serbs).

- The designate Croat and Bosniac Delegates from the Federation are selected, respectively, by the Croat and Bosniac Delegates to the House of Peoples of the Federation. Delegates from the Republika Srpske are selected by the National Assembly of the Republika Srpske.

- Nine members of the House of Peoples comprise a quorum, provided that at least three Bosniac, three Croat, and three Serb Delegates are present.

The House of Representatives has 42 Members, two-thirds elected from the territory of the Federation and one-third from the territory of the Republika Srpske.

- Members of the House of Representatives are directly elected from their Entity in accordance with the election law adopted by the Parliamentary Assembly – for a period of 4 years.

- A majority of all members elected to the House of Representatives comprises a quorum.

The legislation requires the approval of both chambers. All decisions in both chambers are by a majority of those present and voting.

Decisions of the Parliamentary Assembly do not take effect before publication.

The Parliamentary Assembly has responsibility for:

- Enacting legislation as necessary to implement decisions of the Presidency or to carry out the responsibilities of the Assembly under this Constitution.

- Deciding upon the sources and amounts of revenues for the operations of the institutions of Bosnia and Herzegovina and international obligations of Bosnia and Herzegovina.

- Approving a budget for the institutions of Bosnia and Herzegovina.

- Deciding whether to consent to the ratification of treaties.

- Such other matters as are necessary to carry out its duties or as are assigned to it by mutual agreement of the Entities.

Bills can be submitted to Parliament by the Government or by Members of Parliament.

Report 1 - Country profiles - August 26, 2005

When the Government proposes a draft there is a pre-parliamentary procedure. Usually, the responsible ministry makes a first draft and then consults other relevant institutions (other ministries, government offices, agencies, companies affected by the law, the appropriate regulatory agency, and the Office of the High Representative (OHR[7])). There may also be public discussions. Some ministries cover the drafting process on their web pages.

After a draft has been prepared, the ministry sends it to the government for a decision. The Government may seek final revision before formally adopting the draft and sending it to Parliament.

The bill is first discussed by the relevant parliamentary committees and then proposed for a vote in plenary. Together with comments and recommendations made in the first plenary session, the bill is returned to the lead committee for additional drafting. The bill is then submitted for adoption in a second vote in plenary.

After Parliament has adopted an act, it is sent to the Presidency for ratification and signature. Once the Presidency has signed the act, it can be promulgated in the Official Gazette of the Republic of Bosnia and Herzegovina. The Presidency can also exercise the right to veto the act. In this case, it is returned to parliament for further consideration.

## 2.    Judicial process

The Bosnia and Herzegovina Constitutional Court (made up of nine members: four members are selected by the Bosniac/Croat Federation's House of Representatives, two members by the Republika Srpske's National Assembly, and three non-Bosnian members by the president of the European Court of Human Rights).

The Bosnia and Herzegovina State Court (made up of nine judges and three divisions - Administrative, Appellate and Criminal - having jurisdiction over cases related to State-level law and appellate jurisdiction over cases initiated in the entities; note - a War Crimes Chamber may be added at a future date).

NB.    The two Entities (The Federation of Bosnia and Herzegovina [FBiH], and Republika Srpske [RS]) each have a Supreme Court. Each Entity also has a number of lower courts; there are 10 cantonal courts in the Federation, plus a number of municipal courts; the Republika Srpske has five municipal courts.

## 3.    Overview of the relevant institutions

An overview of the institutional structure in Bosnia & Herzegovina is shown in Figure 2 and is discussed in the following paragraphs. Note that the Communications Regulatory Agency (RAK) is a State level institution and acts to implement appropriate policies enacted by the Council of Ministers and relevant and responsible ministries, and the Parliamentary Assembly. The two Entities also have their own Ministries of Communications, but they do not have power to regulate the telecommunications market. RAK consults with and advises these ministries - but does not act to implement any policy defined by them.

---

[7] OHR represents the views of the signatories of the Dayton Peace Agreement – 55 Countries including UN. The Office is a temporary institution)

Report 1 - Country profiles - August 26, 2005



**Figure 2 - Main institutions in the BiH telecommunications regulatory framework**

### 4.    Ministry of Communications and Transport (MCT)[8].

The Council of Ministers (CoM) has the overall responsibility for telecommunications policy and for preparing secondary legislation that implements the Communications Law. As defined by Article 2 of the Communications Law of 2002, the main government policy objectives and detailed actions to be expected for the telecommunications sector are:

- continuing development of the telecommunications sector and information communication technologies, in order to ensure provision of complete telecommunication services under competitive conditions and at a defined quality for all citizens of BiH,

- attracting investments in order to promote development of the sector,

- further development of the regulatory framework to ensure the competitive provision of services,

- the realisation of mechanisms that shall fulfil social policy requirements,

- the realisation of maximal benefit for the State and its citizens from the process of running a business and the privatisation of Telecommunications sector.

---

[8] Note that for those matters which are not the responsibility of MCT, then the CoM has the responsibility, on the basis of Article 3 of the Communications Law, to act through appropriate Ministries (MCT, Ministry of Finance)

Report 1 - Country profiles - August 26, 2005

**5.     Article 3 of BiH Communications Law**

The responsibilities of the Institutions of Bosnia and Herzegovina concerning Communications:

- In order to carry out the constitutional provisions for communications, the Council of Ministers shall be responsible for policy-making, and the Agency shall be responsible for the regulation.

- The Council of Ministers shall be responsible for:

  - Developing and adopting policy in line with existing legislation; and

  - Determining the representation of Bosnia and Herzegovina in international forums concerned with communications.

- The Agency shall be responsible for:

  - Regulating broadcasting and public telecommunications networks and services, including licensing, tariffs, interconnection, and defining the basic conditions for the provision of common and international communications facilities; and

  - Planning, co-ordinating, allocating and assigning the use of the radio frequency spectrum.

- The Council of Ministers and the Agency according to the respective responsibilities as set out in the Law shall take all reasonable measures that are aimed at achieving the following objectives:

  - The promotion of fair competition in order that users derive the maximum benefit in terms of choice, price and quality;

  - That there is no distortion or restriction of competition in the communications sector according to the Council of Ministers' sector policies;

  - That efficient investment in infrastructure is encouraged and innovation promoted;

  - That copyright and other intellectual property as well as personal data and privacy is protected;

  - That efficient use and effective management of radio frequencies and numbering resources are ensured in accordance with the radio regulations and other recommendations of the International Telecommunication Union and with other international agreements entered into by Bosnia and Herzegovina.

The current Policy for the telecommunications sector of Bosnia and Herzegovina was established progressively from 2000 until it was approved by the Council of Ministers in March 2002.

The Policy looked forward and established an action plan through to the end of 2005. The Plan has not been followed for several reasons but the following information gives the current situation:

Report 1 - Country profiles - August 26, 2005

| | Activity | Progress |
|---|---|---|
| 1 | Universal Service Obligation. Finance mechanism for USO | All fixed line Licences for the 3 main fixed line operators include the obligation. Financial operation of (any) compensation has yet to be determined. Note that the rapid rollout of GSM service required by the Licence coverage requirements (to ensure no ethnic bias), has effectively ensured universal service availability. |
| 2 | Start of telecommunications privatization process | Entity Governments started the process in 2002 and a percentage of each ex-State Telecommunications Operator (see elsewhere for amount) is now in private hands. |
| 3 | Liberalization of local regional and national voice services, telecommunication data transmission, Internet operators, network operators, cable television operators. | All enacted and in place by mid 2003. |
| 4 | International Voice Telephony | Service protected by exclusive rights until end 2005 |
| 5 | Liberalization of mobile telephony services | Three operators currently defined as the maximum. Two operators were licensed in 2002 with requirements to provide service over the whole territory. Third national Licence challenged in 2003, resolved and confirmed in 2005. |
| 6 | Adopt a mechanism for tariff balancing | Currently in consultation – target implementation end 2005 |

**Table 4 – Summary of policy document**

## 6.    Communications Regulatory Agency (RAK)

The Communications Law of BiH establishes the Agency as a functionally independent and a non-profit making institution with the status of a legal person under the laws of Bosnia and Herzegovina. The Agency shall carry out its duties according to the objectives and regulatory principles as enumerated in Articles 3 and 4 of this Law and the Council of Ministers' sector policies. In fulfilment of its duties, the Agency shall act in accordance with the principles of objectivity, transparency and non-discrimination. Members of the Agency's bodies, its officers and staff shall act in the interests of Bosnia and Herzegovina as a whole.

The bodies of the Agency are the Council of the Agency and the Director General.

Neither the Council of Ministers, nor individual Ministers nor any other person shall interfere in any way in the decision-making of the Agency in individual cases.

The duties of the Agency shall be:

- To promulgate rules on broadcasting and telecommunications, and ensure adherence thereto;

- To license broadcasters and telecommunications operators under the provisions of this Law, and monitor their compliance with licence conditions;

- To plan, manage, allocate and assign frequency spectrum and monitor the use of it as well as to maintain and publish a frequency usage plan for the whole territory of Bosnia and Herzegovina;

- To require the disclosure of such information as is necessary for the due performance of its regulatory obligations;

- To apply technical and quality standards, for example to ensure interconnection and functionality of public telecommunications networks and telecommunications services;

- To establish and maintain a technical licence fee system for both broadcasting and telecommunications; and

- Such other duties as are assigned to it under this Law or by the Council of Ministers.

## 7.   RAK Procedural provisions

### a)   Complaints

Notwithstanding the jurisdiction of civil courts, users or interested parties may refer complaints, in particular complaints about the quality of service that have not been satisfactorily resolved with the telecommunications operator to the Agency. The Agency shall endeavour to resolve the complaints within a reasonable period of time. All parties involved shall co-operate in this process and shall submit to the Agency all information and documentation required to assess the situation. The Agency may specify the types of complaints it will handle and the method used.

### b)   Enforcement Measures

In securing compliance with Agency codes of practice and rules, the Agency shall have enforcement authority in accordance with European regulatory practices.

If a telecommunications or broadcasting network or service is being operated without a licence, the Agency is empowered to take all necessary steps to stop the operation thereof.

The Agency shall have the authority to apply enforcement measures proportional to the violations in accordance with the following scale:

- Oral and written warnings;

- Inspection of licensed facilities;

- Concrete demands for action or cessation, to be complied with within a specified time limit;

- Assessment of a financial penalty not to exceed 150,000 KM (75,000 euro) in case of deliberate or negligent violation of individual provisions of the Law or of conditions specified in the licence or in the codes of practice and rules of the Agency. The level of the financial imposition shall be commensurate with the gravity of the infringement and, where applicable, with the gross financial benefits derived from the infringement. In case of repeated violations, the financial imposition may not exceed 300,000 KM (150,000 euro). The Agency shall devise a schedule of infractions and resulting penalties, which shall be adopted by the Council of Ministers;

- Orders to interrupt broadcasting or the provision of telecommunications services for a period not exceeding three (3) months;

- Revocation of a licence.

Upon request of the Agency, all law enforcement agencies in Bosnia and Herzegovina shall assist it in the enforcement of its decisions.

Report 1 - Country profiles - August 26, 2005

*c)    Appeals*

In deciding upon appeals against decisions made by the Director General, the Council of the Agency shall act according to the Law on Administrative Procedures of Bosnia and Herzegovina, and shall make a full review of the appealed decision.

Appeals against decisions made by the Director General shall not suspend the effectiveness thereof.

Decisions of the Council of the Agency shall be final and binding in administrative procedure. Legal review of the decision can be brought before the State Court of Bosnia and Herzegovina.

**B.    Main legal instruments**

**1.    Primary legislation**

| Measure | Subject |
|---|---|
| **Law on Communications** (Official Gazette of BiH, No. 33, November 12, 2002) No significant amendments since 2003. | Contents of the law - *inter alia*: General provisions Regulatory principles of Broadcasting and Telecommunications BiH Communications Regulatory Agency (RAK) Telecommunications infrastructure Telecommunications services Universal telecommunications services Protection of rights of users Market competition Addressing and numbering Broadcast services Radio frequency spectrum management Radio equipment and telecommunications terminal equipment Electromagnetic compatibility and the protection from interference Data protection Inspection supervision and control Penalty provisions Transitional and final provisions |

**Table 5 – Primary legislation**

**2.    Secondary legislation**

The table is a list of active secondary legislation.

Report 1 - Country profiles - August 26, 2005

| Measure | Subject |
|---|---|
| The decision of Telecommunications sector policy | Sector Policy in telecommunications |

**Table 6 – Secondary legislation**

## C.    Status and recent developments on key communications issues

### 1.    Introduction

As a signatory to a Roadmap agreement with the European Union, BiH has an obligation to align its legal and economic framework with that of the EU. Progress is being made toward the next step of the Stabilisation and Association agreement.

In November 2002 BiH adopted the new Communications Law. The Law is intended to transpose the 1998 *acquis*, the actual implementation has been slow and until recently there has been little real competition in fixed and mobile telephony markets.

This first report on BiH provides a general overview of the status of the communications market after the adoption of the new Law. Therefore, it covers a longer period than for the other countries and is intended to establish a base for further monitoring.

### 2.    Licensing / liberalisation / market access issues

*a)    Licensing regime*

The Communications Law of 2003 is based on the 1998 *acquis* and opens telecommunications networks and services to competition. The Law also includes certain elements of the 2003 *acquis*. For example, it brings all forms of electronic communications, under the same regulatory framework.

In accordance with the 1998 *acquis*, individual licences are required for the operation of communications networks, for example to provide telecommunications services or cable TV services. Individual licences are also required for the provision of public voice telephone services.

All other services may be provided on the basis of a general authorisation with a requirement to notify the Communications Regulatory Agency (RAK). For example, Internet Service Providers (ISPs) may operate under a general authorisation regime.

The table below summarises individual licence or notification requirements for provision of electronic communications networks and services in BiH (1 KM = € 0.50).

| Service | Authorisation | One-off fee |
|---|---|---|
| Fixed voice telephony | Individual licence | 70,000 KM (35,000 euro)/year for national level |
| Leased lines | Individual licence | Dependent upon capacity (64 Kbs to 34 Mbs) for national level |
| Fixed network services (infrastructure operator ) | Individual licence | Local, regional, and national Licences from 5,000 KM to 50,000 KM (2,500 to 25,000 euro)/year |

Report 1 - Country profiles - August 26, 2005

| Service | Authorisation | One-off fee |
|---|---|---|
| Private Mobile Radio (PMR) | Individual licence | 1,000-5,000 KM (500 to 2,500 euro)/year dependent upon coverage |
| Services using free radio spectrum | No licensing | |
| Mobile virtual network operations (MVNO) | None in place | |
| Cable TV - distribution | Individual licence | 1,500 KM (750 euro)/year |
| Internet Service Provision (ISP) | Notification | 4,000 KM (2,000 euro)/year |
| Multi-video conferencing | Notification | None yet issued |
| Value added services | Notification | 150 KM (75 euro)/phone number/year |
| Fixed point-to-multipoint radio network services | Notification | None issued yet |
| Fixed and mobile satellite services | Notification | No mobile satellite service licences issued |
| Voice over IP services | Notification | None issued yet |

**Table 7 - Licensing regime in BiH**

In addition to fees paid for appropriate Licence(s), the Treasury raises an annual levy from all operators who access the radio spectrum to provide service.

The legal basis for the licensing regime is set out in Article 44 of the Communications Law.

The funding of the Agency shall come from the following sources:

- Recurrent technical licence fees for the regulation and supervision of the telecommunications operators and broadcasters; and

- Grants or donations received by the Agency insofar as they are in conformity with general principles of law. When grants or donations are given for specific tasks or projects in the public interest, they shall be accounted for separately to the approved budget and not be included therein.

*b)    Fixed voice telephony*

Telekomunikacije BiH (BiHTEL, 90% owned by the Federation of BiH), Telekomunikacije Republika Srpske (TelekomRS, 90% owned by Republika Srpske), and Hrvatske Telekomunikacije Mostar (HT 63% owned by Federation of BiH) are the three incumbent operators with requirements to offer service over the whole of the country.

*c)    Mobile licences*

There are three mobile operators in BiH, all have requirements to cover the country:

- GSMBIH, part of Telekomunikacije BiH, with the same ownership structure,

- MOBI'S, part of Telekomunikacije Republika Srpske, with the same ownership structure

- HT Mostar, (Hrvatske Telekomunikacije Mostar) with HT-Eronet as the operating company.

**3.    Competitive safeguards, including SMP designation, carrier selection, number portability, accounting separation**

No operators have been designated as having SMP.

The RIO does not yet include any prices for carrier pre-selection.

Number portability has not yet been implemented for fixed or mobile networks.

Accounting separation is a legal requirement for SMP operators, but there has been no regulatory action or decision where this requirement has been enforced.

**4.    Interconnection**

*a)    Reference interconnection offer (RIO)*

Many discussions have taken place and drafts have been lodged for comment by the Agency but nothing formal has been confirmed.

In the second half of 2005, RAK will publish a RIO for Telecommunications market in BiH.

**5.    Local loop unbundling and broadband developments**

*a)    Reference unbundling offer*

No draft reference unbundling offer has been made publicly available.

This will be included in the second phase of the Interconnection rule implementation (it is planned in the second half of 2006)

**6.    Universal service developments**

The framework for universal service has been set out in the Communications Law of 2003 according to the EU 2003 *acquis*. There has been no particular regulatory action on universal service since the adoption of the Act.

**7.    Other developments**

The Model Rule for Tariff Rebalancing is in a public consultation procedure. It should be in place in the second half of 2005.

Report 1 - Country profiles - August 26, 2005

## D.    Summary

| Bosnia and Herzegovina | |
|---|---|
| **Topic** | **Status** |
| National Regulatory Authority | • Communications Regulatory Agency (CRA)<br>• Appointment by Parliament<br>• 11 professional staff for regulatory tasks<br>• Financed primarily from licensing fees (63%) and numbering fees (29%)<br>• Covering broadcasting frequencies<br>• Has the power to intervene in commercial disputes |
| Market Access | • Partly liberalised, international telephony will be opened January 1, 2006<br>• Individual licences required for telephony networks and services<br>• General class licence for ISPs<br>• VoIP not allowed<br>• Individual licences required for Cable TV |
| Competitive safeguards | • Carrier selection and pre-selection not yet decided<br>• Number portability not yet decided<br>• Three fixed operators with SMP designation<br>• Reference interconnection offer at drafting stage<br>• Reference unbundling offer legally required, not yet implemented |
| Universal service | • Scope of universal service broadly in line with the EU<br>• No USO cost recovery scheme |
| Telephony – Market structure | • Three incumbent operators – national level  - all majority owned by the State<br>• Incumbent operators 100% market share<br>• Three 2G mobile operators / no 3G / no service providers<br>• Public radio local area networks active<br>• Fixed penetration 24.7, digitalisation 89.9, party lines 8.6<br>• Mobile penetration 34.2 |
| Telephony - Retail tariffs | • Tariffs not yet rebalanced – Residential access: 2.69[9], Business access: 12.31<br>• Local calls – low range – no low tariff package (except for war victims)<br>• National long distance calls – 2 medium, 1 high range<br>• International long distance calls – 1 medium range, 2 high range |
| Telephony – Wholesale tariffs | • Interconnection rates not yet determined |
| Internet and broadband | • Internet penetration 6%<br>• Internet dial-up cost - medium range<br>• xDSL lines 0.02%. broadband connections 0.12%<br>• 3 national ISPs, 40 local ISPs, 42% market share by incumbents |

---

For an explanation of this indicator, see Report 1 – Country Comparative Report, Chapter III.G.4 on Access charges

Report 1 - Country profiles - August 26, 2005

## III.    BULGARIA

### A.    Legislative process and overview of the relevant institutions

### 1.    Legislative process

The Bulgarian legislative body is the National Assembly (Parliament). It consists of representatives of the Bulgarian people, directly elected every four years.

Bills can be submitted to the Parliament by the Government or by a certain minimum number of Members of the Parliament. The bill is first discussed by relevant committees and then proposed to be voted on in a plenary session of the Parliament. Together with comments and recommendations made in the first plenary session, the bill is returned to the lead committee for additional drafting. Then the bill is submitted for adoption in the second vote by the plenary.

After Parliament has adopted the act, it is sent to the President of the Republic for ratification. Once the President has signed the act, it can be promulgated in the State Gazette. The President can also use his veto and refuse to ratify the act. In this case, it is returned to the Parliament for further consideration.

### 2.    Overview of the relevant institutions

The institutional structure in Bulgaria is shown in Figure 3 below and is discussed in the following paragraphs.

Report 1 - Country profiles - August 26, 2005



**Figure 3 - Main institutions in the Bulgarian telecommunications regulatory framework**

## Ministry of Transport and Communications

The Ministry of Transport and Communications (MTC)[10] is responsible for overall telecommunications policy and for preparing secondary legislation ensuring the implementation of the Telecommunications Act. The main government policy objectives for the telecommunications sector are to:

- facilitate the development of modern, efficient and high quality services for residential and business users;

- ensure further liberalisation of the communications sector;

- develop the information society;

- harmonize the national legislation with the EU Regulatory Framework 2003;

- facilitate the development of the telecommunications infrastructure;

- ensure the efficient use of scarce resources;

- promote fair competition.

The Ministry holds one privilege stock of BTC share capital on behalf of the Bulgarian Government.

---

10  www.mtc.government.bg/indexe.htm

Report 1 - Country profiles - August 26, 2005

**Communications Regulation Commission**

The Communications Regulation Commission (CRC)[11] is the regulatory authority created in compliance with the Telecommunications Act. It is an independent State body with five Commissioners appointed for terms of five years. The Chairman of the CRC is appointed by the Prime Minister, three other Commissioners are appointed by the Parliament and one by the President.

Responsibilities of the CRC

The CRC oversees compliance with the Telecommunications Act and related secondary legislation. It is responsible for:

- granting licences for public telecommunications activities;

- frequency assignment and monitoring the use of radio spectrum for civil use;

- the national numbering plan and allocation of numbers and addresses;

- promotion of fair competition;

- tariff policy supervision;

- telecommunications and postal service quality standards and control;

- monitoring electromagnetic compatibility;

- resolving disputes related to interconnection agreements, leased lines, local loop unbundling, end-users' complaints, etc.

The CRC has considerable powers to request information and to inspect and audit business records of public telecommunications operators and other companies engaged in telecommunications. It is also empowered to impose administrative fines for breaches of the Act.

Organisation of the CRC

The table below shows the current organisation of the CRC.

| CHAIRMAN, DEPUTY CHAIRMAN AND THREE CRC MEMBERS |
|---|
| **CHIEF SECRETARY - GENERAL ADMINISTRATION** |
| I ADMINISTRATIVE AND ECONOMIC SERVICES DIRECTORATE |
| II FINANCIAL SERVICES, IT SERVICES AND HUMAN RESOURCES MANAGEMENT DIRECTORATE |
| **SPECIALISED ADMINISTRATION** |
| I COMMUNICATIONS CONTROL GENERAL DIRECTORATE |
| II LICENSING/AUTHORISATION AND FREQUENCY PLANNING DIRECTORATE |
| Registers and class licences |
| Strategic planning of radio spectrum and electromagnetic compatibility |

---

[11]  www.crc.bg/v1/eng/index.htm

Report 1 - Country profiles - August 26, 2005

| |
|---|
| Radio and TV broadcasting |
| Fixed radio services |
| Mobile networks and services |
| III TECHNICAL REGULATION AND ELECTRONIC SIGNATURES DIRECTORATE |
| National numbering plan and access to networks |
| Electronic signatures and telecommunications networks |
| IV MARKET REGULATION DIRECTORATE |
| Economic regulation in telecommunications |
| Research and strategic planning |
| Postal services regulation |
| V LEGAL REGULATION DIRECTORATE |
| Secondary legislation and legal support |
| Legal regulation and individual administrative acts |
| Court litigation and administrative penalties |
| VI INTERNATIONAL RELATIONS AND PROJECTS DIRECTORATE |

**Table 8 – Organisation of the CRC**

Funding of the CRC

The CRC is a self-supporting administration funded by:

- initial licence fees, issued following a tender;

- one-off licence fees for radio spectrum;

- annual fees for the use of radio spectrum;

- annual fees for use of numbering capacity;

- registration fees;

- penalties and sanctions as determined in the Telecommunications Act;

- interest rates, donations, revenues from administrative activities performed by CRC.

*a)    Council for National Radio Frequency Spectrum*

The Council for National Radio Frequency Spectrum (CNRFS), established under the Telecommunications Act, is an intra-governmental authority having representatives from CRC, Ministry of Transport and Communications, Ministry of Finance, Ministry of Economy, Ministry of Defence and Ministry of Interior. CNRFS drafts, updates and manages the national plan for radio frequency spectrum allocation[12].

---

[12]  www.crc.bg/v1/eng/cat145.htm

Report 1 - Country profiles - August 26, 2005

*b)    Electronic Media Council*

The Electronic Media Council (EMC) is an independent specialised authority, set up in compliance with the Radio and TV Act. It has nine members, five of them elected by the Parliament and four appointed by the President and the Council of Ministers for terms of six years. EMC's powers relate to the regulation of radio and TV activities.

*c)    National Competition Authority*

The Commission for the Protection of Competition (CPC)[13] was set up in 1991 to enforce the Competition Act and the State Aid Act. The CPC consists of a chairman, two deputy chairmen and members elected by Parliament for terms of five years.

The CPC is financed from the State budget.

*d)    Appeal body*

Acts, decisions, resolutions and orders of any kind of the MTC, CRC, CNRFS, EMC and CPC may be appealed before the Supreme Administrative Court in a two-stage proceeding.

