# FOREIGN INVESTORS COUNCIL

Proposal for Improvement
Of the Investment Climate in Serbia

**2004**

**Copyright Notice**

Copyright © 2004 Foreign Investors Council, Hyatt Regency Hotel, 5, Milentija Popovica Street, 11000 Belgrade, Serbia and Montenegro.  All Rights Reserved.

Permission to use, copy, and distribute the contents of this document in any medium and without fee, royalty and formal request to the Board of Directors of the Foreign Investors Council is herby granted, provided that copies are not made or distributed for profit and that the Foreign Investors Council's copyright is acknowledged and attributed of the source is given.

The Foreign Investors Council does not warrant, guarantee or make any representations regarding the currency, accuracy, reliability, or any other aspect regarding this document.  Under no circumstances shall Foreign Investors Council be liable for any direct, indirect, special, incidental or consequential damages, or for damages of any kind arising out of or in connection with the use of this document under any theory of liability even if we have been advised of the possibility of such damages.

# Table of Contents

**Foreword of the President/Spokesman – Mr. Christoph Greussing**    7

**1.  Foreign Investors Council – Introduction and Overview**    9

**2.  Country Overview**    13
  Political Overview    13
  Economic Overview    14
  Monetary and Exchange Rate Policy    14
  External Sector    16
  Fiscal Policy    17
  Outlook    18

**3.  FIC Highest Priorities**    21
  Highest Legislative Priorities    21
  Highest Institutional Priorities    22
  Highest Policy Priorities    22

**4.  Legal and Regulatory Framework**    23
  Constitutional Framework    23
  Court System    24
  Company Law    25
  Concession Law    27
  Securities Law    28
  Intellectual Property    29
  Labor Law    30

**5.  Privatization**    33

**6.  Taxation**    35
  Taxation of Corporations    35
  Tax Residents    35
  Taxable Persons    35
  Tax Rate and Tax Base    35
  Thin Capitalization    36
  Transfer Pricing    36
  Tax Incentives    36
  Tax Holidays    36
  Tax Credits    36
  Accelerated depreciation    36
  Employment of Disabled Persons    37
  Exemptions    37
  Groups of Companies    37
  Withholding taxes    37
  Losses    37
  Capital Gains and Losses    37
  Assessment and collection    37
  Taxation of Individuals: Personal Income Tax    38

Residents vs. non-Residents                                          38
Taxation of salaries                                                 38
Other Income                                                         38
Social Security Contributions                                        38
Tax on salary fund                                                   39
Annual Taxation                                                      39
Personal allowances                                                  39
Taxation of Expatriates                                              39
Property Tax                                                         40
Inheritance and Gift Tax                                             41
Transfer Tax                                                         42
Indirect Taxation                                                    43

**7.  Accounting and Auditing**                                     47
International Accounting Standards                                    47
Annual Financial Statements                                          47
Submission of Financial Statements                                   47
Audit Requirements                                                   48
Chart of Accounts and Accountants                                    48
Company size                                                         48
Requirements for preserving records                                  48

**8.  Labor, Public Administration**                                51
Availability of labor                                                51
Working hours                                                        51
Social Security                                                      51
Expatriates                                                          52

**9.  Financial/Banking Sector**                                    53
Training of Compliance Auditors                                      53
Role of the Banking Association                                      53
Treatment of Share Capital of Banks                                  54
Open Foreign Currency Position                                       54
Legal Lending Limit                                                  56
Mortgage Market in Serbia                                            57
Temporary Mortgage Register                                          58
Serbia and Montenegro, transactions between entities and individuals 60
Syndicated Loan                                                      60
Lending Limit for Leasing Operations                                 61
Interbank Foreign Exchange Market                                    61
Tax on transfer of the absolute right's                             61
Commission on Transaction on Secondary Market                        62

**10. Leasing**                                                     65

**11. Real Estate: Land Ownership**                                 67
Governmental control over supply of land and prices of land          67
Restitution of land and properties                                   67
Restrictions on speculative buying of land and time                  67

**12. Insurance, Pensions and Social Reform**                       69
Insurance                                                            69
Pension and Social Reform                                            70

**13. Telecom Market**                                              73

**14. Environment**                                                 75

**15. Hospitality Industry**                                        77

Foreign Investors Council

# Time is of the Essence

Following the early elections in December 2003, Serbia entered 2004 with ongoing negotiations between political parties on the formation of the next government. The manner of the election campaign led to the assumption that the post election period and the negotiations will not be easy. For quite some time it was not clear in which direction these talks would develop. Even the option of new elections was seriously considered. This situation contributed to the increasing concern of the international community. This is why the Foreign Investors Council (FIC) decided to raise its voice, stressing that a quick formation of the government is of utmost importance in order to continue with reforms and to regain trust and creditibility.

Today, one year after the tragic assassination of Zoran Djindjic in March 2003, Serbia is ruled by a minority government made up of parties of the democratic bloc. Many challenges are ahead, such as approval of the new budget, adoption of numerous draft laws, commencement of deeper institutional reform etc. Since early elections were announced in November 2003 valuable time has passed by. And time is of the essence in Serbia. Good and valuable initiatives supporting reforms, were put on hold and were not adressed anymore. The reform process in Serbia was practically at a stand still.

This month saw the formation of the new Government. Much will now depend on the openness and professionalism of the newly appointed ministers, who are urged to restart the transformation process. Many economic laws have been drafted and need to be quickly adopted, and more importantly implemented in a consistent manner in order to demonstrate that Serbia is back again on the "road of reform". Still the country faces structural problems, such as a weak export industry, which last year resulted in a current account deficit of Euro 2 billion. In addition, with the background of global recession, in 2003 the economic growth in Serbia slowed down to 1,5 %. In the same year, the industrial output fell by 3 % and during the same period the official unemployment rate rose to 34 %. Only immediate reform efforts taken by the new government can prevent this imbalance from endangering the monetary stability the country has achieved to date on a medium term basis. Still, the inflation rate is under 10 %. The Dinar is relatively stable and at the end of 2003 the FX reserves amounted to Euro 3,5 billion.

Despite all these concerns, Serbia is still on the short list of investors. The potential for this country is substantial. The 2003 financial results of different existing investors also show that developing successful  business in Serbia is possible and that financial targets can be reached within a reasonable time. Nevertheless, it must be mentioned that it remains a difficult and volatile environment, which needs further and speedier transformation. That is why the FIC continues to support the government in its efforts to push reforms forward by sharing with them the experience of reputable international companies with a vested interest in the region. I am pleased to present to you the second "White Book", which  is the outcome of the work of a dedicated team and represents our bench mark of Serbia today. The main target of this book is to highlight the main obstacles foreign investors experience in their day to day business. Once again, the principle of the book is not to criticise, but also to provide possible solutions, which are based on the principle of "Best Practise". The FIC regards itself as a reliable and permanent partner of the Serbian government as it shares the same target: Improving the overall economic situation in Serbia and creating a prosperous, stable and open environment for its people.

As the President and Spokesman of FIC I would like to thank all contributors, who invested their time and energy in putting together this book. Without these dedicated people this publication would not have been possible.

Belgrade, March 2004

*Christoph Greussing*
*President and Spokesman*
*Foreign Investors Council*


_Chapter 1_

# Foreign Investors Council – Introduction and Overview

The Foreign Investors Council (FIC) was founded by 14 major foreign investors in Serbia with the support of OECD – Investment Compact for South East Europe at the official foundation meeting (Constituent Assembly) on July 15, 2002 in Belgrade, with the clear mission:

_"To contribute together with the Authorities to a better investment environment for foreign and domestic companies on the market through open, informal dialogue between different willing stakeholders."_

The main purpose of the Foreign Investors Council is to improve the investment and the business development climate in Serbia and Montenegro by making concrete reform proposals, to stimulate foreign direct investment, to promote communication between the Foreign Investors and the authorities in Serbia and Montenegro – to assist and support the international business community and help in overcoming difficulties which might be encountered in a course of investment.

**The aims of the FIC are:**

- Improvement of the investment and business climate in Serbia and Montenegro, by making concrete reform proposals;
- Stimulation of foreign direct investments;
- Promoting the communication between FIC and the Serbian Authorities;
- Assist in overcoming difficulties which may exist in relations with foreign investors;
- Link with other foreign investor organizations across the SEE region to benefit from best-practices sharing;
- Studying concrete means to facilitate regional operations;
- Facilitating the flow of information between FIC Members and the Government

Besides mentioned, one of the purposes of the FIC is also to link with other foreign investors organizations across the SEE Region, to benefit from best-practices sharing and to study concrete means to facilitate regional operations, this in partnership with all relevant authorities, international organizations and institutions.

All 80 companies – current members of the Foreign Investors Council have a long lasting presence in SEE and would like to share their rich experience from the region with Serbian and Montenegrin authorities and to support the reform work of the government. They also believe that they can draw substantial benefits from their various experiences, common interests and economic strengths to build a better enabling framework for future business in Serbia as well as in South East Europe.

In its current development stage, the FIC is a powerful and constructive tool of reference. It represents most of the FDI stock in SCG, over 15 different nationalities, a vast range of economic sectors, a large part of employment and high economic interaction with domestic SME's.

Foreign Investors Council    WHITE BOOK

The FIC has 16 specialized working committees which meet on a regular basis and have counterparts within the government and administrations. Committees are grouped into sector based: macro economics, banking, transportation, chemical, construction, consumer goods, energy & telecommunication and media; and cross functional committees: environment, intellectual property, privatisation, human resources, taxation, leasing, legal and insurance.

The FIC operates in partnership with OECD – Investment Compact for SEE and closely cooperates with major international organizations present in Serbia and Montenegro, such as IMF, The World Bank, The Delegation of the European Commission, EBRD, EAR, IFC, and the European Union.

The Foreign Investors Council is established as a non-profit business association of foreign investors. The bodies of the Council are the General Assembly of the Council, the Board of Directors, the President/Spokesman and the Executive Manager.

## Foreign Investors Council Organisation



The White Book 2004 of the Foreign Investors Council summarizes the main obstacles to investment and business development in the country and formulates concrete proposals to overcome these impediments.  It is designed and presented by the FIC as an instrument for constructive dialogue and partnership between investors and government authorities that can help to improve the business and investment environment and lead to increased private investment.

This book is also a reference for the monitoring process of reforms set by the OECD – Investment Compact for SEE within the framework of the Stability Pact for South East Europe.  The White Book is therefore also a natural part of the monitoring process of reforms set by the OECD – Investment Compact for SEE.

By publishing the White Book 2004, FIC aims to respond to the Serbian authorities on some chosen subjects which are linked to several sectors of the economy.  This publication can not cover all aspects of the Serbian economy and therefore does not reflect the complete picture and status quo of the reform work of the government.  It has rather to be seen as a process, which is repeated on a regular basis.

The White Book 2004 can be downloaded from *www.fic.org.yu*

**Contacts for Foreign Investors Council are:**

**Mr. Christoph Greussing, President/Spokesman**

**Ms. Maja Gedosev, Executive Manager**

**Foreign Investors Council Office**
Hyatt Regency Hotel
5, Milentija Popovica Street
11 070 Belgrade
Serbia and Montenegro

Tel: +381 11 301 1155
Fax: +381 11 301 1242

E-mail: office@fic.org.yu
Web-site: www.fic.org.yu

## PRESIDENTS OF FIC COMMITTEES

| | | |
|---|---|---|
| BANKING | Christoph Greussing, HVB Bank | Christoph.greussing@yu.hvb-cee.com |
| CHEMICAL | Vladislav Sywala, Tehnogas-Messer | Vladislav.sywala@tehnogas.co.yu |
| CONSTRUCTION | Henrik Larsson, VELUX | Henrik.larsson@velux.com |
| CONSUMER GOODS | Spiros Pyrgidis, Delyug | spipyr@delyug.co.yu |
| ENERGY & TELECOM. | Per Haakon Loekka, Ericsson | Per-haakon.loekka@eyu.ericsson.se |
| MEDIA | Joachim Zaumsegel, WAZ/Politika | jzaumseg@politika.co.yu |
| TRANSPORTATION | Nebojsa Mandic, DHL | Nebojsa.mandic@dhl.com |
| HUMAN RESOURCES | Danijela Filipovic, Tetra Pak | Danijela.filipovic@tetrapak.com |
| TAXATION | Mike Ahern, PWC | Mike.ahern@yu.pwcglobal.com |
| LEASING | Ognjen Medic, Raiffeisen Bank | Ognjen.Medic@rba-belgrade.raiffeisen.at |
| LEGAL | Patricia Gannon, Karanovic & Nikolic | Patricia.gannon@karanovic-nikolic.co.yu |
| PRIVATIZATION | Zoran Vujovic, Buda-Cash | budacash@eunet.yu |
| MACRO ENVIRONMENT | Christoph Greussing, HVB Bank | Christoph.greussing@yu.hvb-cee.com |
| INSURANCES | Hadar Zeev, DUNAV - TBIH | zeev.hadar@dunav-tbih.com |
| ENVIRONMENT | Jelena Trninic, Tetra Pak | Jelena.trninic@tetrpak.com |
| INTELLECTUAL PROPERTY | Markus Krupp, DaimlerChrysler | Markus.Krupp@DaimlerChrysler.co.yu |

### Chapter 2

# Country Overview

## a) Political Overview



Serbia has not yet recovered from the assassination of Prime Minister Zoran Djindjic in March 2003. Political uncertainty has increased and this has slowed the implementation of reform initiatives. While the government succeeded in stabilising the situation immediately after the assassination, the political scene in the country gradually deteriorated. By the time the third presidential election on 16 November failed it became obvious the government could not muster a majority to survive a vote of confidence and called early elections for 28 December 2003 as a result.

The result of this election was inconclusive in the sense that the distribution of seats in the 250-member Serbian parliament did not lend itself to the seamless formation of a government. The ultra-nationalist Serbian Radical Party (SRS) won most seats (82), followed by the Democratic Party of Serbia (DSS - 53). Five parties, the DSS, the Democratic Party (DS - 37), G17 Plus (34) and the Serbian Renewal Movement (SPO)/New Serbia (NS) (23) coalition, make up what is commonly referred to as the 'Democratic Bloc'. Together they have a majority of seats in Serbian Parliament (147 out of 250), but failed to form a government. The DS party convention on 22 February, which saw Boris Tadic elected to the party leadership, replacing the previous Premier ivkovic, did not change a thing in the sense that the DS still opted to remain in opposition.

Thus, after more than two months of protracted negotiations a minority government, dependent on the support of the Socialist Party of Serbia (SPS), was formed by the DSS, G17 Plus and the SPO/NS coalition. On 3 March Vojislav Kostunica (DSS) was appointed Premier and parliament approved his proposed 18-member cabinet. Kostunica's DSS has 9 ministers, G17 Plus four as does the SPO/NS coalition. Miroljub Labus, leader of G17 Plus is the sole Deputy Prime Minister. His task will be to co-ordinate European integration efforts.

Parliament has abolished the 50% voter turnout rule for the presidential election, guaranteeing its success the next time it is held. At the same time, parliament has also annulled the appointment of Kori Udovicki as Governor of the National Bank of Serbia and appointed Radovan Jelasic in her place. Vice-governor under Dinkic, Jelasic's appointment guarantees the continuation of a cautious monetary policy, but as long as legislation governing the Central Bank allows the political process to bring into question the independence of the National Bank of Serbia, confidence in the institution is likely to remain in question.

## b) Economic Overview

Economic growth in Serbia slowed to 1.5% in 2003 according to official statistics. GDP per capita in 2003 rose to an estimated US$2,500 (excluding Kosovo) which represents an increase of US$500 on 2002. Roughly half of this increase can be attributed to the depreciation of the US$ in 2003.

Industrial production fell 3.0% in the year with the manufacturing sector, which makes up over 75% of industrial output, registering a reduction of output of 4.6%. Of the main industrial sub-sectors only chemicals and basic metals managed an increase in output. The important food and beverage sector saw output decline 2% while the textile and clothing sectors saw steep declines in production. The hardening of budget constraints on state-owned companies and a general shortage of capital were the main reasons behind this fall in industrial output. At the same time, agriculture was adversely affected by the drought last year, which saw yields fall.

**Figure 1: Industrial Production in Serbia**



*Source: Serbian Statistics Office, NBS, CA IB Estimates*

Import growth remained strong despite the increase in unemployment and the fall in industrial production. This in part raises questions about the reliability of the official statistics, but also points to the existence of a large shadow economy, whose role as a surrogate social welfare mechanism should not be ignored. According to National Bank of Serbia data real wages rose 13.6% in 2003. In addition, the government was in a position to increase government spending in 4Q 2003 after substantial privatisation revenues were realised in September and October. Domestic demand was therefore the main source of economic growth in 2003.

## c) Monetary and Exchange Rate Policy

The beginning of 2003 saw the abolition of the socialist-era Payments Bureau and the establishment of a modern domestic payments system with interbank payment function run through a settlement and clearing centre with the central bank, retail payments conducted by the banks and fiscal functions under the auspices of the Ministry of Finance and its agencies. This process did generate initial teething problems with regard to tax collection and cash management, leading to the accumulation of and additional CSD 8bn in government deposits with the banking sector in the two months to the end of February 2003. This enabled deposit withdrawals by the non-government sector and an outflow of foreign exchange.

