IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| INTELSAT GLOBAL SALES AND<br>    MARKETING, LTD., formerly known as<br>    INTELSAT UK, LTD.,<br><br>                          Plaintiff,<br><br>        v.<br><br>COMMUNITY OF YUGOSLAV POSTS<br>    TELEGRAPHS AND TELEPHONES<br><br>                          Defendant. | **Civil Action Number**<br>**1:06CV00897 (RWR)**<br><br>Hon. Richard W. Roberts |

**REPLY IN SUPPORT OF DEFENDANT COMMUNITY OF YUGOSLAV POSTS
TELEGRAPHS AND TELEPHONES' MOTION TO DISMISS THE COMPLAINT
OR, IN THE ALTERNATIVE, COMPEL ARBITRATION**

# TABLE OF CONTENTS

Page

INTRODUCTION AND ARGUMENT SUMMARY ........................................................... 1

ARGUMENT ................................................................................................................. 3

I.     INTELSAT HAS FAILED TO DEMONSTRATE THAT THE FSIA PROVIDES
       SUBJECT MATTER JURISDICTION OVER THIS DISPUTE ............................... 3

       A.     The FSIA Does Not Apply To The Unique Facts Of This Case. ..................... 3

       B.     Intelsat Has Not Introduced Any Relevant Evidence To Support Its
              Allegation That CYPTT Is An Instrumentality Of A Foreign State ................ 5

              1.     Jurisdiction under the FSIA is determined as of the filing of the
                     Complaint. ......................................................................................... 6

              2.     CYPTT is not an organ of a foreign government .................................. 7

              3.     Intelsat is not entitled to discovery to support its conclusory
                     allegation that CYPTT is an instrumentality of the government of
                     Serbia and Montegro. ...................................................................... 10

       C.     No Exception to CYPTT's Alleged Sovereign Immunity Applies. ............... 11

              1.     CYPTT did not waive immunity for this contract dispute. ................. 12

              2.     Intelsat's Complaint is not based on commercial activity
                     carried on in the United States by CYPTT. ....................................... 14

II.    INTELSAT DOES NOT CONTEND THAT THERE IS PERSONAL
       JURISDICTION OVER CYPTT ABSENT APPLICATION OF THE FSIA ........... 16

III.   FORUM NON CONVENIENS REQUIRES DISMISSAL, BECAUSE
       THE ICC IS AN ADEQUATE ALTERNATIVE FORUM AND THE
       BALANCE OF PRIVATE AND PUBLIC INTEREST DOES NOT
       SUPPORT PLAINTIFF'S CHOICE OF FORUM ................................................ 16

IV.    THE SERVICE TERMS AND CONDITIONS REQUIRE ARBITRATION
       OF THIS DISPUTE ........................................................................................... 18

       A.     The Service Terms and Conditions Require Mandatory Arbitration ............. 18

       B.     Paragraph 9 Of The Tripartite Novation Does Not Apply ........................... 21

CONCLUSION ............................................................................................................ 22

# TABLE OF AUTHORITIES

## CASES

Abrams v. Societe Nationale Des Chemins De Fer Francais, 389 F.3d 61 (2d Cir. 2004) .................................................................................................................. 6

Allis-Chalmers Corp. v. Lueck, 471 U.S. 202 (1985) .............................................. 20

*Atl. Tele-Network, Inc. v. Inter-Am. Dev. Bank, 251 F. Supp. 2d 126 (D.D.C. 2003) ......................................................................................................... 15

Austin v. Owens-Brockway Glass Container, Inc., 78 F.3d 875 (4th Cir. 1996) ........................ 19

Bombardier Corp. v. Nat'l R.R. Passenger Corp., 298 F. Supp. 2d 1 (D.D.C. 2002) .................. 20

*Booker v. Robert Half Int'l, Inc., 315 F. Supp. 2d 94 (D.D.C. 2004), aff'd, 413 F.3d 77 (D.C. Cir. 2005) ......................................................................................... 19

Cole v. Burns Int'l Sec. Servs., 105 F.3d 1465 (D.C. Cir. 1997) ............................................ 14,20

Commc'ns Workers of Am. v. AT&T Co., 40 F.3d 426 (D.C. Cir. 1994) ............................ 19,21

Detroit Edison Co. v. Burlington N. & Santa Fe Ry., 442 F. Supp. 2d 387 (E.D. Mich. 2006) ..................................................................................................... 21

Doe I. v. State of Israel, 400 F. Supp. 2d 86 (D.D.C. 2005) ....................................................... 11

*Dole Food, Co. v. Patrickson, 538 U.S. 468 (2003) ........................................................ 1,6,7,9

*Edmond v. United States Postal Serv. General Counsel, 949 F.2d 415 (D.C. Cir. 1992) ......................................................................................................... 10

El-Fadl v. Cent. Bank of Jordan, 75 F.3d 668 (D.C. Cir. 1996) ......................................... 11,17

Filius v. LOT Polish Airlines, 907 F.2d 1328 (2d Cir. 1990) ............................................... 10,11

Foremost-McKesson, Inc. v. Islamic Republic of Iran, 905 F.2d 438 (D.C. Cir. 1990) ......... 10,11

Gates v. Victor Fine Foods, 54 F.3d 1457 (9th Cir. 1995) ...................................................... 9,10

Gen. Elec. Capital Corp. v. Grossman, 991 F.2d 1376 (8th Cir. 1993) ....................................... 7

Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20 (1991) .................................................. 19

*Goodman Holdings v. Rafidain Bank, 26 F.3d 1143 (D.C. Cir. 1994) ..................................... 15

Group Hospitalization & Med. Servs., Inc. v. Stubbs, No. 90-823, 1990 WL 183576 (D.D.C. Nov. 16, 1990) ................................................................................................ 20

Held v. National R.R. Passenger Corp., 101 F.R.D. 420 (D.D.C. 1984) .................................... 20

* - Authorities upon which we chiefly rely are marked with an asterisk.