---

[13]    www.cpc.bg/about-en.php

Report 1 - Country profiles - August 26, 2005

## B.    Basic legislation

### 1.    Primary legislation

| Measure | Subject |
|---|---|
| Telecommunications Act (St. G. No 88/2003) | General provisions |
| | State management of telecommunications activities |
| | Communications Regulation Commission |
| | Telecommunications operators |
| | Telecommunications activities |
| | Universal telecommunications service |
| | Access, Interconnection and leased lines |
| | End-users' interests protection |
| | Radio frequency spectrum and positions of the geo-stationary orbit |
| | Build and use of telecommunications infrastructure |
| | Ensuring telecommunications in crises, military events and other extreme circumstances |
| | Interception |
| | Confidentiality of communications, protection of privacy and personal data |
| | Radio equipment and terminal telecommunications equipment |
| | Prices and fees |
| | Control |
| | Administrative and penalty provisions |
| | Additional provisions |
| | Final and transitional provisions |
| Radio and Television Act (St. G. No 138/1998) | General provisions |
| | Council for Electronic Media |
| | Bulgarian national radio and television |
| | Advertisements, radio and TV market and sponsorship |
| | Funding of radio and TV activities |
| | Licensing and registration of radio and TV operators |
| | Administrative and penalty provisions |
| Act on the Protection of Competition (St. G. No 52/1998) | General part - general provisions, Commission for the Protection of Competition, |
| | Restriction of competition - prohibited agreements, decisions and concerted practices, monopolistic and dominant position, State intervention, concentration of business activities, unfair competition, |
| | Proceedings |
| | Liabilities and penalties |

Report 1 - Country profiles - August 26, 2005

| Measure | Subject |
|---------|---------|
| State Aid Act (St. G. No 28/2002) | General provisions |
| | Terms and methods for evaluation and control of state aid |
| | Powers of the Minister of Finance |
| | Administrative provisions |

**Table 9 – Primary legislation**

## 2.    Secondary legislation

| Measure | Subject |
|---------|---------|
| DECREE No 71 of 4 April 2004 on Adoption of Tariff of Fees Collectable by the Communications Regulation Commission – www.crc.bg/v1/files/en/1024.htm | Fees collected by the Communications Regulation Commission (CRC) |
| REGULATION 13 of 22 December 2003 on Specification of Telecommunication Activities Subject to Individual Licensing and Registration - www.crc.bg/v1/files/bg/1031.htm | Regulation is issued by the Minister of Transport and Communications who is entitled to specify which activities require an individual licence, which may be carried on under a general licence |
| Updated Sector Policy Paper, approved by the Council of Ministers www.mtc.government/en/Communications/Programs/SectorPolicy2004_Eng.htm | The Updated Sector Policy Paper of December 2004 set out the targets and main objectives relevant for the telecommunications sector in line with the Bulgarian accession to EC |
| REGULATION 12 of 5.05.2004 on the terms and the order for granting individual licences for provision of fixed voice telephone services www.crc.bg/v1/files/en/1151.htm  RULES for defining prices of fixed voice telephone services www.crc.bg/v2/files/bg/1105.htm | Specific definition and quality requirements for fixed voice telephone services;  Proceeding for granting individual licence;  Content of the individual licence  General provisions; Consumer basket Price cap formula |
| REGULATION 10 of 29.06.2004 on the terms and order for interconnection of telecommunications networks - www.crc.bg/v1/files/bg/1182.htm | Detailed provisions setting out the obligations for all PTOs where interconnecting their public networks and specific requirements for the SMP operators in fixed networks and fixed telephone services |

Report 1 - Country profiles - August 26, 2005

| | |
|---|---|
| REGULATION 15 of 2.09.2004 on the terms and the order for provision of universal telecommunications services its qualitative parameters<br><br>www.crc.bg/v1/files/en/1489.htm | Concrete provisions related to the set of elements of the USO;<br><br>Specific requirements for the designated US provider;<br><br>Quality parameters. |
| REGULATION 16 of 13.10.2004 on the rules for allocation and the proceedings for assignment of use, back up and revocation of numbers, addresses and names<br><br>www.crc.bg/v1/files/en/1528.htm | Ensure public and transparent procedure for allocation of numbers |
| REGULATION on the terms and proceedings for destruction or submission of possessions seized in favour of the State by virtue of the TA –<br><br>www.crc.bg/v1/files/en/1490.htm<br><br><br>METHODOLOGY on the terms and proceedings for designation of SMP operator -<br>www.crc.bg/v1/files/en/1186.htm | The CRC is entitled to destruct or submission of possessions seized in favour of the State by virtue of Chapter XVII of TA.<br><br>This METHODOLOGY is approved by the Council of Ministers in compliance with Art. 45, (1) of TA to define the criteria for assessment of relevant markets and designation of SMP operator. |
| METHODOLOGY for assessment of US price affordability<br><br>www.crc.bg/v1/files/bg/1565.htm | The METHODOLOGY is approved by the Council of Ministers, in compliance with Art. 99, (1) of TA<br><br>to set out the criteria for assessment of US price affordability . |
| RULES on evaluation of US net costs<br><br>www.crc.bg/v1/files/bg/1357.htm | The Rules prescribe the US operators:<br><br>- to define categories of end-users dependent to usage, social status, geographic location and tariff packages, healthcare and social institutions, disabled and<br><br>- fix the services, which costs have to be evaluated ;<br><br>- define a system for determining the amount of net costs. |
| General licence No 201 for carrying out telecommunications via public cable telecommunications network for distribution of radio and TV programmes and for provision of telecommunications services (St.G. No 2/2004)<br>www.crc.bg/v2/bul/cat246.htm | |

| | |
|---|---|
| General licence No 217 for carrying out telecommunications via public telecommunications network for data communications without using of scare resources and for provision of telecommunications services (St.G. No 2/2004) www.crc.bg/v2/bul/cat247.htm | |

**Table 10 – Secondary legislation**

**C.    Status and recent developments on key telecommunications issues**

**1.    Introduction**

Bulgaria is an accession country and the Treaty of Accession was signed in Luxembourg on April 25, 2005. This treaty paves the way for ratification procedures that will formalise its membership of the EU on January 1, 2007.

Behind this event are many years of effort for Bulgaria to satisfy all EU requirements. Final accession depends, at least in theory, on Bulgaria's ability to complete this process before the date of accession.

In the telecommunications sector, Bulgaria has completed its accession negotiations based on its implementation of the 1998 acquis. A new Telecommunications Act was adopted on October 7, 2003, which in most respects, represents a correct transposition of the 1998 acquis. Bulgaria must thus transpose the 2003 acquis over the next 18 months in order to meet these particular EU accession requirements.

**2.    Licensing / liberalisation / market access issues**

The Telecommunications Act of 1998 is based on the 1998 acquis and opens telecommunications networks and services to competition.

In accordance with the 1998 acquis, individual licences are required for fixed voice telephony services as well as leased lines, including international leased lines services. In addition, individual licences are required for the operation of services using individually assigned scarce resources, such as radio spectrum or numbers.

Other services can be provided under class licences. A non-exhaustive list of such services is provided below.

*a)    Fixed voice telephony*

On August 4, 2004 the Communications Regulation Commission (CRC) granted the following individual licences for the provision of fixed voice telephony through public telecommunications networks:

- Bulgaria Telecom Net (a shareholding partnership of Bulgarian cable-TV operators);

- Vestitel BG (a subsidiary of the private gas distribution company Overgaz AD);

- Spectar Net (Internet service provider);

- Telecom Partners Network (former subsidiary of Equant Bulgaria owned by France Télécom);

Report 1 - Country profiles - August 26, 2005

- Trans Telecom (a subsidiary of the oil distribution company Petrol AD).

On the same date, four licences were granted for the provision of fixed voice telephone services through carrier selection:

- Gold Telecom Bulgaria (Internet service provider);

- Vestitel BG;

- Spectar Net;

- Trans Telecom.

On January 26, 2005 Mobiltel (M-Tel) was granted an individual licence for the provision of telecommunications and fixed voice telephone services over a public fixed telecommunications network. The licence has a duration of 20 years. One of the licence conditions is that Mobiltel transfers the licence to a separate legal entity 100% owned by Mobiltel.

*b)     Mobile licences*

**Mobile telephony**

Bulgaria has licensed three GSM operators:

- Mobiltel (in the process of being taken over by Telekom Austria);

- COSMO Bulgaria Mobile (100% owned subsidiary of OTE in Greece);

- Bulgarian Telecommunications Company (BTC)

    On January 13, 2005, the incumbent operator was granted a licence for GSM and will be the third operator. BTC will transfer its licence to its wholly owned subsidiary BTC Mobile. The launch is expected to take place during second quarter 2005.

In addition, Mobilkom is active with an NMT 450 network.

On May 15, 2005, the Chairman of CRC granted UMTS licences to Mobiltel AD, Cosmo Bulgaria Mobile EAD (GLOBUL) and Bulgarian Telecommunications Company AD (BTC). Mobiltel AD was the wining bidder in the open tender for the UMTS class A licence against BTC. The initial one-off fee is equal to the bid price of 78 million Lev (50 million euro). As GLOBUL and BTC were the only two applicants for the two UMTS class B licences they were awarded without efficient tender, for a one-off licence fee of 42 million Lev (21.5 million euro).

The annual licence fee for the UMTS class A licence is 2.5 million Lev (1.3 million euro) and the annual licence fee for a UMTS class B licence is 1.5 million Lev (775,000 euro).

The launch of the 3G services should not be later than two years after the licence award. Mobiltel AD has to ensure coverage of 20% of the population and the other two operators – 15%. In five years, the operators should cover respectively 55% and 50%.

Report 1 - Country profiles - August 26, 2005

**Tetra network**

On July 22, 2004 Pro Wave was granted an individual licence for terrestrial trunked radio (TETRA) for network and services with national coverage. The one-off licence fee was 199,800 Lev (€ 102K) and the licence period is 15 years.

*c)      Class licences*

The following types of services may be provided without the need for individual licences, subject only to registration with the CRC:

- telecommunications networks for data transmission;

- public cable networks for radio and TV broadcasting;

- voice telephony services through public payphones;

- telecommunications networks for paging services;

- telecommunications through satellite networks for satellite news gathering (SNG);

- telecommunications through networks for services ancillary to programming (SAP), ancillary to broadcasting (SAB), electronic news gathering (ENG), and outside broadcasting (OB);

- telecommunications through radio equipment for radio amateur services;

- telecommunications through private telecommunications networks for mobile radio services (PMR);

- telecommunications through private telecommunications networks for fixed satellite radio services (VSAT networks);

- telecommunications through access to global personal satellite communications systems;

- public telecommunications through telegraph or telex networks.

**3.      Competitive safeguards, including SMP designation, carrier selection, number portability, accounting separation**

BTC was designated as having significant market power for fixed telephone networks and leased lines in 2004. The operator is required to:

- ensure non-discrimination;

- meet all reasonable demands for access;

- provide a reference interconnection offer and a reference unbundling offer;

- observe cost orientation;

- maintain accounting separation;

Report 1 - Country profiles - August 26, 2005

- respect confidentiality;

- provide co-location in connection with interconnection:

- provide leased lines.

Mobiltel was designated as having significant market power on October 28, 2004. The operator is required to ensure equal, non-discriminatory access for interconnection to its mobile network for all other telecommunications operators.

From January 1, 2005 BTC has enabled carrier selection and carrier pre-selection facilities for its subscribers. However, these functions are not yet in use by any alternative operator.

Number portability has been deferred to January 1, 2009 in agreement with the European Commission. This late date has been accepted due to Bulgaria's low degree of digitalisation.

NB.    The digitalisation rate in Bulgaria is expected to grow and according to Bulgaria's pre-accession negotiation commitments, as well as the terms of BTC's licence, it should reach 50-55% by the end of 2005 and 75–81% by the end of 2007.

Number portability for mobile networks is planned for January 1, 2007.

## 4.    Interconnection

### a)    Reference interconnection offer

The CRC adopted Decision No 2295 of December 29, 2004 approving the RIO for 2005 of the Bulgarian Telecommunications Company (BTC). BTC's key interconnection charges are shown in the table below. There are only per minute call conveyance charges and no call set-up charges.

| Interconnection service | Peak/min | | Off-peak/min | |
|---|---|---|---|---|
| | Lev | €cents | Lev | €cents |
| Single transit call origination for carrier selection on a call-by-call basis | 0.037 | 1.892 | 0.0036 | 1.841 |
| Single transit call origination for carrier pre-selection | 0.041 | 2.096 | 0.040 | 2.045 |
| Local call origination*/termination | 0.018 | 0.920 | 0.017 | 0.869 |
| Metropolitan call origination*/termination | 0.027 | 1.1381 | 0.026 | 1.329 |
| Single transit call origination*/termination | 0.033 | 1.687 | 0.031 | 1.585 |
| Single transit call origination*/termination for international calls | 0.034 | 1.738 | 0.032 | 1.636 |
| Double transit call termination | 0.090 | 4.602 | 0.075 | 3.835 |

Report 1 - Country profiles - August 26, 2005

| Interconnection service | Peak/min | | Off-peak/min | |
|---|---|---|---|---|
| | Lev | €cents | Lev | €cents |
| Double transit call termination for international calls | 0.100 | 5.113 | 0.075 | 3.835 |

**Table 11 – BTC interconnection charges**

* Origination prices, part of the RIO, are indicative.

The RIO is updated on an annual basis. In March 2005, BTC had signed interconnection agreements with Orbitel, Nexcom, GlobalTech, Trans Telecom, and Spectrum Net.

**5.    Local loop unbundling and broadband developments**

*a)    Reference unbundling offer*

The CRC adopted Decision No 2297 of December 29, 2004 approving the first reference offer for local loop unbundling (RUO) of the BTC. The RUO is available in Bulgarian on BTC's website.

BTC's unbundling charges are shown in the table below.

| Unbundling service | One-off | | Per month | |
|---|---|---|---|---|
| | Lev | Euro | Lev | Euro |
| Full access | 18.00 | 9.20 | 26.00 | 13.29 |
| Shared access | 32.00 | 16.36 | 18.00 | 9.20 |

**Table 12 – Charges for local loop unbundling**

Two contracts for local loop unbundling were in the pipeline in June 2005. The contracts between BTC and the alternative operators ORBITEL AD (Decision 912 of 27.05.2005) and SPECTRUM NET AD (Decision 913 of 27.05.2005)[14] have been approved by the CRC on the condition that all applications submitted to BTC shall be provided periodically to the CRC.

*b)    Fixed wireless access*

In 2005, Bulgaria launched a consultation process for point-to-multipoint (fixed wireless access (FWA)) licensing.

**6.    Universal service developments**

BTC was obliged to provide universal service without compensation for any net losses until Dec. 31, 2004 (§10 of the transitional and final provisions of the Telecommunications Act of Oct. 7, 2003).

---

[14] www.crc.bg/v2/bul/index.htm

Report 1 - Country profiles - August 26, 2005

The first payments to the USO fund would be made within one year after the entry into force of the USO funding provisions, i.e. in 2006. The US fund was created in May 2005.

## 7.    Other developments (including privatisation)

### a)    Privatisation of BTC

The planned partial privatisation of BTC was finalised on June 10, 2004 when Advent International, an investment house, acquired full control of BTC by purchasing 65% of the shares.

The remaining 35% stake in BTC owned by the Bulgarian Government has been floated on the stock exchange. This minority stake was 'sold' in exchange for compensatory bonds.

NB.    Compensatory bonds are a financial instrument that was created in Bulgaria after the fall of the socialist regime in 1989 for settling restitution claims of Bulgarian citizens, whose real estate had been taken over by the State. The flotation of the BTC shares represented an opportunity for holders of such bonds to exchange them into a more liquid instrument and/or eventually into cash.

This 35% stake was approximately equal in value to the $280 million deal with Viva Ventures Holding GmbH (unit of the US equity fund Advent International, based in Vienna) completed in June 2004.

The State will only keep what is referred to as a 'golden share' in BTC, allowing the government to veto strategic decisions by the company.

Meanwhile, BTC acquired the whole of its partners' shareholdings in:

- Mobikom, an NMT network operator, 49% from C&W and 12% from the State owned RES; and

- Bulfon, a public payphone operator, 85% from Intracom of Greece.

### b)    Transposition of the 2003 acquis

A working group in the Ministry of Transport and Communications is preparing a draft Act on Electronic Communications that shall transpose the 2003 acquis.

Report 1 - Country profiles - August 26, 2005

## D.    Summary

| Bulgaria | |
|---|---|
| **Topic** | **Status** |
| National Regulatory Authority | • Communications Regulations Commission (CRC)<br>• Appointed by Council of Ministers<br>• 80 professional staff for regulatory tasks<br>• Financed primarily from revenue related fees (43%) and frequency fees (40%)<br>• Broadcasting networks and frequencies in the same framework as telecoms<br>• Responsible for Cable TV<br>• Can give advice, but limited authority to resolve commercial disputes |
| Market Access | • All sectors liberalised<br>• Individual licences required for telephony networks and services<br>• General authorisation for ISPs<br>• VoIP regime depends on quality of service<br>• General authorisation for Cable TV |
| Competitive safeguards | • Carrier selection and pre-selection available for long distance and international calls<br>• 10 operators with access codes for CS, all active<br>• Number portability required from 1.1.2009<br>• One fixed and one mobile operator with SMP designation<br>• Reference interconnection offer published<br>• Reference unbundling offer from 1.1.2005, not yet in practice |
| Universal service | • Universal service requirements according to EU acquis<br>• USO cost recovery scheme may be applied from 2005 |
| Telephony – Market structure | • Bulgarian Telecommunications Company (BTC) – Golden share owned by the State gives veto right<br>• 10 national telephony service operators<br>• Number allocations: incumbent 97%, alternative operators 3%<br>• Three 2G mobile operators, three 3G licences: no service providers<br>• Public radio local area networks active<br>• Fixed penetration 35.1, digitalisation 34.0, party lines 37.0<br>• Mobile penetration 61.0 |
| Telephony  - Retail tariffs | • Tariffs not yet rebalanced – Residential access: 5.68[15], Business access: 9.59<br>• Local calls – high range –several low tariff packages<br>• National long distance calls – medium high range<br>• International long distance calls – low range |
| Telephony – Wholesale tariffs | • Interconnection charges fixed network: 50% above EU average<br>• Interconnection charges mobile network: 25% above EU average |
| Internet and broadband | • Internet penetration 18.4%<br>• Internet dial-up cost – medium high range<br>• xDSL lines – 0.02%<br>• Number of broadband connections – 0.09%<br>• 13 national ISPs, 192 local |

---

[15] For an explanation of this indicator, see Report 1 – Country Comparative Report, Chapter III.G.4 on Access charges

## IV.    CROATIA

### A.    Legislative process and overview of the relevant institutions

### 1.    Legislative process

The Croatian legislative body is the Croatian Parliament, directly elected every four years.

Bills can be submitted to Parliament by the Government or by Members of Parliament.

When the Government proposes a draft there is a pre-parliamentary procedure. Usually, the responsible ministry makes a first draft and then consults other relevant institutions (other ministries, government offices, agencies, companies affected by the law), whose comments must be accepted or turned down with a written explanation. There may also be public discussions. Some ministries cover the drafting process on their web pages.

The ministry then sends the draft to the Government Coordination Committee for the Economy. This is a forum led by the government vice-president responsible for the economy, where officials discuss proposals before they are sent to the government for a decision. This coordination committee may return the draft for further improvement, or forward it to the Government, which formally adopts the draft and sends it to Parliament.

The bill is first discussed by the relevant parliamentary committees and then proposed for a vote in plenary. Together with comments and recommendations made in the first plenary session, the bill is returned to the lead committee for additional drafting. The bill is then submitted for adoption in a second vote in plenary.

When special State interests require rapid legislation, it is also possible to send a draft law to Parliament for an accelerated procedure. In this case, there is only one round of voting in Parliament. During parliamentary discussions in plenary, a responsible person (usually a minister, State secretary or assistant minister) can accept or reject proposed amendments to the draft.

After Parliament has adopted the act, it is sent to the President of the Republic for ratification. Once the President has signed the act, it can be promulgated in the Official Gazette of the Republic of Croatia. The President can also exercise his right to veto the act. In this case it is returned to parliament for further consideration.

### 2.    Overview of the relevant institutions

The institutional structure in Croatia is shown in Figure 4 below and is discussed in the following paragraphs.

Report 1 - Country profiles - August 26, 2005



**Figure 4 - Main institutions in the Croatian telecommunications regulatory framework**

*a)*   *Ministry of the Sea, Tourism, Transport and Development*

The main government policy objectives for the telecommunications sector are defined by Art. 2 of the Telecommunications Law of 2003. They are:

- the construction, maintenance, development and use of the telecommunications infrastructure and equipment;

- the management and use of the radio frequency spectrum and of the addressing and numbering space as naturally limited public resources; and

- providing public telecommunications services and performing activities of national interest.

The Ministry of the Sea, Tourism, Transport and Development (MMTPR)[16] is responsible for overall telecommunications policy and for preparing secondary legislation implementing the Telecommunications Law. Its responsibilities are defined by Art. 3 of the Law:

- preparation of the Strategy for Development of Telecommunications and Information Technology in Croatia for a period of four years, to be passed by Parliament. This strategy is to provide a basis for:

  - liberalisation of telecommunications networks and services;

  - development of the telecommunications infrastructure;

  - benefits to the national economy and consumers from competition in telecommunication markets;

  - universal service;

---

[16] www.mmtpr.hr

Report 1 - Country profiles - August 26, 2005

- in case of large natural disasters, and disruption in providing universal telecommunications services, to take appropriate measures in order to ensure the provision of these services.

- to represent Croatia in international telecommunications organisations and institutions, and to be responsible for the implementation of international contracts, agreements and conventions in telecommunications.

- to participate in the work of bodies and expert groups of these international organisations and institutions. MMTPR may also authorise the Croatian Agency for Telecommunications or other responsible bodies to participate in their work;

- to supervise the inspection of telecommunications for compliance with the provisions of the Law;

- to provide administrative supervision of the Croatian Agency for Telecommunications.

## 3.    The Croatian Agency for Telecommunications

The Croatian Agency for Telecommunications (the Agency) is the national regulatory authority created in compliance with the Telecommunications Law. It is an independent State body with five council members appointed for terms of five years.

*a)    Responsibilities of the Agency*

According to Article 12 of the Telecommunications Law of 2003 (the Law), the Agency is responsible for:

- passing decisions to grant and revoke concessions and licences, in accordance with the provisions of the Law and regulations passed on the basis of the Law;

- supervision and regulation of the prices and quality of telecommunications services, in accordance with the provisions of the Law;

- resolution of disputes between operators, and between operators and service providers, in accordance with the provisions of the Law and regulations passed on the basis of the Law;

- resolution of disputes between service providers and users of services, with the mediation of the Telecommunications Services Users Council, in accordance with the provisions of this Law and specific law[17];

- passing decisions and resolutions on the performance of other regulatory tasks which are the responsibility of the Agency in accordance with the provisions of the Law;

- management of addressing and numbering space in telecommunications and the development of associated plans;

- radio frequency spectrum management, and preparation of the Radio Frequency Spectrum Allocation Table and Radio Frequency Assignment Plans;

---

[17] Refers to a law regulating mediation and arbitrage.

Report 1 - Country profiles - August 26, 2005

- implementing the procedure for coordination of radio frequencies at the national and international levels, and assignment of radio frequencies;

- control of the radio frequency spectrum and measures for protection from harmful interference;

- expert supervision over performance of telecommunications services, and other activities performed in accordance with this law;

- conclusion of frequency concession agreements for providing telecommunications services according to the Law, and frequency concession agreements for providing broadcasting services in accordance with the Law on Electronic Media;

- proposing drafts of by-laws to be passed by the minister on the basis of provisions of the Law;

- giving expert opinions, on request, on particular topics in the telecommunications sector, and on the implementation of the Law and regulations passed on the basis of the Law,;

- preparing expert gatherings, public counselling and market research and public surveys on particular topics in the telecommunications sector;

- holding and maintaining data bases with data the Agency gathers in the conduct of its duties, as well as regular publication of telecommunications data, in accordance with this law and its secondary legislation;

- cooperation with relevant international telecommunications organisations and institutions, and participating in the work of their expert bodies and work groups;

- cooperation with foreign regulatory authorities in telecommunications;

- other tasks defined by the Law and the Articles of Association of the Agency.

Theoretically, the Agency has considerable powers to request information and to inspect and audit the business records of public telecommunications operators and other companies engaged in telecommunications. In cases where the Agency's decisions are not followed, the Agency can issue a misdemeanour warrant in accordance with the provisions of the Law on Misdemeanour.

In practice, however, it has been difficult for the Agency to exercise its rights to request information and enforce its decisions.

**<u>Organisation of the Agency</u>**

The Agency is governed by the Council of the Croatian Agency for Telecommunications (the Council)[18]

The Council has five members, a president, a deputy president and three other members. They are nominated by the Government and appointed by Parliament. Members receive a five-year mandate, except for the first mandates (for appointment in September 2004), in which two of them received a three-year mandate. They cannot be removed from office before the end of their mandates unless one of several conditions is met (member's resignation, being sentenced for felony, six months'

---

[18] www.telekom.hr

Report 1 - Country profiles - August 26, 2005

inability to perform duties or not performing duties, and especially a serious violation of duty as defined by the Council's statute).

The Council is supported by an Expert Service, which performs the professional, administrative and technical work for the Agency's needs. The Expert Service is managed by a Director, who is appointed by the minister for a period of four years following a public recruitment procedure. The Council President can transfer part of his authority to the Director.

The Director can be dismissed by the minister only under circumstances defined in the law, or upon a proposal by the Council.

NB.     The detailed organisation of the Agency is not yet known due to its recent creation. Without statutes in place, the 60-odd professional staff work in an ad-hoc organisation mostly inherited from the previous institutions: (the Telecommunications Council and the Croatian Institute for Telecommunications). The previous Telecommunications Institute was organised mostly in terms of technology, with the regulatory functions of economic analysis and legal affairs practically non-existent.

**<u>Funding of the Agency</u>**

The Agency is a self-supporting administrative body funded by:

- part of the fees for the use of radio frequencies which cannot be less than 5%,

- the fees for use of addresses and numbers,

- 0.2% of the total yearly gross revenues made over the past year by concessionaries and telecommunication service providers for providing telecommunications services, except concessionaries of radio diffusion services.

The surplus money gathered from the above sources and not spent during the year must be paid to the state budget (and not returned to the companies that had paid the 0.2% annual fee).

*b)     The Council for Electronic Media*

The Council for Electronic Media is an independent specialised authority set up in compliance with the Law on Electronic Media to regulate radio and TV activities and electronic publications. It has seven members appointed by Parliament, following a proposal by the Government. In the first appointment (2004), two members are appointed for three years, two for four years, and three for five years.

*c)     National Competition Authority*

The Agency for Protection of Competition is governed by the Council for the Protection of Competition. This has five members appointed for five years by Parliament, following a proposal by the Government. It has a broad range of powers for competition protection, including powers to draft laws and consult parliament. The Agency is financed from the state budget.

*d)     Appeal body*

There is no right of appeal against Telecommunications Agency Council decisions on administrative procedure, i.e. the Council decisions on administrative procedure are final. However,

they may be referred to the Administrative Court of the Republic of Croatia as an administrative dispute.

The administrative procedures of the Agency are conducted in accordance with special provisions of the Telecommunications Law of 2003 (Art. 13) and the General Administrative Procedure Law, which is a generic law in the Croatian legal system. There are additional legal recourses one can take under the latter law, which are not stipulated in Telecommunications Law. Another generic law, the General Administrative Disputes Law, regulates administrative disputes. The affected party has to sue the Agency Council before the Administrative Court of the Republic of Croatia in Zagreb, which is the only court of that kind in the country, within 30 days.

## B.    Main legal instruments

## 1.    Primary legislation

| Measure | Subject |
|---|---|
| **Law on Telecommunications** ("Official Gazette", No. 122/03, 158/03, 177/03, 60/04, 70/05) | Contents of the law:<br>• General provisions<br>• Croatian Agency for Telecommunications (NRA)<br>• Telecommunications infrastructure<br>• Telecommunications services<br>• Universal telecommunications services<br>• Protection of rights of users<br>• Market competition<br>• Addressing and numbering<br>• Radio frequency spectrum management<br>• Radio equipment and telecommunications terminal equipment<br>• Electromagnetic compatibility and the protection from interference<br>• Data protection<br>• Inspection supervision and control<br>• Penalty provisions<br>• Transitional and final provisions |

**Table 13 – Primary legislation**

*a)    Amendments to the primary law*

On May 18, 2005 the Parliament passed a new Law on amendments to the Telecommunications law, as proposed by the Government. These amendments, together with detailed explanations, are available in the Croatian language on the Government's website. There are as many as 73 amended articles, so this is a quite significant revision. The most important ones are explained briefly here.

### Appeal procedures

A new paragraph is added to Article 13 in an effort to speed up the appeal process. It stipulates that procedures before the Administrative Court of the Republic of Croatia related to appeals against decisions by Agency are urgent. It remains to be seen how effective this provision will be as it obviously depends on the co-operation of the Administrative Court.