The National Bank of Serbia (NBS) moved to partially sterilise this increase in bank liquidity by temporarily increasing the reserve requirement from 20% to 23% in March, bringing the rate to 20% by May and lowering it further in July to the current level of 18%. This last reduction occurred at the same time as the majority of government deposits shifted from commercial banks to the NBS.

**Figure 2: Inflation Developments**



*Source:NBS*

As the initial difficulties with the introduction of the payments system were over come, more efficient fiscal-monetary policy co-ordination resulted, easing liquidity conditions by mid-year. In the second half of 2003 the proceeds from the privatisation of tobacco factories injected fresh liquidity into the system, which the NBS was not in a position to sterilise, owing mainly to the lack of sufficient policy instruments such as repo agreements and market based NBS bills. Between September (when the majority of the privatisation receipts came in) and the end of the year M3 grew over 48% y-o-y. Yields on Serbian government T-bills between the end of September and the end of November 2003 fell by over 260 bps to 20.11% on account of improved liquidity in the banking sector as a result of these privatisations.

After beginning the year with a fairly rigid exchange rate policy, the NBS embarked on a somewhat more flexible regime. Overall, from the beginning of 2003 to the end of the year the CSD/EUR exchange rate depreciated 10.5% in nominal terms and 2.7% in real terms as inflation fell to below 8%.

**Figure 3: Exchange Rate Developments**



*Source: NBS*

Inflation developments were extremely favourable in 2003. While the policy of currency stability definitely contributed to anchoring inflation expectations, the slowdown in domestic demand generated in part by uncertainty after the assassination of the Serbian Prime Minister was also a factor. Retail price inflation averaged 11.7% in 2003 and ended the year at 7.5%, despite increases in electricity prices.

## d) External Sector

In 2003 the Serbian merchandise trade deficit increased to US$4.8bn, which is equivalent to 24% of GDP. In US$ terms exports of goods did rise 19% in 2003, but imports rose by 30%. In CSD terms exports rose only 7.3%, while imports were up 17.2%. The Serbian current account deficit on the other hand is estimated at US$1.943bn. Serbia enjoys a slight services surplus of almost US$300mn and an extensive surplus in transfers, mainly drawn up of remittances from Serbs abroad and net purchases of foreign exchange from retail exchange offices. The latter position amounted to US$1bn in 2003 and is mainly related to consumption financing from savings and shadow economy revenues. The resulting effect on foreign exchange reserves is certainly not sustainable in its volume given the high consumption rates. It remains to be seen how this position develops in coming years.

In 2003, foreign direct investment inflows were high more than US$1.2bn, mainly due to privatisations in the tobacco sector. Over this period foreign borrowing of US$1bn was required to cover the current account deficit.

During 2003 Serbia's foreign debt rose to US$14.3bn, up from US$11.8bn at the end of 2002. This is the equivalent of 72% of GDP. Although the depreciation of the US$ was a factor in this increase, the persistently high current account deficit was the major factor in this increase. Domestic demand continues to drive economic growth, as low as it is and this is simply reflected in higher imports of goods and services.

While the debt to GDP figure is not too high, Serbia's debt to exports ratio remains extremely high. In 2003 this ratio was 414% and in the coming years, the expectation is that this ratio will not fall significantly. A 66% write off of London Club debt would lower Serbia's external indebtedness by up to US$1.8bn and ease the future debt service burden significantly.

Even though most of the grace periods on principal repayments for Serbia's external debt do not lapse until 2006-07, debt service costs have already risen significantly. In 2001 the debt service to exports ratio was 3.9%, but this has risen to 13.5% in 2003 and is expected to continue rising to above 25% in 2006. Without the implementation of policies that will attract sustained foreign capital inflows and improve efficiency in large parts of the economy a sustainable increase in export activity is not likely, making debt servicing more of a challenge. The table below provides a regional comparison of the viability of external debt.

### Table 1: External Viability Indicators (2004)

|  | Bulgaria | Croatia | Romania | Serbia |
|---|---|---|---|---|
| Current Account Deficit (% of GDP) | -6.5 | -6.5 | -6.7 | -9.9 |
| Foreign Debt/GDP(%) | 57.3 | 85.8 | 37.1 | 72.9 |
| Debt Service/Exports of Goods and Services (%) | 26.5 | 24.9 | 20.1 | 15.1 |
| Import Cover (months) | 5.4 | 5.3 | 3.6 | 5.2 |

*Source: IMF, National Central Banks, Bank Austria, CA IB*

Public debt accounts for the vast majority of this foreign debt. In addition, there are EUR3.5bn in frozen foreign exchange savings bonds outstanding, a portion of which matures each year up until 2016, outstanding at present. Together with the minor contribution of outstanding T-bills, public debt at the end of 2003 amounted to roughly 86% of GDP. This represents a fall from 92.9% of GDP the year before, but this stock of debt will continue to leave public finances with increasing debt service requirements in the coming years.

**Figure 4: Foreign Exchange Reserves (USDmn)**



*Source:NBS*

The build up of foreign reserves is therefore extremely important for Serbia over the next few years. In January 2004 Serbia's international reserves dropped by US$100mn to US$3.45bn. Since the end of September 2003 the international reserves of the banking sector and the central bank have essentially remained unchanged at US$4.23bn. This in part reflects the inability of the National Bank of Serbia to sterilise the inflows from privatisation revenues in 4Q 2003 and the upswing in budget and private spending which followed after such a significant inflow. Import cover rose to 5.4 months at the end of 2003 compared to 4.0 months at the end of 2002.

## e) Fiscal Policy

Over the past few years a number of key advances in the domain of fiscal policy have been noted. The tax system has been simplified and the efficiency of tax administration and collection improved. All of this has allowed the government to lower the tax burden while ensuring tax revenues increase at a rate higher than that of GDP growth. These efficiency dividends nonetheless cannot ensure this trend continue forever.

In 2003, revenues were in essence in line with revised Ministry of Finance projections, which factored in a slower rate of growth following the assassination of Prime Minister Djindjic in March 2003. The dynamics of budget expenditures came under the influence of payments system reforms, which forced the Ministry of Finance to delay expenditures in the first quarter. This effect saw the deficit narrow in 1H 2003 leading the Ministry of Finance and the IMF to agree that expenditures could be raised in 2H 2003 without endangering the budget deficit targets. The inflow of USD 800mn in privatisation revenues in September and October enabled the Ministry of Finance to increase spending.

Plans to introduce a VAT by 1 January 2004 were dashed by the political uncertainty generated by the third failed presidential election in November 2003 as well as the inherent weakness in the government after the assassination of Prime Minister Djindjic, which culminated in early elections in late December. By that stage meaningful reform activity and semblance of a legislative programme had long stopped. Serbia has not yet delivered the 2004 budget. A new government would almost certainly want to make changes to the existing budget, suggesting one is unlikely to be agreed until a couple of months after a government is formed. We do not expect the VAT to come into force before January 2005.

Serbian public finances, looked at from a consolidated level, should see a deficit of 3.5% of GDP in 2003. According to the Ministry of Finance budget revenues should amount to 42.6% of GDP in 2003, while budget expenditures will amount to 46.1% of GDP. The Table below outlines the consolidated budget in more detail.

**Table 2: Consolidated Serbian Budget 2001-2003**

|                                          | 2001 | 2002 | 2003E |
|------------------------------------------|------|------|-------|
| Total Revenue                            | 38,9 | 43,1 | 42,6  |
| Tax Revenue                              | 37,1 | 41,2 | 40,9  |
| Customs Duties                           | 2,0  | 2,6  | 2,6   |
| Personal Income Tax                      | 4,6  | 5,4  | 5,3   |
| Profit Tax                               | 0,5  | 0,5  | 0,6   |
| Turnover Tax                             | 10,2 | 11,4 | 11,4  |
| Excise Taxes                             | 3,7  | 4,9  | 5,0   |
| Property Tax                             | 0,4  | 0,4  | 0,4   |
| Financial Transactions Tax               | 1,4  | 1,1  | 0,3   |
| Other Taxes                              | 3,7  | 4,3  | 3,8   |
| Social Security Contributions            | 10,6 | 10,6 | 11,5  |
| Non-tax Revenues                         | 1,8  | 1,9  | 1,8   |
|                                          |      |      |       |
| Total Expenditures                       | 40,2 | 46,7 | 46,1  |
| Wages and Salaries                       | 8,9  | 9,6  | 9,6   |
| Other Purchases of Goods and Services    | 8,1  | 7,9  | 7,4   |
| Pensions                                 | 9,9  | 12,1 | 12,0  |
| Social Welfare                           | 3,3  | 4,0  | 3,9   |
| Subsidies and Restructuring              | 5,6  | 6,2  | 5,9   |
| Capital Investments                      | 1,1  | 2,5  | 2,5   |
| Debt Service Costs                       | 1,6  | 2,0  | 2,4   |
| Other Expenditures                       | 1,7  | 2,4  | 2,6   |
|                                          |      |      |       |
| Primary Budget Deficit                   | 0,3  | -1,6 | -1,1  |
|                                          |      |      |       |
| Overall Budget Deficit                   | 1,3  | 3,6  | 3,5   |

*Source: Serbian Ministry of Finance and Economics*

The introduction of Serbian Ministry of Finance T-bills was another major achievement in 2003. While providing another source of financing for the government the T-bills represent a first step in the development of the domestic money market. Yields have generally been affected by liquidity conditions in the market, although concerns over political developments in late 2003 also played their part in pushing yields higher.

# f) Outlook

The outlook for the Serbian economy in 2004 is clouded by the continuing political uncertainty enveloping the country. A new minority government, supported by the SPS, is in power however political stability is not assured. The key issues is this political set up will be whether the government manages to push through an economic reform agenda given the different views of the SPS in particular towards privatisation and economic policy. The best case scenario in terms of economic policy might see the Democratic Party support economic reform initiatives from opposition, marginalising SPS influence.

The prospect of successful presidential elections in the spring is positive for political stability. After an extensive period of time, Serbia will finally have filled all key executive positions.

Last year's low rate of growth of 1.5% is not likely to improve noticeably this year. While a rebound in industrial and agricultural production can be expected on the back of base effects alone, the

**Serbia and Montenegro - Selected Indicators**

| | 1999 | 2000 | 2001 | 2002 | 2003 | Forecasts 2004 | 2005 |
|---|---|---|---|---|---|---|---|
| Change from previous year in % | | | | | | | |
| GDP (real) | -21.9 | 5.0 | 5.5 | 4.0 | 1.5 | 1.5 | 2.0 |
| Industrial output (real) | -23.1 | 10.9 | 0.0 | 1.7 | -3.0 | 2.0 | 2.5 |
| Gross fixed capital formation (real) | -26.3 | 13.3 | - | - | - | - | - |
| Consumer prices (yearly average) | 42.4 | 75.7 | 88.9 | 19.5 | 11.7 | 7.5 | 6.0 |
| Unemployment (yearly average) | 25.5 | 26.8 | 27.9 | 31.3 | 34.3 | 35.5 | 35.5 |
| Budget balance (Central gov., in % of GDP) | -5.6 | -0.9 | -1.4 | -4.5 | -4.5 | -4.5 | -4.0 |
| | | | | | | | |
| in EUR mn | | | | | | | |
| Merchandise exports | 1,571 | 2,080 | 2,235 | 2,549 | 2,202 | 2,240 | 2,540 |
| Merchandise imports | 3,089 | 4,015 | 5,398 | 6,680 | 6,447 | 6,280 | 6,560 |
| Current account | -716 | -660 | -1,249 | -2,121 | -2,007 | -1,780 | -1,600 |
| Current account (in % of GDP) | -5.2 | -6.0 | -9.7 | -12.7 | -11.1 | -9.9 | -9.3 |
| FDI (inflow, net) | 105 | 27 | 184 | 594 | 1,016 | 400 | 480 |
| Gross foreign debt (end of period) | 10,071 | 12,337 | 13,335 | 12,500 | 12,180 | 13,080 | 13,500 |
| Gross foreign debt (in % of GDP) | 72.9 | 111.9 | 103.2 | 75.2 | 73.3 | 72.9 | 74.6 |
| Import cover (in months) | 1.0 | 1.5 | 2.7 | 4.0 | 5.3 | 5.2 | 5.0 |
| | | | | | | | |
| Average exchange rate: CSD/EUR | 11.7 | 34.9 | 59.4 | 60.5 | 65.3 | 70.0 | 75.0 |
| Average exchange rate: CSD/USD | 11.1 | 37.5 | 66.7 | 63.9 | 57.4 | 56.0 | 60.0 |

Source: IMF, NBS, Federal Statistical Office, CA IB

prospects for private consumption growth and investment will be meagre. The main reason for this will be the uncertainty of foreign direct investments inflows in 2004. In addition, with real wage growth well above industrial production growth the prospects for sustained export growth in the short-term are minimal.

Under the IMF Extended Agreement the National Bank of Serbia is committed to remonetising the economy through the increase of Net Foreign Assets. Without an adequate inflow of foreign currency, either through loans, grants or investments the scope for money supply growth and, by extension, economic activity remains limited. As stated the investment component of this matrix is the one most at risk, although the extent of foreign grants will be contingent on the government's relationship with the EU, US and the Hague.

In such a growth environment we expect inflation to average 7.5% this year. Last year's disinflation effort will not be repeated, but any price hikes for infrastructure and utility services should not endanger the achievements to date. We also expect to see the dinar depreciate slightly in real and nominal terms. By the end of 2004 we look for the CSD/EUR exchange rate to be 75. The monetary authorities will, in our opinion, seek to assist the price competitiveness of Serbian exports without compromising price stability. Delays in introducing repo auctions during 2003 should be resolved during 2004.

Consistent with our view of slow growth in 2004, we expect the current account deficit to narrow. This will occur due to slower import growth rather than a sustained increase in exports. Debt financing of the current account deficit combined with grants and transfers will be more important for the financing of the current account deficit, given the expected fall in FDI inflows.

Debt service costs will rise again this year to 20% of exports of goods and services (US$760mn). Foreign debt reached US$14.3bn at the end of 2003 and will increase again this year. Any conclusion of the London Club negotiations will provide an obvious boost to macroeconomic stability and confidence in the Serbian economy. The need for the government to form a new negotiation team for the London Club increases the risk a resolution may be delayed until 2005.

The increase in foreign exchange reserves will be dependent on FDI inflows. The National Bank of Serbia forecasts a net increase of US$150mn, which we consider realistic given our FDI scenario.

The Serbian budget will feel the effects of slower growth again this year, primarily through lower tax revenues. In addition, with the current political situation we do not expect to see the VAT introduced before January 2005. This means that the 2005 budget rather than the 2004 budget will be the one to benefit from a boost to tax revenues inherent with the introduction of a broad based tax. At the same time public debt service costs will increase in 2004 and will continue to increase throughout this decade. With the formation of a draft budget likely to lag the constitution of a new government by a couple of months, the scope for the implementation of focussed reform initiatives is reduced this year.

# FIC HIGHEST PRIORITIES

The following highest priorities of the Foreign Investors Council have been selected on the basis of the unified voice of the Foreign Investors Council members, and largely correspond to the priority reform targets of the OECD-Investment Compact Monitoring Instruments and to those of other international organizations such as the EC, the IMF, and the World Bank.

For more detailed information, and for a detailed list of obstacles to business and investment together with FIC proposals for improvements, please refer to the text in this FIC White Book 2004.

## a) HIGHEST Legislative priorities

### Laws for adoption

- Anti-Monopoly Law
- Law on avoiding conflict of interest in the performance of public positions
- Law on Foreign Trade
- Law on Investment Funds
- Law on Mortgage
- Law on Denationalisation
- Law on Registration of Business Entities
- Law on Restitution of Land and Property
- Law on Urban Planning and Construction
- Law on VAT

### Laws for revision

**Bankruptcy Law**
- To provide for greater creditors' rights and satisfaction of their claims, more efficient and impartial modes of sale of assets and for quicker proceedings.
- To avoid keeping the company operational at any price and to the cost of existing creditors.

**Company Law and the Securities Act**
- To remove discrepancies in the respective texts and to remove provisions creating conflict between the two laws.
- Company law to address the issue of socially owned companies which will remain on completion of the privatization program.

**Corporate Income Tax Law**
- To adapt to the introduction of IFRS.

**Law on Securities and Financial Markets**
- To allow the issue of shares in foreign currency
- To remove excessive financial burdens on secondary market transactions in short-term securities



- To amend the procedures for intervention in the foreign exchange market by the National Bank of Serbia (NBS)

## b) Areas for Improvements

### Banking

Open Foreign Currency Position: to allow banks with share capital paid in foreign currency to report such capital as a foreign currency denominated liability for calculation of the maximum open FX position report.

Legal Lending Limit: to allow the full deduction of receivables guaranteed by a parent bank  in the calculation of the bank's legal lending limit.

### Land and real estate

Monopolistic control of urban land: to abolish government agency monopolistic control over the supply of urban land to allow  the market to determine prices
Construction: to remove time restrictions on construction work
Mortgage: to implement a temporary mortgage register.

### Taxation

Tax administration and legislation: to introduce a system of binding interpretation of fiscal provisions to address the imprecise wording of laws, the discretionary powers of authorities, and the reluctance of the tax administration to issue general rulings all of which contribute to untenable uncertainty.