Jugobanka A.D. Belgrade v. Sidex Int'l Furniture Corp., 2 F. Supp. 2d 407
(S.D.N.Y. 1998) .................................................................................................4,5

Keene Corp. v. United States, 508 U.S. 200 (1993) .................................................6

Lempert v. Republic of Kazakstan, 223 F. Supp. 2d 200 (D.D.C. 2002), aff'd, 62 Fed.
Appx. 355 (D.C. Cir. 2003) ................................................................................15

Mastrobuono v. Shearson Lehman Hutton, Inc., 514 U.S. 52 (1995) ....................14,20

McKeel v. Islamic Republic of Iran, 722 F.2d 582 (9th Cir. 1983) ............................4

Mollan v. Torrance, 22 U.S. (9 Wheat) 537 (1824).................................................6

Olympia Express, Inc. v. Linee Aeree Italiane S.P.A., 437 F. Supp. 2d 780
(N.D. Ill. 2006) ..................................................................................................6

Pere v. Nuovo Pignone, Inc., 150 F.3d 477 (5th Cir. 1998).......................................7

*Piper Aircraft Co. v. Reyno, 454 U.S. 235 (1981) ...........................................17,18

Price v. Socialist People's Libyan Arab Jamahiriya, 294 F.3d 82 (D.C. Cir. 2002) ....................4

Republic Steel Corp. v. Maddox, 379 U.S. 650 (1965) ............................................20

Singleton v. Potter, 402 F. Supp. 2d 12 (D.D.C. 2005) .............................................9

In re Swine Flu Immunization Prods. Liab. Litig., 880 F.2d 1439 (D.C. Cir. 1989) ....................9

*Verlinden B.V. v. Cent. Bank of Nigeria, 461 U.S. 480 (1983)..........................3,4,18

Zveiter v. Brazilian Nat'l Superintendency of Merchant Marine, 833 F. Supp. 1089
(S.D.N.Y. 1993)..................................................................................................9

## STATUTES

28 U.S.C. §§ 1602 et seq. .........................................................................................1

*28 U.S.C. § 1603(b) .........................................................................................5,7,11

*28 U.S.C. § 1603(d) ...........................................................................................6,15

## CONGRESSIONAL MATERIAL

Jurisdiction of U.S. Courts in Suits against Foreign States: Hearing Before the
Subcomm. on Administrative Law and Governmental Relations of the House
Committee on the Judiciary on H.R. 11315, 94th Cong. 31 (1976) (statement of
Bruno A. Ristau) ..................................................................................................4

* - Authorities upon which we chiefly rely are marked with an asterisk.

Defendant Community of Yugoslav Posts Telegraphs and Telephones ("CYPTT")

submits this reply in support of its motion to dismiss the complaint for lack of subject matter

jurisdiction, lack of personal jurisdiction and *forum non conveniens*, or, in the alternative, to

compel arbitration and dismiss the complaint.

## INTRODUCTION AND ARGUMENT SUMMARY

CYPTT demonstrated in its Statement of Points and Authorities in Support of

Defendant's Motion to Dismiss the Complaint or, in the Alternative, Compel Arbitration

("Opening Brief" or "Mem.") that this case, brought by a United Kingdom corporation

against a Serbian trade association concerning a dispute over the provision of satellite

services in Serbia under a contract that requires arbitration in Paris, does not belong in the

United States District Court for the District of Columbia.

In Plaintiff's Points and Authorities in Opposition to Defendant's Motion to Dismiss

the Complaint, or in the Alternative, Compel Arbitration ("Opposition" or "Opp'n"), Intelsat

Global Sales and Marketing, Ltd. ("Intelsat") fails to offer this Court a valid reason to deny

CYPTT's motion.  Intelsat's arguments in support of jurisdiction and against arbitration rest

precariously and ineffectively upon two fundamental errors, either of which is more than

sufficient to require dismissal.

First, relying on outdated precedent, Intelsat argues that jurisdiction under the Foreign

Sovereign Immunities Act, 28 U.S.C. §§ 1602 et seq. ("FSIA"), is determined as of 2001,

when the contracts under which it is suing were signed.  All of the evidence it presents in

support of its jurisdictional arguments relates to this time period.  However, in Dole Food,

Co. v. Patrickson, the Supreme Court stated unambiguously that jurisdiction under the FSIA

is determined at the time the complaint is filed.  538 U.S. 468, 478 (2003).  CYPTT's

evidence demonstrating that CYPTT was not an agency or instrumentality of a foreign state

as of the filing of the complaint in May of 2006 stands unchallenged.  Because Intelsat has

provided no evidence to support its wholly conclusory allegation that CYPTT was an instrumentality of the government of Serbia and Montenegro at the time the Complaint was filed, and admittedly has no such evidence, Intelsat it is not entitled to jurisdictional discovery and the Complaint should be dismissed.

Second, Intelsat concedes that the dispute resolution provisions of Section 17 of the Service Terms and Conditions[1] apply to this action, yet asserts that jurisdictional limitations in Paragraph 9 of the Tripartite Novation[2] also apply.  In its Opening Brief, CYPTT demonstrated that this dispute is governed by the Service Terms and Conditions, not by the Tripartite Novation.  All of the terms relevant to this dispute -- such as the service, payment and termination provisions -- are contained in the Service Terms and Conditions, and the Tripartite Novation relates only to the novation of prior contractual arrangements (to substitute Intelsat for Old Intelsat, its predecessor).  Intelsat fails to refute or even address these facts.  Furthermore, Section 17 of the Service Terms and Conditions and Paragraph 9 of the Tripartite Novation both cannot apply to this dispute, because they directly conflict with one another.  Paragraph 9 provides for the "exclusive jurisdiction" of the D.C. courts; Section 17 provides for arbitration before the International Chamber of Commerce ("ICC") in Paris, and limits the parties' ability to seek relief in D.C. courts.  Given that the contracts at issue are form contracts drafted by Intelsat, they must be construed in favor of CYPTT.

Without the ability to rely on Paragraph 9 of the Tripartite Novation, Intelsat is bereft of support for most of its opposition to CYPTT's motion:  (1) Intelsat's sole basis for waiver of sovereign immunity under the FSIA evaporates; (2) Intelsat no longer can contend that CYPTT "consented" to litigate this matter in D.C. courts, and therefore the doctrine of *forum*

---

[1]     Declaration of Živojin Matejić ("Matejić Decl."), Ex. 3, Tab 5.

[2]     Matejić Decl., Ex. 3, Tab 2.

*non conveniens* applies; and (3) Intelsat's assertion that Paragraph 9 provides an "option" to arbitration under Section 17 of the Service Terms and Conditions fails.  CYPTT's motion to dismiss should be granted; in the alternative, the Court should compel arbitration before the ICC.

## ARGUMENT

## I. INTELSAT HAS FAILED TO DEMONSTRATE THAT THE FSIA PROVIDES SUBJECT MATTER JURISDICTION OVER THIS DISPUTE

Intelsat has failed to support its sole alleged basis for subject matter jurisdiction. Intelsat has not demonstrated that the FSIA can provide subject matter jurisdiction over a claim between two foreign entities based on activities wholly unrelated to the United States or that CYPTT is an agency or instrumentality subject to the FSIA.