### Transparency

Article 14 is changed to oblige the Agency to operate with a greater standard of transparency. The Agency is obliged to organise several databases with public information to be available without cost.

### Market concentrations

New text of Article 34 establishes clearly that the Croatian Competition Agency is responsible for dealing with intended concentrations in the telecommunications markets. Before submitting an application to the national competition authority, the companies will have to obtain written opinions from the Telecommunications Agency.

### Consumer complaints

Previous laws, including the 2003 law, have foreseen the exstence of a "Telecommunications Consumers Council" as an administrative body to resolve disputes between service providers and consumers. However, this council has never been appointed and it has been discovered that the legal text has suffered from internal inconsistencies in its powers and operational procedures.

The affected Article 50 has been completely changed so that the council will perform tasks of mediation and arbitrage according to normal Croatian standards.

### SMP designation

Article 51 on SMP designation has been amended in order to clarify the procedures and criteria applicable. The text of the 2003 law set out a combination of the approach of the EU acquis of 1998 and 2003. On one hand, the static criterion of 25% market share was maintained, while on the other hand, the Agency was also obliged to conduct market analyses after the new regulatory framework procedures.

The 2003 law also assumed that SMP designation would be in accordance with a bylaw, which has never been adopted. The lack of a bylaw also represented an exposure for the designation process.

It was recognised that in the early phases of market liberalisation, the need for sophisticated market analysis is less urgent.

The amendments now establish a very explicit legal presumption on SMP status, which is triggered automatically after reaching a 25% share in a relevant market. There are also provisions on possible case-by-case exemptions from that rule, in both directions. The Agency Council can make such exemptions following criteria set out within the new article 51, as well as the bylaw, which should be passed by the minister. However, the bylaw is not a prerequisite for the Agency's SMP designations. There are also criteria for assessment of joint SMP.

The Agency is obliged to publish SMP players list once a year, but the fact of publication or non-publication has no effect on actual SMP status established by the aforementioned *presumptio juris*. SMP players are obliged to obey the principles of transparency, non-discrimination, and cost orientation of prices.

## Retail price regulation

Article 63, dealing with retail price regulation, has also been significantly changed. Instead of having the right to regulate only retail prices of fixed network voice services and leased lines, the Agency Council has now been given the right to regulate retail prices of any SMP, if the operator:

- charges prices that are too high;

- effectively bars market entry;

- affects competition by charging prices that are too high or too low;

- gives unjustified advances to certain users; or

- unjustifiably bundles certain services.

The measures the Agency Council can take are:

- introduction of price caps;

- regulation of individual service prices;

- cost orientation enforcement; and

- price regulation based on relevant benchmarks.

## Sanctions

New penalty provisions are introduced by amendments to Article 116. For significant breaches of the law, a company can now be charged from 1% to 5% of total annual revenue, instead of the relatively small fixed amounts, not exceeding 1 million Kn (€ 133,000) that could be charged before. Failure to comply with decisions by the Agency Council has been defined as a significant breach under Article 116. Any benefits gained by a breach, siginificant or otherwise, will be removed.

There is also a possibility to ban market activities temporarily for a period of six months to two years.

Penalties are decided by a magistrate's court.

2. **Secondary legislation**

The following secondary legislation is currently in force:

| Type of legislation | Individual acts |
|---|---|
| Secondary legislation passed under | • Bylaw on unbundled local loop access (Official Gazette 45/05) |

Report 1 - Country profiles - August 26, 2005

| Type of legislation | Individual acts |
|---|---|
| the framework of the 2003 Telecommunications Law | • Bylaw on concessions and licences for telecommunications services (Official Gazette 49/04, 57/04, 123/04, 26/05)<br><br>• Bylaw on payment of fees for telecommunications services (Official Gazette 49/04, 57/04, 26/05)<br><br>• Bylaw on electromagnetic compatibility (EMC) (Official Gazette 16/05)<br><br>• Bylaw on technical inspections in telecommunications (Official Gazette 7/05)<br><br>• Bylaw on conditions for selling, putting in operation and usage of R&TT equipment (Official Gazette 5/05)<br><br>• Ordinance on limitations in radio frequencies usage Official Gazette 2/05)<br><br>• Bylaw on telecommunication services Official Gazette 183/04)<br><br>• Bylaw on number portability and carrier preselection (Official Gazette 183/04)<br><br>• Bylaw on permits for performance of activities in telecommunications (Official Gazette 183/04)<br><br>• Bylaw on limitations of electromagnetic field strengths for R&TT equipment (Official Gazette 183/04)<br><br>• Bylaw on radiofrequency spectrum allocation (Official Gazette 193/03)<br><br>• Bylaw on network access and interconnection (Official Gazette 185/03)<br><br>• Bylaw on addressing and numbering in public telecommunications and payment of fees (Official Gazette 177/03)<br><br>• Bylaw on amateur radio communications (Official Gazette 198/03, 3/04)<br><br>• Bylaw on payment of fees for granting and usage of radio frequencies (Official Gazette 49/04, 57/04)<br><br>• Bylaw on identity cards for telecommunication inspectors and authorized officers of the Croatian agency for telecommunications (Official Gazette 133/04)<br><br>• Bylaw on inspection records of telecommunication inspectors and authorized officers of the Croatian agency for telecommunications (Official Gazette 133/04)<br><br>• Bylaw on seal of telecommunication inspectors and authorized officers of the Croatian agency for telecommunications (Official Gazette 133/04) |
| Laws and ordinances on ratification of international agreements which apply completely or partially to the telecommunications sector | • Law on ratification of the Convention on cybernetic crime (Official Gazette – International agreements 9/02)<br><br>• Law on ratification of the European Convention on Cross-border Television, and the Protocol on exchange of the European Convention on Cross-border Television (Official Gazette – International agreements 11/01)<br><br>• Law on ratification of the Protocol of accession of the Republic of Croatia to the Marrakesh agreement on establishment of the World Trade Organization (Official Gazette – International agreements 13/00)<br><br>• Law on ratification of the Convention on establishment of the European Radiocommunications Office (Official Gazette – International agreements 3/95)<br><br>• Ordinance on ratification of the Statute and the Convention of the International Telecommunications Union signed in Geneva at 22 Dec. 1992 (Official Gazette – International agreements 9/94) |

Report 1 - Country profiles - August 26, 2005

| Type of legislation | Individual acts |
|---|---|
| Other legislation | There are another 24 legislative acts inherited from previous legislative frameworks, dating from 1995 to 2002. Many of them are replaced in full by subsequent acts. However, some of them might still apply in the absence of newer acts (mostly bylaws), but only in particular areas in which they are not contrary to the present Law on telecommunications. For clarifications of such bylaws applicability, interested parties should consult the Ministry of sea, tourism, transportation and development. |

**Table 14 – Secondary and other types of legislation**

## C.    Status and recent developments on key telecommunications issues

### 1.    Introduction

As a signatory to the stabilisation and co-operation agreement with the European Union signed in October 2001, Croatia has an obligation to align its legal and economic framework with that of the EU. An interim agreement that has been in force since March 2002 provides nearly free access to the European market.

Croatia is also a signatory to the WTO agreement on basic telecommunications signed in 2000, with a commitment to liberalise the telecommunications sector fully from January 1, 2003.

On February 21, 2003 Croatia submitted its formal application for EU membership and was accepted as an accession country by the European Council on June 18, 2004. However, formal negotiations have not yet started. As part of the accession process, the European Commission will conduct reviews across a wide range of requirements including commitments made in the telecommunications and IT sector.

In July 2003 Croatia adopted a new Telecommunications Act, which came into force on August 1, 2003. While the Act is intended to transpose the 1998 *acquis*, the actual implementation has been slow and until recently there has been no competition in the fixed telephony market.

This first report on Croatia provides a general overview of the status of the telecommunications market after the adoption of the new Act. Therefore, it covers a longer period than for the other countries and is intended to establish a base for further monitoring.

### 2.    Licensing / liberalisation / market access issues

The Telecommunications Act of 2003 is based on the 1998 *acquis* and opens telecommunications networks and services to competition. The Act also includes certain elements of the 2003 *acquis*. For example, it brings all forms of electronic communications, other than content, under the same regulatory framework.

In accordance with the 1998 *acquis*, individual licences are required for the operation of communications networks, for example to provide telecommunications services or cable TV services. Individual licences are also required for the provision of public voice telephone services.

A mobile network operator needs two authorisations: a frequency concession for the right to use radio spectrum and a licence to provide telecommunications services. Frequency concessions are granted by the regulator, with or without a public tender procedure. A mobile virtual network

Report 1 - Country profiles - August 26, 2005

operator (MVNO) that uses spectrum of other licensed operators only needs a licence for service provision.

All other services may be provided on the basis of a general authorisation with a requirement to notify the Croatian Telecommunications Agency. For example, Internet service providers (ISPs) may operate under a general authorisation regime.

The table below summarises individual licence or notification requirements for provision of electronic communications networks and services in Croatia.

| Service | Authorisation | One-off fee |
|---|---|---|
| Fixed voice telephony | Individual licence | Kn 20,000 (€ 2,700) for national level |
| Leased lines | Individual licence | Kn 10,000 (€ 1,350) for national level |
| Fixed network services (other than voice telephony) | Individual licence | Kn 10,000 (€1,350) for national level |
| Private Mobile Radio (PMR) | Individual licence | Kn 5,000 (€ 670) for national level |
| Services using free radio spectrum | Individual licence | Kn 5,000 (€ 670) for national level |
| Mobile virtual network operations (MVNO) | Individual licence | Kn 10,000 (€1,350) for national level |
| Cable TV | Individual licence | Kn 10,000 (€1,350) for national level |
| Internet Service Provision (ISP) | Notification | Kn 5,000 (€ 670) |
| Multi-video conferencing | Notification | Kn 2,000 (€ 270) |
| Value added services | Notification | Kn 2,000 (€ 270) |
| Fixed point-to-multipoint radio network services | Notification | Kn 2,000 (€ 270) |
| Fixed and mobile satellite services | Notification | Kn 2,000 (€ 270) |
| Voice over IP services | Notification | Kn 5,000 (€ 670) |

**Table 15 - Licensing regime in Croatia**

In addition to one-off licensing fees, service providers that operate on the basis of a notification or ordinary individual licence are required to pay the annual fee set at 0.1% of total annual revenue. Mobile operators, that operate on the basis of a (frequency) concession, pay a higher annual fee:

- operators with concessions for NMT, GSM 900 and DCS 1800 pay 0.5% of annual revenue;

- operators with concessions for UMTS or combined 2G/3G networks and other mobile services with voice transmission pay 1% of annual revenues.

In addition, all service providers and operators pay 0.2% of annual revenues as a contribution to the financing of the NRA.

The legal basis for the licensing regime is set out in the following acts:

- Chapter IV, Articles 23 - 36 of the Telecommunications Act of July 2003;

Report 1 - Country profiles - August 26, 2005

- the bylaw on concessions and licences for the provision of telecommunications services of March 2004;

- the bylaw on payment of fees for the provision of telecommunications services of February 2005.

   This ordinance replaced the previous ordinance of March 2004, substantially reducing all licensing and authorisation fees. In particular, it reduced the one-off licence fee for the provision of public voice telephone services over the fixed network to Kn 20,000 (€ 2,700) from the previous Kn 8 million (€ 1.1 million), and VoIP notification fee to Kn 5,000 (€ 670) from the previous Kn 250,000 (€ 33,000).

A list of all authorised network- and service providers is available in Croatian on the <u>website of the Telecommunications Agency</u>.

*a)   Fixed voice telephony*

Hrvatske Telekomunikacije (T-HT), 51% owned by Deutsche Telekom and 42% by the Croatian State[19], is the incumbent operator in Croatia.

On November 19, 2004 the Croatian Telecommunications Agency announced that a second fixed voice telephony licence with a national coverage was granted to Optima Telekom. The new entrant is expected to launch its operations within next six months. A third operator, Portus, has also been licensed.

After more than one year under the new Telecommunications Law, there are now (June 2005) nine companies licensed for fixed telephony services at the national level. All of them are 100% owned by Croatian interests.

*b)   Mobile licences*

With the new Telecommunications Act of 2003, the licensing requirements have been changed so that for a new entrant operator, a concession will be required for the right to use the frequency spectrum, while the provision of mobile services will be subject to a service licence.

There are three nationwide mobile operators in Croatia: T-Mobile, which is 100% owned by T-HT, the incumbent operator; and VIPnet 99% owned by Mobilkom, a mobile subsidiary of Telekom Austria. Both companies are operating under concessions granted by the government.

In addition, following the beauty contest which finished in December 2004, the new mobile network operator, Tele2 (in a consortium with nine Croatian companies having a total shareholding of 49%), has signed the concession contract with the Telecommunications Agency Council for a combined 2G/3G network. The regulator's <u>decision</u> was made on December 22, 2004. The concession agreement was signed on February 2, 2005.

The other mobile operators, T-Mobile and VIPnet, have also purchased concessions for 3G (UMTS) networks, so there are now a total of three 2G and three 3G concessioned network operators.

---

[19] The ownership share of the Croatian State was reduced from 49% to 42% on February 17, 2005 Government decided to transfer 7% of the TH-T shares without compensation to the "Fund of homeland war veterans and their family members".

Report 1 - Country profiles - August 26, 2005

A summary of the October 17, 2001 contract between the Republic of Croatia and Deutsche Telekom has been published on the Ministry's web page. According to this contract, the granting of a fourth 3G concession is precluded until four years after the first 3G services have been launched in Croatia, i.e. until 2009. However, this does not prevent the licensing of a fourth 2G network and there is an expectation that another beauty contest for this type of network may be launched soon.

On February 17, 2005 MMTPR made an announcement that the duration of 2G concessions would be changed from 10 to 20 years, without change of the one-off fee of Kn 105 million (€14 million). This was published in the Official Gazette on February 24, 2005 as an amendment to the ordinance on concessions and licences.

On May 13, 2005 the Agency Council issued a public invitation to tender for 4th 2G (DCS 1800) mobile operator in Croatia. The deadline to submit a bid is June 17, 2005. The Council's decision is scheduled for July 15, 2005. Two sets of tender documentations have been purchased. Only one bid was submitted by the AdriaCella consortium, led by Syriatel. On July 15, 2005 the Agency Council rejected this bid and closed the procedure without granting a new concession.

Another 3G frequency licence cannot be granted at this time because a contract between the Republic of Croatia and Deutsche Telekom precludes the granting of a fourth 3G concession until four years after the first UMTS services have been launched, i.e. until 2009. A 29-page summary of this contract from October 17, 2001 has been published on the Ministry's web page.

## 3.    Competitive safeguards, including SMP designation, carrier selection, number portability, accounting separation

T-HT has been designated as having SMP as the fixed operator. The two incumbent mobile operators, T-Mobile and VIPnet, are also designated as having SMP. The implications of these designations are not fully understood as the SMP ordinance foreseen in the law is still at a drafting stage. In addition, the designation of the mobile operators is being disputed.

Carrier pre-selection is required by the fixed network operator with SMP from January 1, 2005. However, as there are no alternative fixed operators yet, this is somewhat theoretical. The RIO supplement No. 2, of May 2005 includes prices for carrier pre-selection.

On April 20, 2005, the Agency Council passed the Decision on number portability and carrier pre-selection (in Croatian). The deadlines foreseen in Chapter 2 are as follows:

- Fixed network operators and service providers should have enabled number portability by April 2, 2005 (this date is prior to issuance of the Decision in question because the April 20 decision, which is now relevant, is in fact a corrected version of a previous document).

- Fixed network operators and service providers with SMP should also have enabled carrier pre-selection for all calls as from the same date;

- Fixed network operators and service providers with SMP must have carrier pre-selection enabled for international calls, national calls, local calls, calls towards certain telecommunications network, and calls towards all mobile networks by October 1, 2005;

    NB.    It is illogical that the requirement for "all calls" has a deadline prior to the deadline for specified call categories. However, this is the way it is stated in the published decision.

- Mobile network operators had to enable number portability as from 30 May 2005. The Agency Council can extend this period for justified technical reasons for a maximum of 120 days;

- The Agency must provide the centralized administrative database as from August 1, 2005.

Accounting separation is a legal requirement for SMP operators, but CI is not aware of any regulatory action or decision where this requirement has played a role.

## 4.    Interconnection

### a)    Reference interconnection offer

Section VII on market competition of the Telecommunications Act provides for the designation of operators with significant market power (SMP) in the four telecommunications markets defined in accordance with the 1998 *acquis*.

In August 2004, the Telecommunications Council (the NRA prior to the establishment of the Croatian Agency for Telecommunications) designated the following organisations as having SMP:

- Croatian Telecom (T-HT) in the fixed public voice telephony market;

- Croatian Telecom (T-HT) in the leased lines market;

- T-Mobile and VIPnet in the public mobile telephony and the overall interconnection market.

Article 56 of the Telecommunications Act requires all operators designated to have SMP in the public fixed telephony or the overall interconnection market to submit a reference interconnection offer (RIO) to the Croatian Telecommunications Agency Council for approval upon the Council's request. The Agency shall then publish the RIO.

The new T-Com's RIO is now available and published on the Agency website.

The RIO only includes offers for interconnection between a fixed-service operator and the fixed T-Com network.

T-Com's RIO was approved by the Agency Council on February 25, 2005. The RIO and both annexes are available on the Telecommunications Agency's website, but only in Croatia. Annex 1 to this RIO, which was approved on March 24, 2005, covers calls to premium rate service numbers and Freephone (0800) originated by interconnected operators' users. Annex 2, which covers carrier pre-selection, was approved on May 9, 2005.

The RIOs of T-mobile and VIPnet were approved by the Agency Council on March 24, 2005. The documents are only available in Croatian.

## 5.    Local loop unbundling and broadband developments

### a)    Reference unbundling offer

Article 119, §§2-3 of the Telecommunications Act specify that local loop unbundling should be implemented no later than January 1, 2005, and that T-HT must start technical preparations no later than October 1, 2003.

Report 1 - Country profiles - August 26, 2005

There is no information available on the actual status of these preparations. No draft reference unbundling offer has been made publicly available either.

## 6.    Retail price regulations

On March 10, 2005 the Agency Council approved new tariff models of T-HT (see prices and T-HT's conditions), including one model with a one second charging interval:

- one model has a call start up charge (0.08 Kn, or € 0.011) and a price of 0.26 Kn/min (€ 0.035/min) for peak-time local calls.

- a second model has no start-up charge and the prices per minute are equal to these in the standard model, but the minimum chargeable call duration is 1 minute, after which the call is charged per second.

The T-HT designed these models after heavy public pressure, and to obey the obligation from Art. 32, Para. 6(4) and Art. 50, Para. 2 of the Telecommunications services bylaw, that states that SMP providers of public voice services in fixed networks must offer at least one tariff model with a one second unit interval.

## 7.    Universal service developments

The framework for universal service has been set out in the Telecommunications Act of 2003 according to the EU 2003 acquis. There has been no particular regulatory action on universal service since the adoption of the Act.

## 8.    Other developments (including privatisation)

### a)    Privatisation of T-HT

The privatisation of T-HT was carried out in two steps: 35% of the shares were sold to Deutsche Telekom (DT) in 1999, and a further 16% in 2001. Consequently, today 51% of T-HT is owned by DT, and 49% remained in the possession of the Republic of Croatia.

On February 17, 2005 the government decided to transfer 7% of the T-HT shares without compensation to the "Fund of homeland war veterans and their family members". The state's ownership in T-HT is thus reduced from 49% to 42%.

### b)    Telekom Austria gains control over VIPnet

Mobilkom Austria, a mobile operator which is 100% owned by Telekom Austria, has raised its ownership in VIPnet from 99% to 100% by buying the remaining shares from Vecernji List, a leading domestic newspaper.

### c)    MMTPR transparency

MMTPR has recently taken a step to improve transparency and public relations by a new website which is intended to include all public data and documents within its scope of responsibility. MMTPR has also encouraged the Telecommunications Agency to improve its transparency.

Report 1 - Country profiles - August 26, 2005

**D.    Summary**

| Croatia | |
|---|---|
| **Topic** | **Status** |
| National Regulatory Authority | • Croatian Telecommunications Agency<br>• Appointment by Parliament<br>• 32 professional staff for regulatory tasks<br>• Financed primarily from revenue related fees (43%) and numbering fees (42%)<br>• Broadcasting networks and frequencies in the same framework as telecoms<br>• Responsible for Cable TV<br>• Can resolve commercial conflicts |
| Market Access | • All sectors liberalised<br>• Individual licences required for telephony networks and services<br>• General authorisation for ISPs<br>• VoIP special category of general authorisation<br>• Individual licences required for conveyance aspects of Cable TV |
| Competitive safeguards | • Carrier selection and pre-selection obligations, but not yet practical implementation<br>• 3 operators with access codes for CS<br>• Number portability legal obligation, not yet implemented<br>• One fixed and two mobile operators with SMP designation<br>• Reference interconnection offer published<br>• Reference unbundling offer from mid 2005 |
| Universal service | • Universal service requirements according to EU acquis<br>• USO cost recovery scheme in legislation, not yet applied |
| Telephony – Market structure | • HT- Hrvatske Telekomunikacije-incumbent operator – 49% state owned (1.1.2005)<br>• 89 national telephony service operators<br>• Two plus one 2G mobile operators / three 3G licences/ legal obligation to deal with service providers<br>• Public radio local area networks active<br>• Fixed penetration 37.8, digitalisation 100, party lines 0<br>• Mobile penetration 63.99 |
| Telephony  - Retail tariffs | • Tariffs not yet rebalanced – Residential access: 8.87[20], Business access: 11.08<br>• Local calls – high range –low tariff package<br>• National long distance calls – low range<br>• International long distance calls – low range |
| Telephony – Wholesale tariffs | • Interconnection charges fixed network – 50% above EU average<br>• Interconnection charges mobile network – 20%  below EU average |
| Internet and broadband | • Internet penetration 32.2%<br>• Internet dial-up cost - medium range<br>• xDSL lines – 0.53%<br>• Number of broadband connections – 0.61%<br>• 18 national ISPs |

---

[20] For an explanation of this indicator, see Report 1 – Country Comparative Report, Chapter III.G.4 on Access charges

## V.    ROMANIA

### A.    Legislative process and overview of the relevant institutions

### 1.    Legislative process

The legislative body in Romania is composed of the Chamber of Deputies[21]   and the Senate[22]. Members of both houses are elected through a proportional system at the national level every four years at the same time for both houses. For some bills and legislative proposals the first chamber notified is the Chamber of Deputies, but the final decision on the matter is made by the Senate and vice versa. For the legislative proposals in the electronic communications sector the decision maker chamber is the Chamber of Deputies. Joint sessions of Parliament are convened for adoption of the state and the social security budgets and on a number of other occasions.

The legislative initiative belongs to the Government and to individual deputies and senators. Popular legislative initiatives on a restricted number of subjects are also possible, subject to specific thresholds. The Legislative Council, an advisory body of Parliament, first evaluates legislative proposals before they are considered in Parliamentary committees. Where the chambers of Parliament dissent on a legislative proposal, a Mediation Committee is convened. Adopted laws are checked for their constitutionality, on request, before being promulgated by the President.

The Constitution also empowers the Government to adopt emergency ordinances that require approval by Parliament and are a common procedure for introducing economic legislation.

### 2.    Overview of the relevant institutions

The main organisations in the Romanian electronic communications regulatory framework are shown in Figure 5 below and are discussed in the paragraphs that follow.

---

[21]  www.cdep.ro
[22]  www.senat.ro

Report 1 - Country profiles - August 26, 2005



**Figure 5 - Main institutions in the Romanian electronic communications regulatory framework**

a)      *Ministry of Communications and Information Technology*

The Ministry of Communications and Information Technology (MCTI)[23] is responsible for policy development and strategy in the information technology, electronic communications and postal service sectors. An Interdepartmental Radiocommunications Commission advises the Ministry on spectrum matters. The MCTI represents Romania in international sector organisations.

The MCTI also exercises the ownership function of RomTelecom, the incumbent operator.

b)      *National Regulatory Authority*

The National Regulatory Authority for Regulations and Communications (ANRC)[24] has been active since September 25, 2002. The ANRC is responsible for supervising the operators' activities in the electronic communication and postal services sectors. The ANRC supervises the efficient use of numbering resources and ensures the security of public communications networks. The ANRC is also involved with interconnection, local access and universal service.

The ANRC is an independent entity in its structure, operations and financing. The ANRC is subordinated to the Government and is headed, by a president and a vice-president, appointed by the Prime Minister for a 5-year term.

The authority is fully self-financed from revenue related fees and may also impose fees for the use of numbering resources.

---

23   www.mcti.ro
24   www.anrc.ro

c)    *The General Inspectorate for Communications and Information Technology*

The General Inspectorate for Communications and Information Technology (IGCTI)[25] is a public autonomous institution in the radio communications and information technology domains and is self-financed from spectrum fees and other fees.

The IGCTI has administrative control over the radio frequency spectrum and monitors the frequency bands used by non-government organisations, controls their compliance with essential requirements for electromagnetic compatibility and operates at the national level the information system of the central public administration (e-government).

d)    *Competition Authority*

The Competition Council[26] is the Romanian autonomous administrative authority in the competition field. The Council observes the enforcement of the legal provisions on anti-competitive practices (anti-competitive agreements and abuse of dominant position) and controls economic concentrations (mergers and acquisitions) in order to protect, maintain and stimulate a normal, competitive environment and promote consumers' interests. The Competition Council gives binding opinions on the legal drafts that may have anti-competitive impact, and proposes amendments to the normative acts having such effects. The Council also gives advisory opinions on state aid policy and state aid schemes from the point of view of the possible effects on competition. The Council also authorises state aid in the form of schemes and individual acts (stipulated by administrative or normative draft acts) from the point of view of its effects on competition.

e)    *Appeal body*

Decisions by the ANRC's President may be appealed within 30 days at the Administrative Division of the Bucharest Court of Appeal and the ANRC President's Decisions on dispute settlement may be appealed within 15 days. The Court may decide to suspend the NRA decision until the outcome of the case.