## c) HIGHEST Institutional priorities

### Administration
- To establish a One Stop Shop for business registrations and administration
- To clarify the mandates, responsibilities and powers of ministries and governmental agencies
- To improve and streamline work methodologies and procedures within public administrations
- To establish an effective independent body responsible for audit of public finance

### Banking
- To train NBS's compliance auditors in accordance with the shift in orientation of the supervision function.

### Insurance
- To set up an effective insurance supervisory body to monitor and enforce legislation.

### Judiciary
- To train the judiciary and their staff in commercial issues
- To establish clearer court reporting
- To introduce a transparent mechanism for judge appointments
- To establish an effective independent anti-corruption agency entitled to sanction infringements of laws

## HIGHEST Policy priorities

- Adoption of a clear, precise and realistic agenda of legislative and regulatory reforms
- Adoption of FDI and Competitiveness strategies at regional and international levels

Council members also wish to draw attention to the need to address urgently major infrastructural problems which impede business operations and deter investment.   These problems include insufficient digital and ISDN telecommunication lines, insufficient quality office space and low quality roads.

# LEGAL AND REGULATORY FRAMEWORK

## a) Constitutional Framework

### Developments in 2003

The Federal Republic of Yugoslavia underwent major constitutional changes.   On 4 February 2003 it became the Union of Serbia and Montenegro based on the Constitutional Charter and Implementing law.

The Union of Serbia and Montenegro is a democracy with a parliamentary representative system. The legal system of the Union of Serbia and Montenegro is based on the principles of Roman Law and Continental Civil Law thus enabling private ownership rights. The main sources of law are the Laws enacted by the parliaments. However, the legislative power is separated between the federal or union level and the Republics.

Serbia and Montenegro is governed by the President, a unicameral Assembly (composed of the 126 members of which 91 member from Serbia and 35 from Montenegro) and a five-member Council of Ministers (ministers for foreign relations, defense, internal and external economic relations and human and minority rights).

The joint state holds a less extensive set of competencies, primarily in areas such as defense, international relations, human rights protection, common market and border control. Serbia and Montenegro has a joint army. The Court of Serbia and Montenegro has jurisdiction over the remaining narrow set of constitutional and administrative matters. The Serbia and Montenegro Constitutional Court and Serbia and Montenegrin Constitutional Courts have the authority to rule on the constitutional validity of the laws enacted by the Parliaments and on Government or executive actions and it can order their repeal. These Courts may be accessed directly by anyone.

The Federal laws of the former FRY pertaining to the areas within the jurisdiction of the new state continued to be applied as the legal acts of the Union of Serbia and Montenegro. Although member-states of Serbia and Montenegro may apply federal laws of the former FRY which are not in the jurisdiction of the joint state, they have mostly enacted new laws. The member-states have established their own governmental institutions within their jurisdictions. According to that situation, federal institutions at the beginning transferred to the Serbian level, such as NBS, Federal Customs Authority and Federal Securities Commission, have been replaced with the same kind of institutions established on the member-states' level.

The monetary system of the Union of Serbia and Montenegro is separated between two member-states. There are two official currencies applicable in the country, the dinar or CSD in Serbia and EUR in Montenegro. Although there are two Central banks, Serbian and Montenegrin, by agreement

between the two member-states, the NBS represents the Union of Serbia and Montenegro in dealings with all financial institutions.

Further to this, following the expiry of the stipulated three year transitional period, each member unit may initiate the necessary procedure for dissolution of the joint state.

## *Positive signs*

*As a result of the political conflict between Montenegro and the joint state, Montenegro produced its own legislation in matters that were within the jurisdiction of the federation. This has resulted in an anomaly whereby there was a conflict between federal and republic legislation in Montenegro.*

*Following a lengthy public debate, this situation was clarified by the Serbian and Montenegrin Governments which, on 1 July 2003, adopted the Action Plan for harmonization of the economic systems of member-states of the State Union of Serbia and Montenegro for the purpose of preventing and removing obstacles to free movement of people, goods, services and capital. The two member-states complied its legislations regarding most of relevant issues, such as employment, customs, foreign trade regime, representation in the international organizations, tax system, financial mediation, securities' market. The Action Plan legalized this anomaly and clearly determined the competence of each member-state.*

## *FIC Recommends:*

*There is still a need for certain laws to be complied or harmonized between the two member states in order to provide a free and functional movement of capital and services. This issue needs to be addressed properly between the member states as it causes many administrative problems for foreign investment. The member-states must ensure that their constitutions comply with the Charter.*

## b) Court System

In Serbia and Montenegro, there are three levels of court; municipal courts, county courts and the Supreme Courts (of both Republics).

Usually, the municipal courts are the courts of first instance and their jurisdiction encompasses the territory of one or more municipalities. For instance, the city of Belgrade has five municipal courts for approximately 11 municipalities. Municipal courts are competent to resolve all civil matters, labor and housing issues, damage compensation, etc, in all matters not relating to the commercial issues. Generally, with regard to the jurisdiction and competence of particular courts, unless otherwise reserved to a higher court, all lawsuits fall under the jurisdiction of local courts.

There has been no marked improvement in the court system in 2003. Namely, the judiciary is still slow, due to
- inadequate training of judges
- lack of experienced judges
- the outdated Civil Administration Law.

Currently a judge in the lower court is appointed for life by the Parliament, if the following criteria are satisfied
- completed Law School
- passed the Bar exam
- has at least three years of legal practice. On appointment little effort is made to continue the education of the judges in specialized fields of law. It is essential to follow up judges' education, especially in the lower courts, by attending seminars and conferences. Furthermore, although a judge is appointed for life, we recommend regular evaluation of the judges' work.

Secondly, due to a large number of cases appearing in front of each judge, cases are still prolonged. Therefore, we consider that it is vital to ensure through proper education and engagement that more judges are available. This would speed up the process, as judges would have fewer cases and more time in which to resolve them.

## FIC Recommends:

*It is necessary to radically change the Law on Civil Administration radically by doing two things:*
*limit the court's duties*
*give a specified period of time to litigators to prepare the case.*

*To this end we make two detailed recommendations that*

*i.  the court should not be obliged to determine the facts of the case ex officio, but to limit the decision-making process to the evidence provided by the claimant. In such a way, the court would focus on the existing evidence and the parties would bear the burden of proof.*

*ii.  a six-month time period is granted to the parties to prepare the case and collect any evidence which may be used in proving the claim or their defense.  At the end of this period, new evidence would not be admissible. In this way, the parties would be encouraged not to rely on the court and the abuse of procedural rights.   Consequently delays in proceedings would be avoided or minimized.*

*That court hearings are reported steno graphically or in another appropriate manner, so the each word in the proceedings (judge, plaintiff, defendant, witnesses and expert witness) is reported accurately. In this way, it would be easier to track the liability of the judge and to improve decision-making process. Currently the parties present their statements to the court, and the judges dictate their statements or part of it to the court secretary. In this way, the judge may omit certain facts, which can be crucial in a later phase of the proceedings.*

## c) Company Law

The Company Law was adopted as federal law in 1996, to regulate all aspects of incorporation, corporate organization and management in all types of companies established on the territory of the former Federal Republic of Yugoslavia. After the Montenegrin Parliament adopted its own company law on 29 January 2002, the Company Law continued to be the governing corporate legislation in the Republic of Serbia.

Other specialized areas, such as insurance, banking and the stock exchange, are governed by their own sets of laws (e.g. the Law on Banks and Other Financial Institutions, and the Property and Personnel Insurance Act), so that the general provisions of the Company Law serve only to supplement these particular sets of laws in these special areas.

The new Law on Foreign Investments, adopted in 2002, introduced significant improvements for foreign legal entities and individuals with respect to their investments in the Republic of Serbia, giving such foreign legal entities and individuals the same treatment as nationals receive, as well as certain tax and customs benefits.  The Republic of Montenegro adopted its own Foreign Investment Act in 2000.

According to the Company Law, there are four types of companies:
- limited liability company,
- joint stock company,
- general partnership
- limited partnership.

All four types of companies have the status of a legal entity. The latter two forms—the general partnership and the limited partnership—are rarely seen in practice in Serbia. Although the Company Law does not stipulate minimal share capital requirements for partnerships, the members of a general partnership (who must be natural persons) are jointly and severally liable for the obligations of the partnership. In a limited partnership, the general partner remains liable for the obligations of the partnership while the limited partner bears risk only to the extent of his or her investment.

The most commonly used legal form of enterprises in Serbia and Montenegro is the limited liability company (or "d.o.o."). The d.o.o is a separate legal entity that may have from a minimum of one to a maximum of 30 shareholders—who may be either legal or natural persons. The liability of each



shareholder is limited to its share of ownership in the limited liability company (i.e. the liabilities of such company can pass to the shareholders only in very unusual circumstances). Shares of a limited liability company are expressed in percentage terms (i.e. a shareholder may have only one share expressed as a percentage). The contributions to the share capital may be made in the form of cash or contributions in kind (such as equipment, goods, know-how and other tangibles or intangibles). However, the minimum cash share capital is set at an equivalent of US$ 5,000, half of which must be paid prior to the registration of the company, while the remaining half may be paid within two years of registration. After adoption of the Foreign Exchange Act in January 2002, a foreign entity may make its investment in the form of foreign currency.

A joint stock company (or "a.d.") may have one of two forms pursuant to the Company Law: the closed joint stock company and the public joint stock company. The minimum cash share capital requirement for a joint stock company is higher than that for a limited liability company (i.e. US$ 10,000 for a closed joint stock company and USD 20,000 for a public joint stock company). Since Serbia does not yet have a fully developed modern stock exchange, joint stock companies are still predominantly those that are involved in businesses such as banking or insurance, which according to specific legislation must be established as joint stock companies.

The latest amendments to the Company Law were enacted in July 2002, and are mainly intended to
- simplify the process for obtaining the permits that are necessary for commencing company operations,
- remove the company's liability for obligations of its subsidiaries,
- facilitate the privatization process by overriding management control of the privatization process, which could result in frustration of the privatization process itself.

It should be noted that even the amended Company Law still represents a relict from the past as a remnant of a wholly different business climate. In light of this, the Serbian Ministry of Privatization and Economy has drafted a Law on the Registration of Commercial Entities, with a view to providing modern legal solutions in this legislative area and accelerating the registration procedure for companies. However, these revisions have not yet been adopted by the Serbian Parliament.

As for representative offices, the governing legislation is the Ordinance on Detailed Conditions for Opening and Operation of Representative Offices of Foreign Persons in Serbia and Montenegro. This ordinance provides for a registration procedure in the Register of Representative Offices of Foreign Persons at the Ministry of Foreign Economic Relations. The distinguishing feature of a representative office is that it is not a legal person and its permitted activities are limited only to tasks such as surveying the market and preparation of contracts to be concluded with the parent company.

It should be noted that the Company Law makes reference to materialized shares, ie the shareholders receive actual printed share certificates for all issued shares, if they so request and if it is so provided in the company's articles of association. However, under the new Securities Market Act, all shares are to be issued in electronic form and, consequently, all securities issued before the Security Market Act became effective are to be dematerialized by the issuer within the period of two years from the date of establishment of a Central Registry for Securities.

There are also other areas in which the Securities Market Act is in conflict with the Company Law. For example, under the Company Law, a takeover bid is required only for an acquisition of a significant voting share (25% or more) in a company established pursuant to a public offering; whereas under the Securities Market Act, a takeover bid is required if acquiring a significant voting share in any joint-stock company, whether closed or public.

## _Positive Signs:_

• _The aim to establish a one-stop shop to facilitate the establishment of a company or business presence is welcomed by foreign investors._

• _The registration procedure appears to be taking up to three weeks at the moment. A year ago it could take up to six weeks so the process appears to be more efficient._



*There is no longer a requirement to have the foreign investment registered with the Federal Ministry of Foreign Affairs.*

*An extensive draft Company law has been prepared and it signals a clearer approach and introduces new international concepts into Serbia.*

## FIC Recommends:

• *The courts still generally lack the requisite corporate experience (particularly with respect to joint stock companies) to be able to consistently interpret and apply the law with respect to corporate issues. This can result in a great deal of judicial discretion which lends to legal uncertainty for commercial entities in Serbia. We recommend that the Serbian judiciary be properly trained and held responsible for following clearly defined judicial practice in company matters.*

*The Company Law and the Securities Market Act should be amended so as to remove any discrepancies and conflicts between the two laws. The draft Company should be adopted and a training program introduced to those implementing it so that they clearly understand the amendments.*

## d) Concession Law

The new Serbian Law on Concessions (the "Concession Law"), effective from 4 June 2003, provides an efficient vehicle for implementing private public partnerships in Serbia. A concession is a right granted by the government or a municipality to a private person or entity to utilize a public natural resource or to perform public works. Foreign persons or entities may be granted a concession, so long as it does not involve an activity or a territory where foreigners are not permitted to conduct business under Serbia's Law on Foreign Investment.

The new Concession Law has significantly expanded the list of sectors that may be the object of a concession license.  These sectors now include: raw materials, water supply, public roads, railroads, airports, river ports, telecommunications, oil & gas, local community works & services, power plants, medical facilities, sports and recreational facilities, thermal sprints and spas, tourist facilities, and other areas.

The new Concession Law also allows for all forms of Build-Operate-Transfer arrangements, whereby a concessionaire may finance, construct or reconstruct a given asset, after which the concessionaire may utilize the asset for an agreed upon term (after the expiration of the term, the asset reverts back to the government or municipality). The maximum permitted term is currently 30 years.

The process of obtaining a concession is by way of public tender. Once the need for a particular type of works is determined by the Serbian government, district or municipality, a tender program is drawn up.  The tender program describes the works and the general terms on which the concession is to be granted and on which the works must be performed. A public tender is then announced in the Official Gazette of the Republic of Serbia (for larger public works, the tender is also published in local and international newspapers).  The tender is conducted by a specially appointed Tender Committee. Upon completion of the tender process, the Tender Committee reports to the Serbian government on the results of the tender. Within 30 days of the receipt of the Tender Committee's report, the Serbian Government issues a decision on the determination of the concessionaire (note that if only one participant responds to a tender, then the Tender Committee may decide to repeat the tender process or may propose to the Serbian Government to grant the concession to the sole tender applicant).

All of the terms of the concession are to be defined in a concession agreement to be entered into between the concessionaire and the Serbian government. If the concession involves the providing of certain local community services, then the concession agreement may be concluded between the concessionaire and the respective local authority in charge of such community services. The concession agreement must be in line with the Concession Program and must comply with certain formal requirements of the Concession Law. The concession agreement must be concluded within 60 days of an effective determination of a concessionaire.

In the concession agreement, the parties may provide for a concessionaire to have the right to assign the concession rights to a third party, eg, to its lender as security. In addition, a foreign concessionaire may choose international arbitration of disputes (so long as the subject matter of the dispute is not real property).

As an added incentive, the concessionaire may be exempt from paying taxes on its profits for the first five years.

## *Positive Signs:*

• *The new Concession Law reflects the intention of the Government of the Republic of Serbia to improve and clarify the conditions for foreign investors.*

## *FIC Recommends:*

• *While the new Concession Law presents a valuable new tool to help facilitate more foreign direct investment in Serbia, the Serbian government would also be well advised to set up a taskforce or special agency to help recognize and implement future Public Procurement Project (PPP) projects.*

• *The Procedure whereby concessions are granted should be in line with public procurement legislation.*

• *Certain specific legislation prescribing the procedure for granting a concession in specific areas (such as the Law on Mining) needs to be brought into compliance with the new Law on Concessions.*

## e) Securities Law

The new Serbian Law on Securities and Other Financial Instruments Market was adopted in November 2002, but came into force in September 2003. The Law regulates three main fields;
- the process of distribution of and trading in securities
- the activities of authorised participants on the market
- the role of the Securities Exchange Commission (SEC).

### Distribution of and trading in securities

(a) Issuing of new shares through a public offering
The process is initiated by publishing a public announcement and prospectus on the issue of new shares, followed by a series of actions required for subscribing and paying for the shares and obtaining the authorisation on issuance of shares from the SEC. It ends with the transfer of shares to the securities account of the new owner.

(b) Trade in securities through the stock exchange
Trade in securities on the Stock Exchange can be performed only through broker-dealer companies or authorised banks. Purchase of more than 25% of voting shares of a company can be carried out only through a take-over bid, which must have prior approval of the SEC. The methods of trading securities are more closely prescribed through by-laws and internal regulations of the Stock Exchange.

### Authorised Participants On The Market

Authorised participants on the market are the Stock Exchange, the Central Registry of Securities, authorised banks and broker-dealer companies and the Custody Banks. The Law provides the general framework for their foundation and operations, and rights and obligations. These issues are more closely regulated through by-laws and rulebooks of the SEC.

**SEC**

A crucial role and significant power was given to the Commission.  The SEC is responsible for, inter alia, the rules related to application of the Law.  It carries out the following specific functions
- issues licences and supervises the operations of authorised participants in the market
- sets standards for registration of stock exchange trade operations
- establishes contents of mandatory information that is to be submitted to it and published
- monitors trends in the securities market and undertakes corrective actions.