### A.    The FSIA Does Not Apply To The Unique Facts Of This Case.

In its opening brief, CYPTT proved that it would be inconsistent with the purpose and intent of the statute, and potentially violate Article III of the United States Constitution, to construe the FSIA to bestow federal subject matter jurisdiction over a dispute between two foreign entities that was wholly unrelated to the United States.  Mem. at 10-12.  As CYPTT pointed out, in Verlinden B.V. v. Central Bank of Nigeria, 461 U.S. 480, 490 n.15. (1983), the Supreme Court expressly questioned whether such a dispute would be subject to the FSIA.  Id.

Proclaiming that "Verlinden is the law of the land, and holds that the citizenship of the parties is irrelevant," Intelsat argues that "if the substantive requirements of the Act are met, the Court has subject matter jurisdiction."  Opp'n at 8.  Intelsat ignores entirely the fact that distinguishes this case from Verlinden and every other case Intelsat cites in support of its position:  The subject matter of this dispute is "wholly unrelated to the United States."  See Verlinden, 461 U.S. at 490 n.15.

Verlinden does not dictate the result here, not only because the Supreme Court said it was not addressing this set of facts, id., but also because Verlinden did not present a case in which there was no connection between the subject matter of the lawsuit and the United States. The dispute in Verlinden concerned a letter of credit payable through the Morgan Guaranty Trust Co. in New York and challenged amendments to the letter of credit adopted by Morgan Guaranty, among others. Id. at 482-83. Verlinden thus involved commercial activity in the United States and did not involve any alleged waiver, which is why it expressly left open the question presented by this case.

As CYPTT stated in the Opening Brief, the D.C. Circuit and other courts have recognized that it is important to interpret the FSIA as requiring a connection between the acts of the foreign defendant and the United States. Mem. at 11-12 (citing Price v. Socialist People's Libyan Arab Jamahiriya, 294 F.3d 82, 89 (D.C. Cir. 2002); McKeel v. Islamic Republic of Iran, 722 F.2d 582, 588 (9th Cir. 1983); Jurisdiction of U.S. Courts in Suits against Foreign States: Hearing Before the Subcomm. on Administrative Law and Governmental Relations of the House Committee on the Judiciary on H.R. 11315, 94th Cong. 31 (1976) (statement of Bruno A. Ristau)). Intelsat fails to address these authorities or to point the Court to any case holding that the FSIA provides federal subject matter and personal jurisdiction over a dispute that bears no connection to the United States.

Other than Verlinden, the only case Intelsat cites in support of its position is Jugobanka A.D. Belgrade v. Sidex International Furniture Corp., 2 F. Supp. 2d 407, 419-20 (S.D.N.Y. 1998). See Opp'n at 7-8. Jugobanka involved a number of related actions filed originally in state court by a foreign bank. One of the defendants, Sidex International Furniture Company, was a New York corporation. Jugobanka, 2 F. Supp. 2d at 409. The issue of jurisdiction arose in the context of a counter-claim. Jugobanka, the entity that sought protection under the FSIA from defendants' counter-claim, was also the plaintiff; Jugobanka

4

voluntarily chose to invoke the power of the court in order to sue as a plaintiff but at the same time wanted to avoid jurisdiction as a counter-claim defendant. Id. at 417-18. In fact, Jugobanka also failed to plead the defense of sovereign immunity in its first responsive pleading to defendants' counter-claims. Id. at 419. Further, the case involved the interpretation of certain federal laws involving the former Yugoslavia, pursuant to which the United States filed Statements of Interest in each action. Id. at 410-11, 416-17. In summary, Jugobanka involved a U.S. party, a voluntary submission to U.S. jurisdiction and the interpretation of U.S. law, making it inapposite.[3]

The FSIA should not be read to apply to a case such as this that lacks any connection to the United States.

### B.    Intelsat Has Not Introduced Any Relevant Evidence To Support Its Allegation That CYPTT Is An Instrumentality Of A Foreign State.

Whether or not the FSIA might potentially provide jurisdiction in a case like this, it cannot provide jurisdiction here, because CYPTT is not an instrumentality of a foreign government under 28 U.S.C. § 1603(b). In its opening brief, CYPTT demonstrated that it is not an instrumentality of a foreign government, because it is neither an organ of, nor majority-owned by, a foreign government. See Mem. at 12-16. In its opposition papers, Intelsat does not claim that CYPTT is owned by a foreign government, but argues that CYPTT "is or was" an instrumentality of the government of Serbia and Montenegro, because it "was at relevant times an organ" of that government. Opp'n at 9.

Intelsat is doubly wrong. The Court's jurisdiction is determined at the time the Complaint is filed, and Intelsat has provided *no evidence* to support its conclusory allegation

---

[3]    It is not surprising that Intelsat cannot direct this Court to a single similar case. Parties cannot contractually agree to subject matter jurisdiction in United States federal courts. See Mem. at 11.

that CYPTT *is* an instrumentality of the government of Serbia and Montenegro. Intelsat's complaint should be dismissed without any further proceedings.

      1.    Jurisdiction under the FSIA is determined as of the filing of the Complaint.

"Instrumentality status" under the FSIA must "be determined at the time the suit is filed." Dole, 538 U.S. at 478; see also Abrams v. Societe Nationale Des Chemins De Fer Francais, 389 F.3d 61, 64 (2d Cir. 2004) (stating that Dole "unequivocally" holds that an entity's status should be determined at the time of the complaint); Olympia Express, Inc. v. Linee Aeree Italiane S.P.A., 437 F. Supp. 2d 780, 785-86 (N.D. Ill. 2006) (same). As the Dole court noted, this rule is consistent with the "longstanding principle that the jurisdiction of the Court depends upon the state of things at the time of the action brought." Dole, 538 U.S. at 478 (citing Keene Corp. v. United States, 508 U.S. 200, 207 (1993) (quoting Mollan v. Torrance, 22 U.S. (9 Wheat) 537, 539 (1824))).