## B.    Main legal instruments

### 1.    Primary legislation

| Measure | Subject |
|---|---|
| <u>Competition Law</u> (Law No. 21 of April 10, 1996) updated in 2004 and reflecting amendments made in the period between 1996 and 2004. | General provisions |
|  | Anticompetitive Practices |
|  | Economic concentration |
|  | The Competition Office |
|  | The Investigation and Decision-making Procedure |
|  | Sanctions |
|  | Common and Final Provisions |

---

[25]  www.igcti.ro
[26]  www.competition.ro

Report 1 - Country profiles - August 26, 2005

| Measure | Subject |
|---------|---------|
| Government Emergency Ordinance No. 79 of June 13, 2002 concerning the general regulatory framework for communications, approved with amendments and completions, by Law no 591/2002 as Law 591/2002 | General provisions |
| | Authorisation of Electronic Communications Networks and Services Provision |
| | Legal Regime of the Radio Frequency Spectrum and of the Numbering Resources |
| | Rights of Way |
| | Rules Applicable to Providers of Electronic Communications Networks and Services Having Significant Market Power |
| | Promotion of Competition and Resolution of Disputes between Providers |
| | The National Regulatory Authority for Communications |
| | Functions, Objectives, and Responsibilities of ANRC |
| | Consultation, Transparency and Information |
| | Surveillance and Control |
| | Sanctions |
| | Transitional and Final Provisions |
| Government Emergency Ordinance No. 34 of January 30, 2002 on access to public electronic communications networks and to associated infrastructure, as well as their interconnection<br><br>Has been adopted with amendments and completions as Law 527 /2002 | General provisions |
| | Obligations of Undertakings having significant market power |
| | Contraventions and Sanctions |
| | Final Provisions |
| Law no. 506/2004 concerning the processing of personal data and the protection of privacy in the electronic communications sector | General provisions |
| | Scope |
| | Definitions |
| | Security Measures |
| | Confidentiality of Communications |
| | Traffic and Billing Data |
| | Itemised Billing |
| | Presentation and Restriction of Calling and Connected Line Identification |
| | Exceptions |
| | Automatic Call Forwarding |
| | Directories of Subscribers |
| | Unsolicited Calls |
| | Liability |
| | Contraventions and Sanctions |
| | Final and Transitional Provisions |
| Law No. 304 of July 31, 2003 on universal service and users' rights relating to the electronic communications networks and services | General provisions |
| | Scope of universal service |
| | Obligations of operators with significant market power |
| | Rights of end-users |
| | Sanctions |
| | Transitional and Final Provisions |

Report 1 - Country profiles - August 26, 2005

| Measure | Subject |
|---------|---------|
| Law No. 510/2004 on the reorganization of the General Inspectorate for Communications and Information Technology (IGCTI) | General provisions |
| | Organisation and functioning of IGCTI |
| | Functions and attributions of IGCTI |
| | Transitional and final provisions |

**Table 16 – Primary leglislation**

## 2.    Secondary legislation

| Measure | Subject |
|---------|---------|
| Regulations on the organization and operation of the National Regulatory Authority for Communications, approved by Government Decision no 880/2002 | Organisation of ANRC |
| ANRC President's Decision No. 1333/2003 on the general authorization regime for the provision of electronic communications networks and services | Regulation of market entry |
| | Text of the General Authorisation |
| | Notification on the provision of electronic communications networks and services |
| | Standard certificate for providers of electronic communications networks and services |
| ANRC President's Decision No. 136/2002 for the approval of the Regulation on the identification of the relevant markets within the electronic communications sector | General provisions |
| | The identification of the relevant product market |
| | Identification of relevant geographical market |
| | The Hypothetical Monopolistic Test |
| | Identification of a specific relevant market |
| | Annex |
| ANRC President's Decision No. 137/2002 on the approval of the Regulation for conducting market analyses and determining significant market power | General provisions |
| | Criteria for the determination of significant market power |
| | Collective significant power |
| | Final Provisions |
| ANRC President's Decision No. 138/2002 on the imposition of some minimum requirements for the provision of the publicly available electronic communications services | Obligations of publicly available electronic communications service operators |
| | Annex 1 - Publicly available telephony service |
| | Annex 2 - Leased lines service |
| | Annex 3 - Electronic communications services provided on the ISDN network |
| | Annex 4 - Electronic communications services provided through networks using Internet Protocol |
| ANRC President's Decision No. 1331/2003 on the establishment of the procedure for the resolution of disputes within the ANRC's responsibility | General provisions |
| | Initiating the procedure |
| | Preliminary measures |
| | Mediation procedure |
| | Dispute Resolution |
| | Transitional and Final Provisions |

Report 1 - Country profiles - August 26, 2005

| Measure | Subject |
|---------|---------|
| ANRC President's Decision No. 140/2002 on the approval of the National Numbering Plan | National Numbering Plan |
| ANRC President's Decision No. 141/2002 on the application and granting procedure for licences for the use of the numbering resources | Procedure for granting licences for use of numbers |

**Table 17 – Secondary legislation**

**C.    Status and recent developments on key telecommunications issues**

**1.    Introduction**

Romania is an accession country and the Treaty of Accession was signed in Luxembourg on April 25, 2005. This treaty paves the way for ratification procedures that will formalise its membership of the EU on January 1, 2007.

Behind this event are many years of effort for Romania to satisfy all EU requirements. Final accession depends, at least in theory, on Romania's ability to complete this process before the date of accession.

In the telecommunications sector, Romania has already implemented the 2003 acquis through primary and secondary legislation adopted in 2002, 2003 and 2004.

In compliance with the 2003 acquis, Romania has also carried out market analysis for most of the markets recommended as relevant markets by the European Commission. In this regard, Romania is ahead of most EU Member States, although the review of the European Commission has not been carried out since Romania is not yet an EU Member State.

**2.    Licensing / liberalisation / market access issues**

*a)    General situation*

Romania has implemented general authorisations according to the 2003 acquis. Accordingly, only access to limited resources requires individual licences.

Romania reports[27] the following number of licensed or registered companies for the different authorisation categories, i.e. networks and services.

| Type of service | Number of operators |
|-----------------|---------------------|
| Fixed public networks | 1,449 |
| Public radio mobile PAMR networks | 244 |
| Public VSAT networks | 43 |

---

[27] ANRC report of April 25, 2005

Report 1 - Country profiles - August 26, 2005

| Type of service | Number of operators |
|---|---|
| Public mobile networks with satellite transmission | 9 |
| Radio paging public networks | 7 |
| Radio cellular public networks | 5 |
| Total | 1,703 |

**Table 18 - Public network operators**

| Type of service | Number of operators |
|---|---|
| Telephony services provided through fixed public networks | 226 |
| Telephony services provided through terrestrial public mobile networks | 70 |
| Telephony services provided through satellite | 12 |
| Transmission telephony services | 52 |

**Table 19 – Telephony service providers**

| Type of service | Number of operators |
|---|---|
| Internet access | 876 |
| Data transmission services | 628 |
| Professional mobile radio communications | 250 |
| Radio paging | 6 |

**Table 20 –Other types of service providers**

*b)*     *Mobile telephony*

**<u>2G</u>**

Romania has four active mobile networks:

- Zapp (Telemobil) – CDMA 450

- Connex (Mobifon) – GSM 900/1800 – Owned 20% by Vodafone (Expected to increase to 99% by Sept. 2005)

- Orange Romania (previously MobiRom) – GSM 900/1800 – Owned 67% by France Telecom;

- CosmoRom (RomTelecom) – DCS 1800 – Owned 54% by OTE

**3G**

On November 12, 2004 the Ministry of Communications and Information Technology (MCTI) announced Mobifon (Connex) and Orange Romania as the winners of two licences for using radio frequencies to provide 3G mobile communications networks and services after a beauty contest.

According to the terms of reference published on August 31, 2004, MCTI initially intended to issue four 3G licences. Mobifon and Orange were the only bidders that had submitted their applications by October 29, 2004. MCTI announced that by the end of 2005 the process of granting the other two available 3G licences would be re-launched.

The two licensees will have to cover a minimum area including Bucharest and 10 big cities of Romania chosen by each licence holder. The assessment of the coverage, distribution and development rate will be based on the candidates' commitments on three different dates: December 31, 2005 (development phase 1), December 31, 2008 (phase 2) and December 31, 2011 (phase 3).

Starting with April 2005, Mobifon launched 3G services in 8 cities.

3.    **Competitive safeguards, including SMP designation, carrier selection, number portability, accounting separation**

*a)    Carrier selection*

On June 8, 2004 the ANRC granted the first four 16XY carrier selection codes for one-stage dialling to PC-Net, Netmaster, Nevi Cons and Parlatel. Following a consultation in April 2004, on May 20, 2004 the ANRC adopted amendments to the National Numbering Plan to introduce 16XY carrier selection codes.

The new codes will operate alongside the current 10XY codes, but allow for one-stage dialling without an intermediate tone (available to all customers connected to digital exchanges). The current solution, which involves an intermediate tone between the 10XY code and the destination number, is considered to be cumbersome for end-users and to create inter-carrier billing problems. A sub-committee of the ANRC's technical and standardisation commission recommended creating a new category of carrier codes to allow for one-stage dialling.

Carrier selection has been available for all types of calls since February 2003. Carrier selection codes only function with digital exchanges. The obligation for pre-selection is foreseen after mid 2006.

*b)    Number portability*

Number portability is not yet implemented for fixed or mobile networks and there is no date yet for its introduction.

*c)    SMP*

In December 2002 the ANRC designated Romtelecom as having SMP on the market for access to the public fixed telephony networks for the purpose of call origination, termination and transit, on the market for unbundling local loop and terminating segments leased lines market.

Report 1 - Country profiles - August 26, 2005

At the same time, the ANRC designated CosmoRom, Mobifon, Orange and Telemobil as having SMP in the market for call termination on their respective mobile networks. As part of the regulatory obligations, Orange and Mobifon are required to charge cost oriented termination tariffs based on the LRIC model, which will be approved by the ANRC. Until LRIC is implemented, Orange and Mobifon MTRs are subject to a price cap set at 10 US cents per minute.

On November 26, 2004 the ANRC announced the designation of Romtelecom as a provider with significant market power (SMP) in nine out of the ten relevant retail fixed telephony markets, identified by the ANRC President's Decision No 1124/2004 of August 17, 2004.  The decision follows a consultation procedure closed on October 28, 2004. The following markets are covered:

- access at a fixed point to a public telephone network for residential, respectively business users;

- local calls at a fixed location for residential, respectively business users;

- long distance calls at a fixed location for residential, respectively business users;

- international calls at a fixed location for residential, respectively business users; and

- calls at a fixed location to public mobile telephone networks for residential users.

On April 5, 2005 the ANRC submitted a draft decision for public consultation, on the market for calls to public mobile telephone networks, at a fixed location, for business users. In November 2004, the ANRC had concluded that this business-oriented market required further analysis of the competitive effect of direct connections between the switchboards of business users and the networks of mobile operators.

At the time of the analysis, there were 16 providers in this market. Nevertheless, the market share of RomTelecom exceeded 80% of measured traffic volume, and 90% measured by revenue. ANRC has consequently concluded that RomTelecom has significant market power in this market.

NB.    The retail market 7 of the European Commission recommendation on relevant markets (minimum set of leased lines) has not been covered in the context of the ANRC analysis of retail markets.


**4.    Interconnection**


*a)    Reference interconnection offer*

The current RIO was updated according to a decision by the ANRC on November 24, 2004. This decision required RomTelecom to amend its RIO for the terminal segments of leased lines covering the provisions on the forecasting process, the due delivery terms, and the obligation to provide certain types of analogue leased lines based on the RIO. The decision also regulates:

- the tariff for call origination from public pay telephones;

- the correlation of peak hours on the wholesale market with those on the retail market; and

- the calculation of the wholesale tariff charged by RomTelecom for routing emergency 112 calls.

Report 1 - Country profiles - August 26, 2005

## 5.    Local loop unbundling and broadband developments

On July 28, 2004 ANRC adopted a decision on 'principles and conditions of the reference offer for unbundled access to the local loop (RUO)'.

The ANRC Decision determines the maximum tariffs that RomTelecom will be entitled to charge from interested operators for access to the local loop. The tariffs are listed in the table below:

| Service | Monthly rental (excl. VAT) | One-off connection charge (excl. VAT) |
|---------|----------------------------|----------------------------------------|
| Full unbundling | €8.37 | €59 |
| Shared access | €4.20 | €59 |

**Table 21 – Charges for local loop unbundling**

RomTelecom has published a RUO on its website.

## 6.    Retail price regulations

On May 12, the ANRC submitted a draft decision on remedies to be imposed on operators with significant market power on specific relevant retail markets. Their obligations would include:

- implementation of carrier selection and pre-selection;

- service unbundling restrictions;

- ban against charging tariffs below cost;

- ban against charging tariffs that are "excessively high" relative to cost.

## 7.    Universal service developments

### a)    Universal service fund

On November 10, 2004 the universal service fund of €14.3 million for the year 2004 was approved by government decision 1872/2004. The fund will be allocated to compensate the universal service providers for the net cost of providing the following services:

- 35% for granting subsidies and facilities to low income families. About 0.5 million subscribers have applied for subsidy, which will be approximately €10 for each subscriber;

- 45% for installing telecentres; and

- 20% for installing public payphones and for providing subscriber directories and directory services.

Providers of public electronic communications networks and publicly available telephone services with a turnover of at least € 3 million in 2003 are required to contribute 0.8% of their relevant turnover (after having deducted revenue from interconnection and roaming services) to the

Report 1 - Country profiles - August 26, 2005

universal service fund. For the period 2005-2010, the percentage will be reduced to 0.5% with a maximum of € 2 million per provider.

b)      *Provision to low income households*

The ANRC has designated 14 fixed telephone service providers with the task of providing subsidised services for residential subscribers with monthly earnings less than ROL 2.43 million (€60) per family member. The designations were valid until December 31, 2004.

c)      *Telecentres*

Romania has a policy of establishing telecentres for community access to telephony and Internet services as an interim solution before telephony can be generally affordable to individual households. Each telecentre shall include at least two computers with operational access to the Internet, one facsimile machine, one uninterruptible power supply (UPS) device and two telephones.

On December 3, 2004 the ANRC designated Orange Romania as a universal service provider for telecentres following an open call for tenders based on an auction procedure. Orange Romania had bid for telecentres for five localities.

Auctions for additional telecentres, as well as public payphones, will be organised later in 2005.

On May 19, 2005 the ANRC launched a public consultation on the implementation of universal service for electronic communications. The main modification to the present regulations are cooperation with local authorities in order to support universal service operators with the provision of local facilities for call centres, by entering into formal three-party agreements, involving operators, ANRC, local authorities.

## 8.      Other developments (including privatisation)

RomTelecom is owned 46% by the State and 54% by OTE of Greece. The latest transaction took place in November 2002, when OTE increased its stake from 35% to 54% in a deal that included:

- a cash injection of $145 million into RomTelecom's capital;

- conversion to equity of $98 million debt owed to OTE;

- transfer of shares from the Ministry to OTE for $31 million;

- agreements on plans for further investments and work force reductions.

Report 1 - Country profiles - August 26, 2005

**D.    Summary**

| Romania | |
|---|---|
| **Topic** | **Status** |
| National Regulatory Authority | • ANRC<br>• Appointed by the Prime Minister – President replaced early 2005 after elections<br>• 57 professional staff for regulatory tasks<br>• Financed by monitoring fees from the industry (100%)<br>• Broadcasting networks and frequencies in the same framework as telecoms<br>• Shares responsibility for Cable TV with the National Audio-Visual Council and IGCTI<br>• Can resolve commercial conflicts |
| Market Access | • All sectors liberalised<br>• General authorisations for telephony networks and services<br>• General authorisation for ISPs<br>• VoIP categorised as telephony if meeting criteria for publicly available telephony services<br>• Cable TV licence from the National Audio-Visual Council and IGCTI |
| Competitive safeguards | • Carrier selection and pre-selection implemented and active<br>• 47 operators with access code, 31 active<br>• Number portability not yet decided<br>• One fixed and four mobile operators with SMP designation<br>• Reference interconnection published<br>• Reference unbundling offer active, 4,161 unbundled loops |
| Universal service | • Universal service requirements according to EU acquis<br>• USO cost recovery scheme used to finance telecentres, public pay phones and low income subsidies |
| Telephony – Market structure | • S.C. ROMTELECOM S.A. incumbent operator – 45.99% state owned<br>233 operators of telephony services (May 4, 2005)<br>Number allocations: incumbent 48%, alternative operators 52%<br>Three 2G mobile operators / one CDMA operator/ two 3G licences / no service providers<br>Public radio local area networks active<br>Fixed penetration 20.3, digitalisation 77.0, party lines 1.1<br>Mobile penetration 47.1 |
| Telephony – Retail tariffs | • Tariffs not yet rebalanced – Residential access: 6.56[28], Business access: 8.96<br>• Local calls – high range –low tariff package<br>• National long distance calls – medium range<br>• International long distance calls – low range |
| Telephony – Wholesale tariffs | • Interconnection charges fixed network – twice EU average<br>• Interconnection charges mobile network – 50% below EU average |
| Internet and broadband | • Internet penetration n/a<br>Internet dial-up cost -  medium range<br>xDSL lines – 0.01%<br>Number of broadband connections – 1.70% (largely based on mobile subscribers)<br>515 active  ISPs |

---

[28] For an explanation of this indicator, see Report 1 – Country Comparative Report, Chapter III.G.4 on Access charges

## VI.    SERBIA AND MONTENEGRO / MONTENEGRO

### A.    Legislative process and overview of the relevant institutions

### 1.    Legislative Process

The separation of powers is one of the most important principles of the political system in the Republic of Montenegro. Political power is divided into legislative, executive and judicial power. The legislative power is performed by the Parliament, the executive power by the Government and the judicial power by the courts. The Republic of Montenegro is represented by the President[29].

The Parliament of the Republic of Montenegro consists of representatives elected by direct and secret voting of the people of Montenegro. The Parliament's mandate is for four years[30].

Legislative activity is the most important responsibility of the Parliament within the political system in Montenegro. During its regular or extraordinary sessions the Parliament makes decisions by a majority of the votes of the representatives present if more than half of the total number of them are present at the session. On special occasions, the Parliament decides by a majority of votes of the total number of representatives[31].

Draft bills and other regulations can be submitted to the Parliament by the Government, by a Parliamentary representative or by at least six thousand voters[32]. Relevant parliamentary committees, as permanent bodies, are formed to discuss topics within the Parliament's authority. After discussion in the relevant committee, a draft bill is proposed for voting in plenary session.

The procedure to pass a bill[33] starts with the submission of an annotated draft to the Parliament. The Parliament speaker sends the draft bill to the representatives and relevant parliamentary committee. When a draft bill is submitted by a representative or a group of voters, the Parliament speaker sends it to the relevant Government body for an opinion to be given within fifteen days.

Before a draft bill is discussed in a plenary Parliament session, it is discussed by the responsible Parliamentary committee. In its report on the draft bill, the committee can recommend adoption of the entire draft, adoption with a modified text, or not to adopt it at all. A general hearing and a detailed hearing about the draft bill take place in a plenary Parliament session. When the draft bill is adopted in principle, the Parliament proceeds with a detailed hearing and decides about amendments. After finishing the hearing, the Parliament votes on the draft bill. Voting is usually public.

On special occasions, a bill can be passed by an emergency procedure. That is strictly for bills to resolve issues that have developed due to unforeseen circumstances, and not passing an emergency law in this way could have harmful consequences. In this case, after the relevant committee has considered the draft bill, Parliament can decide to start the draft hearing immediately without a written report. Voting takes place immediately after the hearing.

---

[29] According to article 5 of the Constitution of the Republic of Montenegro

[30] According to article 77 and article 78 of the Constitution of the Republic of Montenegro

[31] According to articles 81, 82 and 83 of the Constitution of the Republic of Montenegro

[32] According to article 85 of the Constitution of the Republic of Montenegro

[33] The entire procedure of passing the bills and other official records in competence of the Parliament is regulated by Parliamentary Rules of Procedure (Official Gazette of the Republic of Montenegro No. 37/1996, 16/1997, 24/1997)

Report 1 - Country profiles - August 26, 2005

After adoption of the bill in plenary session, the Parliament speaker submits the bill to the President of Montenegro for proclamation. The President proclaims the bill by decree within a period of seven days starting from the day of its adoption by Parliament. The bill is then promulgated in the Official Gazette of the Republic of Montenegro. The President can, within the period of seven days starting from the day of adoption, express his disagreement with the text of the bill as adopted and demand the Parliament to have it reconsidered. However, the President is obliged to promulgate a law passed for the second time by the Assembly[34].

## 2.    Overview of the Relevant Institutions

The main organisations in the Montenegrin electronic communications regulatory framework are shown in Figure 6 below and are discussed in the paragraphs that follow.



**Figure 6 - Main institutions in the Montenegrin electronic communications regulatory framework**

Responsibility for telecommunications in Montenegro is divided between several bodies. In accordance with the Law on Telecommunications[35], which is the basic legal instrument, the bodies that are responsible for telecommunications are: the Government of the Republic of Montenegro[36],

---

[34] According to article 89. of the Constitution of the Republic of Montenegro
[35] Official Gazette of the Republic of Montenegro No. 59/2000, 58/2002
[36] Web presentation available at http://www.vlada.cg.yu/eng/

the Ministry responsible for telecommunications (the Ministry of Economy[37]), and the Agency for Telecommunications[38].

*a)      The Government of the Republic of Montenegro*

The Government has the following functions in telecommunications[39]:

- establishing development plans for telecommunications sector;

- approving the national frequency plan;

- defining the measures to ensure integrity and security of telecommunication networks in exceptional circumstances.

Development plans for telecommunications determine the strategy, principles and phases of development of the telecommunication sector and contain the liberalization plan for specific services. The Government reviews the realization of the development plans at least once a year and evaluates the need for modification in order to harmonise with the relevant legal and technical national and international standards and regulations.

*b)      Ministry of Economy of the Republic of Montenegro*

The Ministry of Economy's responsibilities for telecommunications are the following[40]:

- suggesting development plans to the Government and implementing them;

- defining the universal services which should be provided by the public fixed telecommunication network operators;

- passing regulations on telecommunications;

- coordinating and stimulating research and development in the telecommunications sector;

- participating in the work of international organizations;

- determining the amount of registration and licence fees for telecommunications service providers and the fees for radio-frequencies;

- executing Government decisions in connection with the functioning of telecommunication networks in exceptional circumstances.

*c)      Agency for Telecommunications*

The Agency for Telecommunications was founded[41] as a legal entity in 2001 by a Decision of the Government of Montenegro[42]. It is a regulatory body, functionally independent of all entities

---

[37] Web presentation available at http://www.vlada.cg.yu/eng/minekon/
[38] Web presentation available at http://www.agentel.cg.yu/english/
[39] According to article 5 of the Law on Telecommunications
[40] According to article 6 of the Law on Telecommunications
[41] According to article 7 of the Law on Telecommunications
[42] Official Gazette of the Republic of Montenegro No. 10/2001,

Report 1 - Country profiles - August 26, 2005

operating telecommunications networks or providing equipment and services. The primary task of the Agency is implementing regulatory framework for the telecommunications market in Montenegro and monitoring the compliance of telecommunications service providers with legal and licence requirements.

### **The Agency's Responsibilities**

The Agency is responsible for[43]:

- adopting implementing regulations in accordance with the Law on Telecommunications;

- licensing and registration of telecommunications service providers in accordance with the Law on Telecommunications and monitoring compliance with the licence terms;

- supervising compliance with national and international technical standards;

- drafting the proposals for the national frequency plan and spectrum regulations;

- resolving disputes between telecommunications service providers and setting terms and conditions for interconnection and network access, resolving disputes between end users and telecommunications service providers; between telecommunications networks operators and land owners;

- regulating, supervising and enforcing prices for telecommunications services and prices for network interconnection;

- protecting end user rights and dealing with end user complaints;

- preparing the national numbering plan and allocating numbers to public telecommunications service providers and network operators on a non-discriminatory basis;

- monitoring competition in the telecommunications sector, determining undertakings with significant market power and their obligations;

- performing other supervisory activities, according to the Law, which are necessary for exercising the authority of the Agency under the Law and regulations passed by the Ministry[44].

The Agency is accountable for its work to the Government[45]. It prepares and submits an annual report to the Government, including the financial aspects of its work. The Agency's report is a public document and contains data related to:

- the dynamics of competition in the telecommunications market and the situation related to the application of tariff policy principles;

- the degree of universal service availability with an evaluation;

- evaluation of the efficiency of the use of frequency resources for civil use;

---

English version at http://www.agentel.cg.yu/english/agencija/osnivanje.htm
[43] According to article 12 of the Law on Telecommunications
[44] Official Gazette of the Republic of Montenegro No. 39/2003
[45] According to article 15 of the Law on Telecommunications

## Organizational structure of the Agency

In November 2001, the Agency adopted the Statute of the Agency for Telecommunications[46] regulating its tasks, organizational structure, planning of the budget and financing of projects.

The Agency is governed by the director appointed by the Government for a period of four years. There is also a deputy director appointed by the Government under the same conditions. The director and deputy director cannot be appointed more than twice consecutively[47]. The Law on Telecommunications strictly forbids any conflict of interests[48]. The director, his deputy and members of their families are not allowed to have proprietary rights or other interests in entities exploiting telecommunication networks, providing equipment or offering services.

The Agency has 34 employees and carries out its activities in three sectors:

- Sector for legal and administrative services;

- Sector for economic services;

- Sector for technical services.

## Council of the Agency for Telecommunications

At the beginning of 2004, the Agency for Telecommunications by its Decision[49] founded the Council of the Agency as an expert advisory body with the following responsibilities:

- evaluating the implementation of the Law on telecommunications, of domestic and international standards and other relevant regulations;

- reviewing the proposal for the Telecommunications development plan and giving suggestions for its amendments;

- reviewing proposals for regulations in the area of telecommunications;

- evaluating the process of market liberalization and the degree of competition and interim measures for improvement;

- taking part in an open consultation process led by the Agency for Telecommunications;

- organizing international and regional seminars and scientific events related to the development of telecommunications;

- cooperating with international organizations in the area of telecommunications and representing the Agency;

- reviewing education plans for the Agency's professional staff;

Since its founding as the Agency's advisory body, the Council has had seven sessions.

---

[46] According to article 8 of the Law on Telecommunications. English version at
   http://www.agentel.cg.yu/english/regulativa/statut.htm
[47] According to article 9 of the Law on Telecommunications
[48] According to article 10 of the Law on Telecommunications
[49] Official Gazette of the Republic of Montenegro" No. 18/2004

Report 1 - Country profiles - August 26, 2005

**Financing of the Agency**

During 2001, the Agency was financed by the Government. Today, the resources for the Agency's activities come from several sources[50]:

- licence fees;

- registration fees;

- radio frequencies fees;

- other income from the Agency's activities, in accordance with the Law.

If these resources are not sufficient to cover the costs of the Agency's activities, the additional funds are provided from the state budget. However, if income exceeds expenditure for a fiscal year, the surplus is transferred to the state budget.

**Appeals against the Agency's decisions**

In its administrative procedures, the Agency acts in accordance with the Law on Telecommunications as a special law in that area and the Law on General Public Administrative Procedure[51] as a general law in Montenegro's legal system.

The decisions made by the Agency in the administrative procedure are final[52]. However, it is possible, in accordance with the Law on Administrative Disputes[53], to submit an appeal against an Agency's decision to the Supreme Administrative Court of Montenegro, within 30 days starting from the date of submitting official records of the decision to the party concerned. The Administrative Court rules on the basis of the correct application of the law, and not the merits of a specific case.

**B.    Main legal instruments**

**1.    Primary legislation**

The basic legal instrument regulating the telecommunications sector in Montenegro is the Law on Telecommunications. The Law: regulates the performance of telecommunications activities; defines the role of the Agency for Telecommunications, regulates network construction conditions, as well as maintenance, security, use and supervision of telecommunication networks, objects and equipment. It also regulates relations between providers and users of telecommunication services, provision of the universal service, issuing of licences, as well as managing, use and control of radio-frequency spectrum.