## *Positive signs*

*The law is in principle an important factor in regulating the securities market.*

*The law introduces a contemporary model for distribution of and trade in securities, as well as mechanisms to control that process.*

## *FIC Recommends:*

*A company should be able to choose its strategic partner without risk of interference by a speculator. The distribution of shares in the name of that partner should not require a public offer of shares.*

*The number of provisions open to the discretion of the SEC should be reduced and deadlines for making decisions should be clearly prescribed.*

*Rules related to summoning general meetings of a company should be abolished, since these may be excluded by the Articles of Association of the company. Until this happens the process is likely to be unnecessarily protracted.*

*The very onerous and strict rules of procedure for obtaining the different and numerous approvals of the SEC should be simplified.*

## f) Intellectual Property

The Union of Serbia and Montenegro have a number of regulations outlining guarantees and safeguards for foreign investors in the field of Intellectual Property (IP).

Strong intellectual property right protection is usually one of the prerequisites for foreign investors before transferring their most competitive technologies including trademarks, designs etc. In that respect, the former Yugoslavia ratified a number of multilateral conventions in order to comply with international standards and provide protection for the intellectual property rights of foreign investors, and these are still applicable in the Union of Serbia and Montenegro.

At the international level, Treaties such as the Madrid Agreement relating to International Registration of Trademarks and Madrid Protocol, the Locarno Agreement relating to International Classification of Industrial Designs and Models were signed and ratified by Yugoslavia.

However, certain amendments to the current regulations are one of the priorities necessary to ensure intellectual property protection. Such legislation is expected to come into force as soon as the Union of Serbia and Montenegro becomes a full member of the Council of Europe and the WTO.

## *Positive Signs:*

*• There is an increasing awareness that infringement of IP rights must be reduced and therefore breaching parties are facing legal proceedings to stop the breach.*

*• A special task force has been established to deal with counterfeit products.*

## *FIC Recommends:*

*• IP protection is impossible without a sophisticated administration which would be able to deal with this issue. This will require reorganization of the current judicial system by establishing separate departments to deal only with intellectual property registration and infringement. It will also demand creating other institutions to cooperate among themselves in solving the intellectual property rights problems, particularly regarding organized crime and pirate producers, such as: special departments, non-governmental agencies with specific powers of investigation and enforcement.*

*• There should be measures to prevent infringement of IP rights. This may be done by enforcing existing regulations and introducing a more stringent punishment for intellectual property violations discouraging potential violators to commit such infringements; perhaps by making IP offences a criminal offence.*

*• A strong media campaign should be developed in order to influence the wider population on intellectual property issues and raise the sensitivity to such violations.*

## g) Labor Law

Following lengthy public and parliamentary discussion, the new Labor Law came into force on 21 December 2001. The new law is very free-market oriented and comes as a response to the major economic and social changes that call for more flexibility in the labor market of Serbia. The most important feature is that in comparison with the previous labor regulation, the new law is more liberal regarding employment procedures and termination of employment, thus giving more flexibility to employers.

Collective agreements used to be an important instrument in the hands of the unions and workforce. Under the new Law conclusion of a collective agreement is no longer mandatory. The parties are obliged to negotiate, but if the negotiation does not result in an agreement, rights and obligations can be regulated by the employer's Employment Rules and/or the employment contract. Furthermore, the new law provides that agreements create obligations only for those employers who are members or who become members of the association that took part in the bargaining. This represents a change from the White Book old regulation which provided that all employers from a certain field were directly obliged by the relevant agreement whether they took part, directly or indirectly, in the bargaining or not.

In response to the rapidly changing economic environment the new law makes it easier for employers to hire labor for a definite period (as in temporary employment). However the term of such relationship is still limited to a maximum of three years, an attribute of the old system, so as to eliminate the practice of repeatedly extending employment contracts for definite periods.

Criteria and elements of salaries were previously determined in great detail by the law and collective agreements. The new law just states that employees are entitled to equal pay for equal work, gives general elements of the salary and leaves it to employers to determine the specific criteria. In a similar spirit, employees are guaranteed at least 18 working days annual vacation and unlike the previous legislation, the new law does not provide for a maximum length, nor does it set criteria to determine the length of the vacation.

Termination of the employment by the employer is an area that has undergone major changes. The contract can be terminated only for a just cause concerning the employee's working capability, skills or conduct and the employer's needs, whereby just cause is broadly defined giving the employer lots of freedom and is deemed to exist in particular in the case of unsatisfactory working results, lack of the required knowledge and skills, misbehavior at work, criminal acts in connection with work, absence from work upon termination of the unpaid leave, misuse of the right for sick leave or layoffs due to the economical, technological or organization reasons. The termination procedure is simplified and the severance payment in case of the layoff is considerably reduced. (The old law provided for the amount from 24 up to 36 monthly salaries. Under the new law, employees are entitled to a severance payment starting at double the monthly salary up to five monthly salaries, depending on the duration of the employment).

## *Positive Signs:*

• *The new law eliminated those features of the old regulation that were viewed as overly protective for workers and highly restrictive for managerial functions. It now tries to achieve the balance between the necessity for greater flexibility of the labor market, which is an important incentive for investors, and the need to protect security of employment.*

## *FIC Recommends:*

• *Judges must be further educated on the difference between the old and new systems.*
*One of the remaining problems is that the courts still tend to base their interpretation of the provisions of the new law on some legal concepts of the old system which have in fact been abolished.*
• *Further harmonization of the other labor and related regulations with the new law (new Collective Agreement, social security regulation, etc.).*

# Privatization

The privatization process in Serbia, defined by the Law on Privatization (RS Official Gazette, No. 38/01 and 18/03), is mainly based on the model of direct sale whereby up to 70% of the shares of the firm is sold either in tender or in public auction to a private buyer. The process was launched in 2001, while the first tangible results were realized in 2002 when 217 firms were sold in tender (12) or auction sale (205), generating the total price of Euro 261 million as well as the additional investment and social welfare commitments of the buyers amounting to Euro 320 and 140 millions respectively[1]. Furthermore, minority government holdings in 87 firms were offered for sale, of which 48 sales were successful and generated the total price of Euro 81 million.

The privatization process in Serbia almost tripled its speed in 2003 in all the segments. A total of 696 privatizations were completed via tender and auction procedures (the success rate is 85%), while 121 minority packages held by the government, were sold to the private buyers via capital market. The total generated privatization receipts of Euro 947 million in 2003 exceeded the projections by far[2].

In 2003 a total of 42 enterprises were offered through tender sale. Of these only 22 (as opposed to 12 in 2002) were successfully sold mainly to foreign buyers. The total sale price realized amounts to Euro 605.5 million (which is three times the amount realized in 2002), while the additional investment and social commitments amount to Euro 330.8 million and 129.8 million respectively. The three privatization champions in 2003 were in the excise industries – those were the sales of Beopetrol and the two tobacco factories in Vranje and Nis to Lukoil, British American Tobacco and Philip Morris International. These three tender sales realized 63% (Euro 554 million) of the total sales price realized in both auction and tender sales in 2003.

Out of 773 enterprises that were offered via the auction proceedings in 2003, 674 were successfully sold, which is more than three times the number of the enterprises auctioned off in 2002 (which was 205). The total sale price realized was Euro 274 million, with additional investment commitments of Euro 61.7 million made by the buyers.

## *Positive signs:*

*The privatization process tripled the momentum it gained in 2002 – both in the numbers of enterprises and in the amount of the privatization receipts received.*

*Due to the prompt reaction of the Ministry of Economy and Privatization (hereinafter: the Ministry for Privatization), the Law on Privatization, which had been adopted in June 2001, was amended in February 2003. These timely amendments were not to the substance of the Law, but to improve the*

---

[1] *Data were obtained by the courtesy of the Privatization Agency.*
[2] *IMF Country Report No. 03/296, September 2003, «Serbia and Montenegro: Second Review Under the Extended Arrangement and requests for Waiver and Modification of Performance Criteria, and for Extension of Repurchase Expectations», page 16, anticipates total privatization sales to reach Euro 550 million while the realized amount was Euro 880 million.*

*efficiency of the process as well as to rectify some minor practical issues that arose during the employment of the Law.*

*The Draft Law on Bankruptcy was also developed by the Ministry of Privatization in 2003, and is currently before Parliament for adoption. The Law is aimed at improving efficiency and the quality of the bankruptcy procedure. Adoption of this Law will have a most significant impact in particular in the further stages of the privatization process.*

### *FIC Recommends:*

*Issues connected to the functioning of the Law on Securities (e.g. Central Register did not begin to function, while the Temporary Register ceased to function; provisions of mandatory offer to all shareholders when purchasing over 25% of stocks etc.) should be resolved before more damage is done to the privatization process.*

# TAXATION

## a) Taxation of corporations

### Tax Residents

A legal entity is considered resident if it is established or has its place of effective management in Serbia.  Residents are taxed on their worldwide income while non-residents are taxed only on their Serbian sourced income.

### Taxable persons

A taxable person includes a joint stock company, a limited liability company, a socially owned company, a general partnership, a limited partnership as well as any other legal entity selling goods and services.

### Tax rate and tax base

The tax rate is 14% and the tax year is the calendar year.  The tax base is determined by adjusting the taxpayer's accounting profit before tax (from its profit and loss account) in accordance with the Corporate Tax Law.

As of 1 January 2004, accounting profit is determined according to IFRS.  This change will affect the tax base, in most cases lowering it.

Areas where tax adjustments may arise include:

- Inventory (valued at average cost);
- Depreciation; allowances are granted for tangible fixed assets and intangible long-term assets on the declining balance or straight-line methods;
- Reserves and provisions: provisions for specific doubtful debts are, according to the Law on Accounting, tax deductible;
- Costs of employment (e.g. salary, social security contributions): fully deductible;
- Expenses for health care, scientific, educational, humanitarian, religious, ecological and sport-related purposes are tax-deductible up to 3.5% of gross receipts;
- Expenses for cultural purposes are tax-deductible up to 1.5% of gross receipts;
- Membership fees paid to chambers of commerce and other associations (except political parties) are deductible up to 0.1% of gross receipts;
- Advertising, promotional and business entertaining expenses are tax deductible up to 3% of gross receipts.

## Thin capitalization

Interest paid to a related company which exceeds four times share capital and reserves multiplied by 110% of the interest rate of the Central Bank of the lender's country is not deductible.  The excess may be carried forward.

## Transfer pricing

A company must identify transactions with related companies and compare them with arm's length transactions when filing its tax return.  Credit relations between associated companies are compared with credit conditions in the market.  Any unexplained differences are included in taxable income.

## Tax Incentives

There are a number of incentives intended to attract investors to certain sectors and designated areas and to promote employment.

### Tax Holidays

A proportional tax holiday of 10 years is available for a taxpayer who makes an investment in tangible fixed assets of at least CSD600 million and creates additional employment for at least 100 employees during the investment period.  The tax holiday begins when these two conditions are met but only from the first year in which taxable income is generated.

The tax holiday is proportional based on the ratio between the investment concerned and total fixed assets after the investment.  Until the conditions for the tax holiday are met, the taxpayer is entitled to the tax credits mentioned below.

Only new fixed assets purchased in Serbia or imported fixed assets (new or second-hand) are recognized for the holiday.  It is not clear whether fixed assets provided as a contribution in kind are eligible.

New employees are not required to be unemployed prior to employment with the taxpayer to satisfy this need.

If a condition for the tax holiday is breached during the holiday period, the taxpayer will lose holiday.  The taxpayer must pay the tax saved increased by the relevant inflation rate.

A five-year tax holiday exists for companies investing CSD6 million and employing a minimum of five workers in underdeveloped regions.

Profit earned on the basis of a concession is tax exempt for five years.

### Tax credits

A taxpayer who employs additional staff previously registered as unemployed is granted a tax credit for the value of their gross salaries.  The tax credit is granted for two years from the date of employment.  The taxpayer cannot have retrenched any staff for a year before the new employment.

A company which acquires fixed assets may reduce its tax liability by 20% of the investment, but the reduction may not exceed 50% of its total tax liability.  A small company may decrease its tax liability by 40% of the investment, but the reduction may not exceed 70% of its total tax liability.

Unused credits may be carried forward for ten years and offset against future tax liabilities.

### Accelerated depreciation

Accelerated depreciation is allowed in respect of some fixed assets associated with ecology, scientific research and education as well as computer equipment.  Accelerated depreciation rates are up to 25% higher than standard rates.

**Employment of Disabled Persons**

The tax liability for companies employing disabled persons is decreased in proportion to the percentage of such persons to the total number of employees.

## Exemptions

Non-profit organizations have special rules for tax exemption.

## Groups of Companies

Companies are considered a group if one company controls 75% or more of the shares of another. A group has the right to tax consolidation if all companies are Serbian residents. Each company files its own tax return and the parent company files a consolidated return for the entire group.

In the consolidated return, losses of one or more companies are offset by the profits of other companies. Each company is liable for tax proportional to its share of the profit of the group.

## Withholding taxes

Withholding tax at the rate of 20% is levied on dividends, interests and royalties paid to a non-resident. An applicable double tax treaty may reduce withholding tax rates.

## Losses

A company can carry forward loss for ten years.

## Capital Gains and Losses

Capital gains are taxable at the rate of 14%. Capital gains can be offset against capital losses incurred in the same period. A capital loss can be carried forward for ten years.

## Assessment and collection

Corporate tax is payable in monthly advance instalments by the 15th of the following month, based on the tax liability of the preceding year.

The tax return and tax balance sheet must be filed by 8 March of the following year. The tax payable is established in the authorities' notice of assessment, based on the tax return and tax balance sheet. A company has eight days from receipt to appeal. The prescription period is five years.

### Developments on 2003

While there have been a few positive signs since publication of the first edition, there has been limited progress during this period.

## _Positive signs:_

• _The establishment of the large taxpayer unit is beneficial for taxpayers associated with this unit;_
• _The Ministry of Finance has clarified some, but not all, issues associated with the ten-year tax holiday;_
• _There are a number of examples of tax inspectors adopting a responsible and more educated approach when conducting audits of taxpayers._

## *FIC Recommends:*

• *Corporate tax law should be reviewed following the introduction of IFRS. Consequent changes should be adopted by Parliament as soon as possible;*
• *The level of uncertainty is too high due to imprecise wording of laws, discretionary powers of authorities and reluctance to issue rulings.  Laws should be reviewed, the authorities should be more responsive and a binding ruling system should be introduced;*
• *Taxes other than corporate tax which a company has to pay (e.g. property taxes such as public land use charge and tax on transfer of absolute rights, company name disclosure fee, charge for water use and protection, charge for protection and improvement to the environment, mineral raw material use charge) should be reduced and simplified;*
• *Many investors have a financial year other than the calendar year.  However, the authorities will not register a company for a financial year-end other than 31 December.  The authorities should revise their practice;*
• *Clarification of Permanent Establishment (PE) regulations is required e.g. the registration of PEs with the Tax Authorities, payment of tax;*
• *The limited deductibility of advertising costs should be reconsidered.  The limited deductibility is more applicable to entertainment costs than advertising;*
• *Draft legislation should be submitted to FIC / other appropriate forums for comment before being finalised;*
*The new government should continue with the development of a market oriented and attractive tax system.*

## b) Taxation of Individuals: Personal Income Tax

### Residents vs. non-Residents

Residents are taxable on their worldwide income, whereas non-residents are only liable to tax on Serbian source income.  Individuals are regarded as Serbian residents if they meet any of the following criteria:

- Domicile in Serbia, or
- Their habitual abode in Serbia (i.e. if they stay in Serbia at least 183 days, whether or not consecutively, within a period of 12 months), or
- The centre of their business and vital interests in Serbia

### Taxation of salaries

The taxable person is the employee, but the employer is responsible for calculating and withholding personal income tax on behalf of its employees. The taxable base is the gross amount including fringe benefits. The tax rate is 14%.

### Other Income

Other types of income eg. royalties, business income, income from agriculture and forestry, investment income, income from immovable property, capital gains and miscellaneous income, are subject to a flat rate tax, which ranges from 10 to 20%, depending on the type of income concerned.

Proposals for 2004 are to unify the rate of tax on other income at 14%, consistent with tax on salaries.

### Social security contributions

Social security contributions are calculated and withheld by an employer from the salary paid to an employee.  These contributions are payable by employer and employee at equal rates (on amounts up to a specified threshold). The rates are as follows:

 **WHITE BOOK** — Foreign Investors Council

- Pension and disability insurance: 10.30%
- Health insurance: 5.95%
- Unemployment insurance: 0.55%

## Tax on salary fund

This is a monthly tax, payable by the employer, at the rate of 3.5% of gross salary.

## Annual taxation

Net income from all categories is aggregated and, if exceeding a prescribed threshold, is taxed at the (additional) rate of 10%. The current threshold is CSD 867,225. Advance personal income taxes and social security withheld decrease the tax payable.

## Personal allowances

Taxable income may be reduced by allowances for supporting dependent family members (CSD 86,722 per taxpayer, and CSD 28,907 per dependant, but not exceeding 50% of taxable income).

## Taxation of Expatriates

### Benefits

Expatriate-residents of Serbia employed with a resident entity or a representative office of a foreign entity are entitled to a 35% reduction in tax on salaries if remuneration is appropriately structured.

Proposals for 2004 would eliminate this incentive for expatriates.

### Annual taxation

The net income from all categories is aggregated and taxed at the (additional) rate of 10% if exceeding a threshold. At present, the threshold is CSD 4,047,049.

Proposals for 2004 are to reduce the threshold to the same amount as for Serbian citizens (CSD 867,225).

### Filing Requirements

Each taxpayer is required to file a tax return by 15 March of the following year. There is no joint tax return filing system in Serbia.