Intelsat's complaint is facially consistent with the Dole standard, alleging that CYPTT "*is* an instrumentality of the government of Serbia and Montenegro as defined in 28 U.S.C. § 1603." Compl. ¶ 3 (emphasis added). However, knowing it has no evidence to support this allegation, and never had any, Intelsat now asserts that it need only show that CYPTT "was" an organ of the government of Serbia and Montenegro "when the acts and events underlying the complaint occurred." Opp'n at 9.[4] As an initial matter, Intelsat should be bound by it

_____

[4]    Intelsat never defines "when the acts and events underlying the complaint occurred," but assumes, without support, that this is when the contracts under which it is suing were signed in July of 2001, see Opp'n at 10, rather than when the alleged unpaid invoices accrued between March 17, 2005 and May 31, 2006, see Compl., Ex. 2. Of course, it is absurd to assert that CYPTT was an instrumentality of the government of Serbia and Montenegro in 2001, because Serbia and Montenegro did not exist in 2001. See George Stuteville, Yugoslavia Name Change No Surprise to Geographers, National Geographic News, February 14, 2003, available at http://news.nationalgeographic.com/news/2003/02/0214_030214_yugoslavia.html (stating that on February 4, 2003, the Federated Republic of Yugoslavia was abolished, replaced by the Government of Serbia and Montenegro).

pleading, which is an admission that it must demonstrate instrumentality status at the time it filed the complaint.

In any event, Dole is unequivocal and binding. Although Dole directly addresses the question of when instrumentality status under 28 U.S.C. § 1603(b) is determined, 538 U.S. at 478, and CYPTT cited Dole for this very proposition in support of its motion to dismiss, Mem. at 13 n.3, Intelsat does not address Dole in its opposition papers. Instead, Intelsat cites two cases that predate Dole for the proposition that "the relevant time period of inquiry is not when the complaint was filed, but when the acts and events underlying the complaint occurred." Opp'n at 9 (citing Pere v. Nuovo Pignone, Inc., 150 F.3d 477, 480-81 (5th Cir. 1998); Gen. Elec. Capital Corp. v. Grossman, 991 F.2d 1376, 1381 (8th Cir. 1993)). In light of Dole, these cases are no longer good law, particularly given that Dole considered and rejected the very arguments on which those courts relied to rule differently. Compare Dole, 538 U.S. at 478-80 (holding that: a) use of the present tense in the FSIA is determinative; b) the analysis of instrumentality status is similar to that of diversity jurisdiction; and c) the FSIA is dissimilar to other status-based immunities, such as diplomatic immunity under Nixon v. Fitzgerald, 457 U.S. 731 (1982)), with Grossman, 991 F.2d at 1380-82 (holding that: a) use of the present tense in the FSIA is not determinative; b) the FSIA is dissimilar to diversity jurisdiction; and c) the FSIA is similar to diplomatic immunity under Nixon) and Pere, 150 F.3d at 480-81 (agreeing with the rationale of Grossman).

2.    CYPTT is not an organ of a foreign government.

CYPTT's opening brief and the Matejić Declaration demonstrate that CYPTT is not an organ of a foreign government, but is rather an independent business association that operates for the profit of its member companies. Mem. at 13-15; Matejić Decl. ¶¶ 3-17. Intelsat *does not challenge* CYPTT's evidence of the nature of its organization as of May 11,

2006, the date on which the complaint was filed, and it *provides no evidence* that CYPTT was

an organ of the government of Serbia and Montenegro as of that date.

      Intelsat offers a declaration of one of its officers and five exhibits to support its

misdirected argument that CYPTT *was* an organ of a foreign state in 2001.  Affidavit of Yuri

Wexler ("Wexler Aff.") Exs. A-B, Opp'n Exs. B-D.[5]  Not surprisingly, none of this evidence

addresses the instrumentality status of CYPTT as of May 11, 2006.  <u>See</u> Wexler Aff., Ex. A

(International Telecommunications Satellite Organization (Intelsat) Agreement (August 20,

1971)) (1971 treaty involving Yugoslavia, a country that has not existed for years); Opp'n,

Ex. B (Natasa Gospic, Milan Jankovic, and Borislav Odadzic, <u>Yugoslav Telecommunications</u>

<u>Markets: Vision and Potential</u>, IEEE Communications Magazine, August 2000, at 112)

(article authored in August of 2000 regarding Yugoslavia); Opp'n, Ex. D (Foreign Investors

Council, <u>Proposal for Improvement of the Investment Climate in Serbia</u> (2004)) (2004

"proposal" confirming that the Serbian telecommunications market was in the process of

deregulation); Opp'n, Ex. C (Cullen International, <u>Report 1 - Country Profiles:  Supply of</u>

<u>Services in Monitoring of South East Europe - Telecommunications Services Sector and</u>

<u>Related Aspects</u> (Aug. 26, 2005)) (report containing information as of April 1, 2005); Wexler

Aff., Ex. B (Letter from Dr. Milan Jankovic, Executive Director of CYPTT, to Phillip

Spector, Executive Vice President and General Counsel of Intelsat Holdings, Ltd. (Nov. 30,

2005)) (letter written in November 2005 regarding stock ownership in Intelsat, which

stemmed from rights that arose in 1971 at the formation of Intelsat).[6]  Likewise, the Wexler

---

[5]    Intelsat confusingly attaches two exhibits to the Wexler Affidavit, labeled Exhibit A and Exhibit B, and three exhibits to the opposition, labeled Exhibit B, Exhibit C, and Exhibit D.  Exhibit B to the Wexler Affidavit is a letter from Dr. Milan Jankovic. Exhibit B to the opposition is an article, which was co-authored by Dr. Milan Jankovic.

[6]    The Jankovic article, Cullen International Report, and Foreign Investor Council Proposal are unauthenticated hearsay and therefore should not be considered at all.

Affidavit makes claims about CYPTT's role under the Yugoslavian government and provides no information concerning CYPTT's status at the time of the complaint. <u>See</u> Wexler Aff., Ex. A. None of this evidence is relevant, because, as Intelsat recognizes, CYPTT as it exists today "is undoubtedly not the entity that entered into the Novation Agreement or the Service Contracts." Opp'n at 10. As <u>Dole</u> demonstrates, CYPTT's status at the time it signed those contracts is irrelevant.

The cases cited by Intelsat to support its irrelevant evidence do not help its cause. <u>See</u> Opp'n at 10, 13 (citing <u>Zveiter v. Brazilian Nat'l Superintendency of Merchant Marine</u>, 833 F. Supp. 1089, 1092 (S.D.N.Y. 1993) and <u>Gates v. Victor Fine Foods</u>, 54 F.3d 1457, 1460-61 (9th Cir. 1995)). <u>Zveiter</u> is entirely inapposite, because it involved an *agency* of a foreign government (not an instrumentality), and the defendant offered no proof to contest its status as an agency. 833 F. Supp. at 1092.