The contents of the Law on Telecommunications are as follows:

---

[50] According to article 13 of the Law on Telecommunications
[51] Official Gazette of the Republic of Montenegro No. 60/2003
[52] According to article 25 of the Law on Telecommunications
[53] Official Gazette of the Republic of Montenegro No. 60/2003

Report 1 - Country profiles - August 26, 2005

| No. | LEGAL INSTRUMENT | CONTENT |
|---|---|---|
| 1. | Law on Telecommunications<br><br>(Official Gazette of the Republic of Montenegro No. 59/2000, 58/2002) | General provisions |
| | | Competencies |
| | | Licences for telecommunication networks |
| | | Tariffs, interconnection, universal service and leased lines |
| | | Radio-frequency spectrum |
| | | Conditions for building, security, maintenance and use of telecommunication network, objects and equipment |
| | | Customer protection |
| | | Privacy and security |
| | | Supervision |
| | | Penalty provisions |
| | | Transitive and final regulations |

**Table 22 – Primary Legislation**

## 2.     Secondary Legislation

During the four-year period of its existence, the Agency adopted series of regulations dealing with different aspects of telecommunications. A chronological review of these is as follows:

| No. | LEGAL INSTRUMENT | CONTENT |
|---|---|---|
| 1. | Rulebook on general conditions of Interconnection agreements<br><br>(Official Gazette of the Republic of Montenegro No. 36/2001) | The rights and duties of the parties concluding an Interconnection agreement as well as the procedure. Signed Interconnection agreements are submitted to the Agency, which assesses their compatibility with the Law on Telecommunications and keeps a register of concluded agreements. In case an Interconnection Agreement does not comply with the Law, the Agency informs the contracting parties and requires amendments to the agreement. Operators are obliged to act in line with the defined requirements. Should they not do so the Agency determines the conditions for interconnection in line with the stipulations of this Rulebook |
| 2. | Statute of the Agency for Telecommunications<br><br>(Official Gazette of the Republic of Montenegro No. 8/2002) | Basic legal instrument of the Agency for Telecommunications. |
| 3. | Rulebook on issuing and registering general and specific licences<br><br>(Official Gazette of the Republic of Montenegro No. 8/2002) | The Rulebook prescribes the procedure of accepting and handling licence requests, tender procedure, the conditions for modification and revoking licences, keeping a register of licences, as well as maintaining registers by the Agency. |

Report 1 - Country profiles - August 26, 2005

| No. | LEGAL INSTRUMENT | CONTENT |
|---|---|---|
| | Rulebook on amendments to the Rulebook on issuing and registering general and specific licences<br><br>(Official Gazette of the Republic of Montenegro No. 28/2005) | Amendments prescribe the way of issuing of general licence related to obtaining technical documentation for telecommunication network and objects. Amendments are related to defining the content of the licence, as well as data that should be delivered together with the application during the procedure. |
| 4. | Rulebook on the determination of registration fees and licence fees of telecommunication operators and providers of telecommunication services<br><br>(Official Gazette of the Republic of Montenegro No. 8/2002) | Amounts and payment of fees related to registration of licences for telecommunications operators and providers of telecommunications services. |
| | Rulebook on amendments to the Rulebook on the determination of registration fees and licence fees of telecommunication operators and providers of telecommunication services<br><br>(Official Gazette of the Republic of Montenegro No. 68/2004) | Amendments provide for the increase in the amount of some fees regulated by the law. |
| 5. | The Rulebook on the conditions for providing the services of public pay phones<br><br>(Official Gazette of the Republic of Montenegro No. 14/2003) | The concept of public pay phone services, conditions for placing public pay phones, as well as any necessary conditions for providing this service. |
| 6. | The Rulebook on amateur radio-communication<br>(Official Gazette of the Republic of Montenegro No. 30/2003) | The working conditions of radio amateur operators, types of radio amateur stations, technical conditions for their use, grounds for composing dial codes and identification codes for broadcasting of amateur stations. |
| 7. | The Rulebook on the protection of customers of public telecommunication services<br><br>(Official Gazette of the Republic of Montenegro No. 63/2003) | The conditions for customer protection and procedures related to this matter. |
| 8. | The Rulebook on forms and fees for issuing licences for radio stations<br><br>(Official Gazette of the Republic of Montenegro No. 66/2003) | The forms of licences for radio stations, as well as the amount of fees for their issuance. |
| | The Rulebook on amendments to the Rulebook on forms and fees for issuing licences for radio stations<br><br>(Official Gazette of the Republic of Montenegro No. 35/2004) | Amendments regulate the conditions for issuing licences for radio stations on ships and other vessels. |
| 9. | The Rulebook on the conditions for using short-range devices in local radio networks in frequency bands of 2400-2483.5 MHz<br><br>(Official Gazette of the Republic of Montenegro No. 32/2004) | The conditions for use of short-range devices in local radio networks, conditions for acquiring licences for renting local radio networks, procedure of registration of operators of local radio networks and other matters related to using short-range devices. |

Report 1 - Country profiles - August 26, 2005

| No. | LEGAL INSTRUMENT | CONTENT |
|-----|------------------|---------|
| 10. | The Rulebook on the conditions for preparation of technical documentation for telecommunication networks and telecommunication equipment<br><br>(Official Gazette of the Republic of Montenegro No. 61/04) | The conditions related to technical documentation, which should be fulfilled for construction or reconstruction of telecommunication networks and equipment. |
| 11. | The Rulebook on the tariffs for the public telecommunications service<br><br>(Official Gazette of the Republic of Montenegro No. 73/04) | The conditions and principles on the establishment of tariffs for the public telecommunications service |

**Table 23 – Secondary Legislation**

**C.    Status and Recent Developments on Key Issues**

**1.    Licensing / Liberalization / Market Access Issues**

*a)    Licensing regime*

In accordance with the Law on Telecommunications, as one of its top priority aims, the Agency established the principles for telecommunications liberalisation. According to these principles, telecommunications network operators and of telecommunications service providers must apply for a licence and be registered with the Agency. In 2002, the Agency adopted a Rulebook, which specifies how licences are issued and how the registers of general and specific licences are maintained[54] (see Table 23, point 3). This Rulebook was amended in 2005 in order to improve the text adopted in 2002. The amended Rulebook specifies how general licences, related to obtaining technical documentation for telecommunication network and objects, are issued.

The Agency issues general and special licences.

- **General licence**: issued for performing telecommunications activities when a specific licence is not required. The licence holder has to meet the requirements related to the provision of information and fair operation, enabling the supervision for inspection purposes.

- **Specific licence**: is issued for building, exploiting and maintaining public telecommunications network for the purpose of providing public telecommunications services. The licence holder must meet the conditions and requirements related to open access to networks and services, as well as interconnection with other networks, the conditions arising from the termination of service provision or public safety, the conditions and requirements related to the protection of service users and the protection of privacy of communications, availability of information and fair operation, supervision of inspectors, the conditions related to charging fees and keeping accounting records, as well as the requirements concerning environmental protection.

    The specific licences are issued such as:

---

[54] English version available at http://www.agentel.cg.yu/english/regulativa/licence.htm

Report 1 - Country profiles - August 26, 2005

- specific licences for telecommunication networks and or services;

- specific licences for the use of radio frequencies.

Licence fees must be paid for a licence to be issued, according to the Rulebook on the specification of registration fees and licence fees for telecommunication operators and telecommunications service providers[55] (see Table 23, point 4).

All telecommunication operators and telecommunications service providers pay a one off registration fee of 1,000 euro.

Applicants for a general licence pay a one time fee of 10,000 euro. In exceptional cases, with the prior approval of the Ministry of Economy, the Agency can determine a fee for the issuance of a general licence that cannot be less than 3,000 euro as well as more favourable terms of payment for enterprises with lower revenues.

First time applicants for specific licences pay the one time fee, determined according to the best bid offer in the tendering procedure. The minimum amount of the fee is determined by the Ministry of Economy. On the other hand, applicants already performing telecommunication activities pay a one time fee for the issuance of the specific licence according to the total income made from providing telecommunication services in the previous year. The fee ranges from 2,500 euro to 6 million euro. The amount of 6 million euro is a ceiling irrespective of the income.

The incumbent fixed telecommunication operator, Telekom Montenegro, paid a one off fee of 6 million euro for a licence and the existing telecommunications mobile operators, ProMonte GSM and Monet, paid 4.25 million euro each.

For international traffic, a fee of 120,000 euro is paid for each year that the licence is valid.

Owners of specific licences also pay a fee determined by the licence itself, which is 1% of the total monthly income made by telecommunication operators or providers of telecommunication services.

Owners of specific licences using frequencies for radio stations for functional connection systems that do not generate revenue from the frequencies used are exempt from paying a one off fee. However, they pay an annual fee, which depends on the size of the radio network (the number of emitter stations), as follows:

- for a radio network without emitter stations – 100 euro;

- for a radio network with one emitter station – 200 euro;

- for a radio network with more than one emitter stations the fee is 200 euro per station.

Health organizations, fire services, organizations funded from the budget of the Republic of Montenegro and other organizations performing similar activities are exempt from paying the annual fee for a special licence.

The Agency has issued 82 licences, 7 general and 75 specific[56]. With the adoption of the Broadcasting Law[57] a certain number of licences fall under the authority of the Agency on Broadcasting.

_____

[55] English version available at http://www.agentel.cg.yu/english/regulativa/naknade.htm

Report 1 - Country profiles - August 26, 2005

*b)    Fixed voice telephony*

Telekom Montenegro is the only public telecommunication operator licensed to maintain and operate a fixed public telecommunication network and provide fixed public telecommunication services. Telekom Montenegro's exclusive rights ended on December 31, 2003[58]. In March, 2005 Magyar Telekom purchased 51.12% of Telekom Montenegro's shares.

*c)    Mobile telephony*

There are two national mobile operators in Montenegro's telecommunication market: ProMonte GSM is 100% owned by Telenor Mobile Communications AS and Monet is owned by Telekom Montenegro. Both operators have a licence for 2G mobile networks (GSM 900, GSM 1800). There are no licences for 3G or other 2G technologies. Mobile telephony is currently experiencing the most dynamic development in the telecommunications sector. In the first quarter of 2005, there were approximately 483,000 mobile telephone users in Montenegro, which is an increase of about 15% compared to the 1st quarter in 2004.

## 2.    Interconnection

The Law on Telecommunications contains regulations[59] defining the rights and obligations of all telecommunication operators to negotiate on interconnection for the provision of services.

Additionally, when the Agency for Telecommunication adopted a Rulebook on the general conditions for Interconnection Agreement[60] (see Table 23, point 1) defining the rights and obligations of both parties when interconnection agreements are concluded. The Rulebook is based on the best international practice and the application of EU Directives on interconnection.

As required by this Rulebook, Telekom Montenegro, as a public telecommunication operator with significant market power, produced its Reference Interconnection Offer (RIO). This document was published in December 2004, having received approval from the Agency. The RIO defines various aspects of technical and commercial conditions under which Telekom Montenegro offers its interconnection services to other operators. Today, Telekom Montenegro has interconnection agreements with both mobile operators in Montenegro and there is an interconnection agreement between the mobile operators as well.

With a view to solving some conformance issues, the Agency has mediated between the telecommunication operators on several occasions. In 2003, there were conflicting interpretations of how the interconnection rates between Telekom Montenegro and mobile operators ProMonte GSM and Monet should be calculated. Furthermore, the Agency held a meeting with the GSM operators ProMonte GSM and Monet in 2003, with the aim of harmonizing their positions on their direct connection. The meeting resulted in the conclusion of an interconnection agreement between ProMonte GSM and Monet. Having assessed the conformity of the agreement with the Law on Telecommunications and having made the necessary changes, the Agency approved the agreement in 2004.

---

[56] Source – website of the Agency http://www.agentel.cg.yu/
[57] Official Gazette of the Republic of Montenegro No. 51/2002, 62/2002, 46/2004, 56/2004
[58] According to article 27. of the Law on Telecommunications
[59] Articles 30 - 33 of the Law on Telecommunications
[60] English version available at http://www.agentel.cg.yu/english/regulativa/interkonekcija.htm

Report 1 - Country profiles - August 26, 2005

### 3.    Tariff regulations

Tariff policy is a responsibility of the Agency. The Law on Telecommunications stipulates that tariffs for public telecommunications services, which are offered on competitive grounds, are set by the telecommunication operators and telecommunications service providers. However, if there is only one public telecommunication operator or provider of telecommunication services, or when a provider of public telecommunication services has significant market power in the provision of a service, then the Agency, in consultation with the operator or service provider, implements a special regime for price regulation. When the tariffs are defined, the Agency enforces international standards and references[61].

In these cases, the Rulebook on tariffs for public telecommunication services is applied (see Table 23, point 11). It defines the terms and conditions as well as the procedures for determining the public telecommunication service tariffs.

In line with this Rulebook, apart from applying for a tariff definition or change, a public telecommunication operator or a public telecommunication service provider is obliged to provide the following data:

- a detailed description of the service proposed for the definition and or change of a tariff, as well as the data on the quality of the service;

- data on the income made from the service in the two-year period prior to submitting an application and the data on the income envisaged in the two-year period after submitting the application (if a service tariff is changed), or data on the income envisaged for a two-year period (if a service tariff is being defined);

- data on services provided during the past two years and a plan of service sales in the two-year period following the application, as well as data on the real and planned capacity usage for the same period (if a service tariff is changed), or data on the planned service sales and capacity usage in the two-year period (if a service tariff is being defined);

- analyses of the costs of providing the services, especially the costs of labour, material, interest and capital;

- data on the financial effect that a tariff change will have on the users, especially the expenditure structure for individuals and legal entities, as well as on the competition that resells the services.

When defining and changing the telecommunication service tariffs, the Agency takes into consideration the macro-economic policy measures determined at the level of the Republic, as well as practices in neighbouring and EU countries.

The Agency will notify the public telecommunications service operator or provider of its approval or rejection of the proposed tariffs no later than seven days after the request and the complete documentation have been received. In addition, in line with its official duty, the Agency can define the maximum tariff for certain services. The Rulebook also defines the right to a discount offer, a free-calls option, subscription to telephone services, compensation for the establishment of subscription relations, and other matters that are important to the provision of public telecommunication services. The application of the Rulebook is monitored by the Agency.

---

[61] Articles 28 - 29 of the Law on Telecommunications

Report 1 - Country profiles - August 26, 2005

During 2004, the Agency also adopted a Rulebook on the tariffs for the public telecommunications service[62] (see Table 23, point 11). The Rulebook defines conditions and principles on the definition of tariffs for public telecommunications service.

The tariff rebalancing process in Montenegro started in 2004 and is planned to complete in 2010.

## 4.    Universal Service

The Law on Telecommunications sets out the concept of universal service. The Ministry of Economy is responsible for defining the rules related to the conditions for the provision of universal service and the procedures to be applied during the service provision. The Ministry nominates the universal service providers, as well as the initial group of universal services, which have to include:

- access to public fixed telephony service;

- equal access publicly available phone services for handicapped customers and customers with special social needs;

- free access to emergency services;

- access to operator's services and directory enquiries.

The Ministry periodically, at least once every two years, reviews the group of universal services. The list of universal services can be changed by the Ministry.

A preparation the draft Rulebook on universal service is in progress. The draft is expected to be published for a consultation during 2005.

## 5.    Consumer protection

The Law on Telecommunications explicitly states the general right to use public telecommunication services, under established prices and conditions, if it is technically possible[63]. Every user has right to:

- access the public telecommunication network, within 15 days from the day a request is submitted, if it is technically possible;

- unlimited and high quality use of telecommunication services;

- detailed bill including price of telecommunication services in a form which enables control;

- secrecy of telecommunication.

The mutual rights and obligations between providers of public telecommunications services and users are regulated by the contract, whose content is defined by the Agency.

The Agency for Telecommunications has also adopted a Rulebook on the protection of customers of public telecommunication services[64] (see Table 23, point 7). The Rulebook defines the conditions for the protection of customers, as well as the procedure for their complaints.

---

[62] Official Gazette of the Republic of Montenegro No. 73/04
[63] According to article 58. of the Law on Telecommunications

Report 1 - Country profiles - August 26, 2005

**6.    Public pay phone services**

During 2003, The Agency adopted a Rulebook on the conditions for providing public pay phone services[65] (see Table 23, point 5), which defines the conditions for locating public pay phones, as well as the conditions for providing this service in Montenegro.

Three companies have licences for providing pay phone services:

- Montenegro Card, which is owned by Telekom Montenegro (51%), Hellascom AE Athens (40%), and Jugoimport Mont d.o.o.(9%), and has approximately 240 public pay phones.

- The Post of Montenegro d.o.o., which has approximately 380 public pay phones

- Bristol d.o.o. Herceg Novi with 15 public pay phones

According to the Agency for Telecommunications' data, a decreasing traffic trend for this service has been noted during 2004.

**7.    Internet Services**

Two Internet service providers offer internet services based on licences issued by the Agency for Telecommunications. Internet Montenegro, which started in 1997, has a dominant market share of 93% while Informatika Montenegro, which started in 2003, has a market share of 7%.

The Agency prepared a draft Rulebook defining the conditions for the provision of Internet services. The main reason for adopting this rulebook is because of Internet Montenegro's dominant market position. Internet Montenegro, a company founded by Telekom Montenegro, has significant telecommunication infrastructure, as well as free access to specific resources. Accordingly, other potential Internet providers are in an unequal position. The draft Rulebook on Internet services was discussed in the Agency's council session in November 2004. The process of public consultation with relevant market participants is currently in progress. The adoption of this Rulebook is expected by the fourth quarter of 2005.

---

[64] Official Gazette of the Republic of Montenegro No. 63/2003
[65] Official Gazette of the Republic of Montenegro No. 14/2003

Report 1 - Country profiles - August 26, 2005

## D.    Summary

| Montenegro | |
|---|---|
| **Topic** | **Status** |
| National Regulatory Authority | • Agency for Telecommunications<br>• Appointment by Parliament<br>• 17 professional staff for regulatory tasks<br>• Financed primarily from revenue related fees (98%)<br>• Broadcasting networks in a different regime, but the NRA is responsible for frequency allocations<br>• Not responsible for Cable TV<br>• Can resolve commercial conflicts |
| Market Access | • All sectors liberalised<br>• Individual licences required for telephony networks and services<br>• General authorisation for ISPs who operate without network ownership<br>• VoIP is a telephony service<br>• Individual licences required for Cable TV from Broadcasting Agency |
| Competitive safeguards | • Carrier selection and pre-selection not yet decided<br>• Number portability not yet decided<br>• One fixed operator with SMP designation<br>• Reference interconnection offer published<br>• Reference unbundling offer not decided |
| Universal service | • Universal service requirements according to EU acquis<br>• USO cost recovery scheme in draft, not yet applied |
| Telephony – Market structure | • Telecom Montenegro incumbent operator 51.12% state owned<br>• One national operator<br>• Two 2G mobile operators / no 3G / no service providers<br>• Public radio local area networks active<br>• Fixed penetration 30.6, digitalisation 99.8, party lines 6.3<br>• Mobile penetration 77.9 |
| Telephony – Retail tariffs | • Tariffs not yet rebalanced – Residential access: 3.24[66], Business access: 5.18<br>• Local calls – low range –low tariff package<br>• National long distance calls – low range<br>• International long distance calls – medium range |
| Telephony – Wholesale tariffs | • Interconnection charges fixed network – extremely high range<br>• Interconnection charges mobile network – 10% above EU average |
| Internet and broadband | • Internet penetration 16.1%<br>• Internet dial-up cost – low range<br>• xDSL lines – information not available<br>• Number of broadband connections – information not available<br>• 2 national ISPs |

---

[66] For an explanation of this indicator, see Report 1 – Country Comparative Report, Chapter III.G.4 on Access charges

## VII.   SERBIA AND MONTENEGRO / SERBIA

### A.   LEGISLATIVE PROCESS AND OVERVIEW OF THE RELEVANT INSTITUTIONS

### 1.   INTRODUCTION

The separation of posts and telecommunications, as the first step in the process of telecommunications sector structural reforms, took place in Serbia in June 1997, with the Telecom Law of the Republic of Serbia, which separated the telecommunications operation from the Public Enterprise of PTT and established a new company "Telekom Serbia". At the same time, 49% of "Telekom Serbia" was privatized by direct negotiation with Telecom Italia (29%) and OTE, Greece (20%). Mobile operations were performed by MOBTEL, a private company, which at that time was owned 51% by BK Trade company and 49% by the Public Enterprise of PTT "Serbia". The obsolete federal level PTT Law from the Federal Socialistic Republic of Yugoslavia-FSRY was maintained at the federal level. The Federal Ministry of Telecommunications established in 1997, whose responsibilities cover not only the telecommunications sector but also broadcasting and post, defines the policy and regulatory framework. There were two ministries responsible for telecommunications at the republic level: the Republic Ministry of Transport and Communications of Serbia, and Republic Ministry of Industry of Montenegro. The Federal Ministry was dismantled in 2002 when the new Constitutional Act of The State of Serbia and Montenegro was adopted by the Federal Parliament.

The unstable political situation in Serbia and several changes of government has delayed the telecommunications sector regulation. The overlap of the existing Federal Law and Republic Telecom Law is still present and a regulatory vacuum in the telecommunications sector in Serbia is evident. The Community of Yugoslav PTT performs some regulation on technical matters, type approval, numbering and Master plan, but this body is financed by post and telecommunications operators and there is no independency in its operation.

After the last change of the Government of Serbia, the Ministry of Transport and Communications was dismantled and the Ministry for Capital Investments took over responsibility for the telecommunications sector.

The Telecommunication Agency, as an independent regulatory body with a wide range of responsibilities such as regulation, coordination, development, tariff regime, and also the issue of licences for public telecommunications networks and services, spectrum management and technical approvals, has not yet been established. However, on May 23, 2005 the Serbian National Assembly appointed the Managing Board, and this could be a first step towards regulating the sector.

A similar situation exists in the Broadcasting Sector. The radio broadcasting law with changes and amendment was approved in 2002 and 2004, but due to several changes of the Broadcasting Regulatory Agency's council members, the implementation of the Law only covers a few topics.

### 2.   Legislative process

The Republic of Serbia includes the Autonomous Province of Vojvodina and the Autonomous Province of Kosovo and Metohia these being Constituents with territorial autonomy (in accordance with the United Nations Security Council Resolution 1244, Kosovo currently is a territory under interim international administration). Legislative power is vested in the National Assembly. The National Assembly consists of 250 representatives elected, every four years. The Government or Members of the National Assembly of Republic of Serbia can submit draft Laws (Bill).

Report 1 - Country profiles - August 26, 2005

In accordance with the Rules of Procedure, which regulate the organization and work of the National Assembly (Articles 136, through 140) the following procedures should be followed in order to adopt a Law:

- Before the National Assembly considers a draft law, it is reviewed by the responsible Committees and the Government (if it is not the initiator of the law). The responsible Committees and the Government prepare reports and/or opinions and propose whether the National Assembly should accept, in principle, the draft law or not. If the responsible Committees and the Government propose that the law be accepted in principle, they are obliged to specify whether they accept the law as a whole or with amendments. The responsible Committees and the Government shall forward to the National Assembly reports or opinions, as a rule, within not less than five days prior to the date of the opening of the sitting of the National Assembly, which will consider the draft law. If the responsible Committees and the Government do not provide reports or opinions, the National Assembly may decide to consider the draft law without them or may set a new deadline by which they are obliged to do so. A first debate is held on the draft law in principle. The National Assembly may decide to have a joint debate in principle on several draft laws that are on the agenda of the same sitting and are mutually conditioned or the solutions they contain are mutually linked but the decision on each individual motion must be made separately. After the conclusion of the debate in principle, the National Assembly shall move on to debate the particulars.

- The debate on particulars takes place on the Articles to which the submitted amendments refer and on amendments proposing the inclusion of new provisions. The following people may take part in the debate: the initiator of the amendment or if the amendment is proposed by several Deputies - their authorized representative; the initiator of the act; the Rapporteur of the Committee; Chairman or representative of the Deputies' Group and the Government's authorized representative if the Government is not the initiator. They have the right to take part by taking the floor once and for not more than 5 minutes. When the debate in principle on a bill concludes, the initiator or his authorized representative has the right to make a concluding statement. The initiator of the law has the right to withdraw the draft law until the debate on the draft law, at a sitting of the National Assembly, has finished.

- If the National Assembly adopts several amendments, it may suspend the adoption of the bill as a whole and ask the Legislative Committee to perform a legal-technical analysis of the text in cooperation with the bill's initiator, or ask the responsible Committee to harmonize the adopted amendments among themselves and with the text of the bill.

- After the National Assembly has adopted the act, it is sent to the President of the Republic for ratification. Once the President has signed the act, it can be published in the Official Gazette of the Republic of Serbia. The President can also exercise his right to veto the act. In this case, it is returned to the National Assembly for further consideration.

## 3.  Overview of the relevant institutions

The institutional structure of the telecommunications sector in Serbia is shown in Figure 7 below and is discussed in the following paragraphs.

Report 1 - Country profiles - August 26, 2005



**Figure 7 - Main institutions in the Serbian telecommunications regulatory framework**

a)    *Ministry for Capital Investments*

The Ministry for Capital Investments (MKI) is responsible for transport (road, air, maritime, railway, and inter-modal traffic), post and telecommunications matters.

The MKI is responsible for overall telecommunications policy and for preparing secondary legislation based on the Telecommunications Law (the New Telecommunications Law, Official Gazette 44/03, referred to as "the Law" in the following text). Article 6 of the Law authorises MKI to:

- Prepare a proposal for the strategy for telecommunications development in the Republic.

- Take measures to promote research and development in the telecommunications sector, in cooperation with the ministry responsible for the promotion and development of scientific research.

- Prepare a proposal for the Radio Frequency Bands Allocation Plan and adopt the Radio Frequency Assignment Plan based on the proposal made by the Telecommunications Agency.

- Define, in accordance with the Radio Frequency Allocation Plan, the number and timing of individual licences to be granted for public telecommunications networks or services for which the Law permits a limited number of licences to be granted. It must also define the

Report 1 - Country profiles - August 26, 2005

minimum conditions required for the granting of these licences including the minimum amount of a one-time fee payable for each licence granted.

- Define the list of universal services to be provided by the operators of public fixed telecommunications networks, based on the proposal made by the Telecommunications Agency.

- Take measures in order to prevent cross-ownership or other forms, which could prevent competition, caused by relationships between telecommunications operators, which existed when the Law came into force, with the aim of eliminating and preventing monopolies and ensuring full competition in accordance with the Law.

- Supervise the implementation of the Law and regulations adopted that are based on it.

- Implement the decisions and other Government acts relating to telecommunications networks, systems and equipment, in the event of war or a state of emergency.

The Government of the Republic of Serbia defines the policy and strategy of telecommunications development and adopts the Radio Frequency Bands Allocation Plan following a proposal by the MKI, prepared with the participation of the responsible authorities in the Autonomous Region,

The Ministry of Capital Investments is responsible for the ownership functions of the incumbent operator Telekom Serbia.

*b)    Community of Yugoslav PTT*

In the current situation, apart from the MKI, the Community of Yugoslav PTT-CYPTT is also involved in regulatory matters. It is the body established by the Federal Law on the Community of Yugoslav PTT (Official Gazette 17/78) and acts as the "regulator" and as an association of operators from different republics. After the separation of the Federal Socialist Republic of Yugoslavia (FSRY), it still performs this role today. Its main fields of responsibility cover technical regulations (standards), equipment type approval (homologation/certification), numbering plan, network organization, interworking between different networks. At the same time, acting as the association of operators, the CYPTT deals with traffic routing and joint telecommunications capacity planning. Until very recently, the CYPTT was responsible for international accounting on behalf of both fixed operators in Serbia and Montenegro For the moment it performs this role only for postal services. It has a staff of about 80 people.