### Comparison with 2003

No action has been taken in response to recommendations in the First Edition of the White Book

## *Positive Signs:*

- *The introduction of 20.6% pension and disability insurance contributions on 1 July 2003 for services contracts should greatly reduce the practice of using such contracts for staff who are de facto employees.*
- *The proposal to unify the rates of tax for other income at the same rate as for salaries (14%)*
- *Low rates of tax are an incentive for innovation, hard work and tax compliance*
- *Tax rates are designed to encourage expatriates to come and work in Serbia and share their knowledge with national staff*
- *Relative simplicity of the personal tax regime*

### *FIC Recommends:*

• *Proposals to reduce incentives for expatriates (lower annual tax threshold, 35% allowance abolished) should not be adopted as these send the wrong message to expatriates and (potential) investors in Serbia*
• *The upper threshold for social security contributions should not change every month as this adds greatly to the administration required.  It should be fixed eg for a six or ideally 12 month period.*
• *To reduce the future financial burden of the State, lower social security contribution rates should be introduced for employees who contract out of state social security benefits.*
• *Clear instruction on how to report and pay tax on income earned and received from abroad for tax residents (forms, procedure, etc.)*
• *A separate section within the PRA dealing with expatriates (wherever located in Serbia) to facilitate efficiency. Equally important, this is essential to ensure confidentiality, as many expatriates are reluctant to disclose their earnings in full, due to concern about their personal security. (The latter concern applies equally to Serbian nationals earning significant income.)*
• *Move from a mentality of net salaries to gross salaries as part of the move to a modern, market orientated economy*
• *Stricter enforcement of laws as the payment of tax is in many cases voluntary*
• *The personal tax law provides that a taxpayer who is not able to keep books, runs a specified kind of business, does not have more then two employees and has annual turnover less than CSD 2m pays taxes on the so-called "lump-sum" basis.*
• *Clear instructions as to what can be treated as a royalty from a Personal Income Tax Law perspective, in order to avoid misuse of royalty agreements in the same manner as services agreements were misused in the past.*

## c) Property tax

Property tax is due on the ownership rights/rights of permanent use on real estate and on ownership rights on registered shares and interest in limited liability company.

For property tax purposes, real estate is understood to mean the following: land, residential and business buildings, dwellings, business premises, garages, buildings and rooms serving for resting and recreation, and other buildings.

### Taxpayer
The taxpayer of property tax on real estate is a legal entity or individual holding the title to real estate located on the territory of the Republic of Serbia.  If several legal entities or individuals exercise the ownership right relating to the same real estate, each will be a taxpayer in proportion to its share.
The taxpayer of property tax on shares/stake held in legal entities, is a legal entity or individual, resident of the Republic of Serbia.

### Tax rate
Property tax on real estate is levied at the rate of 0.4%. Property tax on shares/stake is levied at 0.25%.

### Tax base
The base of property tax on real estate of any taxpayer that keeps books is the value of real estate declared in its books, in conformity with regulations, as at 31 December of the previous year.

The base of property tax on real estate, other than agricultural and forest land, where the taxpayer does not keep books, is the market value of real estate as at 31 December of the year preceding the year for which property tax is levied and paid. The real estate market value is determined by the competent tax office and such value is reduced for each year for the amount of depreciation, which can not exceed 70%.

The base of property tax on registered shares and interests in limited liability companies, when the taxpayer is a legal entity is the value declared in its books and determined in conformity with regulations on 31 December of the year preceding the year for which property tax is levied and paid.

The value of the capital is its total value adjusted for revaluation, reserves and losses according to the data furnished by the legal entity/company in which the taxpayer holds capital, as at 31 December of the year preceding the year for which property tax is levied and paid.

**Filing tax return**

Taxpayers should file their tax declaration by 31 March of the year for which tax is to be assessed. Any taxpayer who acquires, begins to or stops using property in the course of the year or if their tax liability starts running or ceases on other grounds, is due to file a new tax declaration within ten days from the date of such change.

The annual property tax is paid quarterly within 45 days from the beginning of each quarter. Prior to the issue of the ruling determining the property tax for the current year, tax prepayments should be paid in the amounts equal to the tax liability in the last quarter of the year preceding the one for which the tax is determined and paid.

# d) Inheritance and gift tax

Inheritance and gift tax is due on the transfer of ownership rights and other rights in relation to the real estate inherited by heirs or received as gift.

Inheritance and gift tax is also due on monies inherited or received as gift, securities, savings deposits, bank deposits, monetary claims, intellectual property rights, interests in a legal entity, securities, second-hand motor vehicles/second-hand vessel and other chattels.

The transfer of a legal entity's property without compensation is subject to gift tax.

**Taxpayer**

The taxpayer is inheritor or recipient of the gift.

Taxpayer is a resident or non-resident of the Republic who inherits or receives as gift ownership rights in relation to real estate located on the territory of the Republic.

Taxpayer of inheritance or gift tax who inherits or receives as gift securities, money, intellectual property rights and other objects other than real estate, is a resident of the Republic, in the case of objects existing in the territory of Serbia or abroad.

**Tax base**

The inheritance tax base is the market value of the inherited property less debts, costs and other encumbrances which the taxpayer is bound to pay or settle in some other way from the inherited or donated property on the date of tax liability commencement.

The gift tax base is the market value of the property received as gift on the date of the tax liability commencement, as set by the competent tax office.

**Tax rates**

The rates of inheritance and gift tax are progressive.

Taxpayers who are in the second order of succession according to the legal order of succession in relation to the decedent or donor pay inheritance and gift tax at the following rates:

| TAX BASE | PAYABLE TAX |
|---|---|
| Up to 200,000 CSD | 3% |
| Over 200,000 CSD | 6,000 CSD + 5% of the amount in excess of 200,000 CSD |

The taxpayers that are in the third and any subsequent order of succession in relation to the decedent or donor or the taxpayers that are unrelated to the decedent or donor, shall pay inheritance or gift tax at the rate of 5%.

Inheritance and gift tax is not payable on any money or anything other than real estate, if the individual market or nominal value of the object of taxation or individual amount is under 6,000 CSD.

**Filing tax declaration and payment**
The inheritance tax liability runs from the effective date of the inheritance ruling. Gift tax liability runs from the date of conclusion of the gift contract and, in the absence of the contract, from the date of reception of the gift.

Taxpayers are due to file a tax declaration together with the documents necessary for the determination of tax liability, within 10 days from the date of such change.

Inheritance and gift tax is due to be paid within 15 days from the presentation of ruling.

# e) Transfer tax

The property transfer tax is due on the transfer of the following rights against compensation:
- Property rights in relation to the real estate
- Intellectual property rights;
- Interests in a legal entity and securities;
- Property right in relation to a second-hand motor vehicle or a second-hand vessel;
- Permanent right of use of urban building land, by municipality to an individual or legal entity for the purpose of erecting a building;
- Permanent right of use of and right of construction on urban building land, between individuals, between legal entities and individuals and legal entities;
- Rights to expropriated real estate, if expropriation is carried out for the purpose of erecting residential or industrial buildings.

**Taxpayer**
The taxpayer is the seller, i.e. the transferor of the rights.

A  resident of the Republic of Serbia is the taxpayer on the transfer of intellectual property rights and interest in a legal entity/securities carried out in the Republic of Serbia and outside its territory. A non-resident is the taxpayer on the transfer of these rights only in cases of transfer carried out on the territory of the Republic of Serbia.

**Tax base**
The base of tax on the transfer of ownership rights is the contracted price, unless the contracted price is lower than market value.

Should the competent tax office estimate that the contracted price is lower than market price, it shall have the right to set a tax base that is equal to market value, within 10 days from receipt of the contract.

**Tax rate**
Property transfer tax is levied at the rate of 5% on the transfer of all rights, with the exception of the transfer of securities and interest in legal entities, which is subject to 0.3% tax.

**Filing tax declaration and payment**
Property transfer tax becomes due from the date when the contract is executed. The taxpayer needs to file the tax declaration to the tax authorities within ten days from the execution of the contract, together with the documents relevant for the determination of tax base.

Property transfer tax is due to be paid within 15 days from the presentation of the Assessment.

# f) Indirect taxation

Turnover of goods and services is subject to 20% sales tax. The introduction of VAT is expected from 1. January 2005.

## Turnover tax on goods

Sales tax is a single stage tax. It is levied on the turnover and import of goods for final consumption. The taxpayer is the seller/importer. Acquisition of raw material, equipment or goods for further resale is exempt from sales tax. The conditions for tax exemption include the presentation of tax statement by the buyer, sale from warehouse/storehouse with the issuance of invoice, and non-cash payment.

Mini VAT exists in the case of turnover of cigarettes, coffee, alcohol, where tax is levied in each stage of turnover. The tax liability paid is deducted from the tax liability due. In the case of oil and oil products, taxpayer is importer, i.e. producer of oil products.

## Turnover tax on services

Services provided against consideration are subject to sales tax. The taxpayer is the entity that provides the services. In the event a foreign entity provides a service to a domestic entity, the taxpayer would be the domestic legal entity, the recipient of the service.

Services provided abroad, as well as export services are not subject to sales tax. Other services exempt from tax include medical, educational, religious services.

## Retail and wholesale

Turnover of goods in retail sale, i.e. sale of goods for final consumption is subject to sales tax on goods. Turnover of goods in wholesale trade is subject to sales tax on services. The sales tax is levied on the margin, i.e. on the difference between the acquisition cost and the selling price.

## Introduction of cash registers

All legal entities and entrepreneurs engaged in retail sale and provision of services to natural persons, have the obligation to use fiscal cash registers when recording turnover. The deadline for introduction of fiscal cash registers is 1 March 2004.

Fiscal cash registers should enable presentation of fiscal documents (reports and fiscal receipts) in the appropriate form, recording of turnover data, such as value of goods and services and storing of data in the period of three years. The system should also ensure the existence of reliable database and storing of the recorded data in an unchanged condition.

Fiscal cash registers and fiscal printers contain fiscal memory and can use any application software. They should have the database with the relevant information on products and services. The software must ensure the recording of turnover of goods and services, functioning of the printer and inscription of data in the fiscal memory, printing of fiscal logo on the fiscal receipt, daily, interim and status reports, reading of recorded turnover (day, month, year), printing of recorded data from the fiscal and operating memory, storing of recorded data in the fiscal memory and printing of these data on the control band.

The information system should prevent recorded data for which fiscal receipt was issued, from being cancelled, deletion or substitution of data on products and services that were entered into the data base of the fiscal register, with the exception of price of products/services, change in specification of tax rates, change in the date, printing of fiscal documents prior to putting fiscal cash register into operation. The information system should also provide specification of tax rates.

Application software should enable grouping of recorded data in the fiscal receipt, issuance of daily and interim reports per groups of products/services depending on their tax status/rates, such as goods exempt from sales tax, services exempt from sales tax, goods subject to sales tax with the exception of cigarettes and alcohol drinks, services subject to sales tax, etc.

## Excise

Excise duties are levied on the turnover of following products:
- oil products,
- tobacco products,
- alcoholic and soft (carbonated) drinks,
- ethyl alcohol (ethanol),
- coffee.

Excise duty is calculated on the import and sale of excise duty products. It is charged as a fixed fee per unit of the product . Excise duty is payable by the producer or importer of products.

## Customs

Import of goods is subject to import duties and sales tax, unless tax statement is provided. Import duties and tax are due by the importer. Import duties include 0.5% customs clearance charge and customs duties based on Customs Tariff.

The average customs rate is 10%. Most of the goods are subject to customs duties ranging from 1-10%. The highest tariff rates (between 20-30%) are applied to agricultural products. The import of certain agricultural and food products is also subject to agricultural administrative charges. Licenses are required for import/export of certain goods, such as agricultural products, drugs, precious metals. Licenses are issued by the relevant Ministry.

Goods can be imported under the regular and temporary import procedures.

Regular import procedure implies that the goods are customs cleared, i.e. duties paid at the border. After the completion of customs procedure, imported goods acquire the status of domestic goods and can be freely disposed of on the territory of Serbia.

Temporary import procedure is a special procedure where the customs authorities approve the import of goods with partial or complete exemption from customs duties, provided that such goods leave the country in their original condition within a specified period of time, requested by the importer and approved by the customs authorities. Temporary import is granted with a complete or partial exemption from customs duties, as prescribed by the Government. Such goods cannot be disposed of or traded on the territory of Serbia without being customs cleared first, and the entire amount of customs duties paid.

## Free zone

Free Trade Zone may be established by domestic or foreign legal and natural persons, subject to obtaining authorization from the Federal Government. Minimum 30% of goods and services produced/supplied in the zone should be exported.

Export and import of goods and services from/into Free Trade Zone is free. The import of the goods to be used in business activities in Free Trade Zone is exempt from customs duties and other import charges, with the exception of 0.5% customs clearance charge. The sale of goods produced in Free Trade Zone on the territory of Serbia, is subject to import duties.

## Tax on financial transactions

Financial transaction tax is due on all payments made by legal entities through their bank accounts and accounts of other financial organizations. It is levied at the rate of 0.22% on the amount of payment. The taxpayer is a legal entity that makes the payment.

Certain payments are exempt from financial transaction tax by law, such as payment of tax, contributions, salaries, pensions, public charges, payments made to utility companies, purchase of shares, transfer of money based on loan repayment, purchase of securities issued by the Republic of Serbia, sale and purchase of foreign currency, transfer of funds from one account into another account of the same legal entity, transfer of funds from banks to NBS and vice versa.

Foreign Investors Council 

## *Positive Signs:*

• *The introduction of a new customs law, prepared in accordance with World Trade Organisation Principles*

## *FIC Recommends:*

• *The introduction of VAT*
• *Where new laws such as the customs law are introduced, appropriate execution of the law is essential*
• *Abolition of tax on financial transactions*
• *Adoption and implementation of regional free trade agreements*
• *Creation of single customs area between Serbia and Montenegro*

# ACCOUNTING AND AUDITING

The Law on Accounting and Audit is based on The Official Gazette No. 71/2002 dated 26 December 2002

## a) International Accounting Standards

The implementation of International Accounting Standards has been obligatory for all legal entities; for Banks, from 1 January 2003, and for other companies, from 1 January 2004.

## b) Annual Financial Statements

Annual financial statements should comprise the following documents:

- balance sheet ,
- income statement,
- cash flow statement,
- a report on the changes in equity,
- notes to the financial statements.

For small companies, only the balance sheet and the income statement are obligatory.

## c) Submission of Financial Statements

Only Annual Financial Statements must be prepared (as at 31 December) and submitted to the NBS

Legal entities must submit their financial statements as follows:
- Annual Financial Statements by 28 February
- Consolidated Financial Statements by 30 March
- Approved Financial Statements together with the auditor's opinion by 30 June.

Additionally, all companies requiring audit (see below) are requested to publish their financial statements together with the auditor's opinion on their website at least seven months after the B/S date. However, there are two exceptions to the rule relating to the preparation of Annual Financial Statements at 31 December:

- Foreign company subsidiaries, for which the financial year differs from the calendar year. Such companies may prepare and submit their Financial Statements coterminous with the financial year of the Parent company. However approval from the Ministry of Finance shall be obligatory.

- Entities undergoing a change of status for example merger, liquidation or bankruptcy. Such entities are required to prepare their financial statements at the date on which the procedure is completed.

## d) Audit Requirements

The Annual Financial Statements audit for big and medium-sized companies is obligatory although the requirement for medium companies is effective from 1 January 2004.  A rotation of medium-sized company auditors is compulsory every five years while the rotation of large company auditors is required every three years.

## e) Chart of Accounts and Accountants

Records must be kept in accordance with the prescribed Chart of Accounts. However, it is not yet evident whether a new Chart of Accounts for companies is to be released or the present Chart of Accounts is to be amended.

For tasks such as keeping the book of accounts, preparing and presenting Financial Statements, all Legal Entities are requested to engage professional staff holding certification.

## f) Company size

### Classification criteria

Medium-sized companies
1) Average number of employees: 50 - 250;
2) Annual total income: Euro 2,500,000 - 10,000,000 in CSD equivalent;
3) Average property value: Euro 1,000,000 - 5,000,000 in CSD equivalent.

Small companies - if the value of at least two of the above criteria is lower than that mentioned.

Big companies - if the value of at least two of the above criteria is higher than that mentioned.

## g) Requirements for Preserving Records

- salary records containing important employee information    Permanently
- financial statements                                        50 years
- the general ledger                                          10 years
- supporting documentation                                    5 years

Financial institutions are obliged to keep data on payment clearance for 5 years.

### Comparison with 2003:
- The Minister of Finance has established an Accounting and Audit Committee the task of which shall be to keep an eye on the implementation of Accounting and Audit Regulatory Rules

- A Decree has been passed on the evaluation of Balance Sheet items and the preparation and submission of Financial Statements for the year 2003

- The Minister of Finance has passed a Decision on the translation of the IASs (The Official Gazette 133/2003 of 31 December 2003).  The translation of IFRS 1 - First-time Adoption of International Financial Reporting Standards - has been published (The Official Gazette 6/2004 of 21 January 2004).

- The Ministry of Finance has passed onto the Parliament of Serbia a Draft on the Amendments to the Law on Accounting and Audit.  However, due to the current parliamentary and political crisis in Serbia, the Draft remains to be considered in the future.