<u>Gates</u> is readily distinguishable. In <u>Gates</u>, the Ninth Circuit held that a marketing board ("Alberta Pork"), established by a "governmental body" called the Alberta Agricultural Products Marketing Council ("the Council"), was an organ of the Province of Alberta, because it was extensively controlled by the Province and "resemble[d] an administrative agency." 54 F.3d at 1461. Through the Council, the Province of Alberta played an active supervisory role over Alberta Pork. <u>Id.</u> For example, the Council granted Alberta Pork the power to issue regulations that were binding on all pork producers, but only if authorized by the Council. <u>Id.</u> Indeed, the Council had to approve the very corporate transaction that gave rise to the dispute in the case. <u>Id.</u> Anyone dissatisfied with Alberta Pork's regulatory

---

<u>See</u> <u>In re Swine Flu Immunization Prods. Liab. Litig.</u>, 880 F.2d 1439, 1443 (D.C. Cir. 1989) (a motion pursuant to Rule 12(b)(1), based in part upon matters outside the pleadings, should be analyzed like a summary judgment motion); <u>Singleton v. Potter</u>, 402 F. Supp. 2d 12, 37 (D.D.C. 2005) (hearsay evidence insufficient at summary judgment).

decisions could appeal to a government-appointed appellate body. Id. However, Alberta Pork's employees were immune from liability for acts performed in good faith as part of carrying out their duties "-- a protection normally afforded governmental actors." Id.

Unlike Alberta Pork, CYPTT is not extensively controlled by any government. CYPTT is a business association that operates for the profit of its members.[7] Matejić Decl. ¶ 15. CYPTT is not a regulatory agency; the Republic Telecommunication Agency in Serbia and the Agency for Telecommunications in Montenegro are the sole government telecommunications regulatory agencies in Serbia and Montenegro. Id. ¶ 14. CYPTT's employees are not government employees and, unlike the Board's employees, are not entitled to immunity from liability. Id. ¶ 17. In short, CYPTT does not at all resemble Alberta Pork, and Gates offers no support for Intelsat's position.

   3.    Intelsat is not entitled to discovery to support its conclusory allegation that CYPTT is an instrumentality of the government of Serbia and Montenegro.

Intelsat requests that the Court grant it discovery regarding CYPTT's status as an instrumentality of a foreign state prior to dismissal. Opp'n at 13-14 (citing Foremost-McKesson, Inc. v. Islamic Republic of Iran, 905 F.2d 438 (D.C. Cir. 1990); Filius v. LOT Polish Airlines, 907 F.2d 1328 (2d Cir. 1990)). This request should be denied.

Although jurisdictional discovery can be appropriate in certain circumstances, it is not appropriate when a plaintiff offers only conclusory allegations in support of jurisdiction. See Edmond v. United States Postal Serv. Gen. Counsel, 949 F.2d 415, 425, 427 (D.C. Cir. 1992) (affirming the denial of jurisdictional discovery because the plaintiff failed to offer specific,

---

[7]    Intelsat argues that "the fact that CYPTT seeks to make a profit does not defeat jurisdiction, but rather militates in favor of [it]." Opp'n at 13. This argument confuses an entity that operates to make a profit directly for the state with an entity like CYPTT, which seeks to make a profit for its members and pays only normal commercial taxes to the government. Matejić Decl. ¶¶ 15-16.

non-speculative allegations linking the defendant to the alleged conspiracy); see also El-Fadl v. Cent. Bank of Jordan, 75 F.3d 668, 676 (D.C. Cir. 1996) (jurisdictional discovery to be appropriate as long as allegations are not conclusory).  At a minimum, plaintiff must "allege some facts upon which jurisdiction could be found after discovery is completed."  Doe I. v. State of Israel, 400 F. Supp. 2d 86, 121-22 (D.D.C. 2005).

In its complaint, Intelsat baldly alleges that "CYPTT is an instrumentality of the government of Serbia and Montenegro as defined in 28 U.S.C. § 1603."  Compl. ¶ 2.  It alleges no specific facts to support this statement.  Moreover, as demonstrated above, Intelsat cannot support its conclusory allegation.  Therefore, jurisdictional discovery would be inappropriate.

Foremost-McKesson and Filius do not suggest otherwise.  Foremost-McKesson concerned an interlocutory appeal of the denial of a motion to dismiss, and thus provides no relevant guidance.  905 F.2d at 439-42.  In Filius, the principal jurisdictional issue was whether plaintiff's action was "'based upon commercial activity . . . in the United States' by one of the Soviet defendants as required by the first commercial activity exception in section 1605(a)(2)" of the FSIA.  907 F.2d at 1333 (citation omitted).  The Second Circuit expressly recognized that plaintiff's complaint contained sufficiently specific allegations if proven.  See id. ("A fair reading of plaintiff's complaint contains allegations that a Soviet entity or entities inspected, overhauled and serviced the fatal aircraft and its engines in the United States prior to the crash.").  Filius therefore is distinguishable.

C.      No Exception To CYPTT's Alleged Sovereign Immunity Applies.

Even if this Court finds that the FSIA applies and CYPTT is an instrumentality of a foreign state, Intelsat must still demonstrate that one of the general exceptions to a foreign state's jurisdictional immunity applies.  Intelsat cannot demonstrate that either the commercial activities exception or waiver exception applies in this case.

1.    <u>CYPTT did not waive immunity for this contract dispute.</u>

The only argument that Intelsat advances in support of its allegation that CYPTT waived immunity in this matter is that Paragraph 9 of the Tripartite Novation constitutes such a waiver. Paragraph 9 provides:

> This Agreement and the relationship between the Contracting Parties shall be governed by and construed in accordance with the laws of the District of Columbia, U.S.A. and the Contracting Parties hereby submit to the exclusive jurisdiction of the District of Columbia courts or any United States Federal Court sitting in the District of Columbia.

Tripartite Novation ¶ 9.

In its opening brief, Intelsat demonstrated that this dispute is governed by the Service Terms and Conditions, not the Tripartite Novation. Mem. at 5-7, 18-20. The Tripartite Novation does nothing more than transfer Old Intelsat's obligations to Intelsat. <u>Id.</u> at 5-6, 18-19. It does not contain any of the terms of service under which Intelsat is suing. <u>Id.</u> Indeed, the Tripartite Novation states, in language that could not be any clearer, that the novated contracts are governed by the Service Terms and Conditions: "The contracting Parties hereby acknowledge and agree that from and after the Closing, without any further action or consent of any of the Contracting Parties hereto, such Novated Contracts will be provided according to the [Service] Terms and Conditions." Tripartite Novation ¶ 3.