*c)    Republic Telecommunication Agency:*

Under the provision of the Law, the Telecommunication Agency is established as an independent telecommunication regulatory body for the territory of the Republic of Serbia. The Agency is an autonomous legal entity, is functionally independent of, and is not subordinated to any government authority, or any organization or person engaged in operating telecommunications networks and equipment or providing services. The Agency shall ensure implementation of the telecommunications development strategy adopted for the telecommunications sector in the Republic.

**<u>Main responsibilities</u>**

Article 9 of the Law specifies the Agency's responsibilities as:

Report 1 - Country profiles - August 26, 2005

- Regulate activities in the telecommunications sector, and in particular where there is one or more public telecommunications operators which, under the criteria established herein, have a significant market power.

- Supervise and monitor activities in the telecommunications sector.

- Promote interconnection between telecommunications networks or operators on a non-discriminatory basis, and if telecommunications operators cannot agree on interconnection conditions, it shall prescribe those conditions, bearing in mind that they should be non-discriminatory and based on costs.

- Settle disputes between telecommunications operators concerning interconnection, special conditions for network access and/or leased lines.

- Regulate the use of radio frequency spectrum and draft proposals for the Radio Frequency Allocation Plan and the Radio Frequency Assignment Plan, in accordance with this Law, as well as to monitor the use of radio frequency spectrum.

- Assign radio frequencies in accordance with the Law;

- Grant licences to telecommunications operators for specific telecommunications activities, licences for telecommunications networks, systems and equipment, and licences for radio stations, in accordance with the Law.

- Prepare and conduct public tenders for individual licences in accordance with the Law and the Ministry's resolution on the number, timing and minimum conditions for granting such licences.

- Supervise compliance by the telecommunications operators with the terms and conditions contained in the licences granted and take measures and impose penalties in accordance with the Law, in case they violate the terms and conditions contained in their licence or the provisions of the Law.

- Define special tariff regimes and monitor implementation of tariff policy, in the manner stipulated in the Law, in cases when there is only one public telecommunications operator for particular telecommunication services, when a public telecommunications operator has a significant market share or, when a public telecommunications operator subsidizes or co-finances other telecommunication network or service of its own with income from telecommunication network or service in which it is a sole operator or in which exploitation, or providing it has a significant market share.

- Manage the fund for compensation of universal service costs, which is to be established in accordance with the Law;

- Prepare, adopt and monitor implementation of the Numbering Plan and assign numbers to public telecommunications operators on a non-discriminatory basis, bearing in mind rational use of numbers contained in the Plan.

- Decide upon users' complaints in cases stipulated by the Law and the by-laws of the Agency.

- Settle disputes, in cases stipulated by the Law or the Agency's by-laws, between users and telecommunications operators and between telecommunications operators.

Report 1 - Country profiles - August 26, 2005

- Create and maintain a database which contains all significant information from the telecommunications sector and regularly publish that information.

- Co-ordinate its work with the authorities or organizations responsible for broadcasting, in accordance with the Law.

- Monitor developments in telecommunications, gather information from telecommunications operators, and provide information to users, operators and international organizations.

- Adopt technical regulations.

- Supervise and ensure implementation of national and international standards and technical regulations.

- Make its work transparent, including the possibility for all interested parties to give their remarks and comments about measures taken and decisions made.

The Agency shall be managed by the Managing Board, which shall adopt all the resolutions falling within the responsibility of the Agency.

The Government shall determine the candidates for the Managing Board upon its own initiative, on the basis of proposals duly submitted by the Ministry, the Executive Council of the Autonomous Region of Vojvodina, association of telecommunications operators, registered associations of businessmen, and scientific telecommunications institutions, or on the basis of announced vacancies.

The Law stipulates that the Government shall determine the candidates on the criteria of their professional knowledge and experience relevant to the activities falling within the responsibility of the Agency, in particular in engineering, economics and law, especially taking into account that through determined proposal, both the interests of development in telecommunications and users needs, in the whole territory of the Republic of Serbia, should be expressed.

At the proposal of the Government, the National Assembly shall appoint and relieve from office the Chairperson and members of the Managing Board.

A list of candidates (not based on the specified criteria of their professional knowledge and experience, mostly as a first compromise between coalition parties) has been prepared several times by the Ministry but has appeared on the Parliament agenda. The latest list of candidates has been proposed and put forward for the last Parliamentary session agenda. Members of the Managing Board have been proposed by the Government (MKI) and finally appointed on May 23, 2005 (two years after the approval of the Law). They will be entitled to start their work after the Decision has been published in the Official Gazette of RS from May 27, 2005.

In the daily journal POLITIKA, (May 20, 2005) the Agency for Privatization on behalf of the Serbian Government published a Public Tender for a consultant in the process of preparation and issuing of a strategy for restructuring and privatizing the telecommunications sector in Serbia. Some the request's Terms of Reference cover the duties of the Telecommunication Agency.

The Telecom Law contains clauses on: the Mandate of the Members of the Managing Board (Article 12), the Work of the Managing Board (Article 13), the Termination of the Term of Office of the Chairperson and members of the Managing Board (Article 14), Relief from Office (Article 15) and Relief from Office (Article 16)

Report 1 - Country profiles - August 26, 2005

The Managing Board shall adopt the Statutes of the Agency regulating in detail, inter-alia, the internal organization and the Agency's procedures. The regulations governing the salaries of employees in government authorities and public services shall not apply to the Managing Board Chairperson and the Agency employees. The Government shall approve the Statutes of the Agency.

## Funding of the Agency

The Agency shall be financed in accordance with the financial plan adopted by the Managing Board for each year. Should the Agency's annual accounts for revenue and expenditure show a surplus of total revenue over expenditures, such surplus shall be paid into the budget of the Government of the Republic of Serbia. A part of such a surplus, in proportion to the revenues of the public telecommunications operators with their headquarters in the territory of the Autonomous Region of Vojodina, shall be paid into the budget of the Autonomous Region of Vojvodina, and shall be primarily used for telecommunications development.

Article 19 of the Law deals with sources of financing:

> *"The revenues of the Agency shall be the funds generated from the fees payable by public telecommunications operators for the right to build, own or operate public telecommunications networks or to provide public telecommunications services, for the use and assignment of radio frequencies, for issued certificates, as well as for costs of technical inspection and other costs.*
>
> *The Managing Board shall determine the amount of the fees and charges from paragraph 1 of this Article with the approval of the Government.*
>
> *The funds generated from the one-time fee for obtaining the individual licence shall be paid into the budget of the Republic of Serbia.*
>
> *For the first year, the funding of the Agency shall be provided as a short-term loan from the budgetary reserve in accordance with the law and based on a financial plan adopted by the Government which shall also set out the time schedule for repayment of such funds to the budget from the revenues of the Agency."*

## Decision-Making and Legal Remedy (Article 23)

> *"The decisions on rights or obligations of a public telecommunications operator or service user, or decisions imposing sanctions on a public telecommunications operator in accordance with this Law, are made by the Agency in the manner stipulated in its Statutes.*
>
> *In deciding on the rights and obligations of the public telecommunications operator or on sanctions to be imposed, the Agency shall allow the public telecommunications operator to present the relevant facts before the decision is made, as well as to submit all documentation or other evidence which the public telecommunications operator deems relevant for decision-making.*
>
> *The decision of the Agency is final.*
>
> *Upon an initiative of a party, or upon its own initiative, or upon a complaint instituted in the administrative litigation, the Agency may decide to amend or revoke its decision. The administrative litigation may be instituted against any such amendment or revocation of the Agency's decision.*

Report 1 - Country profiles - August 26, 2005

*Any party believing that the decision of the Agency has violated any of its rights or interests protected by the law may institute a proceeding administrative litigation by appealing against the decision with the court of competent jurisdiction.*

*Within 15 days from the delivery of the Agency's decision, the party is under an obligation to comply with such decision, and if it fails to do so, the decision shall be enforced in accordance with the rules of standard administrative proceedings, unless the Agency, in the event from paragraph 4 of this Article, or the court, upon the appeal instituted in the administrative litigation, temporarily suspends the enforcement of the decision."*

d)    *Republic Broadcasting Agency*

In 2003, the Republic Broadcasting Agency (RRA) was established according to the Broadcasting Law (Official Gazette 42/02). In September 2003, the members of the RRA Council approved the Statutes of the RRA but these have not yet been confirmed by the National Assembly (Article 33 of the Broadcasting Law).

Article 8 of the Law on Broadcasting defines the main responsibilities of the RRA as:

- Issue the Broadcasting Strategy after receiving the confirmation from Serbian Government.

- Execute control and implementation of this Law.

- Issue licence for the program content and regulates the form for this licence.

- Issue technical, organizational and content requirements for production and emission of programs in accordance with provisions of this Law.

- Issue rules, which are obligatory for emitters, and which provide implementation of broadcast policy of the Republic of Serbia.

- Supervise the operation of emitters in the Republic of Serbia.

- Decide on appeals by physical and legal people and emitters' objections against other emitters' operations.

- Submit opinions to relevant State bodies about signing and jointing international conventions that are relevant to broadcasting.

- Undertake relevant measures against emitters in accordance with this Law.

Additional RRA responsibilities are related to:

- The protection of minors.

- The implementation of Intellectual Property Rights (IPRs) and related rules.

- The prevention of programs containing information inciting discrimination, hatred or violence against people or groups of people belonging or not belonging to a different race, nation, ethnic group or gender.

The RRA, in cooperation with the Telecommunication Agency, adopts the Strategy for Broadcasting development, which determines the number and type of emitters, service areas and

other parameters that are issued in a public tender, based on different needs of citizens and social groups on education, information, culture, sport and other content.

The RRA's income comes from fees for the right to broadcast programs, which broadcasters pay in accordance with the Law. If the Agency has insufficient financial resources it will be financed from the State budget.

There is no right of appeal against the RRA's decisions. However, they may be referred to the Administrative Court of the Republic of Serbia as an administrative dispute.

*e)    Protection of competition and consumers*

The Law on the Protection of Competition is in the process of being adopted. It will specify how the separate Competition authority will be established.

Today, the Federal Law on trade (Official Gazette of FRY 32/93, 50/93, 41/94, 29/96 and 37/02) regulates this area where acts which are considered as preventing competition are: unfair competition, immoral market behaviour or limitation of the market.

The Law on Consumer Protection was published in the Official Gazette of FRY 37/2002.

The Association for the Protection of Telecom Users was established in 2004.

The Law against market monopoly is also at the federal level (Official Gazette of FRY 29/96) and specifies measures to prevent monopolistic behaviour in specific markets (the telecommunications market is not recognized in this Law as a potential monopolistic market).

*f)    Appeal body*

The Administrative court is responsible for administrative disputes against decisions made by the Telecommunication Agency (Article 23 of the Telecommunications Law) and the Broadcasting Regulatory Agency (Article 37 of the Broadcasting Law). Administrative procedures are regulated in the General Administrative Disputes Law. The regulation of administrative disputes is also at the federal level (Official Gazette No 33/97 and 31/2001).

B.    BASIC LEGISLATION

| Measure | Subject |
|---|---|
| 1. Telecommunications Law (Official Gazette of Republic of Serbia 44/2003.)<br><br>Serbian version published<br><br>English version exists but not officially published | I - General provisions<br>II - Republic Telecommunications Agency<br>III - Licences for public telecommunications networks and public telecommunications services<br>IV - Tariffs, interconnection, universal service and leased lines<br>V - Radio communications<br>VI - Numbering<br>VII - Standards and requirements for construction of telecommunications networks and facilities and installation of telecommunications equipment<br>VIII -Protection of users<br>IX - International telecommunications<br>X - Penal provisions<br>XI - Final and transitional provisions |
| 2. Federal Law on Communication Systems (Official Gazette of SFRJ basic text 41/88 and last amendments Official Gazette 28/96)<br>Serbian version with all amendments exists | |
| 3. Federal Decree on General Conditions with Nomenclatures for Telecommunication Services Operations (Official Gazette FSRY 35/88 and 30/02 | |
| 4. Broadcasting Law (Official Gazette of RS 25/2002<br><br>Amendments and revisions Official Gazette of RS 42/2002.<br><br>Serbian version is completed with all amendments: http://www.parlament.sr.gov.yu<br>English version not available | I - General provisions<br>II - Republic Broadcasting Agency<br>III - Licences for program emission<br>IV - General program's standards<br>V - Public broadcasting service<br>VI - Prevention of not permitted media's concentration<br>VII - Advertisement and Sponsorship<br>VIII - Penal provisions<br>IX - Final and transitional provisions |
| 5. Law on trade (Official Gazette of FRY No. 32/93, 50/93, 41/94, 29/96 and 37/02) | |

**Table 24 – Primary legislation**

The table below is a list of active secondary legislation. The first by-law has been developed on the basis of the Telecommunications Law of 2003. The list of by-laws is given below as examples of the old legislation still in force that needs to be changed in accordance with the Telecom Law, 2003. Many technical and operational standards have been issued by the CYPTT in accordance with the Federal Law on Communication Systems and published in the Official Gazette of the CYPTT. They are not listed in the table below.

Report 1 - Country profiles - August 26, 2005

| Measure | Subject |
|---------|---------|
| Frequency plan allocation (Official Gazette of RS 112/04) | Radio frequency spectrum allocations according to the Law on Telecommunications of 2003 |
| Decision on fees for testing and measuring in the area of microwave systems (Official Gazette of FRY No. 49/95, 60/96, 4/98, 72/00) | |
| Decision for fees to use broadcasting data (Official Gazette of FRY 24/98, 72/00) | |
| Decision on fees for temporary usage of radio-frequencies and TV channels (Official Gazette of FRY 24/98, 26/98, 42/99, 72/00) | |
| Rules on the way and conditions for registry and way out for broadcasting receivers… (Official Gazette of RS 15/89 and 14/91) | |
| Rules on form for radio-station licence (Official Gazette of FSRY 72/90 and Official Gazette of FRY 65/01) | |
| Rules on elimination of interference in frequency modulation based broadcasting stations (Official Gazette of FSRY 52/73) | |

**Table 25 – Secondary legislation**

## C.    STATUS AND RECENT DEVELOPMENT OF TELECOMMUNICATIONS

### 1.    Introduction

In Serbia and Montenegro, the regulatory environment is in a transition phase reflecting the whole political and economical framework. Both republics are developing their legislation independently and new laws and rules in the telecommunications sectors at a federal level do not exist. The old legislation from the former FSRY and from Yugoslavia are still in force for the areas not covered by secondary legislation (numbering plan, technical requirements (standards), nomenclatures, general conditions). Membership of international telecommunications organizations is still at the federal level (State Union of Serbia and Montenegro).

After two years of debate, the Telecommunications Law was adopted in 2003. However, this Law is still not applied because the members of the Managing Board of the Telecommunications Agency (TA) were not appointed. On May 23, 2005 the members of the Managing Board were approved by the National Assembly and so it can be expected that the first results of the telecommunications sector regulation will come in six months.

### 2.    Description of telecommunications market

*a)    Fixed service*

Telekom Serbia a.d., is the incumbent fixed telephony network operator owned 80% by the Public Enterprise of PTT "Serbia" and 20% OTE, Greece. It does not follow the development of neighbouring incumbent operators in fixed network services. There are 34 subscribers per 100 inhabitants and in the last four years, less than 300,000 new subscribers were connected. The

Report 1 - Country profiles - August 26, 2005

official waiting list is about 300,000 but the real figure is higher and people do not apply if some of their neighbours get a negative answer. It takes between six months to a couple of years to get a connection. The introduction of ADSL services started in the spring of 2005, one year later than planned. Digitalization of the largest cities (Belgrade, Novi Sad and Nis), the development of access networks and the installation of more ISDN BRI and ISDN PRI ports gives better results and enables the introduction of new broadband services such as always on, minimum download of 144 Kbit/s, video streaming etc, see Table below. There are about 500,000 party lines in the network, mostly in the big cities and very often in the business areas. The network digitalization rate is 67%.

| Services | Dec 2001 | Dec 2002 | Dec 2003 | Dec 2004 |
|----------|----------|----------|----------|----------|
| Fixed phone | 2,229 | 2,300 | 2,399 | 2,541 |
| ISDN PRI | 0.187 | | 0.363 | 1.059 |
| ISDN BRI | 2.147 | 5.760 | 7.998 | 25.572 |
| ADSL | | | | ~0.5 |
| Cable modems | | | ~3 | ~4 |

**Table 26 - Telecommunications service users in Serbia, thousands**

The old tariff system is still applied and the Government has not allowed any tariff rebalancing which can have a negative impact on Telekom Serbia's competitiveness. Different tariffs are applied for business and residential subscribers.

The monopoly on telephone services and fixed infrastructure was removed on June 9, 2005. However, the licensing conditions have not been prepared for fixed or mobile operators and it is unlikely that the NRA will be ready to issue any licences before June, 2006. There is no sign that Telekom Serbia is concerned about competition.

A Reference Interconnect Offer (RIO) has not been published.

Some of the Internet Service Providers (ISPs) illegally offer wireless fixed telephony services and will be among the first to apply for licences after June 9, 2005.

Voice over Internet Protocol (VoIP) is not yet regulated. The NRA is authorised to determine the quality of service conditions

There are no licences issued for fixed telephony services.

Data services are liberalized in the new Telecom Act. The previous Telecom Law did not explicitly retain a monopoly for data services but providers still must use the incumbent's international lines while the monopoly is in place.

*b)    Mobile services*

An intensive development of mobile telephone networks by MOBTEL (ownership: Private capital 51%, State 49%) and Mobile Telephony Serbia (operating within Telekom Serbia) has resulted in the fact that the number of mobile users (more than 4 million, see Figure 8) is considerable larger then the number of fixed telephony users (2.5 million). Apart from telephony services, many other services are available on the market: SMS, Voice Mail, VPN, Roaming, MMS, WAP, Internet and GPRS/EGPRS. Both mobile operators have started UMTS trials in Belgrade, Novi Sad and Nis.

Report 1 - Country profiles - August 26, 2005

The main obstacle, for both operators, to the provision of commercial UMTS services is the 2 GHz frequency band, which is not available. Development of mobile subscribers in Serbia in the period 1998 – 2004 is given in Figure 8. There are no licences issued for mobile services, only licences for frequency bands. The present market share is Telekom Serbia 53%, MOBTEL 47%. There is no national roaming.



**Figure 8 – Development of mobile subscribers in Serbia (Data provided by Mobtel and Telekom Serbia, April 2005)**

*c)    Cable TV market*

There are more then 20 Cable TV providers with their own networks, mainly in big cities. They developed their networks over the last four years but they do not have any licences. More then 500,000 subscribers are connected and some of the Cable TV providers offer Internet services too. The Public Enterprise of PTT "Serbia" is one of the biggest providers.

*d)    Internet Services*

There are 38 registered ISPs in Serbia but only a few of them have nation wide coverage (EUNET, Public Enterprise of PTT "Serbia", Sezampro, and Informatika).

The number of personal computers (PCs) per 100 inhabitants is 7% and Internet user penetration is 9% (around 640,000 users)[67].

## 3.    Conclusion

The existing situation for the telecommunications sector in Serbia could be summarized as follows:

---

[67] Giovanni Maruzzelli, ICT Expert - Gallo ECF, serbiait@yahoo.com, Belgrade, May 2004

Report 1 - Country profiles - August 26, 2005

- It is an unregulated market. The Telecommunications Law was approved in June 2003 but its application has been delayed due to the delay in establishing the Telecom Agency. Although recently created the Telecom Agency has not started operating yet.

- There is a monopoly in the provision of fixed networks and services and a duopoly in the provision of mobile services. Results have been achieved, but these are:

  - low penetration (34%) in fixed networks compared to neighbouring countries;

  - too many party lines (494,000);

  - low digitalization (67%);

  - old fashioned tariff system;

  - mobile networks are much better developed and the number of mobile subscribers is almost double that of the fixed subscribers;

  - two GSM operators but no licences for 3G and still no free frequency band for 3G;

  - undeveloped broadband services, and

  - unsatisfied customers.

The strategy for the sector's development is not approved and will be a limiting factor for the Telecom Agency's operation (Article 7 of the Telecommunications Law states: "… In performance of the activities stipulated herein, the Agency shall ensure implementation of the development strategy adopted for the telecommunications sector in the Republic"). Although the draft text was discussed, no public consensus was achieved.

Report 1 - Country profiles - August 26, 2005

**D.    Summary**

| Serbia | |
|---|---|
| **Topic** | **Status** |
| National Regulatory Authority | • NRA not yet established, foreseen by the 2003 Telecommunications Law<br>• Appointment will be by Parliament<br>• Will be financed initially by a Government loan<br>• Broadcasting networks and frequencies in the same framework as telecoms<br>• Many Cable TV operators operate without authorisation<br>• Role in commercial conflicts not yet defined |
| Market Access | • Telephony network and service monopoly to end mid 2005<br>• Individual licences required for telephony networks and services<br>• General authorisation for ISPs<br>• No official position on VoIP<br>• Cable TV licences are not being issued |
| Competitive safeguards | • Carrier selection and pre-selection not yet decided<br>• Number portability not yet decided<br>• One fixed and one mobile operator with SMP designation<br>• Reference interconnection offer not available<br>• Reference unbundling offer not decided |
| Universal service | • Universal service defined in legislation, not yet applied<br>• USO cost recovery scheme defined in 2003 law, not yet applied |
| Telephony – Market structure | • Telekom Srbija incumbent operator –80% state owned<br>• Monopoly operator<br>• Two 2G mobile operators / no 3G / no service providers<br>• Public radio local area networks active<br>• Fixed penetration 33.9, digitalisation 67.4, party lines 18.3<br>• Mobile penetration 57.0 |
| Telephony – Retail tariffs | • Tariffs not yet rebalanced – Residential access: 1.14[68], Business access: 1.76<br>• Local calls – low range –low tariff package for two party lines<br>• National long distance calls – low range<br>• International long distance calls – low range |
| Telephony – Wholesale tariffs | • Interconnection charges fixed network – not available<br>• Interconnection charges mobile network – 80% below EU average |
| Internet and broadband | • Internet penetration 8.5%<br>• Internet dial-up cost – low range<br>• xDSL lines – information not available<br>• Number of broadband connections – information not available<br>• 15 national ISPs, 60 local |

---

[68] For an explanation of this indicator, see Report 1 – Country Comparative Report, Chapter III.G.4 on Access charges

## VIII.  SERBIA AND MONTENEGRO / KOSOVO

### A.    Legislative process and overview of the relevant institutions

### 1.    Introduction

Kosovo is a territory under interim international administration. Although still recognised internationally as a province of the Republic of Serbia, its actual administration is conducted by the United Nations with no involvement on the part of the Serbian government. Following the end of the Kosovo war, on June 10, 1999 the United Nations Security Council adopted Resolution 1244 (UNSCR 1244), which provides the legal framework for Kosovo's current status. Until a political solution to the Kosovo crisis can be found, UNSCR 1244 affirmed the sovereignty and territorial integrity of Serbia and Montenegro, but also called for 'substantial autonomy' for Kosovo. UNSCR 1244 authorized the establishment of "an international civil presence in Kosovo in order to provide an interim administration" which has been implemented through the creation of the United Nations Mission in Kosovo (UNMIK). A NATO-led force called KFOR provides an international security presence in support of UNMIK's work.

According to UNSCR 1244, UNMIK is to:

- perform basic civilian administrative functions;

- promote the establishment of substantial autonomy and self-government in Kosovo;

- facilitate a political process to determine Kosovo's future status;

- coordinate humanitarian and disaster relief of all international agencies;

- support the reconstruction of key infrastructure;

- maintain civil law and order;

- promote human rights; and

- assure the safe and unimpeded return of all refugees and displaced people to their homes in Kosovo.

UNMIK is divided into four sections called "pillars". These are:

- Pillar I: Police and justice, led by the United Nations;

- Pillar II: Civil Administration, led by the United Nations;

- Pillar III: Democratization and institution building, led by the Organization for Security and Co-operation in Europe (OSCE);

- Pillar IV: Reconstruction and economic development, led by the European Union.

The head of UNMIK is the Special Representative of the Secretary-General for Kosovo (SRSG), who presides over the work of the pillars and facilitates the political process designed to determine Kosovo's future status.

Report 1 - Country profiles - August 26, 2005

## 2.    Sharing of responsibilities between UNMIK and national institutions

In order to share the administrative responsibility with the people of Kosovo, in February, 2000 UNMIK set up the Joint Interim Administrative Structure (JIAS). The functions of the administration were passed to the JIAS 20 departments and divided across the four UNMIK pillars. Following the municipal elections of October 2000, the administration of municipalities was also handed over to locally elected representatives.

In May 2001, the SRSG promulgated a new Constitutional Framework for provisional self-government in Kosovo. This Constitutional Framework, together with UNSCR 1244, is now the fundamental document regulating the governance of Kosovo, pending a resolution of its final status.

The Framework introduced the provisional institutions of self-government (PISG) that replaced the JIAS departments. The PISG comprise the President of Kosovo, the parliament (Assembly) and the government consisting of the cabinet of ministers headed by the Prime Minister. The Framework also provided for the separation of executive, legislative, and judicial powers and institutions. The first Kosovo-wide elections under this Framework took place in November 2001.

At the same time, the Framework circumscribed the authority of the PISG by reserving some key powers and responsibilities exclusively for the SRSG. The SRSG continues to promulgate laws voted by the Assembly, coordinate with KFOR on security matters, and have the authority to appoint and dismiss judges and prosecutors. Until the final status of Kosovo is determined, a number of executive powers are reserved exclusively for the SRSG. These include:

- concluding agreements with states and international organizations;

- controlling the police, correctional services, and the Kosovo Protection Corps;

- setting the overall parameters for the economic policy and the budget;

- controlling the UNMIK Customs Service;

- administering state-owned and socially owned property through the Kosovo Trust Agency (KTA), in cooperation with the PISG; and

- exercising authority over railways, frequency management, and civil aviation.

Under the policy of "standards before status", discussion on Kosovo's final status will depend on progress toward a range of benchmarks. Detailed *Standards for Kosovo* were elaborated by the SRSG in December 2003 and have been endorsed by the UN Security Council. Standards are intended to outline the minimum conditions for what the SRSG has described as a "normal society". A comprehensive review of progress toward the Standards is expected in mid-2005, and decisions on how and when to begin discussions of Kosovo final status are anticipated to follow this review. The UNMIK will then prepare the ground to hand over to a newly defined international presence following a settlement of the status.

## 3.    Legislative process

The Assembly is the highest representative and legislative body within the PISG of Kosovo. The Assembly has 120 members elected by secret ballot.

A draft law may be introduced to the Assembly for debate by:

Report 1 - Country profiles - August 26, 2005

- the government;

- a member of the Assembly, if five additional members have signed the draft law to state they support the introduction of the draft law;

- the Assembly, if the Assembly has passed a resolution directing the government to draft a law for debate in the Assembly;

- a committee of the Assembly.

Every draft law is translated into Albanian, Serbian and English and presented to the Secretariat of the Assembly in written and electronic form prior to its introduction to the Assembly. In general, laws are approved with a majority of the votes from the members present at the session. This number must be at least one third of the total number of members of the Assembly.