Foreign Investors Council

## *Positive Signs:*

• *The fast implementation of International Accounting Standards is a key step toward transparency and will certainly facilitate foreign investment*

• *The implementation of International Accounting Standards will position Serbia ahead of other countries in the region in regard to the accounting framework*

## *FIC Recommends:*

• *Implementing International Accounting Standards implies and requires significant training and a high degree of knowledge which is not found in Serbia at present. Tax authorities, Finance department staff and professional organizations lack a thorough knowledge of International Accounting Standards.*

• *The impact of applying International Accounting Standards on taxable profit needs to be addressed as a matter of urgency, bearing in mind that taxable income is largely based on accounting profit.*

• *The prescribed format of statutory Financial Statements and the Chart of Accounts needs to be revised to comply with International Accounting Standards.*

• *The role and independence of auditors needs to be debated and clarified by the relevant Authorities.*

• *The Ministry of Finance needs to give approval to foreign company subsidiaries for which the financial year differs from the calendar year, to prepare and submit their Financial Statements coterminous with the financial year of the Parent company.*

Chapter 8

# LABOR, PUBLIC ADMINISTRATION

## a) Availability of labor

The Serbian labor force is skilled and well trained. This applies particularly to those under 45 years of age. Another important feature is that the labor force is inexpensive compared with many European countries, although there are indications that this is likely to change as salary expectations rise. However, due to the crisis of the past decade, the unemployment rate is high, estimated to be about 30%. Accurate statistics on unemployment are, however, difficult to obtain as a large proportion of the population works in the grey market.

The Labor Law provides that an employee has to be over 15 years of age and be medically fit to work. Special requirements may be determined at the discretion of the employer. The labor relationship is established by an employment contract concluded between the employer and the employee.

## b) Working Hours

Full time employment is 40 hours in a week. Overtime cannot last longer than four hours per day, and not more than 240 hours per year.

## c) Social Security

The Serbian social security system encompasses retirement, health and unemployment rights and obligations. All employees of domestic companies are within this system. Foreign citizens employed by companies that are partly or wholly foreign owned are within the system, unless there is an applicable social security treaty.

Social security contributions are calculated and withheld by an employer from the remuneration paid to an employee. These contributions are payable by employer and employees at equal rates. The portion of social security contributions payable by an employer is treated as an operating cost, while the portion payable by an employee is part of his gross wage.

The social contribution calculation base is gross salary. The minimum base for the calculation of social security contributions depends on the level of the employee's qualifications and is adjusted quarterly in accordance with the growth of average salaries. The maximum base for the calculation of social security contributions is five times the average gross salary in Serbia. The social security contributions were reduced so that they are now some of the most competitive rates in the region. However, as healthcare, unemployment and pension funds remain under funded; employees see little for their money. The former FR Yugoslavia has concluded several multilateral treaties on social security as well as bilateral treaties with Austria, Belgium, Bulgaria, the United Kingdom, Denmark, Egypt, Italy, Libya, Luxemburg, Hungary, Germany, Norway, Panama, Poland, Romania, France, the Netherlands, the Czech Republic, Switzerland and Sweden.

## d) Expatriates

### Work permits

Foreign citizens are required to hold work permits issued by the Serbian Agency for Employment. Foreign citizens who have obtained permanent residence permits and work permits are entitled to work full time. Those who have temporary residence in Serbia have to obtain approval for full time employment. In this case, the employer is obliged to submit a request explaining reasons for employing a foreign citizen. No work permit is required if the foreigner is to be employed for the purpose of performing duties set out in a foreign investment agreement.

### Work visas

A business visa is issued to an expatriate either:

- Intending to conduct activities in the area of foreign investment or international trade, according to domestic law, or
- Not requiring a work permit to conclude an employment contract with a domestic entity.

A business visa can be issued for the entire period of conducting business, but it cannot last longer than the petitioner's passport. It is usually issued for six months.

Expatriates with the appropriate visa are entitled to stay in the Serbia for up to three months without claiming temporary residence.

An individual with a transit visa is entitled to stay for up to seven days. People with a business visa are entitled to stay as long as the business visa lasts. Visas can be rejected or revoked by the Ministry of Internal Affairs and there is no need to giver a reason. Neither appeal nor any other legal remedy is allowed against such a decision.

### Residence permits

An expatriate who wishes to be employed by a representative office or by a local company has to submit an application for a residence permit. Before the representative office or company is established, the residence permit is initially issued for six months. After the registration procedure is complete, an expatriate will have the right to apply for a business visa which is valid for one year. Personal documents of the expatriate are presented to the Ministry of Internal Affairs (Belgrade Police/ Department for expatriates). Submission of these documents and obtaining a residence permit has to be undertaken by the expatriate personally. The procedure takes approximately 30 days. All visitors to the country are obliged to present themselves for registration within 72 hours of arrival.

## Positive Signs:

*There is a growing awareness within the Ministries dealing with foreign investors that bureaucratic barriers and red-tape results in time consuming and frustrating first hand experience doing business in the country.*

## FIC Recommends:

*• One Ministry or national coordinator should be required to overhaul and guide reform with respect to the time, documentation required and efficiency of the institutions dealing with expatriate investors. This may be done by establishing a fast track department to deal only with business expatriates. There must be good communication with the relevant Ministry or organization dealing with the investment.*

# FINANCIAL/BANKING SECTOR

## a) Training of compliance auditors

### Current situation

NBS is the main supervision body for the local banking industry. Their main operations consist of adopting of by-laws, daily consultation with banks and on-sight inspection of their operations.

### *Positive signs:*

*NBS had made efforts to change the general mission of the supervision function from criteria compliance watchdog towards risk monitoring institution.*

### *FIC Recommends:*

*In order to promote this orientation shift of the supervision function, it is our opinion that the necessary further step would the training of the NBS's compliance auditors. Banking industry is subject of constant changes regarding the type of operations, banking instruments, risk hedging policies and consequently international accounting regulations. It would be beneficial for the banking industry itself, if the supervision function would also follow these improvements in order to be able to perform its function.*

## b) Role of the Banking Association

### Current situation

The Serbian Banking Association is the banking industry group established to provide support and represent the interests of its members towards the government, central bank and other institutions.

### *Positive signs:*

*Representatives of the foreign capital local banks are currently represented both in the Managing Board and operating committees of the Association where they are in position to present standpoints of the banking industry segment.*

### *FIC Recommends:*

*The Serbian Banking Association should take a more proactive role in the creating the bank favorable environment that would not limit the growth of the industry itself, but would promote it.*

## c) Treatment of Share Capital of Banks

### Current situation

According to the Article 9 of the Law on securities and financial markets, the legal entities can only issue shares in local currency. Regarding debt securities, the only possibility to issue foreign currency denominated paper is prior approval of the NBS.

On the other hand, the required minimum amount for share capital for establishment of a bank is set at EUR 10 million. Additionally, there is requirement of the NBS for commercial banks to maintain the level of share capital above the minimum throughout their operations.

In the case of initial capital contribution made in foreign currency, share capital would be defined in domestic currency and be subject of possible future negative influences of local currency devaluation. The nominal CSD depreciation towards EUR in 2003 of 11.1%, with no additional share issue in the meantime, is an example of how the bank would lose their required share capital amount with no other influences taken into consideration.

The additional element is the fact that in the registration document issued by the Commercial Court, disclose the amount of founding capital in foreign currency with stating that the shareholders are liable for the operations of the bank up to amount of contributed share capital – in foreign currency.

### _Positive signs:_

_The authorities in the Republic of Serbia are considering the changes of the Law on securities and financial markets and the Law on banks and other financial organizations._

### _FIC Recommends:_

_The Law on securities and financial markets should be subject of change where it would be also allowed to issue shares in foreign currency. This provision would introduce an additional confidence anchor to foreign investors willing to contribute their funds for the establishment or expansion of their operations in the Republic of Serbia._

## d) Open Foreign Currency Position

### Current situation

According to the current regulation (Decision on Detailed Conditions of the Application of Articles 26 and 27 of the Law on Banks and Other Financial Institutions) the commercial banks are required to keep the sum of all foreign currency exposures below 30% of the share capital. This limitation is being monitored on daily basis and non-compliance has significant consequences for the bank as not being able to participate on the Inter-bank Foreign Exchange Market.

Since the share capital contributed in foreign currency is not being considered as foreign currency liability, in order to be in compliance with the ratio, foreign capital local banks were using different strategies, either deducting the counter-value of the share capital from foreign currency deposits or disclosing their share capital as part of foreign currency liabilities.

**The gravity of the problem can be illustrated in the following example of foreign capital local bank:**

| | | | | | |
|---|---|---:|---|---|---:|
| EUR | Cash | 4 | EUR | Amounts owed to banks | 14 |
| EUR | Bonds portfolio | 18 | CSD | Amounts owed to banks | 1 |
| CSD | Bonds portfolio | 12 | EUR | Amounts owed to customers | 50 |
| CSD | Claims to customers | 1 | CSD | Amounts owed to customers | 15 |
| EUR indexed | Claims to customers | 38 | EUR | Shareholders' Equity | 20 |
| CSD | Claims to banks | 5 | | | |
| EUR | Claims to banks | 22 | | | |
| | | 100 | | | 100 |
| EUR | | 82 | EUR | | 84 |
| | | | EUR | | 64 |

| FX Position in relationship to equity: | | Open FX Position | |
|---|---:|---|---:|
| with equity | 10.00% | with Equity | -2 |
| without equity | 90.00% | without Equity | 18 |

*Based on the articles 30 – 39 of the Decision on Detailed Conditions of the Application of Articles 26 and 27 of the Law on Banks and Other Financial Institutions concerning the foreign exchange risk ration the FX ratio is complied with, if the equity position is included into the calculation.*

If this is not applicable, banks would have to face the following consequences.

A restructuring of the assets side as the counter position of equity has to be invested into CSD, whereby the only liquid instruments in CSD are the T-Bills issued by the NBS and the Ministry of Finance. The bank would need to decrease its exposure in:
> a) FX savings bonds and/or
> b) FX indexed lending to clients

as the placements with banks are typically related to Mandatory Reserves held with the NBS or to short term liquidity surpluses as the local inter-bank money market does not offer enough liquidity to absorb additional lending.

Furthermore, from the shareholder's point of view, the shift to CSD denominated assets would increases the vulnerability of the equity stake due to the EUR/CSD exchange rate movements, making the investment in the Republic of Serbia riskier. As there is no long term FX forward market available in Serbia, which makes it for the investor impossible to hedge the FX market risk, the future investments of foreign investors might suffer under this new risk.

The minimum capital requirement of EUR 10 mio creates an "indexed liability", which is not taken into account in the FX calculation (Article 8, 18, 26 Law on banks and other financial institution). In case a bank wants to ensure automatic compliance with the minimum capital requirement by keeping this amount as an EUR denominated asset (cash, T-bills etc.) it creates non-compliance with its Open FX Position.

**Banks in other countries of the CEE have to face the following regulations:**

| | Croatia | Slovenia | Bulgaria | Romania | Hungary | Slovakia |
|---|---|---|---|---|---|---|
| Denomination of capital in foreign currency possible? | NO | NO | NO | YES | YES | YES |
| Is FX capital included on the liability side of the calculation of the Open FX position? | NO | NO | NO | YES | NO | YES |
| Minimum capital requirement linked to foreign currency? | NO | NO | NO | NO | NO | NO |

## Positive signs:

*In year 2003 and at the beginning of year 2004, the NBS had issued two drafts of amendments for the regulation of the foreign exchange ratio. However, none of them had proposed the solution of the question of the treatment of share capital paid in foreign currency. On the other side, compliance auditors of NBS had made several audits of foreign capital local banks where they have stated the non-compliance in calculation of foreign currency ratio and order the banks to take remedial actions.*

## FIC Recommends:

*We believe that it would be in the interest of all parties to allow the banks with the share capital paid in foreign currency to report such a capital as foreign denominated liability for the purpose of the calculation of Maximum Open FX Position Report.*

## e) Legal Lending Limit

### Current situation

According to the Law on banks and other financial institutions, one of the compliance criteria set for commercial banks is the maximum amount of placements to the single counterparty of 25% of the bank's share capital ("largest exposures"). The definition of the single counterparty includes exposures toward all individual counterparties that are considered to represent related parties. Additionally, the total amount of largest exposures should not exceed 400% of the share capital.

In the period from year 2001 to 2003, the Serbian banking sector had witnessed the significant change in the composition of the industry with over ten new banks established or purchased by foreign banking groups. This transition in the financial sector had been followed by the privatization led change in the capital structure in the most propulsive sectors in Serbian economy as pharmaceuticals, cement, tobacco, construction and household chemistry industries. Consequently, the new segment of growth oriented companies with firm support from their multinational company background had been established in Serbian economy. Besides the entrance of the multinational companies through direct or portfolio investments, there is also the increasing group of the propulsive domestic companies that are successfully expending their presence on local and international market.

Further development of operations of these groups of companies on the local market requires the support of the local banking sectors. However, this support is being limited by the legal lending limit regulations. One of the solutions used was overflow booking of the excess amounts by the headquarters of the involved local banks. However, this solution had not been beneficial for local banks in many aspects.

Additionally, the growth of the lending operations had also led to the fact that foreign capital established banks are also approaching to the limit of 400% of total placements to largest exposures.

## Positive signs:

*At the beginning of year 2004, the NBS had made proposals for the change in calculation of the exposure amount towards single entity.*

*Several deduction items had been introduced: cash collateral deposits, short-term deposits up to seven days with prime rating banks, placement guaranteed by prime rating banks.*

*However, regarding the last proposition, NBS had stipulated that no guarantees of the mother banks are going to be considered as the reduction in the calculation of the legal lending limit.*

*In the light of the current unsatisfactory level of country rating, the possibility of obtaining mother bank guarantee for placements represents the important factor in promoting lending activity in the*


*country.  The main shareholder banks of Serbian bank subsidiaries are the banks which rating is in most cases highly above the level required by NBS (Standard & Poor's, Fitch-IBCA or Thompson BankWatch – BBB; Moody's – Baa3). Exemption of this collateral option represents creating more difficult environment for local companies as well as impairing the willingness of main shareholder banks to support activities of their subsidiaries in the Republic of Serbia.*

## FIC Recommends:

*NBS should allow full deduction of receivables guaranteed by mother bank guarantee in the calculation of legal lending limit.*

*With respect to the significant change in the composition of the Serbian economy through privatization and direct foreign investments, together with the strengthening of the Serbian banking industry, the additional impetus for the growth of the economy itself would be the increase of the total amount of largest exposures from 400% to 800% through the change of the provision of the Law on banks and other financial institutions. This move would be in accordance with the regulations in CEE region countries (Hungary, Czech Republic, Romania, Slovakia, Slovenia).*

## f) Mortgage market in Serbia

### Current situation

The process of residential construction and parallel, continual maintenance of the existing housing fund have very positive effects, both direct and indirect, on development of the entire economy. The positive effects of development of mortgage market have an effect on the banking sector as well – one of the more important generators of private savings, which is at the same time one of the most significant long–term sources of financing housing construction, is the financing of housing construction itself.

The mortgage market already confirms the tendency of intensive influence on development of financial markets through one of its deducted projections;  the secondary mortgage market.  This is a form of organized financial market where an array of financial derivatives developed under certain conditions from classic banking loans and are secured by mortgages. It represents one of the safest financial markets, where the most often institutional investors are those who play safe.

## Positive signs:

*In order to even start thinking about the sequence of steps that should be taken in order to establish the mortgage market and develop it in our local market, it is necessary to establish what has been done during the last three years.*

*A new version of the Law on State Measurement and Cadastre is being developed.  The only visible effect of this law is transfer of data about a small number of pieces of registered real estate from competence and registers of one institution to competence and registers of another.  During this transfer, which can become quite lengthy, disposing of this real estate becomes almost impossible, since all the components are excluded or their turnover is brought to a halt.*

*However, approximately 90% of real estate is still unregistered.  Even when it is registered, in most cases this cannot ensure that a third party gets quality and quantity of ownership title of the subject of entry.*

*Institution of mortgage is stipulated in the Serbian legislature only by few provisions of the Law on the principles of property relations, and in Article 64 of that Law mortgage is conditioned by entry into the public register. The fact is that Article 69 of the same Law still forbids fiduciary transfer of property. Mortgage cannot be instituted on a building in the process of construction; efficient (and less expensive) financing of large projects is thus extremely hard, almost disabled.*

*When positive Serbian regulations are concerned, real estate cannot be object of leasing.*

*The practice of the courts, when mortgage is instituted, is not the same everywhere.*

*The effective Law on enforcement procedure, as well as relevant practice related to it, does not put much faith in the creditors about realization (and time of realization) of their mature unsettled claim.*

*An institution, which would secure mortgage loans, public or private, does not exist, probably due to the above mentioned facts.*

### *FIC Recommends:*

• *Pass a certain number of legal regulations in the field which stipulates property issue, and consequently real estate business. The first choice should be a Law on denationalization and a Law on mortgage.*

• *Initiate passing laws which would regulate uniform entry and record – keeping of data in public real estate registers as soon as possible.*

• *Found a legally-based Temporary mortgage register, with the purpose of instituting a mortgage on real estate which is not entered in public books, by entering it into that Register through a legally stipulated procedure. By entering mortgages into that Register, mortgage creditors would be protected against claims of third parties, which is supposed to be the purpose of the Register. In this way a significant number of existing pieces of real estate would be finally available for business with a higher degree of legal security. Data from this Register could later be integrated into the cadastre with certain verification, which would accelerate the procedure of entering real estate throughout Serbia.*

• *Support these regulations and corresponding changes and supplements of the Law on enforcement procedure, unification of court practice should be performed, both in the procedure of mortgage institution and process of mortgage realization, i.e. foreclosure of mortgage loans.*

• *Establish a procedure of selling the real estate under mortgage (foreclosure) should be addressed urgently. and should embody an extremely scope for appeal.*

• *Regulation should stipulate founding of a Mandatory Settlement Agency (under the auspices of state authorities), under whose authority realization of mortgages and non–possessory pledges would be placed, in compliance with strict procedures. Debtors would be also protected from creditors by stipulation of rigid property/penal sanctions for creditors who misuse instruments of security. However such a possibility would be minimized by stipulation of strict procedure for realization of mortgage at the authorized court, and possible mandatory collection.*

• *Founding of an institution for insurance of mortgage loans is also forced at as one of the important parts of this process. Activity of such an institution is, in compliance with experience of other countries, very important for further development of mortgage market (especially the secondary mortgage market). NBS has recently started an initiative with that purpose, but it has remained vain. Having in mind that one of the reasons for failure of this initiative has been lack of funds, one should take into account founding of that institution in cooperation with a strategic partner from the private sector.*

## g) Temporary Mortgage Register

### Current status of the real estate register

The significant part of real estate in Serbia, and outcoming rights is not properly registered in public records. These records, i.e. cadastre, in compliance with the Law on state measurement and cadastre and entry of rights on real estate ("Cadastre Law"), represent the basis for development of mortgage market, since the mortgage is recorded into the ownership certificate, according to the Cadastre Law.