The Service Terms and Conditions contain all the operative terms relating to payment and breach for non-payment that would be at issue in this case. Mem. at 6-7, 19. In stark contrast to Paragraph 9 of the Tripartite Novation, which speaks of "exclusive jurisdiction" of D.C. courts, Section 17 of the Service Terms and Conditions contains a mandatory arbitration provision for resolution of "all disputes" in connection with the provision of services, and limits resort to the courts for "interim relief," such as enforcement of the arbitration provision or an arbitral award. Service Terms and Conditions § 17; <u>see also</u> Mem. at 27-29; <u>infra</u> Part IV. Thus, not only is there no waiver of immunity for this dispute under the Service Terms

and Conditions, but the parties expressly agreed that this dispute should be arbitrated. <u>See</u> Service Terms and Conditions § 17.

Intelsat ignores these arguments, and simply repeats the allegation of its complaint that Paragraph 9 constitutes a waiver. Opp'n at 14-15. The closest it comes to addressing the matter is in a footnote on page 5 of its opposition, in which it argues that the last sentence of Paragraph 3 of the Tripartite Novation somehow suggests that the Service Terms and Conditions are irrelevant. <u>See</u> <u>id.</u> at 5 n.4. Intelsat intentionally ignores both the language of that sentence and the sentence that precedes it, which together provide:

> The contracting Parties hereby acknowledge and agree that from and after the Closing, without any further action or consent of any of the Contracting Parties hereto, such Novated Contracts **will be provided according to the [Service] Terms and Conditions**. As of the Closing, **this Agreement, including the [Service] Terms and Conditions**, shall amend and supercede in their entirety all other previous agreements, arrangements and understandings between the Contracting Parties, whether written or oral, relating to the provision of such services to the Customer.

Tripartite Novation ¶ 3 (emphasis supplied). This provision clearly states that the Service Terms and Conditions govern the provision of services, and therefore govern this dispute. The Service Terms and Conditions, which Intelsat concedes were issued concurrently with the Tripartite Novation, <u>see</u> Opp'n at 4, also make clear that "these [Service] Terms and Conditions amend and supercede in their entirety all other previous agreements, arrangements and understandings relating to the provision of such services to the Customer." Service Terms and Conditions § 3. Given these provisions, any suggestion that the Service Terms and Conditions were somehow superceded by the Tripartite Novation is frivolous.

Even if Paragraph 9 were applicable, it would conflict directly with Section 17 of the Service Terms and Conditions, which Intelsat admits applies to this dispute. Opp'n at 5, 21. The D.C. courts cannot have "exclusive jurisdiction" over this dispute if the dispute also is subject to arbitration (whether such arbitration is mandatory or permissive). Paragraph 9

would also conflict with the portions of Section 17 that limit resort to the D.C. courts to "interim relief" only.  See infra Part IV.

Of course, there is a reading of Paragraph 9 that does not conflict with Section 17. Indeed, the logical reading is that Paragraph 9 of the Tripartite Novation applies to disputes regarding the novation of the service contracts, and Section 17 of the Service Terms and Conditions applies to disputes regarding the provision of and payment for services.  This action has nothing to do with the Tripartite Novation or the "relationship between the Contracting Parties" to that agreement; it is governed by Section 17 of the Service Terms and Conditions.

In the event that this Court has any doubt regarding whether the Service Terms and Conditions or Tripartite Novation applies to this dispute, any ambiguity in application must be construed against Intelsat.  Intelsat does not dispute that the Tripartite Novation and Service Terms and Conditions were form contracts, drafted by Intelsat, and that CYPTT neither negotiated with Intelsat regarding the terms of the contracts nor participated in drafting the contracts.  See Matejić Decl. ¶ 19.  It is well-settled that a court should construe ambiguous or vague language against the interest of the party that drafted it.  See Cole v. Burns Int'l Sec. Servs., 105 F.3d 1465, 1486 (D.C. Cir. 1997) (citing Mastrobuono v. Shearson Lehman Hutton, Inc., 514 U.S. 52, 62 (1995)).

In short, Paragraph 9 of the Tripartite Novation does not apply to this dispute, and Intelsat has failed to allege a valid basis for waiver of any sovereign immunity that might attach to CYPTT under the FSIA.

        2.      Intelsat's Complaint is not based on commercial activity carried on in the United States by CYPTT.

Intelsat's argues that the commercial activity exception of the FSIA, 28 U.S.C. § 1605(a)(2), applies because "*the purpose*" of the services provided under the Intelsat contracts was "to carry telecommunications from Serbia and Montenegro to the rest of the

14

world," including the United States.  Opp'n at 15 (emphasis added).  It is not surprising that

Intelsat's argument contains no reference to the statute or applicable precedent, because it is

consistent with neither.  Defining the term "commercial activity," the FSIA expressly states

that "[t]he commercial character of an activity shall be determined by reference to the nature

of the course of conduct or particular transaction or act, *rather than by reference to its*

*purpose.*"  28 U.S.C. § 1603(d) (emphasis added).  Intelsat's argument thus directly conflicts

with the statute.

      Applicable caselaw affirms that Intelsat's focus on the purpose of the contract is

misplaced and the commercial activity exception does not apply.  In the context of a claim for

breach of contract, the relevant "activity" is performance and payment under the contract.

Goodman Holdings v. Rafidain Bank, 26 F.3d 1143, 1146 (D.C. Cir. 1994); Atl. Tele-

Network, Inc. v. Inter-Am. Dev. Bank, 251 F. Supp. 2d 126, 134 (D.D.C. 2003); Lempert v.

Republic of Kazakstan, 223 F. Supp. 2d 200, 203-04 (D.D.C. 2002), aff'd, 62 Fed. Appx. 355

(D.C. Cir. 2003).  The FSIA commercial activity standard requires "a clause in a contract

mandating the fulfillment of contractual obligations *in the United States.*"  Atl. Tele-

Network, 251 F. Supp. 2d at 134 (emphasis in original).  Intelsat does not dispute that all

contractual obligations under the contracts it is claiming were breached occurred outside the

United States.  See Matejić Decl. ¶ 18; Matejić Decl., Ex. 3, Tab 3 ("Schedule 1") ¶ 2 (stating

that invoices for services will be sent to CYPTT's offices in Belgrade, Serbia and payment

for services will be sent to Intelsat's offices in London).  The commercial activity exception

does not apply.