Approval in the first reading represents acceptance of the broad principles of the draft law. When a draft is approved at the first reading, the draft law is considered by the Budget Committee, the appropriate functional committee and the Committee on Judicial, Legislative and Constitutional Framework matters.

Laws that have been approved by the Assembly either in their second or in third reading are signed by the President of the Assembly and sent to the SRSG of the United Nations for promulgation. They become effective on the day of promulgation by the SRSG, unless otherwise specified.

**4.    Overview of the relevant institutions**

The institutional structure in Kosovo is shown in the figure below and described in the following paragraphs.

Report 1 - Country profiles - August 26, 2005



**Figure 9 – Main institutions in the Kosovo telecommunications regulatory framework**

*a)      Committee for Transport and Telecommunications*

According to Rule 9 from the Rules of Procedures of the Assembly of Kosovo, published by SRCG on May 15, 2001, the Committee for Transport and Telecommunications has jurisdiction on all topics concerning transport over land, air, and water in Kosovo and in all matters pertaining to telecommunications such as postal services, the Internet, television and radio broadcasting and frequencies, and other telecommunication's topics. The Committee:

- reviews and prepares draft laws, amendments, draft resolutions and draft statements for the Assembly pertaining to transport and telecommunications matters in Kosovo;

- requests from the government, namely from the relevant minister, reports and clarifications on subjects within its scope of activity. It may also suggest measures that need to be taken by the Assembly or the government of Kosovo and the relevant ministry;

- recommends bilateral or multilateral relations with other States and international organizations with the view of promoting and developing land, water and air transport lines and telecommunications connections between Kosovo and other countries.

*b)      Ministry of Transport and Communications*

Based on UNMIK Regulation 2001/19, the Ministry of Transport and Communications has the responsibilities to:

- develop policies and implement legislation for the provision of services and facilities in the sector of telecommunications and information technology;

- oversee and monitor performance of the sectors and introduce appropriate measures to overcome service difficulties and problems;

Report 1 - Country profiles - August 26, 2005

- develop policy and propose programs for promoting enterprises in the sectors, including strategies for restructuring and capital investment;

- in the sector of telecommunications, review compliance with European standards covering tariffs and fees, quality of service and technical standards; develop policies to promote competition; and monitor the needs of consumers;

- in the sector of information technology, promote information technology as well as innovation in areas such as electronic commerce; promote access to technology; and encourage the development of information technology training systems.

*c)    UNMIK*

According to the Telecommunications Law (UNMIK Regulation 2003/16 of May 12, 2003), UNMIK through the Special Representative of the Secretary General (SRSG) has the authority to:

- manage publicly owned telecommunications assets, including the management of essential Post and Telecom of Kosovo (PTK) assets through the Kosovo Trust Agency (KTA) in cooperation with the Provisional Institutions of Self-Government (PISG);

- manage the radio frequencies carried out by the Frequency Management Office (FMO) with some administrative functions to be implemented by the PISG through the TRA, and

- regulate the broadcasting industry, which is currently executed by the Temporary Media Commissioner (TMC).

*d)    Telecommunications Regulatory Authority*

The Telecommunications Regulatory Authority (TRA) is an independent body within the framework of the Provisional Institutions of Self-Government created under the Telecommunications Law (UNMIK Regulation 2003/16). According to the Law, the TRA:

- implements the PISG's and the Ministry of Transport and Communications policy in compliance with the relevant legislation;

- issues regulations and instructions for the implementation of the Telecommunications Law;

- issues licences and authorisations for the provision of telecommunications services in Kosovo;

- promotes and facilitates the provision of sufficient and satisfactory domestic and international telecommunications services, universal services and other services covered in the broadcasting regulations;

- prepares the numbering plan, assigns numbers and number blocks and administers them in a non-discriminatory way;

- assigns spectrum resources to service providers and users that are specifically allocated by UNMIK Frequency Management Office;

- coordinates the broadcasting activities with the Temporary Media Commissioner and other relevant institutions in accordance with the provisions of the Broadcasting Regulation;

Report 1 - Country profiles - August 26, 2005

- resolves disputes between participants in telecommunications activities, including disputes between service providers, users and the owners of land and facilities;

- may review international contracts made by service providers related to the provision of telecommunication services and equipment and their compliance with the Law. However, the Authority is not allowed to conclude any agreements with states and multilateral organisations.

The legal authority of the TRA resides in its Board that comprises five members. The members of the Board are recommended by the Minister of Transport and Communications, proposed by the government and are subject to appointment by the Assembly.

The appointment is for a period of five years. A member may serve no more than two consecutive terms. The Minister of Transport and Communications, acting in consultation with the Prime Minister designates one member of the Board to be the Chairman. The Chairman presides over the Board's meetings and activities, is responsible for the TRA, and supervises the selection, hiring, termination and general administration of the staff.

The TRA is a self-funded body, except for the first year of operation in 2004 when the funds were provided from the Kosovo Consolidated Budget. The funds are collected through the application of the fees under the Telecommunications Law, including authorisation, licensing, and assignment of numbers and rights to use spectrum resources.

There are three major concerns that currently affect the TRA's independence and effectiveness in performing its activities:

- the frequency allocation authority is still being controlled by UNMIK Frequency Management Office;

- the TRA has not been able to present the case for "creation of a top - level domain to facilitate the commercial exploitation of the Internet in Kosovo" yet, as foreseen under Section 17.1(d) of the Telecommunications Law;

- no country code has been assigned to Kosovo by the ITU yet. Consequently, all fixed international traffic is routed via Belgrade using code 381, and mobile international traffic is routed via Monaco using code 377 under an arrangement with Monaco Telecom.

## B. Main legal instruments

## 1. Primary legislation

The Law on Telecommunications (the Law) adopted by the Assembly of Kosovo on December 10, 2002 regulates the communications sector in Kosovo. The Law entered into force with UNMIK Regulation No. 2003/16 promulgated by the Special Representative of the Secretary General (SRSG) in May 2003.

Report 1 - Country profiles - August 26, 2005

| Measure | Subject |
|---------|---------|
| Law on Telecommunications No. 2002/7 (UNMIK Regulation No. 2003/16) | Contents<br>• General provisions<br>• Telecommunication regulatory authority (TRA)<br>• Authority and principles of TRA operations<br>• PTK (Postal and telecommunications Kosovo)<br>• Authorisations and licences<br>• Grant of right to use radio frequencies<br>• Assignment of numbers<br>• Service providers<br>• Universal service<br>• Telecommunication networks and services<br>• Telecommunications equipment<br>• Radio communications, spectrum resource allocation, numbering plan for telecommunications services<br>• Consumer protection and privacy<br>• Final provisions |

**Table 27 – Primary legislation**

### 2. Secondary legislation

The secondary legislation based on the Law is still awaited. At the moment, the TRA, the Ministry of Transport and Telecommunications, and UNMIK share the responsibility. Consequently, the TRA has decided on the pricing mechanism for the fixed voice telephony and Internet service provision, while UNMIK and the PISG work on GSM prices.

### C. Status and current developments on key telecommunication issues

### 1. Introduction

The Post and Telecommunications Enterprise of Kosovo (PTK) is a public operator of postal and telecommunications services in Kosovo as defined in UNMIK Regulation 1999/12. By this regulation, the PTK was established as a juridical entity and given the necessary authority for providing postal and telecommunications services. For the purpose of providing postal and telecommunications services, PTK was given the authority to use available public postal and telecommunications assets in Kosovo, including any future expansion. PTK was allowed, with the approval of the SRSG, to establish subsidiary legal entities to provide specific services. PTK now has three subsidiaries: Fixed Telephony, Mobile Operator VALA900, and ISP DardaNet.

PTK has remained under the direct control of UNMIK through the Kosovo Trust Agency (KTA). The management of PTK was, and continues to be, among the sources of major disputes between the PISG and UNMIK. The privatisation process of the KTA-controlled enterprises remains slow and the timing of PTK privatisation is not known at this stage. However, it is unlikely that PTK will be privatised before the subject of Kosovo's final status is resolved.

Report 1 - Country profiles - August 26, 2005

## 2.    Licensing/liberalization/market access issues

### a)    Licensing regime

The liberalisation of the provision of fixed telecommunications networks and local, long distance, and international services was formally introduced in 2003 by the Telecommunications Law, (UNMIK Regulation 2003/16 of May 12, 2003).

However, the secondary legislation on the licensing and authorisation regime for telecommunications services is still to be adopted. The Telecommunications Law foresees the provision of services involving the use of limited resources, such as spectrum and numbers, subject to an individual licence issued by the TRA, and provision of other services subject to an authorisation by the TRA (some sort of a class licence).

The licensing regime for cable TV services is also awaiting adoption.

### b)    Fixed voice telephony

Currently, PTK is the only authorised operator of public fixed telephone networks and provider of local, long distance and international services. The TRA issued the concession to PTK on July 30, 2004 in accordance with Section 50 of the Telecommunications Law. The licence is valid for 15 years and the licensing fee was set at €2,900,000. Under the licence terms, PTK is subject to a set of obligations, including the requirement to ensure the availability of telephone services to 50% of households by December 31, 2005 and to 25% of the population by December 31, 2007.

The process of rebalancing fixed telephony tariffs is continuing, but the date to establish the fixed tariffs is not known yet. The tariff regulation is based on the TRA approval. However, the time frame to issue an information notice about tariff changes has not been defined.

### c)    Internet services

The first ISP authorisations were issued to DardaNet (PTK subsidiary), IpkoNet and Kujtesa by the TRA on May 18, 2005. The TRA actually issued the authorisations at the request of the service providers willing to legalise their status. All authorisations have a validity period of 15 years and the authorisation fee was set at €150,000. However, the provision of VoIP services is not covered by the ISP authorisation. The TRA has no official position on VoIP and there is no specific regulation on it either.

### d)    Mobile telephone services

Currently VALA900 is the only mobile operator officially licensed by the TRA in July 2004. A GSM 900 MHz network, VALA900 was created in 2000 as a joint venture between the incumbent operator, PTK, and Monaco Telecom. As Kosovo does not have its own country code, VALA900 is using the Monaco country code (377) from the numbering range re-assigned by Monaco Telecom.

The second de-facto mobile operator operating in Kosovo is Serbian "Mobilne Telekomunikacije "Srbija" BK-PTT" (Mobtel) company. A GSM 900 MHz network operator that was present in Kosovo before the war; and although unlicensed after the war, it continues its operations. TRA considers its operations unauthorised. Mobtel was invited by the UNMIK to legalize its status by applying for a licence with the TRA as foreseen by the Telecommunications Law. Following its

Report 1 - Country profiles - August 26, 2005

refusal, the UNMIK requested Mobtel to release GSM frequencies in Kosovo. Mobtel still operates using the country code of Serbia and Montenegro (381).

On October 21, 2004 the TRA issued the second official GSM 900/1800 licence to the Mobikos/Mobitel consortium following a public tender procedure. The numbering solution proposed by the licensee was to use the Slovenian country code (386) from a non-geographic number range re-assigned by Mobitel. However, the validity of the licence contract issued by the TRA was questioned by UNMIK and currently the matter is under consideration at the Supreme Court of Kosovo. Earlier, on March 16, 2005 the Regional Court in Prishtina ruled in favour of the Mobikos/Mobitel consortium following a complaint submitted by the licensee, but the lower court's decision has been appealed to the Supreme Court.

**3.    Competitive safeguards, including SMP designation, carrier selection, number portability, accounting separation**

The incumbent operator PTK has been designated as the SMP operator in the territory of Kosovo. The legal scope of the SMP designation is defined by Section 55 of the Telecommunications Law that refers to Open Access to Networks and Services. The SMP obligations prescribed by the Law include, but are not limited to, non-discrimination, cost-orientation, transparency and meeting all reasonable requests for timely access, confidentiality, separation of accounting, interconnection obligation, provision of a minimal set of leased lines retail rate regulation, carrier selection and pre-selection, and merger control.

No specific date has been set when all three categories such as geographically fixed, non-geographically fixed, and mobile number portability will be available. However, the Telecommunications Law contains provisions that when subscribers in a fixed public telephone network elect to change service providers, they may retain the geographical numbers assigned if they remain within the same geographical location. Moreover, when subscribers in a fixed public telephone network holding non-geographical numbers elect to change service providers, they may retain the number originally assigned, whether or not the subscriber stays in the same geographical location.

Currently, all fixed numbers have been allocated to PTK, the incumbent fixed operator. There are no operators with an allocated access code, or using carrier selection (CS) or carrier pre-selection (CPS) for the provision of services (PTK is the only licensed fixed telephony service provider).

The existing legal framework grants non-discriminatory rights of way for all present and potential public network operators. The procedures for access to public land require an application to be submitted to the appropriate authorities. Subsequently, there are procedures for access to private land and these may be based on expropriation.

**4.    Interconnection**

Publication of the Reference Interconnection Offer (RIO) is compulsory under Section 56 of the Telecommunications Law, but no RIO has been published by PTK so far.

**5.    Local loop unbundling**

There is no obligation to publish the Reference Unbundling Offer (RUO) under the current Telecommunications Law. It is expected to become legally compulsory in 2007.

Report 1 - Country profiles - August 26, 2005

Under its licence terms, PTK is required to complete and deliver, by July 30, 2005, to the TRA an assessment concerning the introduction of both local loop unbundling and wholesale line rental within Kosovo, complete with technical solutions, a provisional timetable and estimates of the costs payable by service providers for such access and rentals.

The TRA may then draw up more specific regulations, under Section 4 of the Telecommunications Law, concerning the introduction of local loop unbundling and wholesale line rental within Kosovo.

## 6.    Universal Service

The scope of the Universal Service Obligation (USO) covers the following services: network access, voice telephony, emergency services, payphones, common subscriber directories and directory enquiry services. There is a cost recovery scheme, which includes mobile operators, however, it is not applied in practice yet. PTK is currently required to provide universal service under the terms of its licence.

The Telecommunications Law has a special clause concerning the Equitable and Non-discriminatory Contribution stating that all current and future providers will work on the preservation and advancement of Universal Service, as well as the provision of special mechanisms for doing so.

Report 1 - Country profiles - August 26, 2005

## D.    Summary

| Kosovo | |
|---|---|
| **Topic** | **Status** |
| National Regulatory Authority | • Telecommunications Regulatory Authority (TRA)<br>• Board recommended by Minister of Transport and Telecommunications<br>• 5 professional staff for regulatory tasks<br>• Funded initially from Kosovo Consolidated Budget<br>• Framework for broadcasting networks and frequencies not yet decided<br>• Cable TV regime not yet defined<br>• Can resolve commercial conflicts |
| Market Access | • All sectors liberalised<br>• Secondary legislation on licensing and authorisations not adopted<br>• Individual licences required for telephony networks and services<br>• Individual authorisation for ISPs<br>• No official position on VoIP<br>• Cable TV regime not yet defined |
| Competitive safeguards | • Carrier selection and pre-selection not yet decided<br>• Number portability not yet decided,<br>• One fixed operator with SMP designation<br>• Reference interconnection offer not available<br>• Reference unbundling offer not decided |
| Universal service | • Universal service requirements according to EU acquis<br>• USO cost recovery scheme in legislation, not yet applied |
| Telephony – Market structure | • Post and Telecommunications Enterprise of Kosovo (PTK) incumbent operator 100% state owned<br>• One fixed telephony operator<br>• Two plus one 2G mobile operators / no 3G / no service providers<br>• Public radio local area networks active<br>• Fixed penetration 5.2, digitalisation 47.0, party lines 17.0<br>• Mobile penetration 16.0 |
| Telephony – Retail tariffs | • Tariffs not yet rebalanced – Residential access: 4.84[69], Business access: 5.05<br>• Local calls – high range – no low tariff package<br>• National long distance calls – medium high range<br>• International long distance calls – high range |
| Telephony – Wholesale tariffs | • Interconnection charges fixed network not available<br>• Interconnection charges mobile network not available |
| Internet and broadband | • Internet penetration 11.0%<br>• Internet dial-up cost – high range<br>• xDSL lines – 0.01%<br>• Number of broadband connections – 0.12%<br>• 3 national ISPs, 8 local |

---

[69] For an explanation of this indicator, see Report 1 – Country Comparative Report, Chapter III.G.4 on Access charges

Report 1 - Country profiles - August 26, 2005

## IX.    THE FORMER YUGOSLAV REPUBLIC OF MACEDONIA

### A.    Legislative Process and Overview of the Relevant Institutions

### 1.    Introduction

The Stabilization and Association Agreement, signed on April 9, 2001 between the former Yugoslav Republic of Macedonia and the EU is a preferential agreement, which is intended to bring both political and economic stability and prosperity to the country and the region, and create conditions for establishing an association between EU and the former Yugoslav Republic of Macedonia. On April 1, 2004 the agreement between the country and the EC entered into force and the first meetings of the Stabilization and Association Council and Committee have already taken place in Brussels.

On March 22, 2004 the former Yugoslav Republic of Macedonia applied for membership of the European Union. On May 17, 2004 the Council of Ministers requested the European Commission to prepare an Opinion on the application, thus setting in motion the process which could eventually lead to full EU membership of the former Yugoslav Republic of Macedonia. One of the information sources used by the Commission in the preparation of the Opinion will be the answers to the questionnaire, which was presented to the Government of the former Yugoslav Republic of Macedonia on October 1, 2004 in Skopje. The duly completed questionnaire was returned to the European Commission in Brussels on February 24, 2005

On April 4, 2003 after several years of intensive negotiations, the former Yugoslav Republic of Macedonia became the 146th Member of the World Trade Organization.

### 2.    Legislative process

The Assembly of the former Yugoslav Republic of Macedonia (or the Parliament) is the central legislative institution in the country. It has 120 representatives elected through direct national elections every four years. The representatives represent the citizens of Macedonia and make decisions in the Assembly in accordance with their personal beliefs. Its sessions are open to the public and often broadcast on radio and TV. Under special circumstances, the Assembly may decide to work without the presence of the public by a two-thirds majority vote of the total number of representatives.

Every member of the Assembly, the Government of the former Yugoslav Republic of Macedonia and groups of at least 10,000 voters have the right to introduce a proposal for a law. The proposal is given to a special working group, composed of people in the government, the assembly and public life who are competent in the subject. The working group prepares a report for the Assembly.

When the Assembly adopts the proposal, the proponent prepares the Draft Law. At this phase, amendments may be introduced by the Government or the members of the Assembly. After a debate on the Draft and the amendments, the Assembly takes a vote on the Draft Law. In general, laws are adopted by a majority of votes from the members present at the session. This number must be at least a third of all representatives. The Constitution sets exceptions – so called system laws, which are adopted with a two-third majority of the total number of representatives.

Laws enter into force when signed by both the President of the Republic and the President of the Assembly. The President of the Republic may decide not to sign the promulgation of the law. In this case, the law is put in front of the Assembly in order to be discussed and voted on again. If the

Report 1 - Country profiles - August 26, 2005

Assembly adopts the law with a majority of the total number of MPs, the President has to sign the law.

Each law is published in the "Official Gazette of the former Yugoslav Republic of Macedonia" and is enforced eight days after its publication date.

## 3. Overview of the relevant institutions

Under the Electronic Communications Law ("Official Gazette of the former Yugoslav Republic of Macedonia" No 13/05), the Ministry of Transport and Communications and the Agency for Electronic Communications (AEC or the Agency) are authorized to regulate the activities in the telecommunications sector. The relevant institutions and their structure are presented below.



**Figure 10 - Main institutions in the Macedonian telecommunications regulatory framework**

*a)    Ministry of Transport and Communications*

The Communications Section is responsible for preparing draft-laws in the areas of telecommunications, broadcasting and postal traffic. The Ministry of Transport and Communications submits them to the Government. First, the Secretariat-General of the Government reviews the legislative projects, which are then further reviewed by the Committee for Political System and by the Committee for Economic Policy. The concerted texts are then reviewed in a Government session. The Government submits the proposed draft-laws to the Assembly of the former Yugoslav Republic of Macedonia, which reviews them in a plenary session based on a prior

parliamentary review procedure by the Committee on Legislation and Legal Affairs, where it is possible to propose additional amendments.

In the preparation of legislative projects, the Ministry of Transport and Communications may open a debate on a national level with the public telecommunications operators, the providers of public telecommunications services and representatives of the associations of private electronic media, consumer associations and other organizations and institutions, in order to review all relevant aspects of the proposed legislation.

The Ministry of Transport and Communications implements the policy of the Government of the former Yugoslav Republic of Macedonia in the sector of telecommunications by coordinating the necessary initiatives, activities, and promoting competition. In particular, the Ministry is engaged in the following activities:

- implementing Government policy in electronic communications;

- preparing legislation in the electronic communications field in cooperation with the Agency and performs activities in relation to the development of electronic communications and information technology, and the creation and development of the information society;

- promoting the development of competition in electronic communications and increasing the access and use of electronic communications and information technology as determined by the Government;

- enforcing legislation for performing the activities in electronic communications in case of war or state of emergency. It cooperates with the Ministry of Defence and Ministry of Internal Affairs on electronic communication matters pertinent to defence and security. In case of radio frequencies, this cooperation also involves the Agency;

- representing the former Yugoslav Republic of Macedonia in international organizations in communications and information society, negotiates and signs bilateral and international agreements in communications and information society.

*b)    Agency for Electronic Communications*

In the area of electronic communications, the Agency for Electronic Communications is an independent regulatory body, a non-profit legal entity whose powers are determined by the Electronic Communication Law (ECL).

One of the tasks of the Agency is to support efficient competition in the provision of electronic communications networks and services. The Agency also protects end users of electronic communication services with respect to the service price and quality. Other objectives include the promotion of investment in infrastructure and innovation, efficient use of radio frequencies and numbering space.

**The Agency's responsibilities**

In order to perform all the activities as defined by the ECL, the Agency is responsible for:

- supervision, control and monitoring of electronic communications networks operators, activities and service providers.

Report 1 - Country profiles - August 26, 2005

- stimulation of the establishment of interconnection between electronic communications networks and ensure the interconnection on non-discriminatory terms, on the base of the approved reference offers;

- registration and notification of operators;

- preventing operators and providers from engaging in any anticompetitive practices;

- allocation and management of radio spectrum resources, monitoring the use of frequencies, preparing public tenders for the assignment and use of radio frequencies, issuing radio frequency authorizations, international coordination of spectrum resources;

- adoption and administration of the national numbering plan ; assigning numbers to operators of public communications networks and providers of public communications services;

- define the content of the standard agreements between operators of electronic communication networks, providers and users of the electronic communications services;

- imposing sanctions in cases of violation of the ECL;

- wholesale and retail price control and specific regulatory measures in cases where an electronic communications network operator or an electronic communications service provider, alone or jointly, holds a dominant position in a relevant market for communication services;

- control the tariff regimes laid down in the current concession agreements;

- administering the procedure for determining the universal service provider and signing the agreement with it upon a previous consent obtained by the Minister responsible for electronic communications;

- management and administration of the Universal Service Fund;

- resolution of disputes between operators of electronic communications networks and service providers, and users and operators of electronic communications network and service providers;

- cooperation with institutions responsible for broadcasting and the protection of competition;

- adoption and implementation of the secondary legislation under the ECL;

- ensuring that the operators of the electronic communications networks and service providers abide by the obligations which are prescribed in the interest of defence, security and public order and in the case of declared war and state of emergency;

- administering the implementation of national and international standards and technical regulations in electronic communications; participating in the work of international organizations and associations of national regulatory bodies in the electronic communications sector.

Report 1 - Country profiles - August 26, 2005

**Commission and Director**

There are two bodies within the Agency for Electronic Communication, which have the mandate to plan and perform all the activities, namely the Commission of the Agency (the Commission) and the Director of the Agency. The Commission consists of five members, including its President. It is elected by the Assembly of the former Yugoslav Republic of Macedonia for a five year term. The President of the Commission is nominated for a five-year term, two members of the Commission are nominated for a four-year term, and two members are nominated for a three-year term.

The responsibilities of the Commission include:

- adoption of the statute and other acts of the Agency, its annual financial plan and the final audit of the accounts; annual work programme and report;

- appointment of the Director of the Agency and his dismissal;

- supervising the activities of the Agency and make decisions on complaints in second instance;

- to report to the Assembly of the former Yugoslav Republic of Macedonia;

- to undertake any other activities as prescribed in the ECL and the Agency's Statutes.

The Commission appoints the Director through a public tender. The Director is professionally engaged by the Agency and manages the operation of the Agency and is responsible for its legal work.

**Funding**

The Agency's operation is financed through:

- revenues from reimbursements and fees stipulated by the ECL, and

- by loans, donations and other forms of financial and technical assistance.

**Appeal procedure**

Any entity has the right to appeal against decisions by the Director of the Agency as prescribed by Article 136 and Article 14 of the Electronic Communication Law. The appeal to the decision should be made within eight days of its issuance to the Commission of the Agency, which decides on the appeal within fifteen days. The decisions of the Commission are final.

*c)    Broadcasting Council*

The Broadcasting Council is an independent regulatory body, which represents the interests of the citizens of the former Yugoslav Republic of Macedonia in broadcasting. The Broadcasting Council grants and withdraws concessions according to the provisions of the Broadcasting Law and the Concession Agreements.

The Council was established in 1997 and is financed from the broadcasting fee. It consists of nine members, appointed by the Assembly of the former Yugoslav Republic of Macedonia, who are prominent people in the country's public life.

Report 1 - Country profiles - August 26, 2005

*d)    Monopoly authority*

The Commission for Protection of Competition is responsible for the implementation of the Law on Protection of Competition. The Commission is defined as an independent State body and is a collective body with a president and four members appointed (and dismissed) by the Parliament of the former Yugoslav Republic of Macedonia for a period of five years.

The Commission is responsible for its work to the Parliament of the former Yugoslav Republic of Macedonia to which it submits an annual report.

The Law establishes the Commission for Appeals as a second instance appeal body for competition matters. The Commission consists of three members and their deputies, who are appointed (and dismissed) by the Parliament of the former Yugoslav Republic of Macedonia.

## B.    Main legal instruments

### 1.    Primary legislation

The Electronic Communication Law (ECL) enacted on March 5th, 2005, and the secondary legislation that arises from it, is supposed to completely regulate the area of communications in the former Yugoslav Republic of Macedonia. The ECL replaces the old Telecommunications Law (TL) of 1996 with many subsequent amendments in 1998, 2000, 2002, and lastly, in 2004.

Report 1 - Country profiles - August 26, 2005

| Measure | Subject |
|---|---|
| Electronic Communications Law<br><br>(Official Gazette of the former Yugoslav Republic of Macedonia, no. 13/05) | Contents<br>• General provision<br>• Competence for Electronic Communications<br>• Electronic communications networks and services<br>• Ensuring universal service<br>• Ensuring competition<br>• Radio frequency spectrum<br>• Radio and telecommunication terminal equipment<br>• Measures for protection of public communication networks<br>• Rights of users<br>• Electronic communications in a state of war and emergency<br>• Secrecy and confidentiality of communications<br>• Digital radio and television<br>• Disputes<br>• Supervision<br>• Penalty provisions<br>• Transitional and final provisions |

**Table 28 – Primary legislation**

The amendments made in 1998 provided the necessary conditions for privatization and introduced competition in mobile telephony and some Internet services, while those in 2004, based on the obligations from the Stabilization and Association Agreement, enabled competition in cable TV services, improved protection of telecommunications services users, and more informative and free of charge bills.