The competent ministry has recently announced that the Cadastre will cover around 20% of real estate on the Republic territory by the end of 2003. Undoubtedly we can conclude that this percentage corresponds to the percentage already existing in the land registry. On the other hand, however, it is expected that the process of adequate and final recording of the remaining real estate in Serbia will last much longer.   This is understandable bearing in mind the situation which results from historical heritage of the previous political regime).

### Temporary Mortgage Register

We consider it would be useful to found such a public Register to enter mortgages on real estate which for any reason were not recorded in the Cadastre in the legally regulated way.
The purpose of such a register would be complete protection of mortgage creditor concerning his/her rights regarding the mortgaged real estate.   Therefore, we speak of the relationship of the mortgage creditor with his/her security, i.e. mortgaged real estate, which would not be crucial for the final solution of the property issue and its recording  in the Cadastre afterwards.

### Procedure of entering a mortgage into the temporary Register

Mortgages would be entered after the initiative of interested parties from the basic business deal (mostly loan deal), through a legally stipulated procedure and after fulfilling legally stipulated conditions.

Without becoming inappropriately involved in the legislature, these conditions could concern providing adequate proof in the sense of:

- Title to dispose of the relevant real estate
- Determining its important parameters in the exposure period, whose costs would be borne by proponents, and which would be executed by authorized bodies or other authorized assessors; Procedure of exposure could also include summoning any third interested party which would decrease possibility of misuse, regarding the advanced payment of costs of the procedure
- Assessment of the current market value of thus defined real estate by an authorized assessor
- (Perhaps also) publishing a summons (on the notice board of the authorized court, in local newspapers, etc.) for interested third parties to place an appeal within the set period

Bearing in mind the fact that this would first of all involve protection of his/her interest, it is logical to expect that the future mortgage creditor would behave during mentioned procedure as a good business person at least.   However it would be important not to burden the creditor with determining certain facts which would not be in compliance with their market activity, and which could advert him/her from the deal itself.

After such a procedure and presentation of proof of executed procedure the mortgage would be entered into the temporary Register by the authorized body.

## Purpose of the temporary Register

As has already been pointed out, the purpose of such a Register would be complete protection of the mortgage creditor (i.e. owner of the pledge) from any requests of third parties regarding the real estate in question. Thus the mortgage creditors could safely approve mortgage loans and refinance them without fear for the destiny of the basic security for such financial activities.

## Other issues concerning the temporary Register

This Register does not prejudice the property issue in any way for the real estate in question. This issue would be solved when the Cadastre is updated.

One risk arises, risk of denationalization, which could be solved in the same way the denationalization issue would be solved by an expected legal text. The conclusion is, therefore, that the state should be

the final guarantor to possible damaged third parties in that field and under conditions to be determined by a relevant law.

The second potential risk, risk of fraud, would also be minimized during procedure of entering the mortgage into the temporary Register by strict fulfilment of legal conditions, and could be also ensured with an appropriate organization (when the premium would not significantly make the arrangement more expensive).

We also think that the state would benefit from founding and developing such a Register since the data included into it could subsequently be integrated into the Cadastre.

The basic purpose and benefit of this Register is to create the basic conditions for rapid further development of mortgage financing, and thus of the mortgage market. This, we are assured, would have a positive influence on complete economic movements on the local market.

## h) Serbia and Montenegro, transactions between entities and individuals

### Current Situation

A significant problem arises from the fact that Serbia is treating the entities and individuals from Montenegro in the same manner as those from Serbia, whereas Montenegro takes the stand that these are entirely two separate financial and monetary systems. Given such approaches, no regular CSD and FCY payment operations or credit operations, can be possible between Serbian and Montenegrin entities and individuals. The banking systems in Serbia and Montenegro are independent and completely separate. A bank from Serbia can not establish a branch in Montenegro, and vice versa. Furthermore, a bank from Serbia may establish a business presence in Montenegro by founding a new bank (green field investment) either in the form of joint-stock company (bank) or affiliate, i.e. as a subsidiary bank with independent legal status. In both cases the founding capital (minimum pecuniary capital) is EUR 5 million for a bank in Montenegro, and or EUR 10 millions for a bank in Serbia.

### _Positive Signs:_

_A new law that would regulate payments and credit relations between Montenegro and Serbia is in preparation._

### _FIC Recommends:_

_Accelerate harmonization of the legal and economical framework between Serbia and Montenegro_

## i) Syndicated Loan

### Current Situation

NBS persists with the attitude that:
> (1) this is still considered a foreign exchange loan transaction between Serbian residents irrespective of the fact that the loan administrator (Agent) is a foreign bank;
> (2) foreign exchange loan transactions in the country as stipulated by Article 20 of the Foreign Exchange Operations Law allow financing only of import goods and services.

## FIC Recommends:

• NBS should exercise more flexible approach in interpretation of the Foreign Credit Transactions Law taking into consideration:
(a) Solutions already included in the Foreign Exchange Law
(b) Modern (new) forms of international loan products
(c) Interests of the borrowers and the banks - creditors
• NBS should supplement bylaws where permissible, i.e. supplement the Book of Codes, containing the basis for collection, payments and transfer under current and capital transactions, with the following type of activity:
„Participation, purchase or sale of the participation in the syndicated loan"
The first modification and amendment to the Law should provide possibility to the local banks to be Lead Managers and Underwriters in syndicated loans granted to foreign or local borrowers.

## j) Lending Limit for Leasing Operations

**Current Situation**
According to the existing NBS Decision on Articles 26. and 27. Law on Banks, Banks exposure with their leasing company must not exceed 5% of their liable capital.

## Positive Signs:

At the beginning of February 2004, NBS issued the draft of the new Decision on Detailed Conditions of the Application of Articles 26 and 27 of the Law on Banks and Other Financial Institutions. In the separate section of the Decision on the definition of related parties, NBS had specifically expected leasing companies founded by a bank to be considered as related party.

## FIC Recommends:

The adoption of norms allowing banks to dispurse the refinancing lines to their leasing companies which is not restricted by the 5% clause.

## k) Interbank Foreign Exchange Market

**Current Situation**
According to the NBS Decision on the requirements and procedures in the foreign exchange market operations, an authorized bank must not participate in the Interbank Foreign Exchange Market (IFEM) session. This is in case it purchases or sells foreign exchange and currency in direct contact with another authorized bank or bank whose foreign exchange risk ratio exceeds 30% or in case it has failed to report this ratio to the NBS. In such case, a bank must not participate in the IFEM session for a period of five business days. NBS publishes a black list at 11 a.m. The system produces a great deal of hesitancy and uncertainty on the part of dealers who do not know in advance whether their counterpart is fulfilling NBS requirement or not.

## FIC Recommends:

NBS should use some other regular controlling mechanism to avoid the adverse impact of bureaucracy on the operation of the foreign exchange market.

## l) Tax on transfer of the absolute rights

**Current Situation**
According to the Law on Property Tax and official opinion of the Serbian Ministry of Finance and Economy, tax on transfer of the absolute rights (0.3%) is applied also on every secondary market deal with NBS T-bills and Ministry of Finance and Economy T-bills.

*WHITE BOOK*

## FIC Recommends:

*We strongly recommend that the Ministry of Finance proposes to the Parliament the abolition of this tax in order to give positive signs to further the development of the secondary market.*

# m) Commission on transaction on secondary market

## Current situation

| Category of commission | NBS bills | Debt securities | | | Shares | Proposal |
| --- | --- | --- | --- | --- | --- | --- |
| | | Government T bills | Government FX Bonds | Commercial papers | | |
| **1) At BSE – two options:** | | | | | | |
| Option I - BSE trading fee | - | - | 0,10% | 0,10% | 0,10% | |
| Option II - Free BSE trading fee | - | - | | 0,05% - 0,15% | 0,16% | |
| **2) With the Central Registry – two options:** | | | | | | |
| Option I - Central Registry' fee for **OTC** | 0,10% max CSD 5000 | 0,10% max CSD 5000 | - | 0,10% max CSD 5000 | 0,10% max CSD 1000 | |
| Option II - Central Registry's fee at **BSE** | - | - | 0,10% max CSD 1000 | 0,10% max CSD 1000 | | **To adjust to the RTGS costs** |
| SWIFT charges | 300 CSD | 300 CSD | 300 CSD | 300 CSD | 300 CSD | |
| **3) Taxation** | | | | | | |
| Tax on turnover (20%) | - | - | 20% on total commissions | 20% on total commissions | 20% on total commissions | **To reconsider tax policy** |
| Tax on financial transactions | - | - | - | 0,22% | - | |
| Tax on absolute right's transfer (0,3%) – on seller's charge | 0,3% | 0,3% | | 0,3% | 0,3% | |
| Tax on capital gain – on seller's charge | 14 % on margin | 14 % on margin for legal entities 20% on margin for individuals | 14 % on margin for legal entities 20% on margin for individuals | 14 % on margin for legal entities 20% on margin for individuals | 14 % on margin for legal entities 20% on margin for individuals | |
| Tax on interest (only for individuals) | - | 20% after reducing for tax on capital gain | 20% after reducing for tax on capital gain | 20% after reducing for tax on capital gain | 20% after reducing for tax on capital gain | |
| | | | | | | |
| **TOTAL 1+2+3** | **Min 0,4%** | **Min 0,4%** | **Min 0,2%** | **Min 0,72 %** | **Min 0,56%** | |

By calculating the commissions in the table, the following fees have to be considered in certain proportion:

## Securities Commission's fees:

- Fee for issuing licenses for performance of brokerage 3% of the capital (for banks - 3% of the capital which is calculated on the basis of brokerage house's capital needed for performing selected activities) fees regarding adjustment of the broker's internal regulations and appointment of the director and members of management from 10.000 CSD to 35.000 CSD

- Fee for publishing and delivering the annual report of the broker, custodian bank and other participants 35.000 CSD

- Fee for issuing licenses to the bank to become a custodian bank 150.000 CSD fees for organizing training and examination for obtaining the title of broker, investment consultant and portfolio manager from 70.000 CSD to 200.000 CSD and other fees, whereas the minimal level is at 10.000 CSD.

## Particular fees of the Central Registry:

- Membership fees 240.000 CSD

- Opening certain categories of accounts 10.000 CSD per account

- Installation and servicing of the client's application 30.000 CSD

## _Positive Signs:_

_Positive signs are that the monetary authorities began to create positive environment for further development of the securities market. Last year the Ministry of Finance started issuing the T-bills, at first on three months, afterwards on six months, where the participants (both the banks and brokers) have been free enough to define the real market price of the money. The 3M T-bills discount rate is the only real price at the money market in this country. Another positive sign is that the central bank is preparing to start with the repurchase agreements, and at the same time we could see that the stock exchange is preparing for progressive electronic trading, supported by the simultaneous actions of the Central Registry, which tends to become a clearing house._

## _FIC Recommends:_

• _General tax reform, specially abolishment of taxes on absolute right's transfer, taxes on financial transactions, as well as taxes on interest after reducing gain on margin, as the current tax burden effectively prohibits secondary trading with short term investments._

• _Reconsidering the level of the Securities Commission' fees which are too high_

• _Reconsidering the level of the Central Registry's fees, for example by adjusting them to the RTGS costs_

• _Achieving better transparency at BSE and organizing better information, specially regarding OTC trading_

# LEASING

## Current situation

The situation in Serbia and Montenegro as regards the leasing industry is rather different from that in March 2003.

The Financial Leasing Law was finally passed and came into force in July 2003.  Additional changes in the Tax Law followed in August 2003. Essentially, the Financial Leasing Law established the three parties to the leasing transaction – the Lessor, the Lessee and the Supplier – and defined the objects that can be leased, i.e. movable property; vehicles and equipment/machinery.

It also provided for the crucial aspect of repossession. It is stipulated that if the Lessee does not pay three consecutive installments, the Lessor is entitled to request the court to decide on repossession of the leased object from the Lessee in default and the court has to decide in three days on this matter. In addition, the procedure on repossession of the leased object has to be carried out within three days after the court decision, thus effectively enabling the Lessor to repossess in six days. This is the crucial regulation of the Financial Leasing Law, and it really created grounds for fast development of leasing in Serbia.

In addition, the service tax was abolished in case of both leasing installments and the management fee that is charged when processing the leasing application. This effectively means that the only cost for lessee is the leasing rate charged by the leasing company.

At present there are five leasing companies active in Serbia and Montenegro, and all are members of the Leasing Committee of the FIC. The total portfolio of the leasing industry is just over EUR 50 million, which is quite a success having in mind that Financial Leasing Law was passed only in July 2003. A number of foreign leasing companies are interested in coming to this market as well.

As to the regulations, Financial Leasing and Tax laws did not address certain aspects, while some matters have been unclearly defined. The Leasing Committee has actively worked on clarification of the unclear issues, and has established relations with authorities, namely Ministries of Finance and International Economic Relations and Tax Authority. After longer than expected discussions and a number of written requests, the majority of issues were clarified, much to the advantage of the development of the leasing business. Among the important ones are the clarification of accounting treatment of leasing transactions, abolition of tax on difference in price that dealers had to pay when importing and selling vehicles, abolition of tax in cases in which leased the object is transferred to another lessee and clarification of an import structure for lessors.

Unfortunately, real estate leasing was not covered by the Financial Leasing Law, which would create solid grounds for development of this business in Serbia and Montenegro. These transactions are regulated by a number of Serbian civil laws which do not make the situation favorable. However, real estate leasing will become more attractive with the introduction of VAT.

## *Positive signs:*

• *Fast development of leasing industry helped by Financial Leasing Law and Tax Law changes*
• *Market starting to understand benefits of leasing, huge market potential*
• *A number of international leasing companies interested in coming to Serbia and Montenegro*
• *Authorities and institutions accept importance and advantages of leasing for the country, implement majority of required changes*

## *FIC Recommends:*

• *Introduction of VAT as soon as possible in order to create favorable grounds for expansion of leasing business, especially operating leasing. Real estate leasing would become particularly attractive and economically viable for interested parties, since under the current tax system a better option for financing real estate is via bank loans.*
• *Legal lending limit is imposed by the NBS which regulates that a bank can not lend to its daughter leasing company more than 5% of its own capital. This regulation is unfavorable for the development of leasing business, because all leasing companies must obtain their refinancing from abroad, which is both complicated and expensive. FIC recommends abolition of this limit, or at least an increase to a percentage that would facilitate refinancing of leasing companies, in order to bring it in line with regulation of many European countries.*
• *Register of leases should be established as soon as possible wherein all financial leasing contracts will be registered.   (The Financial Leasing Law stated that the Register would be operative from 1 January 2004.   However this was not the case.)*

# REAL ESTATE: LAND OWNERSHIP

During 2002, a new Law on Urban Planning and Construction was adopted by the Serbian Parliament. This replaced the previously existing Construction Law, the Law on Urban Planning and Development, and the Law on Construction Land. This Law introduced a number of changes related to land ownership including the possibility to transfer the ownership of air rights into a 99-year lease. However, most of the main problems related to land ownership, which are impediments to foreign investment remain unchanged. Among them, the main problems remain as:

## a) Governmental control over supply of land and prices of land

Supply of urban land is monopolistic in nature and controlled by a Governmental agency, which defines how much land is to be sold, when and at what prices. The minimum prices of urban land are determined with governmental ordinances unlike in most markets where prices are determined by the free interaction of supply and demand.