      Intelsat's assertions concerning telecommunications services provided to the United

States are also improperly misleading.  Intelsat claims in its brief that "[t]hose

telecommunications by their very nature include communications between the United States

and Serbia and Montenegro."  Opp'n at 15.  However, Paragraph 8 of the Wexler Affidavit,

on which Intelsat relies for the above statement, does not support it. Mr. Wexler carefully avoids saying that the telecommunications services *at issue in this case* in 2005 and 2006 involved transmitting international calls to the United States, and declares only that CYPTT allegedly provided such telecommunications services under the former state of Yugoslavia. Wexler Aff. ¶ 8.[8]

## II.    INTELSAT DOES NOT CONTEND THAT THERE IS PERSONAL JURISDICTION OVER CYPTT ABSENT APPLICATION OF THE FSIA

Other than alleged jurisdiction under the FSIA, Intelsat has not pled any ground for subject matter or personal jurisdiction over CYPTT. See Opp'n at 8. Intelsat has not disputed that CYPTT does not have sufficient minimum contacts with the United States to establish an independent ground for personal jurisdiction if this Court does not have jurisdiction over this dispute pursuant to the FSIA. See Mem. at 20-22. Therefore, if this Court finds that CYPTT is not an instrumentality of a foreign government subject to jurisdiction under the FSIA, this Court must dismiss Intelsat's complaint for lack of personal jurisdiction as well as lack of subject matter jurisdiction.

## III.   FORUM NON CONVENIENS REQUIRES DISMISSAL, BECAUSE THE ICC IS AN ADEQUATE ALTERNATIVE FORUM AND THE BALANCE OF PRIVATE AND PUBLIC INTEREST DOES NOT SUPPORT PLAINTIFF'S CHOICE OF FORUM

Intelsat argues that dismissal on the grounds of *forum non conveniens* is not appropriate because: a) the forum selection clause contained in the Tripartite Novation must be enforced; b) CYPTT has failed to suggest a suitable alternative forum because arbitration before the ICC cannot be compelled; and c) CYPTT's claims of inconvenience are somehow insufficient. Opp'n at 17-18, 18 n.10. None of these arguments is valid.

---------------------------------

[8]     As Intelsat well knows, CYPTT never used the services that are the subject of this dispute.

Intelsat's principal argument is that CYPTT agreed to litigate this dispute in Washington, D.C. under Paragraph 9 of the Tripartite Novation. Id. at 17. As demonstrated above, Paragraph 9 of the Tripartite Novation does not apply to this dispute. See supra Part I.C.1. Instead, the dispute resolution provisions of the Service Terms and Conditions govern and provide for arbitration at the ICC in Paris, France. See Service Terms and Conditions, § 17; Mem. at 5-7, 18-20, 22-23; infra Part IV.

Intelsat next argues that the ICC is not an adequate, alternative forum because, it maintains, arbitration before the ICC cannot be compelled. Opp'n at 17-18. Intelsat misunderstands the doctrine of *forum non conveniens.* The law is clear that an alternative forum will not be suitable only in rare circumstances, Piper Aircraft Co. v. Reyno, 454 U.S. 235, 254 n.22 (1981), such as where "'the alternative forum does not permit litigation of the subject matter of the dispute,'" El-Fadl, 75 F.3d at 678-79 (citation omitted). Intelsat concedes that that this claim may be arbitrated at the ICC, Opp'n at 5, 21, and does not assert that the ICC is unsuitable for some other procedural reason. Whether arbitration before the ICC can be *compelled* is irrelevant; it is an adequate, available alternative forum.

In a footnote, Intelsat half-heartedly offers cursory observations regarding the burden on CYPTT to litigate these claims in the United States, noting that documents can be transmitted electronically and that depositions of CYPTT's witnesses would take place in Serbia. Id. at 18 n.10. Intelsat ignores the U.S. trial process entirely, and all of the burden that would be imposed on a Serbian entity to participate in litigation under unfamiliar procedures in a foreign language. Intelsat also does not address public interest factors. As demonstrated in the opening brief, Mem. at 24-25, it is clear that the United States District Court for the District of Columbia has no interest in donating its scarce resources to a U.K. entity so it can sue a Serbian entity to collect an alleged contract debt, particularly given that ICC arbitration is an appropriate alternative forum.

As a foreign plaintiff, Intelsat's choice of forum should be accorded no deference. Piper Aircraft, 454 U.S. at 255-56. Because the ICC is an adequate, available alternative forum and the balance of private and public interest factors weigh heavily against plaintiff's choice of forum, Intelsat's complaint should be dismissed on grounds of *forum non conveniens*.[9]

## IV.    THE SERVICE TERMS AND CONDITIONS REQUIRE ARBITRATION OF THIS DISPUTE

Section 17 of the Service Terms and conditions requires arbitration of "all disputes, controversies or claims arising under this Agreement, or in connection with services provided pursuant to this Agreement." Service Terms and Conditions § 17. Intelsat *concedes* that Section 17 provides for arbitration of this dispute, Opp'n at 5, 21, but argues that it is not mandatory, because: (1) it uses the term "may"; and (2) Intelsat can rely on Paragraph 9 of the Tripartite Novation to seek redress in District of Columbia courts, id. at 20-21. Neither argument is persuasive.

### A.    The Service Terms and Conditions Require Mandatory Arbitration.

Perhaps the most revealing aspect of Intelsat's argument concerning the Service Terms and Conditions arbitration provision is that Intelsat never sets out the full text of the provision. For ease of reference, the arbitration provision provides:

> The Customer and the Company **agree to endeavor to settle all disputes**, controversies or claims arising under this Agreement, or in connection with services provided pursuant to this Agreement, within sixty (60) days, or such longer period as may be mutually agreed upon, from the date that either party has given written notice of the existence of such dispute, controversy or claim to the other. If within such time the Customer and the Company have not been able to reach a settlement, either party may submit the dispute, controversy or claim for settlement by arbitration in accordance with the Rules of Arbitration of the International Chamber of Commerce in

---

[9]    As the Supreme Court has noted, even if the FSIA provides jurisdiction, the doctrine of *forum non conveniens* applies. Verlinden, 461 U.S. at 490 n.15.