The ECL has 17 chapters and 154 articles. It defines the authorities in the communication sector such as the Agency for Electronic Communications Agency (AEC), which is actually the NRA, managed by the Commission and the director. The law regulates communication networks and services, competition, universal services, the range of radio frequencies, confidentiality and user rights, designation of the incumbent as the SMP operator, and the time frame for the harmonization of the existing concessions to cable TV operators and ISPs. In general, the law is based on the 1998 acquis, and includes almost all aspects of the 2003 acquis.

## 2.     Secondary legislation

The secondary legislation based on the Electronic Communication Law is in the process of being prepared and it should be completed within six months of the date when the ECL came into force. This implies that the secondary legislation should be in place by the beginning of September 2005.

Report 1 - Country profiles - August 26, 2005

**C.    Status and current developments on key telecommunication issues**

**1.    Introduction**

Currently there are two related pieces of legislation in the process of preparation, the Broadcasting Law (BL) and what is known as the IT law or the National Strategy for ITS. The former has attracted a lot of pubic criticism due to the lack of transparency in the drafting process, which has taken almost two years. The most recent roundtable discussions were in May 2005. The drafting process of the later legislation is to commence in the fall of 2005.

The Commission was completed on May 25, 2005 (Official Gazette of the former Yugoslav Republic of Macedonia 37/05). After a public tender, the Director of the Agency was appointed.

**2.    Licensing/liberalization/market access issues**

*a)    Licensing regime*

The Telecommunication Law of 1998, which was supplanted by the ECL in 2005, liberalized data networks and services, with the exception of international links, which had to be leased from the incumbent until April 2000. On January 1, 2005 the VoIP service was liberalized along with the fixed telecommunication networks and services.

In order to establish a public fixed telecommunication network or service one only needs a notification. Nevertheless, in view of the current Concession Agreement between the Government and the incumbent Makedonski Telekomunikacii AD, there are no licensees for local or national, public voice telephony and network services. The situation is expected to change by December 5, 2005, which is the deadline for harmonizing the Concession Agreement with the ECL.

The two authorization requirements for wireless local loop are the notification and the permission for using radio frequencies; the ECL provides the legal basis. The few frequency bands are: 3.4-3.6 GHz, 5.150-5.350 GHz, 5.470-5.725 GHz, 24.5-26.5 GHz and 27.5-29.5 GHz 3.5 GHz and 5.8 GHz. While there are plans for issuing a public tender, no licences have been awarded for either of the frequency bands so far.

The authorization requirements for Internet Service Providers (ISPs) are reduced to notification. The provision of data transfer service, which includes the complete range of Internet services, is granted on the basis of a concession agreement, which must be in compliance with the ECL by September 2005. There is a right to interconnection and is based on the call origination model.

The Voice over IP (VoIP) service is liberalized by the ECL from March 2005, and notification is the only requirement for authorization. The Electronic Communication Agency has no official position on VoIP yet.

The Broadcasting Council (BC) in accordance with the Broadcasting Law (BL) is responsible for issuing concessions concerning content to any organization on local and national levels. The permission for using frequencies and associated telecommunication services is granted by the Electronic Communication Agency. Cable TV licences are generally available to any organization that is interested. In the last decade, more than 65 concessions have been awarded on a local level. There is no single concession yet at the national level. A full compliance with the ECL of the concession granting process should be completed by September 2005.

Report 1 - Country profiles - August 26, 2005

The mobile virtual network operators (MVNOs) are not subject to the ECL since March 2005.

Public Radio Local Area Networks (R-LANs) are not part of the spectrum of commercial services by the incumbent. The full frequency bands (2.4 GHz and 5 GHz) are available, while for authorization one needs notification and permission to use the radio frequencies.

*b)     Fixed voice telephony*

The incumbent operator, Makedonski Telekomunikacii AD, is 51% owned by Matav and almost 49% by the former Yugoslav Republic of Macedonia (along with the golden share). While the telecommunication market was fully liberalized on January 1, 2005 and the ECL came into force on March 5, 2005, the preparations for introducing at least a second fixed voice telephony operator have been rather delayed.

There are some indications that Macedonian electric power systems and the national postal service Makedonski Posti AD are getting ready to apply to be fixed voice telephony operators. Similar interest has been expressed by a few cable TV operators and one ISP, yet all of these have been in the realm of information dissemination.

*c)     Mobile licences*

There are only two operators with GSM licences (900 MHz), Mobimak AD and Cosmofon AD, that operate in bandwidths as prescribed by the concession agreements.

There are no national roaming agreements between 2G and 3G operators, since there is no 3G network that is operational. In addition, no UMTS licence had been assigned by June 2005.

**3.     Competitive safeguards, including SMP designation, carrier selection, number portability, accounting separation**

The incumbent operator Makedonski Telekomunikacii, A.D. has been designated as the SMP operator in Macedonia. The legal scope of the SMP designation is defined by Article 146 of the ECL. The same law also determines that A.D. Makedonski Telekomunikacii is the SMP operator in the fixed telephony network, fixed telephony and leased lines. The SMP remedies allowed by the ECL from March 2005 are, inter alia, non-discrimination, cost-orientation, transparency and meeting all reasonable requests for access, respect of confidentiality, separation of accounting, interconnection obligation, provision of a minimal set of leased lines, retail rate regulation, carrier selection and pre-selection, and merger control.

The option to select a carrier, concerning local, long distance, international, mobile, and non-geographical numbers, will be available from September 30, 2005. The same applies to the availability of carrier pre-selection.

Numbers should be portable, in all three categories such as geographically fixed, non-geographically fixed, and mobile, by March 5, 2007.

There are no operators with an allocated access code, or using Carrier Selection (CS) and Carrier Pre-Selection (CPS) for the provision of services.

## 4.    Interconnection

*a)    Reference Interconnection Offer (RIO)*

Only Makedonski Telekomunikacii AD is declared as the operator with SMP. Neither of the two current mobile operators, Mobimak and Cosmofon, have been designated as having SMP. Cost orientation is imposed on the fixed operator with SMP, Makedonski Telekomunikacii AD, but neither the cost base nor the cost standards are currently defined.

The incumbent operator with SMP is required to submit its RIO for approval within thirty days of the establishment of the AEC. The formation process of the AEC, including staffing and inner structure is well underway and should be completed by the summer of 2005.

There are two interconnection agreements between fixed and mobile operators, and one between mobile operators. Those were made after direct negotiations between the parties involved. There is no agreement that involves two fixed operators, since there is only one fixed operator, which is the incumbent.

## 5.    Local loop unbundling and broadband developments

*a)    Reference Unbundling Offer (RUO)*

The RUO is legally compulsory in accordance with the ECL and is expected to become effective on September 5, 2005. Nevertheless, there is no information on the status of the technical preparation or on the content of the possible offer.

*b)    Universal service developments*

The scope of the Universal Service Obligation (USO) extends to the following services: network access, voice telephony, emergency services, payphones, common subscriber directories and directory enquiry services. While the ECL defines a USO cost recovery scheme, it is not applied in practice and does not extend to mobile operators. There is no information on the actual deployment of the USO cost recovery scheme.

## 6.    Other developments (including privatization)

*a)    Privatization of Makedonski Telekomunikacii AD*

Makedonski Telekomunikacii AD was the national telecommunications operator and provider of public telecommunication services in the former Yugoslav Republic of Macedonia. In 1997, the telecom operator left the parent company, PTT Makedonija, and in 1998, it was incorporated as a shareholder company with State ownership. This was done in order to prepare the company for privatization.

A consortium, which was headed by the Hungarian PNO Matav, bought 51% of the shares of Makedonski Telekomunikacii in 2000. The total cost of this transaction was 352 million Euros. Matav became the majority shareholder in the company, while the Government of the former Yugoslav Republic of Macedonia retained 47.1% ownership. The remainder; about 1.9% was owned by the IFC (World Bank).

Report 1 - Country profiles - August 26, 2005

In addition to Matav, which belongs to Deutsche Telecom, the Consortium consists of some American and Greek capital. Initially, according to the contract, in the first two years of the privatization, Matav was supposed to invest around 250 million Euros in the company.

b)      *Ministry of Transportation and Communication*

There are some developments in the Ministry of Transport and Communications for the transparency of its work. It has a website where it provides citizens with timely information on draft laws, their reviews and analyses, and some excerpts of the public debates.

Report 1 - Country profiles - August 26, 2005

## D.    Summary

| The former Yugoslav Republic of Macedonia | |
|---|---|
| **Topic** | **Status** |
| National Regulatory Authority | • The Agency for Electronic Communications<br>• Nominally independent – Commission to be nominated by Parliament<br>• 11 professional staff for regulatory tasks in the Telecommunications Directorate, which forms the base for the staff for the Agency<br>• Financed primarily from frequency fees (52%), supervision fees (19%) and numbering fees (18%)<br>• Broadcasting networks and frequencies in the same framework as telecoms<br>• Responsible for quality of service aspects of Cable TV networks<br>• Can resolve disputes between network operators, service providers and consumers |
| Market Access | • Fixed voice telephony was intended to be liberalised from 1.1.2005, but some delays. Data transmission (Internet) and Cable TV already liberalised<br>• General authorisations for public communications networks and services<br>• General authorisation for ISPs<br>• No official position on VoIP<br>• General authorisation for transport and QoS aspects of Cable TV networks |
| Competitive safeguards | • Carrier selection and pre-selection legally required from 30.09.2005<br>• Number portability legally required from 5.3.2007<br>• One fixed operator with SMP designation<br>• Reference interconnection to be submitted for approval one month after AEC establishment.<br>• Reference unbundling offer legal obligations from 5.9.2005 |
| Universal service | • Universal service requirements according to EU acquis<br>• USO cost recovery scheme in legislation, not in practice |
| Telephony – Market structure | • A.D. Makedonski Telekomunikacii incumbent operator –47.125% state owned plus golden share<br>• Only incumbent operator in fixed telephony networks and services<br>• Two 2G mobile operators / no 3G / no service providers<br>• Public radio local area networks active<br>• Fixed penetration 29.2, digitalisation 100, party lines 0<br>• Mobile penetration 64.6 |
| Telephony – Retail tariffs | • Tariffs not yet rebalanced – Residential access: 5.96[70], Business access: 12.73<br>• Local calls – medium price range –low tariff package<br>• National long distance calls – medium price range<br>• International long distance calls – high price range |
| Telephony – Wholesale tariffs | • Interconnection charges fixed network  not available<br>• Interconnection charges mobile network – on EU average |
| Internet and broadband | • Internet penetration 15.4%<br>Internet dial-up cost – high price range<br>xDSL lines – 0.12%<br>Number of broadband connections – 0.12%<br>5 national ISPs |

---

[70] For an explanation of this indicator, see Report 1 – Country Comparative Report, Chapter III.G.4 on Access charges

Report 1 - Country profiles - August 26, 2005

## X.   TURKEY

### A.   Legislative process and overview of the relevant institutions

#### 1.   Legislative process

The legislative body is the Turkish Grand National Assembly (TGNA), consisting of 550 members elected for 5 years. Draft laws can be submitted to the TGNA either by the Cabinet of Ministers or by members of the TGNA. The drafts are first discussed and amended at the relevant commissions of the TGNA and then presented to the general assembly. In the General Assembly, there is first a discussion on the whole of the draft law, followed by a vote on whether discussion on individual articles should be started. A "no" vote here means that the draft law is not accepted. Upon a "yes" vote discussion of individual articles starts, during which amendments or new articles may be accepted or individual articles may be rejected. This is followed by a new vote on the whole of the draft. Once a law is adopted, it is sent to the President of the Republic for ratification. The President may ratify the law, in which case the law is published in the official gazette, or may return the law to the parliament "for further discussion". The TGNA may adopt the law again without any changes in which case the President has to ratify it. If the president still has objections about the law on constitutional grounds, it may file a petition with the Constitutional Court.

#### 2.   Overview of the relevant institutions

The institutional structure in Turkey is shown in **Figure 11** below and is discussed in the following paragraphs.



**Figure 11 – Main institutions in the Turkish telecommunications regulatory framework**

Report 1 - Country profiles - August 26, 2005

*a)*　　*Ministry of Transportation*

The Ministry of Transportation determines the state policies concerning the telecommunications sector. In this context, the subject and scope of universal services are also determined by the Ministry of Transportation. Another function of the Ministry of Transportation is to propose "authorization plans" for the telecommunication services entailing concession agreement to the Council of Ministers.

*b)*　　*Telecommunications Authority*

The Telecommunications Authority is an administratively and financially autonomous national regulation authority of Turkey. The seven members of the TA Board are appointed by the Council of Ministers for a period of 5 years. The Cabinet appoints two members and the president from nominations by operators having at least 10 percent market share, one member from nominations by the Ministry of Industry and Trade and the Union of Chambers and Industry, and three members from nominations by the Ministry of Transport. Appointments require the approval of the President of the Republic. Board members cannot be removed before the expiry of their terms of office except in cases of illness, professional misconduct or conviction of criminal offences.

The NRA is "related" to the Ministry of Transportation.

Revenues of the NRA are determined independently of the Ministry of Transportation. The accounts of the Authority are audited by the Supreme Audit Council of the Prime Ministry, the Ministry of Finance and the Council of Inspectors of the Prime Ministry.

The duties of the NRA can be categorized under four main titles:

- Authorization

- Regulation

- Inspection

- Arbitration

Decisions of the Board can be appealed to the administrative court.

*c)*　　*The Competition Authority*

The Board of the Competition Authority has eleven members. Board members are appointed by the Cabinet of Ministers from candidates nominated by the Ministry of Industry and Trade, the Union of Chambers of Commerce and Industry, Council of State, Inter-University Committee and the Supreme Court. The Competition Authority is "related" to the Ministry of Industry and Trade.

Its revenues consist of appropriations from the Ministry of Trade and Industry's budget and 0.0004 percent of the capital of new companies or of capital augmentations. Its accounts are audited by the High Court of Accounts.

Decisions of the Board are appealed at the Council of State, which functions as a high court.

Report 1 - Country profiles - August 26, 2005

*d)*    *Radio and Television Supreme Council (RTSC)*

Members of the Council are appointed by the Turkish Grand National Assembly (TGNA, the parliament) from among the candidates nominated by political parties represented in the TGNA. Relations between the government and the RTSC are carried out through the Prime minister's office.

The RTSC is audited by the Supreme Audit Council of the Prime Ministry. The Council has its own revenues (such as frequency allocation fees and 5 percent of gross advertisement revenues of broadcasting companies) but it can also make requests for allocations from the state budget.

RTSC decisions are appealed to the Council of State, which functions as a high court.


**B.    Basic legislation**


**1.    Primary legislation**


| Measures | Subject |
|---|---|
| Law number 4502 of January 27, 2000, amending the basic telecommunications laws nos. 406 and 2813 | Separation of policy making, regulation and operational activities. |
| | Monopoly rights of Türk Telekom over voice telephony services and building and operation of infrastructure up to December 31, 2003. |
| Law number 4673 of May 12, 2001 | Transfer of licensing authority to the Telecommunications Authority |

**Table 29 - Primary legislation**


**2.    Secondary legislation**


| Measures adopted by the TA | Subject |
|---|---|
| Ordinance on Access and Interconnection of May 2003 | Interconnection |
| Ordinance on the authorisation of telecommunications services and infrastructure (Official Gazette No 25565 of August 26, 2004). | Authorisation |
| Retail price regulation (January 2002); | Retail prices |
| Numbering ordinance (February 2004); | Numbering including number portability |
| Ordinance on the processing and secrecy of private information (February 2004). | Privacy |

Report 1 - Country profiles - August 26, 2005

| Measures adopted by the TA | Subject |
|---|---|
| Ordinance Amending the Ordinance on the Authorisation of Telecommunications Services and Infrastructure, Official Gazette No 25730, February 17, 2005. | licensing of broadband fixed wireless access |

**Table 30 - Key ordinances and regulation adopted by the NRA**

**C.    Status and recent developments on key telecommunications issues**

**1.    Licensing/liberalisation/market access issues**

The Telecommunications Authority has issued an Ordinance on the authorisation of telecommunications services and infrastructure (Official Gazette No 25565 of August 26, 2004). The Ordinance replaces the Telecommunications Services Regulation issued in 2001 (Official Gazette No 24356 of March 28, 2001). It defines the following types of authorisation:

| Type of licence/authorisation | Type of services/operators covered |
|---|---|
| Authorisation Agreement | Turk Telekom |
| GSM Authorisation Agreement | Third 2G licence held by Aria and Aycell (the two operators merged in February 2004) |
| Concession Agreement | Telecommunications services provided by a limited number of operators on a national scale. |
| | Concession Agreements are issued following an auction. |
| Type 1 Telecommunications Licence | Telecommunications services provided by a limited number of operators but on a regional or local scale. |
| | Type 1 Telecommunications Licence is issued following an auction. |
| Type 2 Telecommunications Licence | Telecommunications infrastructure or services that: |
| | • do not have to be provided by only a limited number of operators, and |
| | • are listed in the Supplementary Article 18 of the Telegraph and Telephone Law (Law No. 406). This includes cable TV, satellite, public phones, intelligent networks, data networks and "similar value added services". |
| | For long distance telephone services, this type of authorisation is further divided into types A, B and C (see table below) depending on whether operators use carrier pre-selection, carrier selection or 10-digit numbers. |
| General Authorisation (registration) | Telecommunications services that: |
| | • do not have to be provided by only a limited number of operators, and |
| | • are *not* listed in the Supplementary Article 18 of the Telegraph and Telephone Law (Law No. 406). |
| | This type of authorisation simply requires a registration, which is currently applied only to Internet service providers. |

**Table 31 - Authorisation regime**

Licences for long distance telephone services were finally issued on May 17, 2004: seven Type-A, thirteen Type-B and seven Type-C licences, as shown in the table below.

Page 124

Report 1 - Country profiles - August 26, 2005

| Type of licence | Activities |
|---|---|
| A type | Long distance services using carrier pre-selection |
| B type | Long distance services using call-by-call carrier selection |
| C type | Long distance services using a 10-digit number provided by the Telecommunications Authority, i.e. calling card services |

**Table 32 – Types of long-distance licences**

On January 2, 2004, a decision by the council of ministers was published in the Official Gazette. The decision defines the fees for long distance telephone service licences. Operators providing long distance telephone services will be authorized through a Telecommunications Licence of the Second Type. The fees are as follows:

| Types of long-distance operators | Licence fees |
|---|---|
| A type long distance operator (carrier pre-selection): | about € 250,000 plus 0.5% of net annual sales |
| B type long distance operators (call-by-call carrier selection) | about € 110,000 plus 0.5 percent of annual net sales |
| C type long distance operators (operators providing service through a 10-digit number provided by the Telecommunications Authority (TA)): | about € 56,000 plus 0.05 percent of annual net sales |

**Table 33 - Licence fees for long distance operators**

The Telecommunications Authority (TA) has issued a regulation on the licensing of cable platform services (Ordinance Amending the Ordinance on the Authorisation of Telecommunications Services and Infrastructure, Official Gazette No 25718, February 5, 2005) but no licences have been issued yet because the Cabinet of Ministers has not yet determined the minimum licence fees.

## 2.    Interconnection

The Telecommunications Authority has decided on reference interconnection tariffs for Turk Telekom until the end of 2005.

Call origination and call termination charges are set as follows:

| | Intra access area calls | | Extra access area calls | |
|---|---|---|---|---|
| | Lira/min | €cents/min | Lira/min | €cents/min |
| TT proposal | 52,000 | 2.8 | 72,000 | 3.9 |
| Rates from Aug 2004 | 41,000 | 2.2 | 59,000 | 3.2 |
| Rates from Jan. to Sept. 2005 | - | 1.8 | - | 2.8 |

Report 1 - Country profiles - August 26, 2005

| | Intra access area calls | | Extra access area calls | |
|---|---|---|---|---|
| | Lira/min | €cents/min | Lira/min | €cents/min |
| Rates from Oct. 2005 | - | 1.1 | - | 2.0 |

**Table 34 - Interconnection rates set by TA for the period 2004-2005**

The NRA has issued an Ordinance on Access and Interconnection (note 1) that came into force on May 23, 2003. Access is defined as the making available of infrastructure and/or services of telecommunications by an operator to another operator. It includes access to elements of a fixed or mobile network, including unbundled access to the local loop and bit stream access, physical infrastructure, software systems, number translation, virtual network services and interconnection between two telecommunications networks (Art. 6).

*a)      Determination of SMP*

The Board of the NRA determines operators having a dominant position and/or significant market power (SMP) (Art. 7). Operators having a dominant position are declared to be subject to obligations imposed on operators with SMP.

The NRA has also issued a draft Communiqué on Principles and Procedures for the designation of operators in a Dominant Position or with SMP.

*b)      Obligations of access and interconnection*

Part Two of the Ordinance identifies access and interconnection obligations that can be imposed on operators.

**<u>Access</u>**

It provides the NRA with the authority to impose on operators the obligation to provide access whenever it deems that denial of access (or imposition of unreasonable terms) would hinder the emergence of a competitive market, or would not be in end-users' interests (Art. 8). While providing access, operators are obliged to provide services and information under the same conditions and of the same quality as it provides for its own shareholders, partners and affiliates. An operator may restrict access only if it can show that the security of network operations or network integrity or data protection cannot be assured, or interoperability of services is not possible (Art. 9). Such restrictions require the approval of the NRA.

**<u>Interconnection</u>**

All operators may request other operators to participate in interconnection negotiations. Turk Telekom, the incumbent operator, and operators with SMP are obliged to provide interconnection. The ordinance also provides the NRA with the authority to force operators to share facilities subject to reasonable financial compensation (Art. 11). Art. 12 provides the NRA with the authority to impose provision of number portability and carrier selection.

Turk Telekom and operators with SMP may not discriminate (Art. 13), providing unbundled access to all network elements, including to the local loop at cost oriented prices (Art. 14), and provide co-location at reasonable prices (Art. 15)

Report 1 - Country profiles - August 26, 2005

**Interconnection charges**

Operators are free to set access or interconnection tariffs (Art. 16). Turk Telekom, operators with SMP and other operators designated by the NRA, are obliged to provide access and interconnection at cost-oriented tariffs (Art. 16). If the NRA decides that tariffs are not cost-oriented, the NRA may determine tariffs according to cost-orientation or may set an upper limit by taking into consideration other countries' implementations (Art. 16).

"Cost-oriented prices" means prices based on the long-run incremental cost of efficient service provision including an appropriate return on capital plus that proportion of common costs that can be attributed to the service. (Art. 17). Art. 18 states that operators with SMP are obliged to follow accounting separation and specifies the activities for which separate accounts will be kept.

**Agreements**

Terms and conditions of access and interconnection agreements are determined by the operators. In case operators cannot reach an agreement, any one of the parties may apply to the NRA for dispute settlement (Art. 21). If the NRA accepts the application (dispute settlement requests related to interconnection are accepted in any case), and if the sides do not reach an agreement within six weeks, the NRA determines the terms, conditions and prices of the agreement within four months. The Authority may impose interim tariffs during execution of the dispute settlement procedure.

Access and interconnection agreements are open to public inspection with the proviso that trade secrets may be hidden (Art. 22).

**Reference offers**

Turk Telekom and operators with SMP are obliged to prepare and send reference offers on access and interconnection (Art. 24) to the NRA.

**3.    Competitive safeguards including SMP designation, carrier selection, number portability, accounting separation**

The NRA issued a regulation on numbering that describes the application procedures for blocks of numbers. The regulation also imposes number portability. Annex 1 of the regulation describes the national numbering plan. Annex 7 describes the codes for call-by-call carrier selection.

**4.    Local loop unbundling and broadband developments**

The Telecommunications Authority has published a Communiqué on procedures for unbundled access to the local loop (Official Gazette No 25528 of July 20, 2004). The communiqué is based on the Access and Interconnection Regulation (Official Gazette No 25116 of May 23, 2003).

The Telecommunications Authority has adopted a decision on bitstream access (Board Decision No. 2004/535 of October 6, 2004). Access is priced on a retail-minus basis and allows a margin of 40-50 percent for ISPs.

NB.    A regulation concerning full or shared access to the local loop was issued in July 2004, but implementation will not start until July 2005.

Report 1 - Country profiles - August 26, 2005

## 5.    Other developments (including privatisation)

On November 25, 2004 the privatisation administration announced the launch of the privatisation procedure of Turk Telekom and invited bids from interested parties by May 31, 2005, at the latest. The privatisation program envisages the block sale of 55% of the company. Participants are required to pay $50,000 for the bidding specifications.

Before the launch of the privatisation procedure, the Competition Authority has decided that the cable TV infrastructure of Turk Telekom would have to be divested within one year from the completion of privatisation. Turk Telekom and its cable TV network have to be sold to different owners. In addition, the Competition Authority has requested that Turk Telekom's Internet business unit, TTNet, be legally separated from Turk Telekom by the creation of a separate subsidiary.

The Privatisation Administration has announced the list of pre-qualified bidders for the block sale of 55% of Turk Telekom shares. The list consists of thirteen bidders, including Belgacom SA, Telecom Italia International N.V., Telefonica SA, SK Telecom Ltd., and a number of joint ventures and consortia. Belgacom and Telefonica have announced that they withdrew from the Turk Telekom tender. The deadline for providing bids has been extended to June 24, 2005.

Report 1 - Country profiles - August 26, 2005

**D.    Summary**

| Turkey | |
|---|---|
| **Topic** | **Status** |
| National Regulatory Authority | • Telecommunications Authority (TA) <br> • Appointed by Council of Ministers <br> • 75 professional staff for regulatory tasks <br> • Financed primarily from frequency fees (71%) and radio device certificate fees (17%) <br> • Broadcasting networks in different framework, but NRA is responsible for frequencies <br> • Responsible for Cable TV <br> • Can resolve commercial conflicts |
| Market Access | • All sectors except local networks liberalised <br> • Individual licences required for telephony networks and services <br> • General authorisation for ISPs <br> • VoIP falls into the same framework as telephony services <br> • Individual licences required for Cable TV. |
| Competitive safeguards | • Carrier selection and pre-selection legally required, but implementation delays <br> • 25 operators with access code <br> • Number portability not yet decided <br> • One fixed and one mobile operator with SMP designation <br> • Reference interconnection offer published <br> • Reference unbundling offer not decided |
| Universal service | • Universal service requirements in law – different from EU <br> • No USO cost recovery scheme, planned for 2005 legislation |
| Telephony – Market structure | • Turk Telecom incumbent operator 100% state owned <br> • 1 operator for local telephony, 44 for long distance telephony <br> • Three 2G mobile operators / no 3G / no service providers <br> • Public radio local area networks under study <br> • Fixed penetration 29.3, digitalisation 97.1, party lines 0 <br> • Mobile penetration 48.9 |
| Telephony – Retail tariffs | • Tariffs not yet rebalanced – Residential access: 5.68[71], Business access: 6.24 <br> • Local calls – high range –low tariff package <br> • National long distance calls – high range <br> • International long distance calls – low range |
| Telephony – Wholesale tariffs | • Interconnection charges fixed network  three times EU average <br> • Interconnection charges mobile network – 40% below EU average |
| Internet and broadband | • Internet penetration 14.2% <br> • Internet dial-up cost – medium range <br> • xDSL lines – 0.63% <br> • Number of broadband connections – 0.64% <br> • 89 national ISPs |

---

[71] For an explanation of this indicator, see Report 1 – Country Comparative Report, Chapter III.G.4 on Access charges