Free interaction of supply and demand is an indisputable requirement for the existence of a healthy and stable real estate market. If the government pulls out from its controlling role in the process of supply of land and price regulation, we will see more logical prices, higher investor interest. From this will result an increase in the volume of construction. In turn that will produce first more jobs and a decrease in the prices of constructed properties. This decrease will make housing and offices more affordable for the average citizen, which will lead to even more investments, and so on until equilibrium is reached. Government budget will also naturally benefit from that since this means more land acquisitions, more taxes paid, more jobs created.

## b) Restitution of land and properties

The lack of clarity on resolution of the issue with restitution of both land and properties continues to create uncertainty and deters many real estate investors from investment in Old Belgrade.

## c) Restrictions on speculative buying of land and time

The current legislation continues to restrict speculative buying of land. It also places restrictions on the time within which construction has to commence and complete, probably with the idea to have a better control over proper usage of land. Unfortunately, this brings uncertainty to investors, which at the end discourages many of them to invest.

## _FIC Recommends:_

• _Review the way in which Central and Eastern European countries handled in the near past restitution issues, as well as research the requirements that a future EU accession will put on the issue of the land_

ownership and restitution. Based on that and local specifics, agree on a policy and adopt a Law on restitution.

• Release the governmental control over supply and prices of urban land by developing a system that allows for forming of prices based on free interaction of supply and demand. As a step towards that, develop a publicly available complete database with all urban land available for construction following the newly adopted Master Plan, as well as including complete information on past transactions, which is the practice in developed real estate markets.

• Release the current policies and allow bigger flexibility to investors who have acquired air rights over certain piece of land in case their plans change in the future.

# INSURANCE, PENSIONS AND SOCIAL REFORM

## a) Insurance

The instability of the insurance sector in Serbia can be attributed to a wide range of microeconomic and institutional failings.

Weaknesses in the legal framework compound the problems of lax management, weak corporate governance and frail supervision.

In the absence of effective market discipline, the entire burden of external control falls on insurance supervisors who may not have the requisite capacity. The strengthening of the regulation and supervision framework in parallel with the slow and cautious introduction of liberalization measures is essential for improving the efficiency of the insurance market in Serbia. The crucial issue for a robust insurance system is the development of capable, professional personnel of insurers and supervisors.

## *Positive signs:*

*The Government has submitted a draft of a new insurance law which is a substantial improvement of the old one, we are waiting for the law to pass the parliament. The Insurance supervision has gone through some training and is currently strengthened with the aid and support of USAID.*

## *FIC Recommends:*

• *The collection of claims data through cooperation of insurers should be encouraged.*
• *The insurance supervisory authorities should also establish a reliable claims database that will help insurers and supervisors confirm the right price for various categories of products.*
• *The insurance supervisory authority should:*
  *- have the power to license insurance companies,*
  *- apply prudent regulations, conduct consolidated supervision,*
  *- obtain and independently verify relevant information,*
  *- engage in remedial action and execute portfolio transfer,*
  *- apply sanctions against insurance companies which do not follow the recommendations and injunctions of the supervisory authorities*
  *- have broad and ample knowledge and experience ranging from actuarial science to contract law drawn from wide experience;*
  *- have a reliable and stable source of funding to safeguard its independence and effectiveness;*
  *- have the powers and sufficient resources to co-operate and exchange information with other authorities both at home and abroad thereby supporting consolidated supervision; and*
  *- establish an employment system to hire, train and maintain a professionally qualified staff. At the same time, the insurance supervisory authority must be bound too strict professional secrecy and the legislation must exclude any arbitrary intervention of the administration.*

• *Except in the cases stipulated in law, the insurance supervisor should under no circumstances be allowed to interfere in the management of insurance companies.*
• *The supervisory authority should establish good cooperation and undertake coordinated schemes with other related government bodies or insurance institutions, such as ministries, tax offices or insurance guaranteed funds so that the given tasks are properly carried out.*
• *The insurance industry should be encouraged to set up private mechanisms and institutions for the application of business guidelines and a code of conduct to limit detrimental practices.*
• *Subject to prudential regulations and supervision being met, competition in the insurance sector should be fostered by removing unnecessary restrictions and allowing participation of sound insurance companies in the insurance market. In particular, establishment of foreign insurance companies should be based on prudential but non-discriminatory rules.*
• *Ensure information disclosure is also essential for consumers to be able to select appropriate insurance products from the right insurance company. The most important information concerns the financial condition of an insurance company, the nature of its insurance products and the character of an insurance intermediary.*
• *Sufficiently strict licensing criteria should in particular govern the establishment of insurance companies. Examination of the nature and adequacy of the financial resources of insurance companies through analysis of business plans and the requirement for a relevant minimum level of capital deserves particular consideration. The supervisor should also consider the suitability of owners, directors and/or senior management. The insurance supervisor should also review changes in the control of companies and establish clear requirements to be met when a change in control occurs. The underwriting of insurance risks should be restricted to insurance companies, which may transact insurance operations only. Life and non-life insurance operations should be separated, so that one activity cannot be required to support the other. Reinsurance companies and direct insurance companies should also be separated at the initial stage in emerging market economies.*
• *Insurance supervision should be exercised over the entire operations of the insurance company undergoing control and should involve various aspects, such as moral, legal, technical and financial. In particular the insurance supervisor should in particular ensure that insurance companies are observing the regulations applicable to insurance. More specifically, the insurance supervisor should ensure that insurance companies:*
  - *meet the contractual commitments made toward the insured (legal control);*
  - *are at all times in a sound financial position so as to meet their commitments.*

## b) Pension and social reform

The pension system is facing challenges in terms of its sustainability. In 2002, the share of the pension system in GDP was around 14% (including all three funds and expenditures), and is able to meet its obligations only thanks to the transfers from the budget equal about 7% of GDP. The reforms carried out to date in the pension system have only managed to stop the rise of the deficit in the pension system, not to reduce it.

The situation in the pension system is influenced by exogenous factors linked with the changes in the structure of the population, the low level of employment and the presence of the gray economy in the area of employment. Longer life age and the low rate of birth, below the level needed for simple replacement of generations, have conditioned the aging of the population. The number of people older than 60 rose from 642,674 to 1,732,219 in the period from 1953 to 2002. In the same period, the share of this group in total population rose from 9.21% to 23.1%.

These tendencies along with high unemployment (34%) and a flourishing black market create a high dependency ratio of 1.16 and make the system unsustainable.

The growth of the part of the population above the age of 60 points to the risks and challenges for the public finance in the field of social insurance and social policy. It is, therefore, necessary to continue the reforms of the pension system, social protection and the health system, which will allow lowering of these outlays in the medium run.

## *Positive signs:*

*Important pension reforms were adopted recently in Serbia. In December 2001 the government implemented important parametric changes followed by a new state pension law in April 2003 whereby:*

• The retirement age was raised three years for both men and women (to 63 and 58 years, respectively) and working period requirement were introduced;
• The pension indexation formula was shifted from wages to the arithmetic average of prices and wages, while the indexation frequency was reduced from monthly to quarterly;
• A points system was introduced to tighten the connection between contributions and pension.
Given the large number of benefits, the complexity of finances and delivery, and the multiplicity of eligibility criteria, the overall social welfare in Serbia is generally inadequately targeted and hence both inequitable and unduly costly. With a view to addressing these problems, the authorities - with World Bank assistance - intend to begin an overhaul of the system, building on a household survey and related poverty analysis work now underway. Designing a nation-wide comprehensive welfare provision framework with unified eligibility criteria, and providing incentives in the welfare system for reemployment and retraining will be key measures.
Further reform measures are envisaged over the next three years to put the pension fund finances on a sustainable path, including a modification of the benefit formula and valorization rule to reduce the redistribution element and increase the linkage between benefits and contributions, a tightening of the eligibility requirements for disability pensions, and a further reduction / elimination of non-pension social benefit paid by pension funds.

## FIC Recommends:

In order to strengthen retirement income security in Serbia and enhance a critical engine of economic growth, the government policies must adhere to the following four principles:
• Provide stable rules that encourage the voluntary creation and maintenance of soundly financed employer-sponsored plans;
• Introduce efficient means for individuals to acquire adequate retirement income;
• Support the dynamic needs of employers;
• Encourage capital formation.

The following strategies for action will implement the policy principles discussed in the previous section:
• Introduce the government's commitment to voluntary employment-based retirement programs;
• Educate the Serbian worker, so that they have the necessary skills to equip them for retirement.
• Provide more opportunities to use modern technology for disseminating information to employees about their plans and in providing employee education.

Chapter 13

# TELECOM MARKET

Telecom market consists of two parts: Serbia and Montenegro.

## a) Serbia

Situation in telecom market in Serbia is still unchanged, despite the fact that new Telecom Act is finished. Under the new Telecom Act, adopted in 2003, Telecommunications Agency was established. Transition process is ongoing and not yet completed to transfer regulatory activities from former regulatory body CYPTT (Community of Yugoslav PTTs) to Telecommunications Agency. It is defined in the last paragraph of the Telecom Act that both Agency and the Act itself will be in force 3 months from the moment when National Assembly will appoint members of the Agency Board. This was expected to happen beginning of 2004, but due to unclear current political situation the appointment probably will be postponed for longer period of time.
Deregulation in telecommunications started with the establishment of Regulatory Agency. According to the new Telecom Act liberalization of fixed line telecom market will happen in 2005. New Telecom Act is a transition form to align with EU regulations.

Telekom Srbija is the only fixed operator in Serbia having monopoly on basic fixed services. In mobile GSM market two operators are licensed: Mobtel and Telekom Srbija Mobile. Internet market is fully liberalized.

## b) Montenegro

Structure of telecom market in Montenegro is different. Under the Republic Telecom Act an independent Regulatory Agency was established in 2001. Under the Telecom Act fixed, mobile and Internet services are liberalized. Incumbent fixed services operator is Telekom Crne Gore and new licenses are not issued yet. The GSM license is granted to two mobile operators, Monet and Promonte.

### _Positive Signs:_

- *Alignment with EU regulation in process*
- *Preparation for establishment of Regulatory agency in Serbia*
- *Fast development of mobile networks*

### _FIC Recommends:_

- *Liberalization and regulation of the fixed line market*
- *Liberalization and regulation of the mobile line market*
- *Further enhancement of Telecom Act in accordance with EU regulations*
- *Development the interconnection directives*

Chapter 14

# ENVIRONMENT

## Current situation

During last 50 years, industrialization of the country increased pollution levels and contributed to environmental degradation. Natural resources were exploited freely and industrial effluents were not treated appropriately. The international embargo put pressure on the country's natural resources and pollution went largely unchecked, worsened by outdated technologies. In 1990s, weak economic performance had favorable effect on the environment. The decline in general economic activity reduced pollution and the pressure on the environment.

In May 2002, Serbia's National Assembly adopted the Law on Ministries.   In this way they established the Ministry for Protection of Natural Resources and Environment, with several key objectives:
- systematic and integrated management of natural resources,
- compliance with EU environmental legislation,
- contribution to the economic development program,
- cleaning up of environmental black spots,

The Law on Environmental Protection is still the most important environmental legislation in Serbia, regulating the system of protection and development of the environment, including spatial planning, environmental impact assessment and construction. However, the protection of various media is divided amongst various institutions, and the Ministry for Protection of Natural Resources and Environment does not have full competence for implementing this Law. In order to approximate the European Union's body of environmental law and introduce other international standards, a new environmental law was developed in 2001. In April 2002 the draft was finalized and submitted to the National Assembly. At the time 2nd edition of the White Book was prepared, this Law was still awaiting parliamentary adoption.

Serbia does not have an integrated environmental permit system, nor media-specific permits except for the water resource permit. Environment responsibilities are very fragmented and number of ministries issue permits in an attempt to limit the negative environmental impacts of certain activities. An example to that is the construction permit issued, on the basis of the Law on the Construction of Facilities (Nos. 44/95 and 24/96), by the Ministry of Construction and Urban Planning. This Law can require certain facilities to include Environmental Impact Assessment (EIA) in the technical documentation for their construction. Approval of the EIA study by the Ministry for Protection of Natural Resources and Environment is required before a construction permit is issued.

This is a considerable overlap and fragmentation of environmental protection responsibilities with little coordination between the various activities of the responsible institutions. Institutions that monitor and protect parts of the environment, in addition to the Ministry for Protection of Natural Resources and Environment, are: The Institute for Nature Protection, The Public Institute for Health, The Ministry of Agriculture and Water Management, The Recycling Agency, The Republic Hydrometeorological Institute. Other ministries with competences relevant to the environment are: The Ministry of the Economy and Privatization, The Ministry of Construction and Urban Planning, The Ministry of Mining and Energy, The Ministry of Transport and Telecommunications, The Ministry of Tourism.

In Serbia, there are two competent authorities for environmental inspection: the republican environmental inspectorate at the republican level and municipal inspectors at the local level. Municipalities have secretariats for environmental protection but with limited responsibility for environmental issues.

Federal budget is the main source of financing for environmental protection, as stated in the Federal Law on the Basic Principles of Environmental Protection (1998). Economic instruments for environmental protection that are in place are mainly conceived as user charges for water and waste to raise revenue. The Serbian draft law on the environmental protection system proposes a chapter on economic instruments, which defines in more detail the use of new economic instruments for financing environmental protection.

During the period of international isolation environmental cooperation was considerably restricted. However, in the past years some important multilateral environmental agreements have been ratified. The main strategic goal in international cooperation is to move forward together with the rest of the region, through full reintegration into the international community, the achievement of sustainable economy and accession to the European Union in the long term. Various operational channels of international cooperation have been opened, with different degrees of effectiveness.

In the present difficult economic situation, environmental management is not among the highest priorities for industry. There is a general lack of environmental management within the industries and a specific lack of adequate waste management. Most of the older industries are basically outdated and run-down. Moreover, there are examples of relatively new industries that use outdated and environmentally inadequate technologies imported from Western countries, which represents a considerable environmental problem, and it is critical in relation to the need for future compliance with EU requirements. At the same time, industry acknowledges that proper environmental management and cleaner technologies are crucial if it is to compete in international markets. An overall action plan for industrial development including clear operational environmental issues has not yet been developed and adopted by the Government. Restructuring and privatization may lead to increased investment in cleaner technologies and production processes, provided effective environmental regulations and enforcement are in place. There is no national system of certification according to the ISO 14001 environmental management standard. Industries with ISO 14001 standard obtained certification from external certification bodies.

Waste is a pressing environmental issue in Serbia. The existing regulations on waste management are inadequate, leading to practices that are rudimentary and entailing clearly evident environmental problems. There is no organized system for the collection, storage, treatment or disposal of industrial (including hazardous) waste. There is few waste recycling facilities in Serbia. Once adopted, the new law on environmental protection will provide the framework for waste management and be followed by a new waste law and other regulatory instruments to address all aspects of waste management.

## *Positive signs:*

• *Improved international cooperation resulted in raised foreign aid for environmental protection and capacity building.*
• *UN's Environmental Commission for Europe has selected Belgrade to host the Ministerial Conference "Environment for Europe" in September 2007.*
• *Actions are taken to meet some of the environmental challenges posed by different waste types (For example in July 2003, the National Assembly adopted the National Waste Management Strategy)*

## *FIC Recommends:*

• *Adoption of the draft law on the environmental protection system*
• *Further compliance with EU environmental legislation*
• *Raising awareness programs for citizens*
• *Continue institutional strengthening and capacity building*
• *Environmental information accessibility*
• *Intensive cooperation on environmental issues with both local and foreign investors industry present on the market*
• *Promotion of cleaner technologies, environmental management and international environmental standards*

Chapter 15

# HOSPITALITY INDUSTRY

## Current situation

In addition to the decline in the hospitality industry in the past decade, the recent privatization process and auction sale have been successful only to a limited extent. Except for several hotel buildings in the central zone of Belgrade, majority hotels were sold at moderate, auction price. Reasons for such failure are different:

- Lack of land register and resolved property rights
- Hotel buildings are in bad shape
- All licence-related work represents a lengthy, tiresome process with uncertain completion term under the current legislation. Relevant government authorities have not made any efforts to expedite and simplify costly administrative procedures or incentives related to highly needed modernization in this industry.
- There is a surplus of under-qualified older employees.

As a consequence, the hospitality industry, except in a couple of cases, failed to attract foreign investors. The long political crisis and resultant stalemate in the economy further reduced low occupancy. The current depression in the international hospitality industry seems to have no major effect to the local situation.

## *Positive signs:*

*Formation of the new government and its proactive performance seems likely to put an end to the current situation in the economy having a positive effect on the hospitality industry.*

## *FIC Recommends:*

*Encourage the privatization process and attract foreign investors calls for the active government response including, among others,*
*• strong social program to deal with the employee surplus,*
*• actions to improve the current time and cost barriers to hotel modernization*
*• actions to complete resolution of the land registers/property rights.*

**Contributors to the White Book 2004:**

- CA IB Zagreb
- OECD - Investment Compact for SEE
- Karanovic & Nikolic Law Office
- Wolf Theiss
- British American Tobacco
- PriceWaterhouse Coopers
- KPMG
- Deloitte
- HVB Bank
- Raiffeisen Bank
- Hypo-Alpe-Adria Bank
- Societe Generale Bank
- Raiffeisen Leasing
- Colliers International
- VELUX
- DUNAV - TBI
- Ericsson
- Tetra Pak
- BMP/Hyatt Regency Hotel Belgrade

Foreign Investors Council

WHITE BOOK

## Members of FIC

    

    

    

    

    

    

    

    

    

    

    

    

    

In partnership with:    

As of March 2004