> effect on the date of the Agreement before a panel of three
> arbitrators designated pursuant to those rules and the decision
> shall be binding on the Customer and the Company.  The place
> of arbitration shall be Paris, France, unless otherwise mutually
> agreed by the Company and the Customer.  Any party to this
> Agreement may seek from a court of the District of Columbia
> or a United States Federal Court sitting in the District of
> Columbia any interim relief, including injunctive relief or
> confirmation of any arbitral award rendered in whole or in part.
> This Section shall not limit the rights of any party to obtain
> execution of judgment or to seek injunctive relief or specific
> performance in aid of such an award from a court of the District
> of Columbia or a United States Federal Court sitting in the
> District of Columbia.

Service Terms and Conditions § 17 (emphasis added).  Intelsat fails to address Section 17 as

a whole, because it is clear that the provision can only be read to provide for mandatory

arbitration.

There is a strong presumption favoring the enforcement of arbitration agreements, and

doubts regarding the scope of an arbitration agreement must be resolved in favor of

arbitration.  Booker v. Robert Half Int'l, Inc., 315 F. Supp. 2d 94, 97 (D.D.C. 2004), aff'd,

413 F.3d 77 (D.C. Cir. 2005); see also Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20,

24-25 (1991).  Section 17 applies to "all disputes," including, as Intelsat concedes, this one.

Service Terms and Conditions § 17.  It states that in the event the parties cannot resolve a

dispute informally in 60 days "either party may" submit the dispute for arbitration at the ICC

Id.  Because either party may submit the dispute to arbitration, Section 17 cannot be read as

permissive; CYPTT has the right to have this dispute arbitrated.  To read it otherwise would

make it superfluous, because parties can always agree to submit a dispute to arbitration.

Austin v. Owens-Brockway Glass Container, Inc., 78 F.3d 875, 879 (4th Cir. 1996).  As

numerous courts have concluded, a provision stating that a party "may" arbitrate claims is

mandatory in the absence of an express contractual agreement that arbitration is not the sole

remedy for the resolution of claims.  See Republic Steel Corp. v. Maddox, 379 U.S. 650, 658-

59 (1965); Commc'ns Workers of Am. v. AT&T Co., 40 F.3d 426, 435 (D.C. Cir. 1994); see

<u>also</u> <u>Allis-Chalmers Corp. v. Lueck</u>, 471 U.S. 202, 204 n.1 (1985).  The only option other than arbitration that Intelsat retained in Section 17 through the use of the word "may" is to abandon its claim.  <u>Held v. Nat'l R.R. Passenger Corp.</u>, 101 F.R.D. 420, 424 (D.D.C. 1984).

If Section 17 ended here, it would be clear enough that arbitration is mandatory.  But Section 17 goes on to state that litigation in D.C. courts is available only for "interim relief, including injunctive relief or confirmation of any arbitral award."  Service Terms and Conditions § 17.  The next sentence confirms that use of the courts is limited to those enumerated purposes: "This Section shall not limit the rights of any party to obtain execution of judgment or to seek injunctive relief or specific performance in aid of such award" from a D.C. Court.  <u>Id.</u>  This sentence would be unnecessary if the Section did not limit resort to the D.C. courts in other ways; that is, it would be unnecessary if arbitration were not mandatory.  <u>See</u> <u>Mastrobuono</u>, 514 U.S. at 63 (contract must be interpreted to give effect to all of the provisions and to render them consistent with each other).

In short, there is no way to read Section 17 in its entirety except as a mandatory arbitration provision.  To the extent there is any ambiguity, it must be resolved against Intelsat, its drafter.  <u>Cole</u>, 105 F.3d at 1486.

Intelsat cites two cases interpreting different language to argue that the use of the word "may" renders Section 17 "optional."  Opp'n at 20-21 (citing <u>Bombardier Corp. v. National R.R. Passenger Corp.</u>, 298 F. Supp. 2d 1 (D.D.C. 2002) and <u>Group Hospitalization & Med. Servs., Inc. v. Stubbs</u>, No. 90-823, 1990 WL 183576, at *2 (D.D.C. Nov. 16, 1990)).  <u>Bombardier</u> is not even remotely relevant.  It deals with alternative dispute resolution, not arbitration, and the issue was not whether ADR was mandatory, but whether it was a precondition to litigation, because the provisions at issue expressly <u>permitted</u> litigation.  <u>Bombardier</u>, 298 F. Supp. 2d at 3-5.  <u>Stubbs</u>, an unpublished decision, provides scant support.  The arbitration provision in that case bears little resemblance to Section 17; it contains no

language analogous to the provision of Section 17 providing that its dispute resolution procedures apply to all claims, or to the provision limiting resort to the courts to "interim relief."  See Stubbs, 1990 WL 183576, at *1 n.4.  In addition, the Stubbs court does not address the cases cited above concerning the use of "may" in arbitration provisions, and the decision is inconsistent with the D.C. Circuit's subsequent ruling in Communications Workers of America.  Cf. Detroit Edison Co. v. Burlington N. & Santa Fe Ry., 442 F. Supp. 2d 387, 391 n.2 (E.D. Mich. 2006) (declining to follow Stubbs).

  **B. Paragraph 9 Of The Tripartite Novation Does Not Apply.**

  Although Intelsat concedes that Section 17 of the Service Terms and Conditions applies to this dispute, it claims that Intelsat has the right to disregard Section 17 and instead proceed under Paragraph 9 of the Tripartite Novation.  As demonstrated above, see supra Part I.C.1., this dispute is governed by the Service Terms and Conditions, not the Tripartite Novation, and even if Paragraph 9 were applicable, it would conflict directly with Section 17.  Accordingly, and because any ambiguity must be resolved against Intelsat, Paragraph 9 of the Tripartite Novation does not permit Intelsat to avoid mandatory arbitration under Section 17 of the Service Terms and Conditions.

## CONCLUSION

For the foregoing reasons, the Court should grant CYPTT's motion to dismiss

Intelsat's complaint, or, in the alternative, to compel arbitration and dismiss the complaint.

Dated:  January 16, 2007                          Respectfully submitted,


                                                  COMMUNITY OF YUGOSLAV POSTS
                                                  TELEGRAPHS AND TELEPHONES


                                                  By: _____

                                                  Kevin B. Clark, D.C. Bar No. 289421
                                                  Joseph G. Davis, D.C. Bar No. 441479
                                                  WILLKIE FARR & GALLAGHER LLP
                                                  1875 K Street, N.W.
                                                  Washington, D.C. 20006
                                                  Tel.:    (202) 303-1000
                                                  Fax:    (202) 303-2000